**Page 21**

[1] then it was the patio area. And --
[2] Q. I'm sorry. What were you going to be doing at
[3] the patio?
[4] A. The patio we were installing pavers, the wrap
[5] around -- the inner part, there was like an L
[6] between the house and the enclosed pool area and we
[7] were covering that section with pavers on the
[8] outside of the house.
[9] Q. Can you spell it, pavers?
[10] A. P-A-V-E-R-S.
[11] Q. And in laymen's terms just describe what you
[12] mean by pavers?
[13] A. It's actually -- they come in all different
[14] sizes, four by four, six by six, six by nine. It's
[15] actually a concrete paver. It's actually like a
[16] walking stone, like a cobblestone.
[17] Q. What were you doing first? Were you going to
[18] fix the enclosure on the pool first and then do the
[19] patio work?
[20] A. The pool was completely done.
[21] Q. That was done first?
[22] A. That whole phase was done. There was nothing
[23] else to be done as far as that.
[24] Q. As of August 30, 2002 the modifications to the

**Page 22**

[1] pool enclosure had already been completed?
[2] A. It had been completed.
[3] Q. How long did it take you to do that?
[4] A. I would probably say -- I'd say probably about
[5] a week, week and a half. Realistic probably about
[6] a week and a half.
[7] Q. So if you started work -- I know I wasn't
[8] being specific necessarily about the exact date,
[9] but if you started approximately August 15, that
[10] would take you up to about August 25 or so, about
[11] five days before this accident that you completed
[12] the pool enclosure work?
[13] A. Right. This was prior, before -- this was not
[14] within a week's time that this happened, within
[15] each other. This pool area was done probably about
[16] two or three weeks before the pavers were even
[17] started.
[18] Q. So as of about August 15 then, if the accident
[19] happened on August 30 -- by the way you have
[20] invoices for this stuff, right?
[21] A. Gosh, man I got to check. I'm sure I do. I
[22] have to.
[23] Q. We can pin down the exact dates that you
[24] worked?

**Page 23**

[1] A. If I can locate them. It's been so long.
[2] Q. But have you looked back since you became
[3] aware that there was a lawsuit to see which dates
[4] you were working?
[5] A. I have not. If anything would happen as far
[6] as on my records, I looked. I'm having a heck of a
[7] time finding them. If Air Base could find them,
[8] because I'm sure they have them because I had to
[9] present them issues with the invoices.
[10] Q. And they may, but I just wanted to be specific
[11] about dates.
[12] A. That's fine. As far as the dates, I wish I
[13] could be more helpful to you, as far as the actual
[14] dates, but, unfortunately, I do not remember date
[15] for date. That's a very bad thing with me as far
[16] as paperwork and all that.
[17] Q. I understand. About two weeks or so before
[18] this accident the pool enclosure work was done?
[19] A. It was completed every bit of two to three
[20] weeks before this patio was even started, in full.
[21] It was completed.
[22] Q. And when you completed it, then you moved to
[23] start the patio work?
[24] A. That's correct.

**Page 24**

[1] Q. And where in relation to the pool is the
[2] patio?
[3] A. It is on the outside of the house. Again, if
[4] I could draw it for you, I could show you better.
[5] If you can picture an L, okay, the
[6] outside of the L, okay, was where the work was
[7] done.
[8] Q. Why don't we --
[9] A. I --
[10] Q. Sir, I have some photographs of the home. Did
[11] you take any before you started work?
[12] A. No, sir.
[13] Q. Is that something you would typically do?
[14] A. No. No.
[15] Q. Did you take any photographs at any time
[16] either before this work that you did in August of
[17] 2002 or after it?
[18] A. No, sir.
[19] Q. So Ashland Construction doesn't have any
[20] photographs of the subject premises or the work
[21] area?
[22] A. Absolutely.
[23] Q. This is a diagram that was produced in
[24] discovery. This was produced by the Air Base

Page 25

defendants. Take a look at this diagram, if you would, sir.

MR. HART: That may have been produced by us.

MR. MINTZER: Is there a number on that already?

MR. CASEY: Yes. It's GORB 22.

BY MR. CASEY:

Q. Looking at what we'll mark as Rizzo-1 for identification purposes, does this diagram help you to describe the layout; and my original question was related to where the patio was in relation to the pool?

A. Yes. This is the actual house. Here's the pool area. This whole pool was enclosed. If you could look at this, this is the actual house, with the sliding door here that goes from the outside of the house, the outside to the house, which would go in.

(Whereupon Exhibit Rizzo-1 was marked for identification.)

BY MR. CASEY:

Q. Into the dining room?

A. Into the dining room, and this is where the

Page 26

rest of this pool area is enclosed.

Q. You're pointing to the --

A. To the --

Q. Just a second. You're pointing to the, looking at the diagram, you're pointing to the east side wall of the pool?

A. Correct. That's what it would be.

My work area consisted of out here. In this area here. That's where we were laying the patio, on the outside of the house.

Q. Why don't you circle the area? I've given you a red pen. Circle the area that was your work area at the time you were doing the patio work?

A. (Witness complies.) Actually this paver patio -- I don't know if you have complete photographs.

Q. Just a second. Before you mark it up, tell me what you're going to do.

A. The actual paver patio came all the way down here also. It wasn't just here. This was a big patio. It wrapped around the end. It came around here. It came all the way down and wrapped around this bottom part also.

Q. I understand.

Page 27

A. There was a little ramp that came down here right to the sidewalk.

Q. Okay. I understand.

Were you physically present at the Coachman Road address each day that the pool enclosure work --

A. Yes.

Q. -- and the patio work was being done?

A. Absolutely.

Q. Who was working with you from Ashland Construction, and I'm talking about when the work began, when you first started doing the pool enclosure work?

A. Oh, gosh, I guess -- well Salvador Ortiz, he was with me -- he was with me for the pavers, and he was with me for a little bit, I'd say of the actual enclosure work of the pool area.

Q. Was anyone else from Ashland Construction there besides Mr. Ortiz?

A. No. That was about it. He was about the only gentleman that was there.

Q. So for the few weeks that you were working at the Coachman Road address first doing the pool enclosure work, and then doing the patio paver

Page 28

work, it was yourself and Mr. Ortiz?

A. That's correct.

Q. On no other days was there any other person from --

A. No. If anything --

Q. Let me finish the question, sir. You've got to let me finish.

At no time was there any person other than yourself and Mr. Ortiz from Ashland Construction working at the Coachman Road address?

A. No. Not when this was going on.

Q. Mr. Ortiz -- he was an employee of yours?

A. That's correct.

Q. When did he first start working for you?

A. Gosh, I'd say prior, a couple years ago, on and off.

Q. Well this accident happened in August of 2002. For how long was he working for you at the time it occurred?

A. I'd say probably about 2000.

Q. How did you come to hire him? Did he apply for a job with you?

A. Well actually his brother-in-law was working with us, and he said that he has a brother-in-law

## Page 37

[1] Q. Did you and Mr. Ortiz have to bring tables and
[2] chairs from any location into the pool area on the
[3] day of the accident?
[4] A. Would you like me to tell the whole story?
[5] Q. Yes.
[6] A. Prior to when we got there -- okay, our work
[7] consisted of on the outside, doing the pavers. We
[8] got there, I would say we were there for probably,
[9] I'd say for about -- I'd say probably about half an
[10] hour, forty-five minutes, maybe an hour, when we
[11] got there. Mrs. Longwell came outside, okay, and
[12] there was actually a white table, and I believe
[13] there was a couple chairs that were out there. I
[14] can't quite remember about the chairs too good, but
[15] she asked me if we could clean up the table and the
[16] chairs and bring them in, you know.
[17]    I said -- before we even did that, I
[18] walked in with Mrs. Longwell, inside the house, I
[19] followed her down into the pool area, and she said
[20] this is where I would like you to set the table at.
[21] Okay.
[22]    I proceeded to walk out of the house.
[23] She was in front of me. Walked out of the house,
[24] walked back out the outside door, okay, and then

## Page 38

[1] continued with my work. I'd say roughly for about
[2] another half hour, okay. I guess half an hour,
[3] forty-five minute, and then got to cleaning off the
[4] table.
[5]    Okay. We cleaned the table off. We
[6] scrubbed it down with Ajax and ammonia. I believe
[7] there was a couple chairs also that we scrubbed
[8] down also.
[9]    And after everything was done, okay, and
[10] ready to go back in, then we proceeded to walk --
[11] we opened up the outside door of the house, we
[12] walked in with the chairs, and then right back out
[13] and got the table, and came right back in with the
[14] table.
[15]    As far as the doors were open, okay, the
[16] only door that was closed, okay, was the outside
[17] door that led to the outside of the house. That's
[18] where we were working at. So we brought the chairs
[19] in, walked right back out, got the table. We were
[20] carrying the table in, we were setting the table --
[21] matter of the fact the table was still in my hands,
[22] walking backward to the steps that went down to the
[23] pool area. We were setting the table down, and
[24] then as -- the table didn't even hit the ground

## Page 39

[1] yet, and I looked up, and I heard Rochelle up on
[2] the top screaming. Okay.
[3]    And then, gosh, it was so fast
[4] everything that went on, then I seen her come
[5] running through the area where I was setting the
[6] table down and running to the pool, and I seen her
[7] grabbing the baby out of the pool.
[8] Q. Okay. What time of day did you have the
[9] conversation with Mrs. Longwell where she asked you
[10] to clean the tables or the chairs and the table and
[11] bring them into the pool area. About what time?
[12] A. It was the morning, probably about nine or ten
[13] o'clock.
[14] Q. By the way, have you made any personal notes
[15] or written this down anywhere, regarding your
[16] description of events?
[17] A. No. I mean it's just -- it's cut and dry
[18] exactly what happened.
[19] Q. I'm asking on the day of the accident did you
[20] sit -- did anybody tell you sit down and write down
[21] what happened?
[22] A. No. Positively not.
[23] Q. At no time since August 30, 2002 have you
[24] actually put pen to paper and wrote down a

## Page 40

[1] statement of what happened?
[2] A. Correct. I have not.
[3] Q. Have you been interviewed by any
[4] representative from any insurance company?
[5] A. When all this, I guess, all this happened.
[6] Q. I don't want to hear about anything you said
[7] with your lawyer.
[8] A. When all this happened I met with John Manger
[9] and we met at a restaurant up on 202 and Route 1
[10] with a couple of -- I don't even know where these
[11] attorneys were from. I don't know if they were --
[12] whose they were. They just wanted to know the
[13] incident, what happened.
[14] Q. None of the attorneys at this meeting with Mr.
[15] Manger were retained by you, correct?
[16] A. Absolutely not.
[17] Q. So they weren't your lawyers?
[18] A. No.
[19] Q. And did the lawyers say anything to you at the
[20] meeting?
[21] A. Just wanted to know what happened.
[22] Q. Were they taking notes?
[23] A. I believe they took a recording.
[24] Q. They took a recording. Okay.

Vincent J. Rizzo
January 30, 2006

Case 1:05-cv-00211-MPT   Document 71-8   Filed 02/16/2006   Page 4 of 7
Estate of Marissa Rose Fishman v.
Bagwell, et/al

Page 77

[1] A. It's not just a pool. It's any hazard in
[2] construction, whether there may be a piece of brick
[3] laying down, maybe a cord that someone can trip
[4] over. It could be anything. It's not just the
[5] pool area.
[6] Q. I understand that, but you told me that when
[7] you left that area every night there were borders
[8] and caution tape and things like that specifically
[9] for safety put up around the pool, correct?
[10] A. On the outside of it. When I was doing that
[11] area on the outside.
[12] Q. That's what I'm saying. When you were doing
[13] that area, you did those things specifically for
[14] safety, correct?
[15] A. Uh-uh.
[16] Q. Yes?
[17] A. Yes. That's correct.
[18] Q. What training did you get at Astra-Zeneca to
[19] which you alluded to a minute ago?
[20] A. As far as?
[21] Q. Safety training. You said it. I'm just
[22] trying to figure out what you mean.
[23] A. Through OSHA, guidelines of safety up there.
[24] Through meetings. It's all they pump into you,

Page 78

[1] safety.
[2] Q. What did you do for Astra-Zeneca?
[3] A. Masonry. Pretty much all their masonry work,
[4] pretty much.
[5] Q. I'm just trying to get a handle on what you
[6] alluded to earlier when you said, I worked at
[7] Astra-Zeneca for 20 years and that's all they
[8] focused on. They were very safety conscious?
[9] A. I guess how to answer that question, they
[10] focus on safety. I'm trained on safety an awful
[11] lot.
[12] The incident when it happened at this
[13] ordeal in this residence at this time in this
[14] manner is very terrible, what has happened. Okay.
[15] But my issue was not on the inside of the house.
[16] My job was maintained outside.
[17] Now if there was an issue as far as my
[18] outside work and something happened, I can be
[19] liable or account for the argument of it, but as
[20] far as what went on inside of that house, I'm
[21] not -- I'm not -- I'm not the owner of the house.
[22] I'm not the one who closed the doors. I'm not the
[23] one that opened up the door or anything of that
[24] nature.

Page 79

[1] Q. Along those very same lines, sir, if you
[2] brought the chairs in first and put them down
[3] around the pool, and then went back out to get the
[4] table, you had to make sure the doors were closed
[5] before you went back out, correct?
[6] MR. LANDON: Objection.
[7] THE WITNESS: No. No. That's not what
[8] it was.
[9] BY MR. CASEY:
[10] Q. So you believe you could be safe and leave the
[11] doors open?
[12] A. I'm saying --
[13] MR. LANDON: Objection.
[14] BY MR. CASEY:
[15] Q. Here's my question.
[16] Do you believe it would be consistent
[17] with the safety training you had to put the chairs
[18] down and go back out and get the table and leave
[19] the doors open?
[20] A. If I was going --
[21] MR. LANDON: Objection.
[22] THE WITNESS: If I was going to leave
[23] the job for 15, 20, 5 minutes, whatever,
[24] that would be a different story. That table

Page 80

[1] was right there with the chairs. There was
[2] no matter of elapsing 30 seconds for me to
[3] walk back out that door, grab that table,
[4] and walk right back in through that next
[5] door and drop that table down.
[6] BY MR. CASEY:
[7] Q. I believe your answer is no, you don't believe
[8] you needed to close the doors; is that what you're
[9] saying?
[10] MR. LANDON: Objection.
[11] BY MR. CASEY:
[12] Q. Between the time that you put the chairs down
[13] and go to get the table?
[14] A. The door was not closed.
[15] Q. Sir. Just presume for me, because I think we
[16] have photographs of this -- we have police
[17] photographs. The chairs that you cleaned were
[18] already there, correct? You had already put them
[19] down. Can we at least agree on that?
[20] A. No. Because as far as on the chair end of it,
[21] there was not -- there was not a time distance with
[22] these chairs. Like I said, everything was cleaned
[23] at one shot and brought into that house at one
[24] time.

Vincent J. Rizzo
January 30, 2006

Case 1:05-cv-00211-MPT   Document 71-8   Filed 02/16/2006   Estate of Marissa Rose Eishman v. Richard Longwell, et/al   Page 5 of 7

Page 85

[1] with me so far?
[2] A. Correct.
[3] Q. Then it would be your responsibility to close
[4] it, correct?
[5] A. If -- if it was said to me to close it.
[6] That's not what this ordeal was, though.
[7] Q. My question is, sir, if --
[8] A. Now --
[9] Q. Wait a minute. If you opened the door into
[10] the pool and brought the chairs in, and then went
[11] back outside to get the table, in order to be
[12] performing that work in a safe manner, it would be
[13] your job to close that door that goes into the
[14] pool, correct?
[15]     MR. LANDON: Objection.
[16]     THE WITNESS: No. Because that door was
[17]   open. I don't know why -- that's the
[18]   homeowner having the door open.
[19] BY MR. CASEY:
[20] Q. My question though was, if you opened the door
[21] to bring the chairs into the pool area, sir, if you
[22] opened the door, and put the chairs down, and then
[23] had to go back out to get the table, if that's what
[24] happened, it would be your job after putting the

Page 86

[1] chairs down and going out onto the patio, to close
[2] that door to the pool before you go get the table,
[3] correct?
[4]     MR. LANDON: Objection.
[5]     THE WITNESS: I mean --
[6] BY MR. CASEY:
[7] Q. Agreed, yes or no?
[8] A. No. It's not agreed totally to the whole
[9] matter of it.
[10] Q. So that's not your job?
[11] A. Absolutely not.
[12] Q. If you were leaving that area, that is the
[13] pool area, and the dining room and the patio
[14] unguarded for a period of time, would it be your
[15] job to make sure that those doors are closed after
[16] you worked in that area?
[17]     MR. LANDON: Objection.
[18]     THE WITNESS: I mean -- I mean I'm
[19]   responsible for my work area. That's what
[20]   I'm responsible for.
[21] BY MR. CASEY:
[22] Q. Your work area that morning, sir, included the
[23] pool area, correct?
[24] A. No. No. My work area that day --

Page 87

[1]     MR. LANDON: Objection. Objection.
[2] Hold it. Hold it. We're just going on and
[3] on and on.
[4]     THE WITNESS: I'm not going to answer
[5] these questions.
[6]     MR. LANDON: You're arguing with the
[7] witness about issues that involve legal
[8] conclusions for one thing.
[9]     For two things they involve
[10] hypotheticals which we have no foundation
[11] for given the testimony that he's given.
[12] And, you know, I don't know if this is --
[13] you're wasting our time. I'd like you to
[14] move on beyond this point.
[15]     MR. CASEY: I understand what you're
[16] saying. I disagree with it, but I tried to
[17] get specific answers from the witness and I
[18] haven't been able to do it.
[19]     He's told me things that are his
[20] responsibility according to the safety
[21] training that he had. There were gratuitous
[22] things said that I think are areas that I
[23] can now explore. I think that his answers
[24] will speak for themselves.

Page 88

[1] BY MR. CASEY:
[2] Q. How do you know that Mr. Ortiz did not open
[3] the interior door?
[4] A. Because he was with me the whole time. He
[5] wouldn't have no business in the lady's house.
[6] Q. You don't even remember if he brought chairs
[7] in or not?
[8] A. My eyes were on him the whole time. He's my
[9] helper.
[10] Q. How do you know that he wasn't bringing in the
[11] chairs --
[12] A. Because --
[13]     MR. CASEY: Roger, please ask him to do
[14]   it. I've asked him like six times now.
[15]   Please let me finish my question. Okay.
[16] BY MR. CASEY:
[17] Q. How do you know that Mr. Ortiz didn't take it
[18] upon himself to bring the chairs into the pool
[19] room, and, accordingly, that he opened the interior
[20] door; how do you know that?
[21] A. Because I'm his boss, and I would tell him
[22] what he's to do. He would not take it upon himself
[23] to do something that I have not asked him to do.
[24] Q. Have you talked to him about this accident?

Page 109

just call it the Longwell residence or the Coachman Street residence; is that fair?
A. Yes.
Q. I take it that Mrs. Longwell asked you to clean the furniture as a favor?
       MR. CASEY: Objection to the form of the question.
       THE WITNESS: That's correct.
BY MR. MINTZER:
Q. Would you conclude that it was a favor?
       MR. CASEY: Objection to the form of the question.
       THE WITNESS: Absolutely, whenever Mr. or Mrs. Longwell would ask me, I have no problem. I've been with them for a long time, and I would have helped them with whatever they needed.
BY MR. MINTZER:
Q. Did you charge Mrs. Longwell for cleaning the furniture?
A. No. Not a specific bill for that.
Q. Was the cleaning of the furniture part of the masonry job?
A. No, sir.

Page 110

Q. And is it your understanding that you were asked by Mrs. Longwell to clean the furniture so that that furniture would be clean for her party later that day?
A. Absolutely.
Q. And the party was a social occasion, as you understood it?
A. As far as what I understand, yes, sir.
Q. It was understood that your masonry job would never have been finished for the party?
A. No. Positively not. At the extent where I had to be at with it, I couldn't get it done.
Q. Did anyone over hear your discussion with Mrs. Longwell about the cleaning of the furniture that you can remember today?
A. Not that I remember.
Q. Do you remember anyone being in the vicinity who, while you do not know, may have been close enough to hear your conversation with Mrs. Longwell?
A. The only one would have been Salvador because he would have been outside the door, which he doesn't understand English.
Q. From earlier questions this morning would it

Page 111

be fair to say that there's no contract between you and Mrs. Longwell for this job?
       MR. CASEY: Objection to the form of the question.
       THE WITNESS: Correct.
BY MR. MINTZER:
Q. In other words, there are no documents discussing the scope of the work?
A. Positively not.
Q. Had you had a fixed price worked out yet with Mr. Longwell?
A. No. Because I mean there's been many a times that things have gotten started and this wants to be changed here or something else needs to be included. It was pretty much how work went on, as far as billing-wise it would have been.
Q. Did you have an understanding how you would bill, for example, hourly, plus materials, plus profit, and that would be a fixed price?
A. Yes. A fair price, whatever -- how it would be as far as time and labor and material.
Q. Would you have to -- by the way, was it understood that you would be bringing a helper to the job?

Page 112

A. It was not specifically asked, but I would assume that with a job that size that you would need -- they would know I would need a helper with me.
Q. It was your choice to bring Mr. Ortiz to the job?
A. Yes.
Q. Did you ever have a need to bring more than one assistant to the job, other than Mr. Ortiz?
A. On that specific job, no, just one helper.
Q. Was it your opinion that it was essentially a two-person job?
A. (Indicating.)
Q. Yes? You have to say yes.
A. I'm sorry. Yes.
Q. Who supervised you on the job?
A. Actually John Manger would have been my supervisor.
Q. And what did he do?
A. He was -- he was the construction overall for Air Base.
Q. Was he present that day?
A. No, sir. He was not.
Q. Was anyone present with you that day, other

Page 113

    than you and Mr. Ortiz while working for Ashland?
 A. No, sir.
 Q. Were you told specifically what to do that
    day?
 A. As far as on my job, myself?
 Q. Yes.
 A. No. I mean I know what to do as far as my end
    of it.
 Q. On that day did you know what to do?
 A. Yes. Absolutely.
 Q. And if materials were needed for the job, did
    you purchase the materials?
 A. Absolutely.
 Q. Now on that day did anyone tell you to do a
    specific duty that day while working on the patio?
 A. As far as the table?
 Q. No. As far as your patio duties, as far as
    your paver duties?
         MR. CASEY: Objection to the form.
         THE WITNESS: No.
 BY MR. MINTZER:
 Q. As far as your job duties that day regarding
    paving, did anyone tell you how to conduct yourself
    at that job as to paving?

Page 114

         MR. CASEY: Objection to the form of the
    question.
         THE WITNESS: No.
 BY MR. MINTZER:
 Q. Did you tell Mr. Ortiz when to arrive on a
    daily basis?
 A. He rode with me pretty much.
 Q. I'm sorry? So you would come together?
 A. Yes. We would come together.
 Q. Would you leave together?
 A. We'd leave together.
 Q. How would you arrive at the job, a truck?
 A. A pickup truck, my truck.
 Q. Was this a truck owned by Ashland?
 A. Yes.
 Q. And would materials be on the truck?
 A. Yes. If not on my truck -- at the time the
    pavers would come -- not at the time this was, but
    they would come in on another truck, a big truck,
    as far as materials.
 Q. So the materials had been dropped off earlier?
 A. If there was material there, I mean I can't
    remember. When I brought these pavers in, they
    came in on a flatbed and they brought them in

Page 115

    from -- on a flatbed truck.
 Q. Would you have calculated in terms of
    materials how many pavers would be needed to
    perform the job?
 A. Yes.
 Q. And then you ordered the pavers?
 A. Yes.
 Q. And then the pavers would be delivered?
 A. Yes.
 Q. And then you would do the crushing -- the
    crushed stone, the leveling, and installation of
    the pavers?
 A. Correct. In this particular job John Manger
    took care of the crushed stone. My job was to the
    level of the pavers.
 Q. When you say took care of the crushed --
 A. The crush and run, the actual stone base for
    the pavers.
 Q. And he put it in is what you're saying?
 A. Right.
 Q. He bought it?
 A. He put it in. He had one of his guys drop the
    stone in. He had a machine up there, the day the
    stone came, and then he dropped the stone in there.

Page 116

 Q. Were any tools supplied to you or did you have
    your own tools?
 A. I have my own tools.
 Q. Did you have to ask for any tools at all,
    other than use of your own?
 A. No.
 Q. Other than the crushed stone that you just
    alluded to, did you perform all the physical work
    on the job?
 A. Yes.
 Q. Would you classify your masonry company work
    as both for residences as well as business
    locations?
 A. We used to -- we do a lot of commercial work
    also.
 Q. Mr. Longwell was not present on the day of the
    accident, correct?
 A. No, sir. He was not.
 Q. As far as you recall only Ashland employees
    were at the scene of the incident on the date of
    the occurrence?
 A. That's correct.
 Q. Did you pay Mr. Ortiz?
 A. Yes.