Page 25

[1] one to two jobs per year for Air Base?
[2] A. If that. That's not a definite. It was
[3] if that. I mean, there was sometimes there
[4] would be a year go by where we didn't do no
[5] work for them.
[6] Q. When you were working at the Lomax Carpet
[7] address, was it your understanding that you
[8] were doing work for Air Base?
[9] MR. MINTZER: Objection.
[10] BY MR. CASEY:
[11] Q. It was your understanding that when you
[12] were working at the Lomax Carpet address you
[13] were doing work for Air Base; is that correct?
[14] MR. MINTZER: Objection.
[15] MR. SMALL: Objection to the form,
[16] but you can answer.
[17] THE WITNESS: Correct, yes.
[18] BY MR. CASEY:
[19] Q. Who hired you to do the job at the 3220
[20] Coachman Road address for August 30, 2002?
[21] A. That was John Manger.
[22] Q. It's the same John Manger who was
[23] construction manager for Air Base?
[24] A. Correct.

Page 26

[1] Q. He's the same gentleman who hired you to
[2] work at Lomax Carpet Mart?
[3] A. That's correct.
[4] Q. On what day, sir, did the work begin for
[5] that project, do you remember?
[6] A. No, sir.
[7] Q. My question is not perfectly clear. The
[8] incident in question, do you understand,
[9] occurred on August 30, 2002. Do you understand
[10] that to be the case, sir?
[11] A. Yes, correct.
[12] Q. For how many days prior to August 30,
[13] 2002, if any, were you folks from Ashland
[14] Construction Company, Inc. on the premises?
[15] MR. SMALL: Again, I'm going to
[16] object and instruct him not to answer.
[17] This is not going to the jurisdiction
[18] argument. This is going to the
[19] substance of the case, Matt.
[20] MR. CASEY: Mike, I'm not going to
[21] get into the substance of the case. It
[22] will relate to --
[23] MR. SMALL: How does how many days
[24] he worked at a Delaware address get into

Page 27

[1] anything with jurisdiction in
[2] Pennsylvania?
[3] MR. CASEY: I can find out who he
[4] talked to and who hired him for the job
[5] and who he interacted with, pursuant to
[6] specific jurisdiction.
[7] MR. SMALL: He answered that
[8] question.
[9] MR. CASEY: He told me who hired
[10] him. I want to know if he was there for
[11] a few days, with whom he had
[12] conversations. That does relate
[13] potentially to specific jurisdiction.
[14] I'm not going to ask him about the event
[15] itself. I'm going to ask about his work
[16] there and who was controlling it.
[17] That's what I want to know.
[18] MR. SMALL: That's fine, but again
[19] that is a different question.
[20] MR. CASEY: If you would let me just
[21] finish I think you will understand why
[22] I'm asking the question. I'm not
[23] getting into the substance of the event,
[24] all right.

Page 28

[1] MR. SMALL: That's fine.
[2] BY MR. CASEY:
[3] Q. Sir, were you there for any period of
[4] days prior to August 30, 2002?
[5] A. Now I don't understand the question.
[6] Q. Sure. The event occurred on August 30,
[7] 2002. You understand that?
[8] A. We're talking about at 3220 Coachman
[9] Road?
[10] Q. Yes.
[11] A. Okay.
[12] Q. You understand that that event in
[13] question occurred on August 30, 2002?
[14] A. Okay.
[15] Q. Do you understand that?
[16] A. Yes.
[17] Q. For how many days, if any, were you
[18] folks, from Ashland Construction Company, Inc.
[19] on the premises at 3220 Coachman Road prior to
[20] August 30, 2002?
[21] A. Okay. To understand the question, are
[22] you asking me how long this job took me to do?
[23] Q. Yes. For example, did it start on the 25
[24] of August?

Page 29

[1] A. No. If I can remember this started, it
[2] started before this incident happened. I would
[3] say the job probably started, I would probably
[4] say about seven days before this incident
[5] occurred.
[6] Q. What was the job?
[7] A. I'm sorry?
[8] Q. Let me back up a second. Would you have
[9] documentation to reflect the specifics of the
[10] job that you were doing there, including the
[11] day on which it started?
[12] A. No, I don't keep a set of files of when I
[13] start a job and each day that I'm there, no,
[14] sir.
[15] Q. Would you have any documentation relating
[16] to the job that you were doing at this time at
[17] the 3220 Coachman Road address?
[18] A. When you say documentation, I guess, Mr
[19] Casey, I don't understand. As far as you mean
[20] writing each day down I worked there?
[21] Q. No. Do you have any documentation that
[22] would reflect any work that you did on this
[23] job?
[24] A. You mean as far as receipts?

Page 30

[1] Q. Any documents. Listen to my question.
[2] Do you have any documents to reflect the work
[3] that you did at 3220 Coachman Road?
[4] A. No.
[5] Q. No documents whatsoever?
[6] A. I would have material receipts, if that's
[7] the question you're asking me.
[8] Q. I'm sorry, you have what?
[9] A. Material receipts.
[10] Q. You have material receipts. Do you have
[11] any other documents?
[12] A. I mean as far as, I mean, documents as
[13] far as bills? I don't understand what you're
[14] asking me. Again, my documents, as far as my
[15] work is concerned, it would be materials. And
[16] that's about the extent of it, and my labor.
[17] Q. So you would have documents relating to
[18] materials and labor?
[19] A. Yes, I would have to research it. I'm
[20] sure they're in there somewhere.
[21] Q. How were you paid for the job?
[22] A. Through check.
[23] Q. From what source did you receive the
[24] check?

Page 31

[1] A. Air Base Carpet.
[2] Q. Do you believe you have a copy of a
[3] cancelled check?
[4] A. I would have to check.
[5] MR. SMALL: How would he have a copy
[6] of a cancelled check?
[7] BY MR. CASEY:
[8] Q. I'm sorry. Do you believe you have a
[9] copy of the check?
[10] A. I doubt if I have the copy of a check.
[11] As far as I can answer on that I want to say
[12] no, until I can go through my files and see.
[13] Q. How is it that you believe that you
[14] received a check from Air Base for the job?
[15] A. I don't understand the question again.
[16] Q. You answered, when I asked you from what
[17] source you received a check, you told me from
[18] Air Base?
[19] A. Correct.
[20] Q. Why did you answer that way?
[21] A. Well, that's where my bill went to, and
[22] Air Base would have wrote the check to me.
[23] Q. And you remember that?
[24] A. Yes.

Page 32

[1] Q. What was the amount of the job, the
[2] amount of money that you billed?
[3] A. I think, I can't remember, ballpark off
[4] the top of my head, I think it was 13, 14
[5] thousand.
[6] Q. What was the job that you were doing in
[7] this time period, August of 2002, at the
[8] Coachman Road address?
[9] MR. SMALL: Matt, you seem to be
[10] getting afield here. I'm going to,
[11] you're not going into anything with
[12] jurisdiction in Pennsylvania. You're
[13] asking him now to describe the entire
[14] job. That's not what you said you were
[15] going to go into.
[16] MR. CASEY: I'm going to do that.
[17] MR. SMALL: Matt, then go there.
[18] This is not a discovery deposition.
[19] This is a jurisdiction deposition.
[20] MR. CASEY: I know and I'm going to
[21] ask him jurisdiction questions once I
[22] establish a foundation for what they're
[23] doing.
[24] MR. SMALL: We've been 40 minutes

Page 33

[1] establishing a foundation.
[2]     MR. CASEY: No, we haven't, Mike.
[3] We've actually established a lot of
[4] things on the subject of venue and
[5] jurisdiction and I think you know that.
[6] If you would, just, I would ask for your
[7] indulgence on that, Mike, and your
[8] courtesy to let me ask questions. They
[9] relate to venue and jurisdiction.
[10]     MR. SMALL: I've been giving you
[11] latitude. I'm going to instruct him not
[12] to answer. You can start asking him
[13] questions relating to jurisdiction in
[14] Pennsylvania. He is not going to
[15] describe the job. That is more of a
[16] discovery deposition, which is not what
[17] we're here for today.
[18]     MR. CASEY: You're instructing him
[19] not to answer the question?
[20]     MR. SMALL: To describe the job,
[21] yes.
[22]     MR. CASEY: That's fine.
[23] BY MR. CASEY:
[24] Q. Did you have any contact, during the time

Page 34

[1] that you were doing this job, with Richard
[2] Longwill?
[3] A. I mean, I have talked to Richard a couple
[4] of times.
[5] Q. My question is, just try and relax and
[6] listen to my question, if you would. Did you
[7] have any contact with Richard Longwill during
[8] the time that you were doing this job at the
[9] Coachman Road address?
[10] A. As far as contact, I don't understand.
[11] Did I see his presence? Is that what you're
[12] asking me?
[13] Q. Why don't you start with that, sure.
[14] A. I saw Richard a couple of times when he,
[15] actually when he got home but that was about
[16] the extent of it.
[17] Q. I don't understand what you just told me,
[18] sir.
[19] A. I mean, I would be out there working and
[20] Richard would pop his head through the door and
[21] say how you doing, fine. That was the extent
[22] of our conversation pretty much.
[23] Q. Did you have any specific conversation
[24] with Richard Longwill about the job that you

Page 35

[1] were performing while you were performing it?
[2] A. Just, actually just minor little stuff,
[3] if he wanted a different way of a curve to be
[4] put into the wall or a different pattern of the
[5] brick to be laid, that was about the extent of
[6] it.
[7] Q. I take it the answer to my question is
[8] yes and the specifics that you remember related
[9] to those two subjects that you just told me
[10] about?
[11] A. Right, if the scenario of that --
[12] Q. I'm sorry?
[13] A. If the scenario, yes, that is what it
[14] was.
[15] Q. Were you supervising the job that was
[16] being done at the Coachman Road address?
[17] A. That's correct, yes.
[18] Q. I would like you to tell me the names of
[19] any other persons who assisted you with this
[20] job, other than Mr. Ortiz?
[21] A. That is all that was there with me.
[22] Q. Your recollection is that the job began
[23] approximately one week before, correct?
[24] A. Correct.

Page 36

[1] Q. And for that span of time, approximately
[2] a week before, until August 30, 2002, the only
[3] persons working at the job and on the job were
[4] yourself and Mr. Ortiz?
[5] A. That is correct, sir.
[6] Q. Did Ashland Construction Company,
[7] Incorporated have any vendors in the
[8] Commonwealth of Pennsylvania?
[9]     MR. SMALL: I object. How would he
[10] know -- I'm sorry, never mind.
[11]     THE WITNESS: Repeat the question.
[12] BY MR. CASEY:
[13] Q. Did Ashland Construction Company,
[14] Incorporated have any vendors in the
[15] Commonwealth of Pennsylvania?
[16] A. When you say vendors, what do you mean by
[17] that? Our supplies, our materials, I don't
[18] quite comprehend your question.
[19] Q. You don't comprehend it?
[20] A. No. When you say vendors, what do you
[21] mean?
[22] Q. What do you think I mean?
[23]     MR. SMALL: Well, Matt, --
[24]     THE WITNESS: Do you want to know

Vincent Rizzo
December 30, 2004
Case 1:05-cv-00211-MPT    Document 71-10    Filed 02/16/2006    Page 4 of 4
James H. Gorley, Jr. v.
Ashland Construction Co., et al.

Page 61

[1] other business activities?
[2] A. No, sir.
[3] Q. How many employees did Ashland
[4] Construction, Inc. have?
[5] A. I would say probably a total of between
[6] five or six people.
[7] Q. When did the company first come into
[8] existence?
[9] A. I would say back in '99.
[10] Q. Was there a company that preceded it,
[11] that came before it?
[12] A. There was Rockford Construction that was
[13] before that.
[14] Q. Rockford Construction?
[15] A. Yes.
[16] Q. Rockford Construction, Inc. or Rockford
[17] Construction Company?
[18] A. No, it was incorporated.
[19] Q. Rockford Construction, Incorporated?
[20] A. Yes.
[21] Q. Spelled R O C K F O R D?
[22] A. Yes.
[23] Q. Did you and your brother own that company
[24] together?

Page 62

[1] A. Yes, we did.
[2] Q. Where was that company located?
[3] A. Same place, 1800 West 11th Street.
[4] Q. For how long was that company in
[5] existence prior to 1999?
[6] A. I would say probably six, seven years, if
[7] not longer.
[8] Q. And were you similarly engaged as masonry
[9] contractors?
[10] A. Yes.
[11] Q. Did Rockford Construction do any work in
[12] the Commonwealth of Pennsylvania?
[13] A. No, very, again, just a small percentage,
[14] which we would have done.
[15] Q. Well, that is two different things. You
[16] said no and then you said a small percentage.
[17] I just want to know which one it is?
[18] A. I mean, I can't remember back that far.
[19] I can't, I don't know exactly what we would
[20] have done back that period of time.
[21] Q. Do you have records from Rockford
[22] Construction?
[23] A. I would have to check, I have no clue.
[24] Q. Who would you check with?

Page 63

[1] A. I guess I would try the accountant.
[2] Q. Who is the accountant?
[3] A. It would have been Dingle and Kane.
[4] Q. Is that a Wilmington accounting firm?
[5] A. Yes.
[6] Q. Have they been your accountants since you
[7] were with Rockford?
[8] A. They came in say midway with Rockford.
[9] Q. And they stayed with you through the
[10] Ashland Construction Company Inc. phase?
[11] A. That is correct.
[12]      MR. CASEY: Let's take a two minute
[13]   break.
[14]      (Whereupon there was a short
[15]   recess.)
[16] BY MR. CASEY:
[17] Q. Sir, we took a short break. Are you
[18] prepared to continue?
[19] A. Yes.
[20] Q. At any time during the period you were
[21] working at the Coachman Road address did Mr.
[22] Manger come out to the premises?
[23] A. Couple times he did. That's the extent
[24] as far as what Mr. Manger came out.

Page 64

[1] Q. Sir, other than, I want to make sure I'm
[2] clear. I am not asking you for your specific
[3] information on this subject, but I just want to
[4] know generally speaking, whether there is any
[5] other Pennsylvania entity, besides your
[6] supplier in Ridley Park, that in the day-to-day
[7] business of Ashland Construction, you had
[8] contact with?
[9] A. No. That's it. The farthest we go to
[10] would be Fazzino's, which would deliver us
[11] block, that is it as far as suppliers would be
[12] with us.
[13] Q. Excluding suppliers, I mean any business
[14] activity of yours, any contacts at all with the
[15] Commonwealth of Pennsylvania by Ashland
[16] Construction Company?
[17] A. Correct, yes.
[18]      MR. CASEY: Those are all the
[19]   questions I have. Thank you.
[20]
[21]      (Witness excused.)
[22]      (Deposition concluded.)