# EXHIBIT A

**KLINE & SPECTER**
A PROFESSIONAL CORPORATION
BY:
ATTORNEY FOR    THOMAS R. KLINE/ROBERT ROSS/MATTHEW A. CASEY
ATTORNEY ID. #    Attorney I.D. No. 28895/47152/84443
THE NINETEENTH FLOOR
1525 LOCUST STREET
PHILADELPHIA, PENNSYLVANIA 19102
215-772-1000

| | |
|---|---|
| JAMES H. GORBEY, JR., Administrator of the ESTATE OF MARISSA ROSE FISHMAN, deceased 110 West Front Street Media, Pennsylvania 19063 | COURT OF COMMON PLEAS PHILADELPHIA COUNTY |
| vs. | CIVIL TRIAL DIVISION |
| RICHARD LONGWILL 3220 Coachman Road Surrey Park Wilmington, DE 19803 | |
| BARBARA LONGWILL 3220 Coachman Road Surrey Park Wilmington, DE 19803 | MARCH TERM, 2004 NO. 003776 |
| | **JURY TRIAL DEMANDED** |
| AIR BASE CARPET MART, INC., d/b/a AIR BASE DISTRIBUTING, INC. d/b/a AIR BASE CARPET MART 230 N. Dupont Hwy. New Castle, DE 19720 | |
| AIR BASE DISTRIBUTING, INC. 230 N. Dupont Hwy. New Castle, DE 19720 | |

## FOURTH AMENDED COMPLAINT
### [2-S Premises Liability]

1.    Plaintiff James H. Gorbey, Jr., was appointed Administrator of the Estate of

Marissa Rose Fishman, deceased, pursuant to the Order of the Register of Wills of Delaware

**KLINE & SPECTER**
A PROFESSIONAL CORPORATION

County dated September 23, 2003; Mr. Gorbey is a citizen and resident of the Commonwealth of Pennsylvania.

2.      Marissa Rose Fishman ("plaintiff's decedent") was born on December 30, 2000 and resided at 110 Kelly Drive, Chadds Ford, PA 19317.

3.      Plaintiff's decedent drowned on August 30, 2002 while staying at the home of her maternal grandparents, who are named defendants herein, at 3220 Coachman Road, Surrey Park, Wilmington, DE 19803.

4.      Defendant Air Base Carpet Mart, Inc., d/b/a Air Base Distributing, Inc. d/b/a Air Base Carpet Mart ("Air Base") is a Delaware corporation or other jural entity with a principal place of business at 230 N. Dupont Hwy., New Castle, DE 19720.

5.      Defendant Air Base Distributing, Inc. is a Delaware corporation or other jural entity, which, upon information and belief, shows the same address.

6.      Defendants Richard Longwill and Barbara Longwill ("the Longwill defendants") reside at 3220 Coachman Road, Surrey Park, Wilmington, DE 19803. The Longwill defendants, either jointly or individually, own the premises, which includes an indoor pool, at this address.

7.      Defendant Richard Longwill is an owner, operator, director and/or officer in several Pennsylvania corporations, including Lancaster Carpet Mart, Inc.; Allentown Carpet Mart and Wallpaper Outlet, Inc.; Reading Carpet Factory Outlet, Inc.; Yorktowne Carpet Mart, Inc.; and Lomax Home Center, Inc. Lomax Home Center, Inc. is located at 2940 Jasper Street in Philadelphia, Pennsylvania, and 100% of its stock is owned by defendant Richard Longwill. See Air Base Web Site Home Page, attached as Exhibit "A".

8.      Defendant Barbara Longwill is the secretary-treasurer of Air Base Carpet Mart,

**KLINE & SPECTER**
A PROFESSIONAL CORPORATION

Inc., which regularly conducts business in Pennsylvania through its affiliates Lancaster Carpet

Mart, Inc.; Allentown Carpet Mart and Wallpaper Outlet, Inc.; Reading Carpet Factory Outlet,

Inc.; Yorktowne Carpet Mart, Inc.; and Lomax Home Center, Inc.  See Exhibit "A".

      9.     Defendant Air Base, itself and through the foregoing affiliates, purposefully avails

itself of the laws and benefits of the Commonwealth of Pennsylvania.  See Exhibit "A".

      10.    Philadelphia county venue is proper because the Longwill defendants, both

individually and through their corporate affiliations with Defendant Air Base, and

defendant Air Base own and operate Lomax Home Center, Inc. at 2940 Jasper Street in

Philadelphia, Pennsylvania.

      11.    On August 30, 2002, Marissa Rose Fishman, a minor, who was visiting at

Richard and Barbara Longwill's residence, was upon information and belief, to be confirmed

through discovery, caused to drown due to the negligent acts and/or failures to act on the part of

defendants and their actual and/or ostensible agents, servants and/or employees, including their

failure to take reasonable steps to make the premises safe and negligently exposing an infant to

an unsupervised swimming pool, which may have constituted an attractive nuisance.

      12.    Plaintiff's decedent, an infant, proceeded unattended through an

open sliding glass door separating the kitchen and a large, indoor pool.

      13.    Said actual and/or ostensible agents, servants and/or employees included, upon

information and belief, Teresa Garcia Zavala, a nanny, and workmen, either employed or

contracted by defendant Richard Longwill and defendant Air Base.

      14.    Upon information and belief, said workmen negligently left the sliding door open

leading to the pool on the subject premises.

**KLINE & SPECTER**
A PROFESSIONAL CORPORATION

15.    Plaintiff will pursue a separate action against said workmen in a different forum that has jurisdiction over them, which action may, at a future date, be consolidated with the within action. If if is found that said workmen, alone, were responsible for making the pool premises safe by keeping entryways to the subject pool closed, then said workmen, and their principals, employers and/or masters, may be solely liable to plaintiff.

16.    All defendants named herein are vicariously liable for the negligent acts and/or failures to act on the part of said actual and/or ostensible agents, servants and/or employees, whose identities may at the present time be known only to defendants and who cannot be known to plaintiff without the benefit of discovery. By way of more specific identification, said actual /or ostensible agents, servants and/or employees were working at the subject premises on August 30, 2002.

17.    The Longwill defendants owed a non-delegable duty to children on the premises to protect them from all hazards that were reasonably foreseeable; said hazards included both the means of access to the indoor pool and the work that was being conducted on the premises that day.

18.    The door to the pool being left open, and the pool itself, constituted an attractive nuisance, one that was reasonably foreseeable given the work that was being done that day. This attractive nuisance caused the death of Marissa Rose Fishman.

19.    The unreasonably dangerous condition created by the work was foreseeable, and it caused the death of Marissa Rose Fishman.

20.    Plaintiff claims all damages recoverable under the Wrongful Death Act, 42 Pa. C.S.A. §8301, and Survival Act, 42 Pa. C.S.A. §8302, arising out of Marissa Rose Fishman's

**KLINE & SPECTER**
A PROFESSIONAL CORPORATION

drowning and subsequent death.

WHEREFORE, plaintiff James H. Gorbey, Jr., hereby demands judgment against

defendants in an amount in excess of Fifty Thousand Dollars ($50,000) exclusive of pre-

judgment interest, costs, and post-judgment interest.

KLINE & SPECTER,
A Professional Corporation

BY: _____
THOMAS R. KLINE
ROBERT ROSS
MATTHEW A. CASEY
I.D. Nos. 28895/47152/84443
Attorneys for Plaintiff

Dated: 8/17/04

**KLINE & SPECTER**
A PROFESSIONAL CORPORATION

<u>**VERIFICATION**</u>

I, James H. Gorbey, Jr., Administrator of the Estate of Marissa Rose Fishman, a minor,

deceased, hereby verifies that the within Fourth Amended Complaint is based on first-hand

information and on information furnished to my counsel and obtained by him in the course of

this lawsuit. The language of the document is that of counsel and not of the affiant. To the

extent that the contents of the document are based on information furnished to counsel and

obtained by him during the course of this lawsuit, the affiant has relied upon counsel in taking

this verification. All statements are founded upon reasonable belief. This verification is made

subject to the penalties of 18 Pa.C.S.§4904 relating to unsworn falsification to authorities.

James H. Gorbey, Jr., Administrator of the
Marissa Rose Fishman, a minor, deceased

Date: 8/16/04



AIRBASE CARPET / CARPET MART / LOMAX RUG CO.

In loving memory of LILLIAN WHITAKER

# AIRBASE CARPET | CARPET MART | LOMAX RUG CO.
### WALLPAPER OUTLET

SITE CURRENTLY UNDER CONSTRUCTION - PLEASE CHECK BACK

STAINMASTER carpet  |  *Karastan*  |  PERGO  |  florida tile  |  MANNING  |  WAVERLY PL


CARPET


LAMINATE/WOOD

VINYL


RUGS

TI




MARTHA STEWART SIGNATURE
FLOORING with SHAW

**Bruce.** hardwood floors from Armstrong

HunterDouglas
WINDOW FASHIONS
STROHEIM & ROMANN®


*Masland* CARPET COLLECTION

SCOTCH

**Air Base Carpet Mart locations**



**Air Base Carpet Mart**
230 N. DuPont Hwy
New Castle, DE 19720
Phone 302-328-1597

**Air Base Carpet Mart**
756 S Little Creek Rd
Dover, DE 19901
Phone: 302-678-0970

**Lomax Rug Company**
2940-56 Jasper Street
Philadelphia, PA 19134
Phone: 215-739-8110

**Exton Carpet Mart**
270 Pottstown Pike or Road
Exton, PA 19341
Phone: 610-363-5017

**Hours all locations:**

Sunday 11 - 5
Monday 10 - 9
Tuesday 10 - 6
Wed - Friday 10 - 9
Saturday 9 - 6

E-mail: rugnroll@aol.com

**Lancaster Carpet Mart**
1271 Manheim Pike
Lancaster, PA 17601
Phone: 717-299-2381

**York Carpet Mart**
1391 Eden Rd. & Rt 130
York, PA 17402-1939
Phone: 717-848-3905

**Reading Carpet Mart**
3515 N. 5th St. Highway
N.
Reading, PA 19605
Phone: 610-921-2037

**Mechanicsburg Carpet**
5103 Carlisle Pike
Mechanicsburg, PA 170
Phone: 717-975-1717

**Harrisburg Carpet Mar**
5051 Hampton CT RD
Harrisburg, PA 17112
Phone: 717-671-1414

# EXHIBIT B

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

JAMES H. GORBEY, JR.,                    :        **CIVIL ACTION**
ADMINISTRATOR OF THE ESTATE OF :
MARISSA ROSE FISHMAN, DECEASED :
                                         :
        v.                               :
                                         :
RICHARD LONGWILL, BARBARA                :
LONGWILL, AIR BASE CARPET                :
MART, INC. d/b/a AIR BASE                :
DISTRIBUTING, INC. d/b/a AIR BASE        :
CARPET MART, ASHLAND                     :
CONSTRUCTION COMPANY, INC.,              :
JOSEPH RIZZO & SONS                      :
CONSTRUCTION, VINCENT RIZZO              :
CONSTRUCTION CO., INC. a/d/b/a           :
ASHLAND CONSTRUCTION                     :
COMPANY, INC., JOSEPH V. RIZZO           :
AND VINCENT RIZZO                        :        **NO. 04-4098**

**FILED**

MAR 7 - 2005

MICHAEL E. KUNZ, Clerk
By_____ Dep. Clerk

RECEIVED
MAR - 2 2005

### ORDER

AND NOW, this _4th_ day of _march_ , 2005, it is hereby

stipulated by and between counsel and ordered by the court that the above-captioned matter is

transferred from the United States District Court for the Eastern District of Pennsylvania to the

United States District Court for the District of Delaware.  The Clerk of Court is directed to transfer

this file to the Clerk of Court of the United States District Court for the District of Delaware.

BY THE COURT:

_____
The Honorable Anita B. Brody

**KLINE & SPECTER, P.C.**

By: _Matt Ca_____

Thomas R. Kline, Esquire
Matthew A. Casey, Esquire
Attorneys for Plaintiff
James H. Gorbey, Jr.,
Administrator of the Estate of
Marissa Rose Fishman, Deceased

**MARSHALL, DENNEHEY, WARNER,
COLEMAN & GOGGIN**

By: _Rachel Kraemer_____

Richard A. Kraemer, Esquire
Daniel J. Hart, Esquire
Attorneys for Defendants
Richard and Barbara Longwill

**RAWLE & HENDERSON, LLP**

By: _Edward C. Mintzer, Jr._____

Edward C. Mintzer, Jr., Esquire
Attorney for Defendants
Air Base Carpet Mart, Inc.
d/b/a Air Base Distributing, Inc.
d/b/a Air Base Carpet Mart

**LAW OFFICES OF
THOMAS D. ROMANDO**

By: _Michael Small_____

Michael R. Small, Esquire
Attorney for Defendants
Ashland Construction Company, Inc.,
Vincent Rizzo Construction Co., Inc.,
a/d/b/a Ashland Construction
Company, Inc., Joseph V. Rizzo and
Vincent Rizzo

\01_18\LIAB\DJH\LLPG\646074\JYS\03030\02632

Copies via ECF on — To: Copies via US Mail on — To:

ENTERED

MAR 8 2005

CLERK OF COURT

2

# EXHIBIT C

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

JAMES H. GORBEY, JR., Administrator :  **CIVIL ACTION**
of the ESTATE OF MARISSA ROSE :
FISHMAN, Deceased :
 :
   v. :
 :
 :
RICHARD LONGWILL and :
BARBARA LONGWILL :
  and :
AIR BASE CARPET MART, INC. :
d/b/a AIR BASE DISTRIBUTING, INC. :
d/b/a AIR BASE CARPET MART :
  and :
AIR BASE DISTRIBUTING, INC. :
  and :
TERESA GARCIA ZAVALA :  NO.  2:04-cv-4098

---

**ANSWER WITH AFFIRMATIVE DEFENSES OF DEFENDANTS,
RICHARD LONGWILL AND BARBARA LONGWILL, IN THEIR
INDIVIDUAL CAPACITY, TO PLAINTIFF'S FOURTH AMENDED COMPLAINT**

Defendants, Richard Longwill and Barbara Longwill ("the Longwill defendants"), in their

individual capacity, by and through their attorneys, Marshall, Dennehey, Warner, Coleman &

Goggin, hereby respond as follows to plaintiff's Fourth Amended Complaint.

1. Denied.  The Longwill defendants lack sufficient knowledge or information in

which to form a belief as to the truth of the averments contained in this paragraph of plaintiff's

Fourth Amended Complaint and, therefore, they are denied and strict proof is demanded at the

time of trial.

2. Denied.  The Longwill defendants lack sufficient knowledge or information in

which to form a belief as to the truth of the averments contained in this paragraph of plaintiff's

Fourth Amended Complaint and, therefore, they are denied and strict proof is demanded at the time of trial.

3.    Denied.  The Longwill defendants lack sufficient knowledge or information in which to form a belief as to the truth of the averments contained in this paragraph of plaintiff's Fourth Amended Complaint and, therefore, they are denied and strict proof is demanded at the time of trial.

4.    Admitted.

5.    Admitted.

6.    Admitted.

7.    Denied.  The allegations contained in this paragraph of plaintiff's Fourth Amended Complaint constitute conclusions of law to which no response is required.

8.    Denied.  The allegations contained in this paragraph of plaintiff's Fourth Amended Complaint constitute conclusions of law to which no response is required.

9.    Denied.  The allegations contained in this paragraph of plaintiff's Fourth Amended Complaint constitute conclusions of law to which no response is required.

10.    Denied.  The allegations contained in this paragraph of plaintiff's Fourth Amended Complaint constitute conclusions of law to which no response is required.

11.    Denied.  The allegations contained in this paragraph of plaintiff's Fourth Amended Complaint constitute conclusions of law to which no response is required.  To the extent a response is required, the Longwill defendants specifically deny that they were negligent in any manner whatsoever and, in particular, as alleged in this paragraph of plaintiff's Fourth Amended Complaint.  Likewise, the Longwill defendants specifically deny the allegations

relating to agents, servants and/or employees as alleged in this paragraph of plaintiff's Fourth Amended Complaint.

12.     Denied.  The Longwill defendants lack sufficient knowledge or information in which to form a belief as to the truth of the averments contained in this paragraph of plaintiff's Fourth Amended Complaint and, therefore, they are denied and strict proof is demanded at the time of trial.

13.     Denied.  The Longwill defendants specifically deny that Teresa Garcia Zavala was their agent, ostensible agent, servant, employee and/or workman and/or the agent, ostensible agent, servant, employee and/or workman of defendant, Air Base.

14.     Denied.  The Longwill defendants lack sufficient knowledge or information in which to form a belief as to the truth of the averments contained in this paragraph of plaintiff's Fourth Amended Complaint and, therefore, they are denied and strict proof is demanded at the time of trial.

15.     Denied.  The Longwill defendants lack sufficient knowledge or information in which to form a belief as to the truth of the averments contained in this paragraph of plaintiff's Fourth Amended Complaint and, therefore, they are denied and strict proof is demanded at the time of trial.

16.     Denied.  The Longwill defendants specifically deny that Teresa Garcia Zavala was their agent, ostensible agent, servant, employee and/or workman and/or the agent, ostensible agent, servant, employee and/or workman of defendant, Air Base.

17.     Denied.  The allegations contained in this paragraph of plaintiff's Fourth Amended Complaint constitute conclusions of law to which no response is required.

3

18.     Denied.  The allegations contained in this paragraph of plaintiff's Fourth Amended Complaint constitute conclusions of law to which no response is required.

19.     Denied.  The allegations contained in this paragraph of plaintiff's Fourth Amended Complaint constitute conclusions of law to which no response is required.

20.     Denied.  The allegations contained in this paragraph of plaintiff's Fourth Amended Complaint constitute conclusions of law to which no response is required.

WHEREFORE, defendants, Richard Longwill and Barbara Longwill, deny liability and demand judgment in their favor, together with interest, costs and attorney's fees.

## FIRST AFFIRMATIVE DEFENSE

The Fourth Amended Complaint fails to state a claim upon which relief can be granted against the answering defendants.

## SECOND AFFIRMATIVE DEFENSE

This court lacks jurisdiction over the person of these answering defendants and/or subject matter jurisdiction over this action.

## THIRD AFFIRMATIVE DEFENSE

This action was not commenced as to these answering defendants within the statutory time, and accordingly, this suit is barred as to these answering defendants by the applicable statute of limitations.

## FOURTH AFFIRMATIVE DEFENSE

Plaintiff's Fourth Amended Complaint is barred by the doctrines of waiver, estoppel and/or laches.

### FIFTH AFFIRMATIVE DEFENSE

Plaintiffs' and/or plaintiffs' decedent's injuries, if any, were the result of superseding and/or intervening causes or parties over which or whom these defendants had no control.

### SIXTH AFFIRMATIVE DEFENSE

Plaintiff's injuries, if any, were caused by one or more of the co-defendants and not by these answering defendants.

### SEVENTH AFFIRMATIVE DEFENSE

Plaintiff's injuries, if any, were proximately caused by the intervening conduct of third persons, parental authorities or entities over whom these answering defendants had no control, authority or responsibility.

### EIGHTH AFFIRMATIVE DEFENSE

Upon information and belief, plaintiff's injuries, if any, may have been caused by the conduct of others.

### NINTH AFFIRMATIVE DEFENSE

The answering defendants had no legal duty to plaintiff's decedent because others/adults were in a better or legal position to warn and protect plaintiff's decedent, and the failure of these other persons and/or entities to so protect the decedent was the proximate cause of plaintiff's injuries, if any.

### TENTH AFFIRMATIVE DEFENSE

The answering defendants breached no duty owed to plaintiff or plaintiff's decedent.

5

## ELEVENTH AFFIRMATIVE DEFENSE

These answering defendants are entitled to an offset/net reduction for any compensation obtained or to be obtained by or on behalf of plaintiff and/or plaintiff's decedent from other sources, parties, entities and/or defendants.

## TWELFTH AFFIRMATIVE DEFENSE

Plaintiff, as against these answering defendants, has failed to properly elect his remedies and forum barring some or all of his claims.

## THIRTEENTH AFFIRMATIVE DEFENSE

Plaintiff has failed to mitigate his damages.

## FOURTEENTH AFFIRMATIVE DEFENSE

Service of process was improper and/or insufficient.

## FIFTEENTH AFFIRMATIVE DEFENSE

Venue is improper.

## SIXTEENTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred and/or limited by the statutes, immunities and laws of the State of Delaware and the laws, ordinance and rules of the City of Wilmington and New Castle County.

## SEVENTEENTH AFFIRMATIVE DEFENSE

Answering defendants aver that the accident more specifically described in the allegations contained in plaintiff's Fourth Amended Complaint was caused by individuals and/or entities who are unknown to answering defendants and over whom answering defendants had no control at any time material hereto.

6

## EIGHTEENTH AFFIRMATIVE DEFENSE

If the event alleged in the Fourth Amended Complaint occurred as alleged by plaintiff, which is denied, it was caused by plaintiff and was no way caused by an act or omission on the part of answering defendants.

## NINETEENTH AFFIRMATIVE DEFENSE

No conduct on the part of answering defendants contributed to plaintiff's alleged injury and/or damages.

## TWENTIETH AFFIRMATIVE DEFENSE

No conduct on the part of answering defendants contributed to plaintiff's alleged injury and/or damages.

## TWENTY FIRST AFFIRMATIVE DEFENSE

Any damages sustained by plaintiff, if any, were entirely or substantially caused by the negligence of plaintiff, including contributory negligence, comparative negligence, assumption of the risk and/or the negligence of parties or persons for whom defendants have no responsibility, and have not by the culpable conduct or negligence of answering defendants.

## TWENTY SECOND AFFIRMATIVE DEFENSE

Any alleged occurrence complained of by plaintiff, said occurrence being specifically denied by answering defendants, was the result of an unavoidable accident or sudden emergency.

WHEREFORE, defendants, Richard Longwill and Barbara Longwill, deny liability and

demand judgment in their favor, together with interest, costs and attorney's fees.

MARSHALL, DENNEHEY, WARNER,
COLEMAN & GOGGIN

By: _____
    Daniel J. Hart, Esquire
    Attorney I.D. No. 1937
    Attorney for Defendants
    Richard and Barbara Longwill

    1845 Walnut Street
    Philadelphia, PA  19103
    215-575-2677

**DATED:**  September 16, 2004

8

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I have served upon all persons listed below a true and correct copy of

the Answer with Affirmative Defenses of Defendants, Richard Longwill and Barbara Longwill,

to Plaintiff's Fourth Amended Complaint in the above-captioned matter this date via regular mail

as follows:

Matthew A. Casey, Esquire
KLINE & SPECTER, P.C.
1525 Locust Street
19th Floor
Philadelphia, PA  19102

Edward C. Mintzer, Jr., Esquire
RAWLE & HENDERSON, LLP
The Widener Building
One South Penn Square
Philadelphia, PA  19107

                                             **MARSHALL, DENNEHEY, WARNER,
COLEMAN & GOGGIN**

                          By: _____
                                   Daniel J. Hart, Esquire
                                   Attorney I.D. No. 1937
                                   Attorney for Defendants
                                   Richard and Barbara Longwill

                                   1845 Walnut Street
                                   Philadelphia, PA  19103
                                   215-575-2677

**DATED:**  September 16, 2004

# EXHIBIT D

| Page: 1 | Report Date: 08/30/2002 | Agency: New Castle County PD | | Complaint: 32-02-086999 | |
|---|---|---|---|---|---|
| Reported Date and Time FRI 08/30/2002 1021 | | Initial Crime Report | | Occurred: FRI 08/30/2002 1013 | |

**Location:** 3220 COACHMAN RD SURREY PARK    Wilmington, DE 19803

**M.O. and Incident Overview:** MARISSA FISHMAN WF 1 FELL INTO A POOL AND NEARLY DROWN.    SUBJECT WAS TAKEN TO AI DUPONT HOSPITAL FOR TREATMENT.

| Grid 114-372 | Sector 12 | County New Castle | Domestic Related ☐Yes ☒No | 4-F-14 Sent? ☐Yes ☒No | Gen Broadcast Sent? ☐Yes ☒No |
|---|---|---|---|---|---|

## Victim Information

| Victim Number 001 | Name FISHMAN, MARISSA | | | | | |
|---|---|---|---|---|---|---|
| Type Individual | Sex Female | Race White | | Ethnic Origin Non-Hispanic | Age 1 | D.O.B. 12/30/2000 |

| Address 3220 COACHMAN RD SURREY PARK Wilmington, DE 19803 | Resident Status Full Time | Home Telephone (302) 478-5671 | Employer/School | Work Telephone |
|---|---|---|---|---|

| Reporting Person? ☐Yes ☒No | Victim Injured? ☒Yes ☐No | Victim Deceased? ☐Yes ☒No | Officer Comments |
|---|---|---|---|

| Injuries Unconsciousness | Description of Injuries |
|---|---|

| Parent/Guardian Information ROCHELLE FISHMAN Same Address as Victim | Parent Telephone |
|---|---|

## Crimes and Associated Information

| Victim Number 001 | Crime Seq 001 | Statute | Crime Description Casualty Injured Subject No Specific Crime Associated | |
|---|---|---|---|---|
| Location Type Residence/Home | | Status Service Clear 08/30/2002 | Involvement ☐Alcohol ☐Drugs ☐Computer | General Offense |
| Suspected Hate/Bias ☐Yes ☒No - N/A | | Crime Code 8191 - Casualty/Injured Subject | | |
| Burglary Force Involved ☐Yes ☐No | | | | |

## Witness Information

| Sequence 001 | Type Person Contacted | Name LONGWILL, BARBARA HELENA | Sex Female | Race White | Age 61 | D.O.B. 03/29/1941 |
|---|---|---|---|---|---|---|
| Address 3220 COACHMAN DR SURREY PARK Wilmington, DE 19803 | | Home Telephone (302) 478-5671 | Employer/School | | Work Telephone | |

| Sequence 002 | Type Person Contacted | Name FISHMAN, ALEXANDRA SOSHNA | Sex Female | Race White | Age 8 | D.O.B. 12/21/1993 |
|---|---|---|---|---|---|---|
| Address 3220 COACHMAN SURREY PARK Wilmington, DE 19803 | | Home Telephone (302) 478-5671 | Employer/School | | Work Telephone | |
| Parent/Guardian Information ROCHELLE FISHMAN Same Address as Witness | | Parent Telephone | | | | |

| Sequence 003 | Type Person Contacted | Name FISHMAN, SAMEUL M | Sex Female | Race White | Age 4 | D.O.B. 06/10/1998 |
|---|---|---|---|---|---|---|
| Address 3220 COACHMAN SURREY PARK Wilmington, DE 19803 | | Home Telephone (302) 478-5671 | Employer/School | | Work Telephone | |
| Parent/Guardian Information ROCHELLE FISHMAN Same Address as Witness | | Parent Telephone | | | | |

| Sequence 004 | Type Person Contacted | Name ZAVALA, TERESA GARCIA | Sex Female | Race White | Age 38 | D.O.B. 04/23/1964 |
|---|---|---|---|---|---|---|
| Address NOT OBTAINED | | Home Telephone | Employer/School SELF EMPLOYED - NANNY | | Work Telephone | |

| Sequence 005 | Type Not Interviewed | Name FISHMAN, ROCHELLE | Sex Female | Race White | Age 36 | D.O.B. 01/20/1966 |
|---|---|---|---|---|---|---|
| Address 3220 COACHMAN SURREY PARK Wilmington, DE 19803 | | Home Telephone (302) 478-5671 | Employer/School | | Work Telephone | |

| Sequence 006 | Type Person Contacted | Name FOX, DEBORAH | Sex Female | Race White | Age 39 | D.O.B. 11/30/1962 |
|---|---|---|---|---|---|---|

| Reporting Officer OFC SCHLOSSER  - 2458 2 | Supervisor Approval ANTHONY W SCELSI OJNCAWS Date 08/30/2002 1649 |
|---|---|

| Page: 2 | Report Date: 08/30/2002 | Agency: New Castle County PD | | Complaint: 32-02-086999 |
|---|---|---|---|---|

| Sequence 006 Continued | | | Witness Information | |
|---|---|---|---|---|

| Address NOT OBTAINED FL | Home Telephone | Employer/School | | Work Telephone |
|---|---|---|---|---|

| Sequence 007 | Type Person Contacted | Name FISHMAN, HARRISON | | Sex Male | Race | Age 4 | D.O.B. 10/21/1997 |
|---|---|---|---|---|---|---|---|
| Address 3220 COACHMAN SURREY PARK Wilmington, DE 19803 | | Home Telephone (302) 478-5671 | Employer/School | | | | Work Telephone |
| Parent/Guardian Information ROCHELLE FISHMAN Same Address as Witness | | Parent Telephone | | | | | |

| Sequence 008 | Type Person Contacted | Name LUCAS, ALLISON ANN | | Sex Female | Race White | Age 24 | D.O.B. 02/16/1978 |
|---|---|---|---|---|---|---|---|
| Address 14 DUNHAM PL APT 4R BROOKLYN, NY 11211 | | Home Telephone (917) 282-5631 | Employer/School | | | | Work Telephone |

| Sequence 009 | Type Person Contacted | Name LONGWILL, HELEN | | Sex Female | Race White | Age 87 | D.O.B. 11/12/1914 |
|---|---|---|---|---|---|---|---|
| Address 4638 LIBBIT AVE ENCINO, CA 91436 | | Home Telephone | Employer/School | | | | Work Telephone |

| Sequence 011 | Type Parent | Name FISHMAN, ROCHELLE | | Sex Unknown | Race | Age | D.O.B. |
|---|---|---|---|---|---|---|---|
| Address 3220 COACHMAN RD SURREY PARK Wilmington, DE 19803 | | Home Telephone | Employer/School | | | | Work Telephone |

| Sequence 012 | Type Parent | Name FISHMAN, ROCHELLE | | Sex Unknown | Race | Age | D.O.B. |
|---|---|---|---|---|---|---|---|
| Address 3220 COACHMAN SURREY PARK Wilmington, DE 19803 | | Home Telephone | Employer/School | | | | Work Telephone |

| Sequence 013 | Type Parent | Name FISHMAN, ROCHELLE | | Sex Unknown | Race | Age | D.O.B. |
|---|---|---|---|---|---|---|---|
| Address 3220 COACHMAN SURREY PARK Wilmington, DE 19803 | | Home Telephone | Employer/School | | | | Work Telephone |

| Sequence 014 | Type Parent | Name FISHMAN, ROCHELLE | | Sex Unknown | Race | Age | D.O.B. |
|---|---|---|---|---|---|---|---|
| Address 3220 COACHMAN SURREY PARK Wilmington, DE 19803 | | Home Telephone | Employer/School | | | | Work Telephone |

## Investigative Narrative

WRITER RESPONDED TO 3220 COACHMAN RD, SURREY PARK, WILMINGTON REFERENCE A DROWNING IN PROGRESS. COUNTY DISPATCH ADVISED THAT A BABY WAS PULLED FROM A POOL, AND THE BABY WAS NOT BREATHING. COUNTY DISPATCH ADVISED THAT THE CALLER WAS UPSET AND NOT   LISTENING TO CPR INSTRUCTIONS.

UPON ARRIVAL, WRITER OBSERVED AN AMBULANCE LEAVE THE RESIDENCE.  DISPATCH ADVISED THAT THE VICTIM WAS BEING TRANSPORTED TO THE HOSPITAL FOR TREATMENT.

WRITER NOTICED SEVERAL FAMILY MEMBERS PRESENT AT THE RESIDENCE.  WRITER CONTACTED BARBARA LONGWILL AND ALEXANDRA FISHMAN.  WRITER OBTAINED A BRIEF STATEMENT FROM THEM.  BOTH SUBJECTS ADVISED THAT THEY OBSERVED MARISSA FISHMAN WF 1 FLOATING ON HER STOMACH IN THE SHALLOW END OF THE POOL.  MARISSA WAS PULLED FROM THE POOL  AND CPR WAS ATTEMPTED.  THEY ADVISED THAT MARISSA MUST HAVE WALKED THROUGH THE OPEN SLIDING GLASS DOOR THAT WAS LEFT OPEN BY CONSTRUCTION WORKERS WORKING ON THE RESIDENCE. SGT BECKER ARRIVED ON SCENE RIGHT AFTER WRITER.  SGT BECKER CONTACTED SOME FAMILY MEMBERS AND CONSTRUCTION WORKERS, AND OBTAINED A BRIEF STATEMENT FROM THEM.

FAMILY MEMBERS PRESENT WERE: DEBORAH FOX, HARRISON FISHMAN, ALLISON LUCAS, HELEN LONGWILL, BARBARA LONGWILL, ALEXANDRA FISHMAN, SAMUEL FISHMAN, AND THE FAMILY   NANNY TERESA ZAVALA. WRITER WAS ADVISED THAT ROCHELLE FISHMAN RESPONDED TO AI DUPONT HOSPITAL WITH MARISSA FISHMAN.

SGT BECKER ADVISED WRITER TO SECURE THE SCENE.  THE SCENE CONSISTED OF A LARGE INDOOR POOL THAT WAS ATTACHED TO THE RESIDENCE.    WRITER OBSERVED A SLIDING GLASS DOOR THAT SEPARATED THE

| Reporting Officer OFC SCHLOSSER  - 2458 2 | Supervisor Approval ANTHONY W SCELSI OJNCAWS Date 08/30/2002 1649 |
|---|---|

| Page: 3 | Report Date: 08/30/2002 | Agency: New Castle County PD | Complaint: 32-02-086999 |
|---|---|---|---|

## Investigative Narrative - Continued

INFORMAL DINING ROOM AREA TO THE POOL ROOM.

SGT MCGOWAN, DET TRALA, AND DET BELL ARRIVED ON-SCENE.  REFER TO THEIR SUPPLEMENT FOR DETAILS ON INTERVIEWS.  EDU OFFICER MURPHY THEN ARRIVED ON     SCENE REFERENCE COLLECTION OF EVIDENCE. OFC SANTOS THEN RESPONDED ON-SCENE REFERENCE TRANSLATION FOR THE CONSTRUCTION WORKERS.  SGT BECKER ADVISED OFC ALREE AND OFF COTE TO RESPOND TO AI DUPONT HOSPITAL TO STANDBY WITH VICTIM.

DET MALONE RESPONDED TO AI DUPONT HOSPITAL REFERENCE INERVEIW WITH VICTIM'S MOTHER AND CHECKING ON CONDITION OF VICTIM.  AS ALL THE INTERVIEWS AND EVIDENCE WORK WERE COMPLETE, WRITER WAS RELIEVED OF HIS DUTIES.  WRITER WAS UNAWARE OF THE VICTIM'S STATUS AT THE HOSPITAL. REFER TO CIU SUPPLEMENTS FOR DETAILS.

| Reporting Officer OFC SCHLOSSER  - 2458 2 | Supervisor Approval ANTHONY W SCELSI  OJNCAWS  Date 08/30/2002 1649 | | | |
|---|---|---|---|---|
| Detective Notified | Referred To | | | |
| Solvability Factors | ☐Witness ☐Suspect Located | ☐M. O. ☐Suspect Described | ☐Trace Stolen Property ☐Suspect Identified | ☐Suspect Named ☐Suspect Vehicle Identified | Status **Has Follow Up** |

## Supplemental Report - #1

| Original Occurrence Dates and Times: | Grid | Sector |
|---|---|---|
| FRI 08/30/2002 1013 | 114-372 | 12 |

Original Location:
**3220   COACHMAN RD SURREY PARK      Wilmington, DE 19803**

## Original Victim Information

| Victim Number | Name |
|---|---|
| 001 | FISHMAN, MARISSA |

| Type | Sex | Race | Ethnic Origin | Age | D.O.B. |
|---|---|---|---|---|---|
| Individual | Female | White | Non-Hispanic | 1 | 12/30/2000 |

| Address | Resident Status | Home Telephone | Employer/School | Work Telephone |
|---|---|---|---|---|
| 3220 COACHMAN RD SURREY PARK Wilmington, DE 19803 | Full Time | (302) 478-5671 | | |

| Reporting Person? | Victim Injured? | Victim Deceased? | Officer Comments |
|---|---|---|---|
| ☐Yes ☒No | ☒Yes ☐No | ☐Yes ☒No | |

## Original Crime and Associated Information

| Victim Number | Crime Seq | Statute | Crime Description |
|---|---|---|---|
| 001 | 001 | | Casualty Injured Subject No Specific Crime Associated |

| Location Type | Status | Involvement | General Offense |
|---|---|---|---|
| Residence/Home | Service Clear 08/30/2002 | ☐Alcohol ☐Drugs ☐Computer | |

| Suspected Hate/Bias | Crime Code |
|---|---|
| ☐Yes ☒No - N/A | 8191 - Casualty/Injured Subject |

| Burglary Force Involved |
|---|
| ☐Yes ☐No |

## Witness Information

| Sequence | Type | Name | Sex | Race | Age | D.O.B. |
|---|---|---|---|---|---|---|
| 004 | Person Contacted | ZAVALA, TERESA GARCIA | Female | White | 38 | 04/23/1964 |

| Address | Home Telephone | Employer/School | Work Telephone |
|---|---|---|---|
| NOT OBTAINED | | SELF EMPLOYED - NANNY | |

| Sequence | Type | Name | Sex | Race | Age | D.O.B. |
|---|---|---|---|---|---|---|
| 010 | Person Contacted | BRITO-ORTIZ, SALVADOR NMN | Male | White | 37 | 04/11/1965 |

| Address | Home Telephone | Employer/School | Work Telephone |
|---|---|---|---|
| 1123 VAN BUREN ST WILMINGTON, DE 19801 | (302) 654-1984 | | |

## Investigative Narrative

Writer responded to 3220 Coachman Road, Surrey Park, Wilmington, DE 19803 reference assist in injured subject complaint.  Upon arrival, writer contacted Detective Trala, and ascertained that Salvador Brito-Ortiz, PC1, and Teresa Zavala, W1, need to be interviewed about the injured subject incident.  Writer advises that both PC1 and W1 did not speak fluent English and required a Spanish translator to obtain their statements.  Writer interviewed W1 and PC1 separately and documented their          statements.

Writer forwarded a copy of this report to CIU at this time.

## Statement of Witness 004 - TERESA GARCIA ZAVALA

Teresa Zavala, W1, advised that she and Marissa Fishman, V1, were asleep in her bedroom when they awoke around 0700 hours.  W1 advised that she and V1 responded to the kitchen and joined the rest of the family for breakfast.  W1 advised that around 0900 hours, she started cleaning the bathroom and bedroom areas of 'Rochelle' and 'Barbara' and heard the children talking in the kitchen area.  W1 advised that she assumed that all the children were being watched and continued cleaning around the    house.  W1 advised that she responded to the kitchen area and was asked by Barbara, '...where is Marissa?', at which time she stated she did not know.  W1 advised that she and Rochelle started calling Marissa's name aloud at which time she suddenly heard Alexandra scream, '...here is Marissa...', as she pointed to the pool area.  W1 advised that she immediately observed the sliding glass door from the kitchen area to the indoor pool area to be open.  W1 advised that she observed Rochelle start to run toward the pool area and she quickly followed.

W1 advised that as she entered the pool area she observed Marissa, motionless, floating face down in the pool.  W1 advised that she then observed two subjects standing on the edge of the pool.  W1 advised that she 'froze' and just stared at Marissa floating in the pool as Rochelle

| Reporting Officer | Supervisor Approval |
|---|---|
| PFC SANTOS   - 2426 | ROBERT C BECKER  OJNCRCB  Date 08/30/2002 1730 |

Case 1:03-cv-00211-MPT   Document 84-2   Filed 04/27/2006   Page 29 of 55

## Statement of Witness 004 - TERESA GARCIA ZAVALA - Continued

pushed the hispanic male subject to the side and dove into the pool towards Marissa.

W1 advised that she observed Rochelle grab Marissa from the pool as she       yelled at the two subjects, '...why didn't you move...'.  W1 advised that Rochelle handed Marissa to her at which time Rochelle started to push on the stomach of Marissa.  W1 advised that she observed water exit the mouth of Marissa.  W1 advised thatthe skin color of Marissa was light blue and she had been wearing her pajamas.  W1 advised that she placed Marissa on the carpeted floor near the kitchen table as Rochelle continued to push on Marissa's stomach and Barbara started blow air into       Marissa's mouth.  W1 advised that she observed Marissa cough once.  W1 advised that the two subjects seen in the pool area were one white male subject and one hispanic male subject.  W1 advised that she had seen these subjecte moving one circular       table and three chairs from the exterior patio area to the pool area through the unsecured door area.  Wadvised that the door between the kitchen area and the pool area is always closed when the children area in the house and the Marissa is incapableto opening the door by herself.  W1 advised that she believes that one of these two subjects had left  the door open while they were moving the furniture.

## Statement of Witness 010 - SALVADOR NMN BRITO-ORTIZ

Salvador Brito-Ortiz, PC1, advised that he had been working on the outdoor patio area with his boss, the other white male subject.  PC1 advised that he had been working on the masonry on the patio and did observe numerous children playing inside theresidence near the kitchen area.

| Reporting Officer | | Supervisor Approval | | | |
|---|---|---|---|---|---|
| PFC SANTOS  - 2426 | | ROBERT C BECKER  OJNCRCB Date 08/30/2002 1730 | | | |
| Solvability Factors | ☐ Witness | ☐ M. O. | ☐ Trace Stolen Property | ☐ Suspect Named | Status |
| | ☐ Suspect Located | ☐ Suspect Described | ☐ Suspect Identified | ☐ Suspect Vehicle Described | Has Follow Up |

Case 1:05-cv-00211-MPT   Document 84-2   Filed 04/27/2006   Page 30 of 55

## Supplemental Report - #2

| Original Occurrence Dates and Times: | | Grid | Sector |
|---|---|---|---|
| **FRI 08/30/2002 1013** | | **114-372** | **12** |

Original Location:
**3220  COACHMAN RD SURREY PARK    Wilmington, DE 19803**

## Original Victim Information

| Victim Number | Name |
|---|---|
| **001** | **FISHMAN, MARISSA** |

| Type | Sex | Race | | Ethnic Origin | Age | D.O.B. |
|---|---|---|---|---|---|---|
| **Individual** | **Female** | **White** | | **Non-Hispanic** | **1** | **12/30/2000** |

| Address | Resident Status | Home Telephone | Employer/School | Work Telephone |
|---|---|---|---|---|
| **3220  COACHMAN  RD SURREY PARK Wilmington, DE 19803** | **Full Time** | **(302) 478-5671** | | |

| Reporting Person? | Victim Injured? | Victim Deceased? | Officer Comments |
|---|---|---|---|
| ☐Yes ☒No | ☒Yes ☐No | ☐Yes ☒No | |

## Original Crime and Associated Information

| Victim Number | Crime Seq | Statute | Crime Description |
|---|---|---|---|
| **001** | **001** | | **Casualty Injured Subject No Specific Crime Associated** |

| Location Type | Status | Involvement | General Offense |
|---|---|---|---|
| **Residence/Home** | **Service Clear 08/30/2002** | ☐Alcohol ☐Drugs ☐Computer | |

| Suspected Hate/Bias | Crime Code |
|---|---|
| ☐Yes ☒No - N/A | **8191 - Casualty/Injured Subject** |

| Burglary Force Involved |
|---|
| ☐Yes ☐No |

## Investigative Narrative

   Writer responded to the above location on the above date and time reference to a drowning. Prior to arrival writer ascerstained the ambulance was transporting the victim to A.I. Hospital. Writer turned around and followed the ambulance to AI    DupontHospital where writer stayed with V1 until writer was released by Det. C. Malone.

| Reporting Officer | Supervisor Approval | | | | |
|---|---|---|---|---|---|
| **OFF. COTE   - 2636** | **CURTIS M CLIFTON  OJNCCMC Date 08/30/2002 1700** | | | | |
| Solvability Factors | ☐Witness | ☐M. O. | ☐Trace Stolen Property | ☐Suspect Named | Status |
| | ☐Suspect Located | ☐Suspect Described | ☐Suspect Identified | ☐Suspect Vehicle Described | |

| Page: 1 | Report Date: 08/30/2002 | Agency: New Castle County PD | Complaint: 32-02-086999 |
|---|---|---|---|

## Supplemental Report - #3

| Original Occurrence Dates and Times: FRI 08/30/2002 1013 | Grid 114-372 | Sector 12 |
|---|---|---|

Original Location:
**3220  COACHMAN RD SURREY PARK     Wilmington, DE 19803**

## Original Victim Information

| Victim Number 001 | Name FISHMAN, MARISSA | | | | | |
|---|---|---|---|---|---|---|

| Type **Individual** | Sex **Female** | Race **White** | Ethnic Origin **Non-Hispanic** | Age **1** | D.O.B. **12/30/2000** |
|---|---|---|---|---|---|

| Address **3220  COACHMAN  RD SURREY PARK Wilmington, DE 19803** | Resident Status **Full Time** | Home Telephone **(302) 478-5671** | Employer/School | Work Telephone |
|---|---|---|---|---|

| Reporting Person? ☐Yes ☒No | Victim Injured? ☒Yes ☐No | Victim Deceased? ☐Yes ☒No | Officer Comments |
|---|---|---|---|

## Original Crime and Associated Information

| Victim Number 001 | Crime Seq 001 | Statute | Crime Description **Casualty Injured Subject No Specific Crime Associated** |
|---|---|---|---|

| Location Type **Residence/Home** | Status **Service Clear 08/30/2002** | Involvement ☐Alcohol ☐Drugs ☐Computer | General Offense |
|---|---|---|---|

| Suspected Hate/Bias ☐Yes ☒No - N/A | Crime Code **8191 - Casualty/Injured Subject** |
|---|---|

| Burglary Force Involved ☐Yes ☐No | |
|---|---|

## Witness Information

| Sequence 010 | Type **Person Contacted** | Name **MAGNER, JOHN EDWARD** | Sex **Male** | Race **White** | Age **64** | D.O.B. **08/24/1938** |
|---|---|---|---|---|---|---|

| Address **2006 BAYNARD BLVD WILMINGTON, DE 19802** | Home Telephone **(302) 229-9664** | Employer/School | Work Telephone |
|---|---|---|---|

## Investigative Narrative

On stated date at 1015 hrs writer responded to 3220 Coachman Rd (Surrey Park) reference to a drowning. Prior to arrival writer ascertained Talleyville Fire Company was transporting Marisa Fishman (V1) to A.I. DuPont Hospital for further treatment sotherefore writer began to follow the ambulance. At Foulk Rd and Shipley Rd Talleyville Fire Company picked up New Castle County Paramedic Unit #8 who also began to provide treatment. After arriving at the hospital writer contacted Ken Getty          (Talleyville Fire Company) who provided writer with the Marisa's clothes. The clothes were tot writer on today's date @ 1030 hrs.


While at the hospital, Rochelle Fishman (V1's mother) arrived and writer began a brief interview. Rochelle stated towriter that at approximately 1000 hours she responded to her bedroom to brush her teeth and then responded back out into the living area. Rochelle had a weird feeling and then realized Marisa was missing so therefore began to look for her. At this point Alexandra (Marisa's sister) located Marisa in the swimming pool floating face down and on the top of the pool. Rochelle then dove into the pool and pulled Marisa out of the water and her and her sister, Deborah Longwill-Fox, began CPR.   Rochelle further stated that upon pulling out Marisa from the pool she was blue and after CPR was begun Marisa began to gain color in her hands. Rochelle further stated that there were workers at the residence who left the door open to the pool.

While at the hospital writer also contacted John Magner who stated he was working on Rochelle's residence (110 Kelly Dr, Chadds Ford, Pa) when he received a phone call from an unknown person stating Marisa fell into the pool. John then responded to the Surrey Park address and then to A.I. DuPont Hospital.


Dr. Palmer treated Marisa while she was in the Emergency Department and Dr.

Stryjeweski treated Marisa when she was transferred to the Pediatric ICU. See Marisa's medical records for          details (#367612).

| Reporting Officer **OFC ALFREE   - 2555** | Supervisor Approval **ANTHONY W SCELSI  OJNCAWS  Date 08/30/2002 1654** |
|---|---|

Case 1:03-cv-00211-MPT   Document 84-2   Filed 04/27/2006   Page 32 of 55

Investigative Narrative - Continued

Marisa's clothes were tot'd Det. K. Murphy at 3220 Coachman Rd on today's date @ 1337 hours by writer.  This case was tot Det. C. Malone.

| Reporting Officer | Supervisor Approval | | | | |
|---|---|---|---|---|---|
| OFC ALFREE  - 2555 | ANTHONY W SCELSI  OJNCAWS  Date 08/30/2002 1654 | | | | |
| Solvability Factors | ☐Witness | ☐M. O. | ☐Trace Stolen Property | ☐Suspect Named | Status |
| | ☐Suspect Located | ☐Suspect Described | ☐Suspect Identified | ☐Suspect Vehicle Described | **Has Follow Up** |

# EXHIBIT E

DOC. NO.
35-05-20-99/08/20

OFFICE OF
VITAL
STATISTICS

LOCAL REG NO.

**CERTIFICATE OF DEATH**

# State of Delaware (107)

DEPARTMENT OF HEALTH AND SOCIAL SERVICES

STATE FILE NUMBER

**DECEDENT**

1. DECEDENT'S NAME (FIRST, MIDDLE, LAST): MArissa   R   Fishman  | 2. SEX: F | 3. DATE OF DEATH (MO., DAY, YR.): XXXXXXX 8/30/02

4. SOCIAL SECURITY NO. | 5. AGE (YRS): 20 | 5B. UNDER 1 YEAR MONTHS / DAYS | 5C. UNDER 1 DAY HOURS / MINUTES | 6. DATE OF BIRTH (MO., DAY, YR.) | 7. BIRTHPLACE (CITY AND STATE OR FOREIGN COUNTRY)

8. WAS DECEDENT EVER IN U.S. ARMED FORCES? ☐ YES ☐ NO | 9. ANATOMICAL GIFT ☐ CONSENT GRANTED ☐ NOT GRANTED | 10A. PLACE OF DEATH (CHECK ONLY ONE, SEE INSTRUCTIONS ON OTHER SIDE) HOSPITAL: ☒ INPATIENT ☐ ER/OUTPATIENT ☐ DOA  OTHER: ☐ NURSING HOME ☐ RESIDENCE ☐ OTHER (SPECIFY)

10B. FACILITY NAME (IF NOT INSTITUTION GIVE STREET AND NUMBER): A. I. Dupont Hospital for Children | 10C. CITY, TOWN, OR LOCATION OF DEATH: Wilmington | 10D. COUNTY OF DEATH: N.C.

11. MARITAL STATUS — MARRIED, NEVER MARRIED, WIDOWED, DIVORCED (SPEC.) | 12. SURVIVING SPOUSE (IF WIFE GIVE MAIDEN NAME) | 13A. DECEDENT'S USUAL OCCUPATION (KIND OF WORK DURING MOST OF WORKING LIFE. DO NOT USE RETIRED) | 13B. KIND OF BUSINESS/INDUSTRY

14A. RESIDENCE — STATE: Pennsylvania | 14B. COUNTY | 14C. CITY, TOWN, OR LOCATION: Chadds Ford | 14D. STREET AND NUMBER: 110 Kelly Drive

14E. INSIDE CITY LIMITS? (YES OR NO) | 14F. ZIP CODE | 15. WAS DECEDENT OF HISPANIC ORIGIN? (SPECIFY NO OR YES. SPECIFY CUBAN, MEXICAN, PUERTO RICAN, ETC.) ☒ NO ☐ YES (Specify) | 16. RACE — AMERICAN INDIAN, BLACK, WHITE, ETC. (SPECIFY): White | 17. DECEDENT'S EDUCATION (SPECIFY ONLY HIGHEST GRADE COMPLETED) ELEMENTARY/SECONDARY (0-12) / COLLEGE (1-4 OR 5+)

**PARENTS**

18. FATHER'S NAME (FIRST, MIDDLE, LAST) | 19. MOTHER'S NAME (FIRST, MIDDLE, MAIDEN SURNAME)

**INFORMANT**

20A. INFORMANT'S NAME (TYPE/PRINT) | 20B. MAILING ADDRESS (STREET AND NUMBER OR RURAL ROUTE NUMBER, CITY OR TOWN, STATE, ZIP CODE)

**DISPOSITION**

21A. METHOD OF DISPOSITION ☐ BURIAL ☐ CREMATION ☐ REMOVAL FROM STATE ☐ DONATION ☐ OTHER (SPECIFY) | 21B. PLACE OF DISPOSITION (NAME OF CEMETERY, CREMATORY, OR OTHER PLACE) | 21C. LOCATION (CITY, TOWN, STATE)

22A. SIGNATURE OF FUNERAL DIRECTOR | 22B. LICENSE NUMBER (OF LICENSEE) | 23. NAME AND ADDRESS OF FACILITY: Schoenberg

24. REGISTRAR'S SIGNATURE | 25. DATE FILED (MO., DAY, YR.)

**PRONOUNCING OFFICIAL**

ITEMS 27-29 MUST BE COMPLETED BY PHYSICIAN OR HOSPICE NURSE WHO PRONOUNCES DEATH

SEE OTHER SIDE ON OTHER SIDE

COMPLETE ITEMS 26 A-C ONLY WHEN CERTIFYING PHYSICIAN IS NOT AVAILABLE AT TIME OF DEATH TO CERTIFY CAUSE OF DEATH. | 26. TO THE BEST OF MY KNOWLEDGE DEATH OCCURRED AT THE TIME, DATE, AND PLACE STATED  SIGNATURE AND TITLE | 26B. LICENSE NUMBER | 26C. DATE SIGNED (MO., DAY, YR.)

27. TIME OF DEATH: 7:03 ☐ AM ☐ PM | 28. DATE PRONOUNCED DEAD (MO., DAY, YR.): 08 - 30 - 02 | 29. WAS CASE REFERRED TO MEDICAL EXAMINER? (YES OR NO): yes

**CERTIFIER**

30A. CERTIFIER (CHECK ONLY ONE)
☐ CERTIFYING PHYSICIAN (Physician certifying cause of death when another physician has pronounced death and completed item 26) To the best of my knowledge, death occurred due to the cause(s) and manner as stated.
☒ PRONOUNCING AND CERTIFYING PHYSICIAN (Physician both pronouncing death and certifying the cause of death) To the best of my knowledge, death occurred at the time, date, and place, and due to the cause(s) and manner as stated.
☐ MEDICAL EXAMINER — On the basis of examination and/or investigation, in my opinion death occurred at the time, date, and place, and due to the cause(s) and manner as stated.

30B. SIGNATURE AND TITLE OF CERTIFIER: MD | 30C. LICENSE NUMBER | 30D. DATE SIGNED (MO., DAY, YR.): 8/30/02

31. NAME AND ADDRESS OF CERTIFIER WHO COMPLETED CAUSE OF DEATH (ITEM 40) (TYPE/PRINT): GLENN STRZYEWSKI, M.D.   A.I. duPont Hospital  1600 Rockland Road  Wilmington DE 1899?

**TO HOSPITAL OR PHYSICIAN — DELAWARE LAW REQUIRES THAT THE DEATH CERTIFICATE BE EXECUTED WITHIN 72 HOURS AFTER DEATH**

32A. WAS AN AUTOPSY PERFORMED? ☒ YES ☐ NO | 33. MANNER OF DEATH ☐ NATURAL ☒ ACCIDENT ☐ SUICIDE ☐ HOMICIDE ☐ PENDING INVESTIGATION ☐ UNDETERMINED | 34. DATE OF INJURY (MO., DAY, YR.): 8/30/02 | 35. DESCRIBE HOW INJURY OCCURRED: Child fell into pool Grandparents Home

32B. WERE AUTOPSY FINDINGS AVAILABLE PRIOR TO COMPLETION OF CAUSE OF DEATH? ☐ YES ☒ NO | TIME OF INJURY: 10:00 ☐ AM ☐ PM | 36. PLACE OF INJURY — AT HOME, FARM, STREET, FACTORY, OFFICE BUILDING, ETC. (SPECIFY)

37. LOCATION: STREET AND NUMBER OR RURAL ROUTE NUMBER, CITY OR TOWN (STATE): 3220 Coachman Rd., Surrey Park, Wilm., DE

40. PART I DO NOT ENTER THE MODE OF DYING SUCH AS CARDIAC OR RESPIRATORY ARREST, SHOCK, OR HEART FAILURE. LIST ONLY ONE CAUSE PER EACH LINE.  |  APPROXIMATE INTERVAL BETWEEN ONSET AND DEATH

IMMEDIATE CAUSE (FINAL DISEASE, INJURY OR CONDITION THAT IN YOUR OPINION CAUSED THE DEATH): IMMEDIATE CAUSE (A) Drowning

DUE TO (B)

SEQUENTIALLY LIST CONDITIONS, IF ANY, LEADING TO IMMEDIATE CAUSE. ENTER UNDERLYING CAUSE (DISEASE OR INJURY WHICH INITIATED EVENTS RESULTING IN DEATH) LAST.

DUE TO (C)

DUE TO (D)

PART II OTHER SIGNIFICANT CONDITIONS — CONTRIBUTING TO CAUSE OF DEATH

REV. 9/99

**(1) ORIGINAL COPY—STATE**

# EXHIBIT F

# New Castle County EMS

## Patient Care Report - Medical - Priority 1 - ALS - Transport

COPY

| | | |
|---|---|---|
| 08/30/2002    **Medic 8** | **Incident:    16409** | |
| **Fisher, Marissa** | **SSN:  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** | **DOB:    12/30/2000** |
| **Location:  3220 Coachman Rd.** | **Talleyville** | **DE** |

**Chief Complaint :** None- CPR

**History of Condition:** The patient is a 1 Year(s) old Female. Pt. was found face down in swimming pool by mother. Pt. was pulled from swimming pool and by-stander CPR initiated.

**PMH:** <<None>>

**Medications:** <<None>>

**Allergies:** <<None>>

---
### Assessment
---

**General Impression:** ALS met BLS en route to hospital. Pt. is lying on stretcher pulseless and apneic.

**Primary Survey:**   **Airway:** Compromised

**Breathing:** Rate:    Absent

Rhythm:  None

Quality:  None with None left lung sounds and None right lung sounds

**Circulation:** Carotid pulse is Absent

Skin is Cool, Moist and Pale in color with a Not Assessed capillary refill.

Radial rate is Absent

**Loc:**  Unresponsive

**Head/Face:** Unremarkable

| | |
|---|---|
| **Left Pupil Size:** Not Checked | **Left Pupil Reacts:**  Not Assessed |
| **Right Pupil Size:** Not Checked | **Right Pupil Reacts:**  Not Assessed |

**Neck:** Unremarkable

| | |
|---|---|
| **Jugular Veins:** Normal | **Heart Sounds:** Not Assessed |
| **Anterior Thorax:** Not Assessed | |
| **Left Lung:** Not Assessed | **Right Lung:** Not Assessed |
| **Posterior Thorax:** Not Assessed | |
| **Abdomen, Pelvis:** Not Assessed | |

**Extremities:** Left Arm: Not Assessed
Right Arm: Not Assessed
Left Leg: Not Assessed
Right Leg: Not Assessed

**Neurological:** Unresponsive

**Differential Diagnosis:** Cardiac Arrest

---
### Summary
---

10:16   Unit(s) Dispatched

10:18   BLS Arrival

# New Castle County EMS

COPY

*Patient Care Report - Medical - Priority 1 - ALS - Transport*

| 08/30/2002    Medic 8 | Incident:  16409 | |
|---|---|---|
| Fisher, Marissa | SSN:  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 | DOB:  12/30/2000 |
| Location: 3220 Coachman Rd. | Talleyville | DE |

--- ***Summary*** ---

10:21  Arrived at Scene

10:21  Arrived at Patient

10:21  The patient was positioned flat - RESULTS: Indicated by BLS prior to ALS intervention

10:21  Mouth to mask respirations performed - RESULTS: Indicated by BLS prior to ALS intervention

10:21  Chest compressions performed - RESULTS: Initiated by BLS prior to ALS arrival.

10:21  Oxygen administered at 15 lpm via Bag valve mask.

10:21  Pulse: 0 | Resp: 0 | BP: 0 over 0 | GCS: 3 | ECG: Asystole

10:22  Transport To Alfred I. duPont Institute

10:22  Oral airway inserted

10:22  Medical direction from Doctor Other- Not listed at Alfred I. duPont Institute with instructions received for Continue CPR and I/O

10:23  Unsuccessful IO attempt in the Left tibial tuberosity

10:26  Arrived At Alfred I. duPont Institute . Total Patient Contact Time = 5 minutes

10:26  Pulse: 0 | Resp: 0 | BP: 0 over 0 | GCS: 3 | ECG: Asystole

10:46  Medic 8 was placed available

**Patient Outcome:**   No change

**Narrative:**

ALS met BLS en route to hospital. Pt. was found floating face down in swimming pool by mother. Mother removed pt. from pool and initiated CPR. Upon BLS arrival to residence they found pt. lying on living room floor with CPR in progress. BLS loaded pt. into unit and began trans. pt. Upon ALS intervention at Foulk rd. and Shipley rd. Pt. is lying supine on stretcher with CPR in progress. Pt. is pale, pulseless, and apneic. Placed pt. on EKG monitor with a rhythm of Asystole. Oral airway inserted by ALS. Began transporting pt. to hospital. During trans. continued CPR and contacted medical control with orders to attempt I/O infusion. Attempted I/O infusion with no success. Pt. TOT ED staff with no complications.

COPY

Signature: _____

Larry H DuHadaway III
NCC Paramedic

New Castle County EMS
NCC Government Cntr, 87 Reads Way
New Castle, DE 19720
(302) 395-8184

**EMS Providers on the call**

DuHadaway, Larry
NCC Paramedic

Taylor, Robert
NCC Paramedic

# CITED UNREPORTED OPINIONS

LEXSEE 2006 U.S. DIST. LEXIS 10700

**ERNESTINE PARKER, Plaintiff, v. COMCAST CORPORATION, a Pennsylvania corporation, COMCAST CABLE COMMUNICATIONS, INC., a Delaware corporation, and COMCAST CABLEVISION OF NEW CASTLE COUNTY LLC, a Delaware limited liability corporation, successor-in-interest to Comcast Cablevision of New Castle County Inc., a Delaware corporation, Defendants.**

**Civil Action No. 04-344-KAJ**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

*2006 U.S. Dist. LEXIS 10700*

**March 17, 2006, Decided**

**COUNSEL:** [*1]  Victor F. Battaglia, Esq., Philip B. Bartoshesky, Esq., Biggs and Battaglia, Wilmington, Delaware, Counsel for Plaintiff.

William M. Kelleher, Esq., Ballard Spahr Andrews & Ingersoll, LLP, Wilmington, Delaware, Counsel for Defendants. Of Counsel: Charisse R. Lillie, Esq., David E. Brier, Esq., Farrah Gold, Esq., Ballard Spahr Andrews & Ingersoll, LLP, Philadelphia, Pennsylvania.

**JUDGES:** KENT A. JORDAN, District Judge.

**OPINIONBY:** KENT A. JORDAN

**OPINION:**

   **MEMORANDUM OPINION**

**JORDAN, District Judge**

**I. INTRODUCTION**

   Before me is a Motion for Summary Judgment (Docket Item ["D.I."] 41; the "Motion") filed by defendants Comcast Corporation, Comcast Cable Communications, Inc., and Comcast Cablevision of New Castle County, LLC (collectively, "Comcast"). The Complaint by plaintiff Ernestine Parker ("Parker") alleges that Comcast discriminated against her in violation of the Americans with Disabilities Act ("ADA"), *42 U.S.C. § 12101, et. seq.*, and wrongfully terminated her employment. (D.I. 1 at PP23-33.) Jurisdiction is appropriate under *28 U.S.C. § § 1331, 1334*, and *1367.* For the reasons that follow, the Motion will be granted.  [*2]

**II. BACKGROUND** n1

- - - - - - - - - - - - - - - - - -

n1 The following rendition of background information does not constitute findings of fact and is cast in the light most favorable to the non-moving party.

- - - - - - - - - - - - - - - - - -

   Parker was hired by Comcast's predecessor n2 on February 8, 1998 as a receptionist, and was promoted to Human Resources Clerk on July 2, 2001. (D.I. 1 at PP10-11.) Starting in the year 2000, Parker began to have "chronic, daily headaches" that were "extremely painful." (D.I. 45 at B-3-4, PP3-4.) She sought treatment from her family doctors and a neurologist, who have been unable to determine the cause of the headaches. (*Id.*)

Case 1:05-cv-00211-MPT    Document 84-2    Filed 04/27/2006    Page 40 of 55

Page 2
2006 U.S. Dist. LEXIS 10700, *

n2 Parker worked for Suburban Cable Company, which Comcast bought in 2000. (D.I. 1 at P10.)

### A. Headache Pain and Limitations

Parker alleges that her headaches affected her in various ways. She claims that the headaches prevented [*3] her from exercising, and that she "wasn't able to read, couldn't watch television. [She] wasn't able to sleep." (D.I. 42, Ex. A at 35.) She also claimed that she stopped cooking meals during the week because of her headaches (*id.* at 106), and that she could not clean her house because her headaches were so bad (*id.* at 204-05). Parker asserts that by July of 2002, "the pain was so excruciating I could not sleep, could not do any housework". (D.I. 45 at B-6, P17.) On August 1, 2002, Parker "passed out while at work due to [her] chronic headache condition and stressful working conditions." n3 (*Id.* at B-6, P18.)

> n3 Most of the evidence in the record of Parker's headaches consists of Parker's own statements in either her deposition or affidavit. However, the record also contains a document entitled "Certification of Health Care Provider," completed by one of Parker's doctors, that was submitted to Comcast under the Family and Medical Leave Act as documentation of Parker's headaches in early 2001. (D.I. 45 at B-9-12.) Additionally, there is documentation from Comcast of the incident when Parker passed out at work. (*Id.* at B-17-20.)

[*4]

However, Parker also claims that her headaches did not prevent her from doing her job, even when she had to work from home at night and on the weekends. (D.I. 42, Ex. A at 35, 108-10.) She asserts that she was still able to read, write, and use the computer to do her job. (*Id.* at 111.) Furthermore, she claims that she would write in her journal "because it would help [her] to not concentrate on [her] pain." (*Id.* at 127.)

Additionally, Parker took at least two different medications, Zomig and Amitriptyline, for her headaches while at Comcast, and she states that those medications made her feel "somewhat" better. (*Id.* at 193-94.) She states that the medications allowed her to work, read a computer monitor, and read better, and that also the medications allowed her to watch TV, go to the movies, cook, and clean. (*Id.* at 194-95.) She also states that if she had not had to work, she could have cooked and cleaned. (*Id.* at 205-06.)

### B. Increased Job Responsibilities and Criticisms of Performance

In early 2002, many of Parker's co-workers in the Human Resources department were fired and replaced. (D.I. 45 at B-67-69.) Parker alleges that, starting in July of [*5] 2002, she was assigned additional duties, and criticized almost daily for her work. (*Id.* at B-31.) Parker asserts that the additional work and criticism increased her headaches and that she was assigned those additional duties and criticized because Comcast was trying to force her to quit. (*Id.* at B-6, P17.) She claims that the criticisms were "false or extremely overstated." (D.I. 44 at 8.) She further asserts that, despite her informing Comcast that she had chronic daily headaches, and despite her passing out at work, Comcast continued to increase her workload. (D.I. 45 at B-6, PP17-21.)

Parker says that she did not ask her superiors at Comcast to decrease her workload, or at least to stop increasing it, because she "was afraid. [She] just tried to do all the work because [she] didn't want to lose [her] job." (D.I. 42, Ex. A at 157.)

Parker was terminated on November 4, 2002. (D.I. 1 at P22.) Parker was told by her superiors at Comcast that her termination was because of reorganization. (D.I. 42, Ex. A at 48, 62-63.) She was offered another position with Comcast as a customer account executive, but declined to take it. (*Id.* at 50.) Parker alleges that she declined [*6] to take it because of "the kind of work that it was" (*id.*), and that the position was offered to her only after she informed Comcast that she had retained an attorney (*id.* at 64). Parker claims that she thought Comcast actually fired her because of her poor job performance, n4 and that her employment record contained a significant amount of criticism of her performance. (*Id.* at 62-63.) Although Parker alleges in her briefing that the criticism of her performance was overstated and inaccurate (D.I. 44 at 20), when asked why she thought the criticisms were fabricated, her only response was "I don't know". n5 (D.I. 42, Ex. A at 61-62.)

n4 At another point in her deposition, however, Parker stated, "I really don't know why they fired me" (D.I. 42, Ex. A at 136), and at yet another point when asked "what was the reason you were given for your termination?" she responded "reorganization" (*id.* at 48). However, she clearly stated: "I'm not saying I was terminated because of my headaches." (*Id.* at 185.)

n5 Parker testified as follows:

Q: Who do you believe fabricated the reasons for terminating?

A: I don't know.

Q. Do you believe Mr. Mosley fabricated the reasons when he was being critical of your work?

A: I don't know.

Q: And when he was being critical of your work, he was actually sharing with you specific criticisms, correct?

A: That's right.

Q: Did anyone else criticize your work?

A: No.

Q: But you believe that some criticisms came from Ms. Pace?

A: That's right

Q: And do you know what her criticisms were?

A: No.

Q: Do you believe that she was lying about her criticisms?

A: I don't know.
(D.I. 42, Ex. A at 61-62.)

[*7]

## III. STANDARD OF REVIEW

A court shall grant summary judgment only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(c).* The moving party bears the burden of proving that no genuine issue of material fact exists. *See Celotex v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).* "Facts that could alter the outcome are 'material,' and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct." *Horowitz v. Fed. Kemper Life Assurance Co., 57 F.3d 300, 302 n.1 (3d Cir. 1995)* (internal citations omitted). If the moving party has demonstrated an absence of material fact, the nonmoving party then "must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)* (quoting *Fed. R. Civ. P. 56(e)* [*8] ). The court will "view the underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion." *Pa. Coal Ass'n v. Babbitt, 63 F.3d 231, 236 (3d Cir. 1995).* However, a court should not make credibility determinations or weigh the evidence. *Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000).*

## IV. DISCUSSION

Parker makes two separate claims against Comcast. n6 First, she claims that Comcast discriminated against her in violation of the ADA. Second, Parker claims that she was wrongfully terminated by Comcast. Comcast, however, asserts that, with respect to each of these claims, there is no genuine issue as to any material fact and that it is entitled to judgment as a matter of law.

n6 Originally, the Complaint set forth four causes of action. (D.I. 1.) However, counts three and four, state law claims of intentional infliction of emotional distress and prima facie tort, were dismissed on October 5, 2005. (D.I. 33, 34.) Additionally, the Complaint originally named two individual defendants, who were dismissed from the case in that same Order. (*Id.*)

[*9]

A. *ADA Claim*

To make out a prima facie case of discrimination under the ADA, Parker must show that "(1) she is a disabled person within the meaning of the ADA; (2) she is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer; and (3) she has suffered an otherwise adverse employment decision as a result of discrimination." *Gaul v. Lucent Techs., Inc., 134 F.3d 576, 580 (3d Cir. 1998).* "Disability" under the ADA is defined as "[a] physical or mental impairment that substantially limits one or more of the major life activities of such individual; [a] record of such an impairment; or being regarded as having such an impairment. 29 C.F.R. § 1630.2 (g).

Here, Parker alleges only that she was actually disabled within the meaning of the act, not that she had a record of a disability or was regarded as being disabled. Thus, she must show that she was substantially limited in a major life activity. "The following factors should be considered in determining whether an individual is substantially limited in a major life activity: (i) The nature and severity of the impairment; [*10] (ii) The duration or expected duration of the impairment; and (iii) The permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment." 29 C.F.R. § 1630.2 (j)(2). Parker asserts that she is substantially impaired in the major life activities of sleeping and cleaning. n7 I address each of these claims in turn.

n7 Parker testified at her deposition that she was not substantially impaired in the major life activity of working. (D.I. 42, Ex. A at 34-35 ("Q: So you could do your job completely? A: Yes.").) Furthermore, her testimony at her deposition indicates that she could read, write, work on a computer, watch TV and go to the movies. (*Id.* at 36, 111, 127, 194-95.) Indeed, Parker seems to concede that none of these limitations amount to a substantial impairment in a major life activity, as she stresses only the activities of sleeping and cleaning in her brief. (*See* D.I. 44 at 16-17.)

1. *Sleeping*

Parker asserts that her headaches [*11] were so bad that she was unable to sleep. (D.I. 42, Ex. A at 35.) However, to establish that she is substantially limited in a major life activity, Parker must show that her alleged sleep problems were substantial. She must provide some evidence as to the severity of her impairment, its duration, and its expected long term impact. See 29 C.F.R. § 1630.2(j)(2). Indeed, with respect to sleeping, this evidence is particularly important, as "difficulty sleeping is extremely widespread." *Colwell v. Suffolk County Police Dept., 158 F.3d 635, 644 (2d Cir. 1998).* Therefore, courts have required that a plaintiff make a "showing that his affliction is ... worse than is suffered by a large portion of the nation's adult population." *Id.; see also Sloan v. City of Pittsburgh, 110 Fed. Appx. 207, 212 (3d Cir. August 31, 2004)* ("Difficulty sleeping is a common problem, and not a limitation of a major life activity unless the plaintiff shows a uniquely severe affliction"); *see also Head v. Glacier Northwest Inc., 413 F.3d 1053, 1060 (9th Cir. 2005)* (denying summary judgment where the plaintiff gave specific details about the severity of his sleeping [*12] impairment, including that it "went on for months" and that "some nights even with the help of medications I could not get to sleep for hours or even at all"). Without such a showing, a plaintiff cannot establish that a limitation he or she suffered in sleeping was substantial. *Colwell, 158 F.3d at 644.*

Here, Parker provides no specific evidence as to insomnia, and no evidence that her problems sleeping were particularly bad. In fact, the only evidence in the record that her sleeping was impaired is her general statements that the pain from her headaches was so bad that she was unable to sleep. (*See* D.I. 42, Ex. A at 35, D.I. 45 at B-6, P17.) Taking all of Parker's allegations as true, and viewing the record in the light most favorable to her, Parker cannot establish that her sleeping impairment was severe. Thus, as a matter of law, Parker cannot establish that she was substantially impaired in the major life activity of sleeping. *See Parker v. City of Williamsport, 406 F. Supp. 2d 534, 544-45 n.10 (M.D.*

*Pa. 2005)* (granting summary judgment to employer where on a "sparse evidentiary record ... [no] reasonable jury could find that plaintiff is [*13] substantially impaired in the major life activity of sleeping.").

### 2. Cleaning and Housework

Parker also contends that she was substantially limited in the major life activity of cleaning. As to this argument, "courts have generally held that 'cleaning,' or, more generally, 'doing housework,' does not qualify as a major life activity. Although the EEOC regulations list 'caring for oneself' as a major life activity, courts interpreting this regulation have held that such relates only to basic activities such as washing dishes and picking up trash." *Marinelli v. City of Erie, 216 F.3d 354, 362 (3d Cir. 2000).* Here, Parker has alleged no facts to show that she is substantially limited in the major life activity of "cleaning," as that term has been interpreted by the courts. Such evidence would have to show that she is limited in a way that prevents her from "living in a healthy and sanitary environment." *Id. at 363.*

Although Parker asserts in her brief that, with respect to cleaning "she could do nothing" and that "her entire life was affected" by her headaches, her deposition testimony and her affidavit do not support those assertions. In her affidavit, [*14] Parker claims that she "could not do any housework and . . . had to depend on her husband to do almost all the cooking, cleaning and housework". (D.I. 45 at B-6, P17.) However, at her deposition, Parker testified that she could not clean, cook or do housework because either she was working at home in the evenings and on weekends, or because she was so tired from work that she could not do any housework. n8 (D.I. 42, Ex. A at 204-06.) Furthermore, Parker testified that "when [she] wasn't at work, [she] didn't do anything stressful. I just wanted to be -- my mind to be sharp when I went to work." (D.I. 42, Ex. A at 36.) Thus, Parker claims that she did not cook, clean or shop, but instead saved all of her energy for work. (*Id.* at 36-37.)

n8 After asserting that her husband "did most of the work. He did the cooking, the cleaning, the shopping. He just did everything because I wasn't able to do it[,]" Parker testified as follows:

Q: You say you weren't able to do it. But this confuses me a bit. You were able to work at least three nights a week at home?

A: I had to do it.

Q: So in place of doing the cooking and cleaning, you were able to work at home?

A: Yes. By him doing that, it gave me time to do it, the strength to do it.

Q: Okay. If you didn't have to work at home, you would have been able to do it?

A: If I didn't have to work --

Q: If you didn't have to do the PAN's at home, you would have been able to cook and clean and do those things?

A: No, I wouldn't have been able to do it.

Q: You could work but not clean?

A: It was awful. I mean my headaches were so bad, I couldn't do anything.

Q: How could you work?

A: I just did. Sheer willpower.

Q: So you could work?

A: Yes. You make yourself do what you have to do.

Q: So why couldn't you have cleaned?

A: Because I was so tired when I would get off from work.

Q: You wouldn't be so tired that you couldn't work?

A: Work comes first.

Q: All right. If you didn't have to work, couldn't you have done other things?

Case 1:05-cv-00211-MPT    Document 84-2    Filed 04/27/2006    Page 44 of 55

Page 6
2006 U.S. Dist. LEXIS 10700, *

A: Yes.

Q: Okay. And those other things would be like cooking and cleaning and those things?

A: Yes.

Q: Your answer to that was yes?

A: Yes.

Q: And how soon after you left Comcast were you able to now do cooking and cleaning and those things?

A: I was better even before I left Comcast because things was [sic] normal again.

Q: All right. So when you had less stress at work, you immediately were able to do those things at home?

A: I was better. I was much better.
(D.I. 42, Ex. A at 204-06.)

[*15]

Additionally, Parker testified at her deposition that she was taking medications while at Comcast that made her feel somewhat better, and allowed her, among other things, to cook and clean. (D.I. 42, Ex. A at 194.) "A person whose physical or mental impairment is corrected by medication or other measures does not have an impairment that presently 'substantially limits' a major life activity. To be sure, a person whose physical or mental impairment is corrected by mitigating measures still has an impairment, but if the impairment is corrected it does not 'substantially limit' a major life activity." *Sutton v. United Air Lines, Inc., 527 U.S. 471, 482-83, 119 S. Ct. 2139, 144 L. Ed. 2d 450 (1999).* Because her medications allowed her to cook and clean, Parker cannot claim that she was substantially limited in these major life activities.

Therefore, even viewing the facts in the light most favorable to Parker, her inability to cook and clean was tied not to her headaches but instead to the fact that she was tired from work or had to work at home. *See supra* at note 8. Moreover, even assuming that her headaches did limit her ability to cook and clean, she was able to do these activities with medication, [*16] and therefore her limitation cannot be considered substantial. Thus, as a matter of law, Parker cannot establish that she was unable to care for herself by doing household chores sufficient to live in a healthy, sanitary environment, and, accordingly, she cannot establish that she was disabled.

Even if Parker had established an impairment substantially limiting a major life activity, her ADA claim would still be subject to an adverse summary judgment, since she undercut her claim of discriminatory adverse job action when she testified, "I really don't know why they fired me" (D.I. 42, Ex. A at 136) and "I'm not saying that I was terminated because of my headaches" (*id.* at 185). Thus, even if Parker could establish that she was disabled, she testified that she was not fired because of her disability. Comcast's Motion for Summary Judgment on Parker's ADA claim will therefore be granted. n9

n9 Moreover, Parker never requested a reasonable accommodation from Comcast, as she is required to do under the ADA. *See Jones v. United Parcel Service, 214 F.3d 402, 408 (3d Cir. 2000).* She claims that she never requested the accommodation that Comcast "stop [its] harrassment" and "not intentionally exacerbate [her] impairment to force her to resign" because asking for such an accommodation would be futile. (D.I. 44 at 18-19; see also D.I. 42, Ex. A at 157.)

[*17]

B. *Wrongful Termination*

In general, employment in Delaware is at-will, and an employee can be fired at any time, with or without cause. *Lord v. Souder, 748 A.2d 393, 400 (Del. 2000).* However, Delaware law recognizes an implied covenant of good faith and fair dealing as a narrow exception to the employment at-will doctrine in four situations: "(i) where the termination violated public policy; (ii) where the employer misrepresented an important fact and the employee relied 'thereon either to accept a new position or remain in a present one'; (iii) where the employer used its superior bargaining power to deprive an employee of clearly identifiable compensation related to the employee's past service; and (iv) where the em-

ployer falsified or manipulated employment records to create fictitious grounds for termination." *Id.* (internal citations omitted). Here, Parker alleges that Comcast violated the implied covenant of good faith and fair dealing because her termination violated public policy and because Comcast falsified her employment records to create a fictitious ground for termination.

### 1. *Public Policy*

An employee "must satisfy a two-part test to demonstrate [*18] a breach of the covenant of good faith and fair dealing under the public policy category: (i) the employee must assert a public interest recognized by some legislative, administrative or judicial authority and (ii) the employee must occupy a position with responsibility for advancing or sustaining that particular interest." *Lord, 748 A.2d at 401*. Here, Parker claims that her termination violated public policy because she was terminated based on her disability, in violation of Delaware's anti-discrimination and employment statutes. (D.I. 44 at 20; see also D.I. 1 at P30.)

The only disability Parker alleges she suffered from was her headaches. However, in her deposition, Parker stated "I'm not saying I was terminated because of headaches. I'm saying that I had headaches, and because of all the interrogation, all the harassment, all the extra work, it just made me sicker because I already had the headaches. It just made me worse." (D.I. 42, Ex. A at 185.) Additionally, at different points in the deposition, Parker asserted that she was terminated because of her poor job performance and that she didn't know why she was terminated. (*Id.* at 48, 60-63.) Never during [*19] her deposition did she assert that she was being terminated because of her headaches and, in fact, she affirmatively stated that she was "not saying [she] was terminated because of headaches." (*Id.* at 185.) In short, the evidence from her own mouth is that she was terminated for reasons other than her alleged disability. Even viewing the record in the light most favorable to her, there is no genuine issue of material fact on this point, and judgment as a matter of law will be granted to Comcast on this claim.

### 2. *Falsification of Employment Records*

Parker also claims that the evidence in the record shows that "the purported justifications for the termination of her employment (i.e., reorganization and upgrade her position) are manufactured and false." (D.I. 44 at 20.) Parker alleges that Comcast "fabricated reasons for firing [Parker] including false claims she was not performing her job satisfactorily." (D.I. 42, Ex. A at 59.) However, Parker does not allege any specific facts regarding false criticisms being placed in her record. In fact, when asked about the criticisms of her work, she stated that her boss, Mr. William Mosley, shared specific criticisms with her, and [*20] discussed those criticisms with her. (*Id.* at 61.) Additionally, when asked whether either Mr. Mosley or Ms. Bethany Pace, another of Parker's supervisors, fabricated or lied about their criticisms of Parker, Parker's only response was "I don't know." (*Id.* at 61-62.)

Parker must allege that Comcast "falsified or manipulated employment records to create fictitious grounds for termination" for this narrow exception to at-will employment to apply. *See E.I. DuPont de Nemours and Co. v. Pressman, 679 A.2d 436, 439 (Del. 1996)* (finding that superior falsified employment records when he "(1) misrepresented [Plaintiff]'s responsibilities to superiors so that it would appear that [Plaintiff] was not completing assigned tasks; (2) edited a progress report to superiors which would have had the effect of understating [Plaintiff]'s accomplishments; and (3) failed to pass along the progress report showing some of [Plaintiff]'s significant accomplishments during the critical time period in which [Plaintiff]'s termination was decided."). Here, viewing the facts in the light most favorable to Parker, she only alleges that Comcast told her it was terminating her because [*21] of reorganization, when in fact, it was terminating her because of her poor performance. n10 (D.I. 45 at B-8, P33.) Parker has presented no evidence to show that any false criticisms were placed in her employment file and, in fact, stated that she didn't know whether the criticisms in her file were true or fabricated. (D.I. 42, Ex. A at 61-62.) She has simply failed to adduce proof to support her allegation of fabrication. n11

n10 Parker presents no evidence, aside from her statements that her work was constantly criticized, to show that she was terminated for poor performance.

n11 Parker argues that there was not a reorganization at Comcast (*see* D.I. 44 at 4), but she recognizes that another employee in her department was also terminated due to the reorganization Comcast said it was undertaking and that she and the other employee were offered alternative positions in the company. (D.I. 42, Ex. A at 50, 63-64.)

2006 U.S. Dist. LEXIS 10700, *

Because "the common law rule regarding at-will employment authorizes the discharge of an employee [*22] at any time without cause," and because Parker's claims are insufficient as a matter of law to show that she was wrongfully terminated, *Lord, 748 A.2d at 400*, Comcast's Motion for summary judgment on this claim will also be granted.

## V. CONCLUSION

Accordingly, based on the foregoing reasons and authorities, Comcast's Motion will be granted. An appropriate order will follow.

ORDER

For the reasons set forth in the Memorandum Opinion of today's date in this matter,

IT IS HEREBY ORDERED that the Motion for Summary Judgment filed by Defendants Comcast Corporation, Comcast Cable Communications and Comcast Cablevision of New Castle County LLC (Docket Item 41) is GRANTED.

KENT A. JORDAN

UNITED STATES DISTRICT JUDGE

March 17, 2006
Wilmington, Delaware

LEXSEE 2001 DEL. SUPER. LEXIS 11

**CRYSTAL DENNIS, as parent and legal guardian of VELVIN MORGAN, JR., a minor, Plaintiffs, v. STEPHANIE YVONNE DENNIS and JAMES DENNIS, Defendants.**

C.A. No. 99C-08-205 PLA

SUPERIOR COURT OF DELAWARE, NEW CASTLE

*2001 Del. Super. LEXIS 11*

**August 29, 2000, Submitted**
**January 31, 2001, Decided**

**SUBSEQUENT HISTORY:** [*1] Released for Publication by the Court February 8, 2001.

**DISPOSITION:** James Dennis's Motion for Summary Judgment Granted.

**COUNSEL:** Michael D. Carr, Esquire, Wilmington, Delaware, Attorney for Plaintiffs.

Carolyn M. McNiece, Esquire, Wilmington, Delaware, Attorney for Defendant Stephanie Dennis.

Thomas S. Bouchelle, Esquire, Christiana Executive Campus, Newark, Delaware, Attorney for Defendant, James Dennis.

**JUDGES:** Judge William C. Carpenter, Jr.

**OPINIONBY:** William C. Carpenter, Jr.

**OPINION:**

### MEMORANDUM OPINION

**CARPENTER, J.**

Defendant James Dennis ("Mr. Dennis") moves for summary judgment, asserting that he is protected against liability in this negligence action under the Delaware Guest Statute, *25 Del. C. § 1501.* For the reasons set forth below, the Court n1 grants his motion.

n1 This case was originally assigned to Judge Bifferato. Upon his retirement, this dispositive motion was assigned to Judge Carpenter. The case is now assigned to Judge Ableman.

### FACTS

On November 16, 1998, Plaintiff [*2] Crystal Dennis ("Crystal") and her thirteen-month-old son, Velvin Morgan, Jr. ("Velvin")(collectively, the "Plaintiffs") went to the home of Mr. Dennis, who is Crystal's father and Velvin's grandfather. Defendant Stephanie Dennis ("Stephanie"), who is Crystal's sister, was also present at her father's home. The sisters had gathered at Mr. Dennis's residence in order to clean it for Thanksgiving dinner. While the daughters were cleaning, Mr. Dennis babysat Velvin. While all three adults and Velvin were in the kitchen prior to eating breakfast, Stephanie warmed water in the microwave for hot tea. She took the cup out of the microwave and placed it on the counter. Velvin, who was sitting on his grandfather's lap, got up and walked over to the counter, reached up and poured the scolding water on himself. As a result, he sustained first and second degree burns on his neck and chest. The Plaintiffs filed suit against Mr. Dennis and Stephanie (collectively the "Defendants"), alleging that the Defendants' negligence was the proximate cause of Velvin's injuries.

### STANDARD OF REVIEW

Summary judgment will be granted when, in viewing the record in the light most favorable to the non-moving [*3] party, the movant has shown that no genuine issues of material fact exist and that the movant is entitled to judgment as a matter of law. n2 When a motion for summary judgment is supported by a showing that there are no material issues of fact, the burden shifts to a nonmoving party to demonstrate that there are material issues of fact. n3

n2 Super. Ct. Civ. R. 56(c).

2001 Del. Super. LEXIS 11, *

n3 *Moore v. Sizemore, Del. Supr., 405 A.2d 679 (1979).*

## DISCUSSION

Mr. Dennis argues that he is protected against liability under the Delaware Guest Statute, *25 Del. C. § 1501*, which provides:

> No person who enters onto private residential or farm premises owned or occupied by another person, either as a guest without payment or as a trespasser, shall have a cause of action against the owner or occupier of such premises for any injuries or damages sustained by such person while on the premises unless such accident was intentional on the part of the owner or occupier or was caused [*4] by the wilful or wanton disregard of the rights of others. n4

Since there is no dispute that the accident was neither intentional nor caused by the wilful or wanton disregard for the rights of others, Mr. Dennis asserts that he is immunized under the statute because his grandson was a "guest without payment." n5

n4 *25 Del. C. § 1501.*

n5 There is no dispute that Mr. Dennis is the owner of the private residence in question.

The legislative intent behind *25 Del. C. § 1501* was to protect a landowner from suits by guests based on simple acts of negligence. n6 In defining the meaning of "guest without payment," it must be shown that the homeowner received or expected no benefit of value from the guest's presence. n7 Delaware courts have construed the language of *25 Del. C. § 1501* broadly, holding that even social guests who confer some benefit upon a property owner will be guests without payment unless that [*5] benefit is more than de minimus. n8 While the benefit to the landowner can be indirect and need not be financial in nature, it has been broadly interpreted to require evidence that the landowner was getting or expecting to get a benefit of value for which other persons would have to pay. n9

n6 *Stratford Apartments, Inc. v. Fleming, Del. Supr., 305 A.2d 624, 626 (1973).* The Court went on to state that the protection in *25 Del. C. §*

*1501* was similar to that of the motor vehicle owner or operator in the automobile guest statute.

n7 *Id.*

n8 *Leuzzi v. Lovell, 1998 Del. Super. LEXIS 521, *5,* Del. Super., C.A. No. 97C-12-166-JOH, Herlihy, J. (Oct. 15, 1998)(Mem. Op.).

n9 *See Stratford Apartments, 305 A.2d at 626.*

Thus, the issue for the Court is whether Velvin was a guest without payment and more specifically, whether Mr. Dennis received a benefit from his grandson's presence. The Plaintiffs argue that since Crystal would have been unable to perform the cleaning [*6] services for her father unless she could bring Velvin with her and have Mr. Dennis babysit him, he has received a benefit. Further, the Plaintiffs assert that Crystal was a business invitee n10 and that status should be imputed onto Velvin.

n10 The landowner only has a duty to business invitees to make the premises reasonably safe. *DiOssi v. Maroney, Del. Supr., 548 A.2d 1361, 1365 (1988).* A business invitee is defined as a person who is invited to enter or remain on land for a purpose directly or indirectly connected with business dealings with the possessor of the land. *Id. at 1366.*

First, in viewing the record in the light most favorable to the Plaintiffs, the Court finds that the record simply fails to support a finding that Velvin's presence conferred a benefit onto his grandfather. Except for the enjoyment associated with spending quality time with one's grandchild, the Court has difficulty contemplating a situation where a thirteen-month-old child would be able to confer [*7] a benefit upon his grandfather as contemplated by *25 Del. C. § 1501.* Other than the good lawyering effort of counsel to explore all possible avenues of recovery, there is no reasonable basis to conclude that the grandson was anything other than a guest who is unable to recover for any negligent acts of the grandfather.

Furthermore, the Court is not persuaded that Crystal's presence in her father's home can reasonably be characterized as a business invitee. n11 This was simply a case of a daughter helping her father clean his home in anticipation of the family's Thanksgiving dinner. This gracious and loving act of a daughter is now arguably being equated to a commercial cleaning service with the exception that payment was not money but was in the form of the care and love of one's grandchild. Under the

facts of this case, the Court simply refuses to find that the normal interaction of one's family expected in a civilized society can be interpreted as engaging in business practices.

    n11 *See supra* note 10.

[*8]

    Moreover, even if the Plaintiffs were able to present unique facts to transform this interaction to a business invitee status for Crystal, this Court has previously examined the status of each person independently for purposes of *25 Del. C. § 1501* n12 and has found in dictum that status is not automatically imputed in the absence of a cogent theory. n13 Therefore, even assuming *arguendo* that Crystal could be characterized as a business invitee, there are no facts, conduct, or actions of the grandson, which would reasonably allow this status to be imputed onto him.

    n12 In *Leuzzi v. Lovell, 1998 Del. Super. LEXIS 521*, Del. Super., C.A. No. 97C-12-166-JOH, Herlihy, J. (Oct. 15, 1998)(Mem. Op.), the Court examined the status of a couple independently for purposes of *25 Del. C. § 1501*. While on their way to dinner, Plaintiff Mary Leuzzi accompanied her husband to the defendants' home. Mr. Leuzzi was on a business errand to pick up a saw that was purchased by the defendant for Mr. Leuzzi as partial payment for work he had done. Mr. Leuzzi needed the saw for another job. The couple both exited the truck together so that Mr. Leuzzi could pick up the saw and Mrs. Leuzzi could examine flowers on the front porch. As she was going up the stairs, she tripped and fell, sustaining injuries. The Court found that Mrs. Leuzzi's purpose in exiting the truck and going up the stairs was purely social and that despite Mr. Leuzzi's presence on the defendants' premise as an arguable business visitor, Mrs. Leuzzi's presence conferred no benefit on the defendants that changed her status from that as a social guest to a business visitor. The Court further noted that "absent some credible evidence of economic benefit to the land owner or occupier, courts are reluctant to find that social guests are business invitees, rather than guests without payment." *Leuzzi, 1998*

*Del. Super. LEXIS 521, *8*. In finding that she was purely a guest without payment, the Court stated:

> Under no party's version of the events, however, did Mrs. Leuzzi assist her husband in removing the saw from the basement by physically handling the saw, lighting her husband's way, or even watching him retrieve it. There is not a scintilla of evidence that Mrs. Leuzzi went onto the defendants' property to inspect the work her husband had been doing.

*Id. Leuzzi* demonstrates that the Court views the role of each person separately for purposes of *25 Del. C. § 1501*. In other words, the mere presence of Mr. Leuzzi, as a business invitee, does not automatically impute that status onto his accompanying wife.

[*9]

    n13 *See Lackford v. Manco Products, Inc.*, Del. Super., C.A. No. 96C-04-068, Bifferato, J. (March 23, 1999)(Letter Op.) at 4, n. 5.

    Finally, the Court believes that age does not play a factor in evaluating Velvin's role independently of his mother. Despite Velvin's young age, there is no authority or rationale that leads the Court to conclude that Velvin's role should not be addressed independently nor that due to his young age, his mother's status should be automatically imputed onto him. The Court finds that both individuals are to be examined independently, and despite his mother's purpose for being at Mr. Dennis's home, Velvin was a guest without payment, precluded from recovery, because he independently conferred no benefit on the landowner as contemplated by *25 Del. C. § 1501*.

### CONCLUSION

    For the reasons set forth above, Mr. Dennis's Motion for Summary Judgment is GRANTED.

    Judge William C. Carpenter, Jr.

LEXSEE 1998 DEL. SUPER. LEXIS 521

**MARY LEUZZI and PETER LEUZZI, Plaintiffs, v. DONITA LOVELL and MARIO MALATINO, Defendants.**

CIVIL ACTION NUMBER 97C-12-166-JOH

SUPERIOR COURT OF DELAWARE, NEW CASTLE

*1998 Del. Super. LEXIS 521*

September 18, 1998, Submitted; September 23, 1998, Argued
October 15, 1998, Decided

**SUBSEQUENT HISTORY:** [*1]

Released for Publication by the Court January 27, 1999.

**DISPOSITION:**

Motion of Defendants for Summary Judgment GRANTED.

**COUNSEL:** Vincent J. X. Hedrick, II, Esq., of Jacobs & Crumplar, P.A., attorney for plaintiffs Mary and Peter Leuzzi.

Robert K. Pearce, Esq., of Trzuskowski, Kipp, Kelleher & Pearce, P.A., attorney for defendant Donita Lovell.

J. Michael Sheridan, Esq., of Carroll, Sheridan & Karagelian, LLP, attorney for defendant Mario Malatino.

**JUDGES:** Jerome O. Herlihy, Judge.

**OPINIONBY:** Jerome O. Herlihy

**OPINION:**

*MEMORANDUM OPINION*

*Upon Motion of Defendants for Summary Judgment*

HERLIHY, Judge

Plaintiff Mary Leuzzi accompanied her husband Peter while he was on an apparent business errand to the home of defendants Donita Lovell and Mario Malatino. She tripped and fell on their front steps. The defendants contend Mrs. Leuzzi was a social guest and that the Delaware Premises Guest Statute bars her action. On that basis, they have moved for summary judgment.

*FACTUAL BACKGROUND*

Lovell and Malatino lived in the same house. Their status is considered to be co-occupant even though the house is Lovell's. Malatino and Mr. Leuzzi had known each other for thirty years and had done a [*2] number of small contracting jobs together. Mr. Leuzzi was doing some work in the Lovell/Malatino household. Apparently, as partial payment for that work, Malatino had purchased a masonry saw for Mr. Leuzzi to use which he could also use for other work. While not social companions, the four had visited each other.

On July 31, 1997, Mr. Leuzzi picked up his wife in his truck from her place of work to go to dinner. On the way, he stopped at the defendants' house to pick up his saw to use on a job in New Jersey. Malatino was not involved in that job. There are several versions of what happened thereafter. The plaintiffs' version is that Mr. Leuzzi went into the house to retrieve the saw while Mrs. Leuzzi remained in the truck. After Mr. Leuzzi came out and put the saw in the truck, Malatino invited Mrs. Leuzzi to come up to the porch to examine some flowers.

Malatino indicates that he invited Mrs. Leuzzi to come up to the porch with her husband while he went inside to get the saw. Apparently, under all parties' versions, Malatino aided or accompanied Mrs. Leuzzi up the stairs to the porch. The last stair riser is higher than the others. The deck of the porch and all of the lower risers [*3] are painted gray and a portion of the top riser is painted white. Mrs. Leuzzi tripped on the last riser. She states that after the fall, Malatino stated, "oh, I forgot to tell you about that step or something." Lovell has testified that she was aware that the last riser was slightly higher but during the time she had lived in the house, there had been no prior incidents involving the steps.

*PARTIES' CONTENTIONS*

Mrs. Leuzzi claims that when on the defendant's property, she was a business visitor, not a guest without

payment. Since Mr. Leuzzi was there for a business reason, her presence was of some benefit to the defendants.

On the other hand, Malatino and Lovell argue that Mrs. Leuzzi was a social guest to whom they would not be liable for ordinary negligence. They contend the Premises Guest Statute, therefore, protects them from liability unless their conduct were shown to be wilful and wanton. Mrs. Leuzzi responds that if she is considered a social guest, the defendants' conduct was wilful and wanton. Therefore, she claims either as a business visitor or as the victim of the defendants' wilful and wanton conduct, they are liable to her.

*APPLICABLE STANDARD*

Summary judgment [*4] should be granted when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. n1 However, if the record indicates that a material fact is disputed, or if further inquiry into the facts is necessary to clarify the application of the law, summary judgment will not be granted. n2 The burden is on the moving party to show, with reasonable certainty, that no genuine issue of material fact exists and, thus, judgment as a matter of law is permitted. n3 When considering a motion for summary judgment, the facts must be construed in the light most favorable to the non-moving party. n4

n1 *Moore v. Sizemore, Del.Supr., 405 A.2d 679 (1976).*

n2 *Ebersole v. Lowengrub, Del.Supr., 54 Del. 463, 180 A.2d 467 (1962).*

n3 *Martin v. Nealis Motors, Inc., Del.Supr., 247 A.2d 831 (1968).*

n4 *Borish v. Graham, Del.Supr., 655 A.2d 831 (1994).*

*DISCUSSION*

The Premises Guest Statute around which the issues in this case revolve states:

[*5]

No person who enters onto private residential or farm premises owned or occupied by another person, either as a guest without payment or as a trespasser, shall have a cause of action against the owner or occupier of such premises for any injuries or damages sustained by such person while on the premises unless such accident was intentional on the part of the owner or occupier or was caused by the wilful or wanton disregard of the rights of others. n5

n5 *25 Del. C. § 1501.*

Delaware courts have construed the language of § 1501 broadly, holding that even social guests who confer some benefit upon a property owner will be guests without payment unless that benefit is more than *de minimus.* n6 The benefit to the landowner can be indirect and not pecuniary in nature, such as a guest visiting a tenant. n7

n6 *Bailey v. Pennington, Del.Supr., 406 A.2d 44 (1979),* cert. dismissed *444 U.S. 1061, 100 S. Ct. 1000, 62 L. Ed. 2d 744 (1980)* (a defendant who hosted a party on his residential property did not lose the protections of the Premises Guest Statute, § 1501, when a guest who was injured on the property brought a bottle of alcohol as a gift)

[*6]

n7 *Hoksch v. Stratford Apartments, Inc., Del.Super., 283 A.2d 687 (1971).*

There are different versions of when Mrs. Leuzzi went up to the porch, either after her husband retrieved the masonry saw or while he was in the process of getting it. Since the posture of this case is a motion for summary judgment, the evidence must be viewed in a light most favorable to Mrs. Leuzzi. Ironically, that version comes from Malatino. In that version, Mrs. Leuzzi and her husband left the truck together, he to retrieve the saw and she to examine some flowers on the front porch. As the three were going up the step on their various errands, she tripped and fell.

Mrs. Leuzzi argues that since her husband was on a business errand of some benefit to the defendants, her presence was an indirect benefit to them, too. Plaintiffs rely on Delaware case law which holds that a person invited to enter or remain on land for a purpose directly or indirectly connected with business dealings with the possessor of the land is a business invitee or business visitor. n8 It is unclear what business purpose beneficial [*7] to the defendants Mr. Leuzzi's trip to get the saw served. At best, it was slight and assuming there was a benefit bestowed on the defendants, the issue is what benefit did Mrs. Leuzzi's presence confer?

n8 *DiOssi v. Maroney, Del.Supr., 548 A.2d 1361 (1988);* see also *Ford v. Ja-Sin, Del.Super., 420 A.2d 184, 187-88 (1980).*

Mrs. Leuzzi cites Manley v. Haus n9 in support of her argument that she became a business visitor on the defendants' premises. In *Manley,* a wife accompanied her husband in his truck when he went on a business errand. Upon arrival at the garage where he was to do his business, she remained in the truck while he went inside. Due to some difficulty with lighting in performing his job, the husband asked his wife to get out of the truck and hold a flashlight for him so he could do his work. While retrieving his tools from the truck, his wife went inside but fell down some steps. She was classified as a business visitor under these circumstances. n10

n9 *Vt.Supr., 113 Vt. 217, 32 A.2d 668 (1943).*
[*8]

n10 *32 A.2d at 671-72.*

The *Manley* case is unhelpful to Mrs. Leuzzi. She was going to dinner with her husband after he picked up the masonry saw. There had been some prior social acquaintanceship between the parties. Even if she got out of the truck at the same time as her husband, her purpose in doing so was purely social. Assuming Mr. Leuzzi's presence on the defendants' premises was as a business visitor, Mrs. Leuzzi's presence conferred no benefit on the defendants that changes her status from that as a social guest to a business visitor. Absent some credible evidence of economic benefit to the land owner or occupier, courts are reluctant to find that social guests are business invitees, rather than guests without payment. n11 If there even were a benefit to the defendants, it was *de minimus* and, again, not enough to put her in the business visitor status. Under no party's version of the events, however, did Mrs. Leuzzi assist her husband in removing the saw from the basement by physically handling the saw, lighting her husband's way, or even watching him retrieve it. There is not [*9] a scintilla of evidence that Mrs. Leuzzi went onto the defendants' property to inspect the work her husband had been doing. Thus, she was purely a guest without payment.

n11 *Whitney v. Brann, D.Del., 394 F. Supp. 1, 8 (1975);* cert. denied *429 U.S. 874, 50 L. Ed. 2d 156, 97 S. Ct. 194 (1976)* (construing "guest

without payment" under 12 *Del. C.* § 1421); *citing Urbanski v. Walker, Del.Supr., 281 A.2d 491 (1971).*

In the alternative, Mrs. Leuzzi contends that if she were a social guest, Malatino and Lovell remain liable to her because their conduct was wilful and wanton. Her original complaint did not make a claim of such conduct, however. Instead, in response to the summary judgment motion, she cites the deposition testimony that they knew the riser was higher, did nothing about it and that Malatino said after she fell that he should have warned her. Even viewing this evidence in a light most favorable to Mrs. Leuzzi, it still does not create a genuine issue of material fact that the defendants' [*10] conduct could be viewed as wilful or wanton.

First, this evidence does not rise to the level of wilful conduct. Such conduct in tort law includes the element of actual intent to cause injury. n12 There is not the slightest evidence suggesting either Malatino or Lovell or both intended to injure Mrs. Leuzzi. Second, wanton conduct has been interpreted to be a reckless indifference to one's conduct and a realization of the probable consequences of that conduct. n13 This evidence does not establish Malatino and Lovell recklessly disregarded a risk that the riser would cause anyone to trip and fall. The evidence does not show a risk was perceived with such indifference to its consequences that an "I don't care" attitude prevailed. At best, and again viewing the evidence most favorably to Mrs. Leuzzi, the evidence may show negligence but it does not show wantonness.

n12 *McHugh v. Brown, Del.Supr., 50 Del. 154, 125 A.2d 583, 585 (1956).*

n13 *Jardel v. Hughes, Del. Supr., 523 A.2d 518, 529-30 (1987).*

[*11]
Therefore, the Premises Guest Statute bars recovery by Mrs. Leuzzi, hence Mr. Leuzzi's derivative claim, because she was a social guest and the conduct of the defendants does not, on this record, rise to the level of wanton conduct.

*CONCLUSION*

For the reasons stated herein, the motions for summary judgment of defendants Donita Lovell and Marion Malatino are GRANTED.

IT IS SO ORDERED.

Jerome O. Herlihy

1998 Del. Super. LEXIS 521, *

J.