# In The Matter Of:

*Estate of Marissa Rose Fishman v.*
*Richard Longwell, et/al*

---

*Vincent J. Rizzo*
*January 30, 2006*

---

*B&R Services for Professionals, Inc.*
*235 S. 13th Street*
*Philadelphia, PA 19107*
*(215) 546-7400*
*FAX (215) 985-0169*

Original File 013006p1.txt, Pages 1-125

**Word Index included with this Min-U-Script®**

Vincent J. Rizzo
January 30, 2006

Estate of Marissa Rose Fishman v.
Richard Longwell, et/al

---

**Page 5**

[1]    (It is stipulated and agreed by and
[2]  between counsel that the sealing, filing and
[3]  certification of the within deposition be
[4]  waived; and that all objections, except as
[5]  to the form of the question, be reserved
[6]  until the time of trial.)
[7]

[8]    VINCENT RIZZO, having been duly sworn
[9]  was examined and testified as follows:
[10]

[11] **BY MR. CASEY:**
[12] **Q.** Good morning, sir.
[13] **A.** Good morning. How are you?
[14] **Q.** I'm doing fine. Thank you.
[15] **A.** Good.
[16] **Q.** My name is Matt Casey, and I represent the
[17]  estate of the little girl who drowned in the
[18]  accident for which you're here today.
[19]    You understand that you're here to
[20]  provide a deposition in a case relating to a
[21]  drowning accident that occurred at a home where
[22]  your company had some workers performing work in
[23]  August of 2002.
[24] **A.** That's correct.

**Page 6**

[1] **Q.** And you understand that that's the matter for
[2]  which you're here today?
[3] **A.** Yes.
[4] **Q.** Have you ever had your deposition taken
[5]  before?
[6] **A.** The last time that we did this. So...
[7] **Q.** Right. You reminded me that I have given
[8]  testimony in this case before, and what I want to
[9]  make sure that you understand is that there's a
[10]  court reporter in this conference room with us
[11]  taking a verbatim transcript of my questions and
[12]  your answers, and for that reason, it's important
[13]  that you keep your voice up, and that you answer my
[14]  questions with words as opposed to with gestures --
[15] **A.** Uh-uh.
[16] **Q.** -- like you just did.
[17]    The court reporter is not able to
[18]  transcribe gestures, and for that reason, it's
[19]  important, for example, that instead of nodding
[20]  your head, you say yes and instead of shaking your
[21]  head you say no. Do you understand that?
[22] **A.** Yes, sir.
[23] **Q.** If for any reason you don't understand my
[24]  question, please ask me to restate it. I will do

**Page 7**

[1]  that. But if you answer my question, I'm going to
[2]  assume that you understood it, and you should know
[3]  and remember that your testimony today is under
[4]  oath, and has the same effect as it would if we
[5]  were actually in a courthouse with a judge.
[6]    Do you understand that?
[7] **A.** Yes, sir.
[8] **Q.** State your full name for the court reporter?
[9] **A.** Sure. My name is Vincent J. Rizzo.
[10] **Q.** Mr. Rizzo, what is the name of the business
[11]  entity that was working at the Coachman Road
[12]  address where this accident occurred on the day of
[13]  the accident?
[14] **A.** Ashland Construction, Incorporated. We're a
[15]  masonry company, a full line of masonry.
[16] **Q.** Were you physically present on the premises on
[17]  August 30, 2002?
[18] **A.** Yes.
[19] **Q.** For what purpose were you and your business at
[20]  the Coachman Road address?
[21] **A.** Outside of the house, the Longwells, they were
[22]  inquiring, and actually -- we were actually doing a
[23]  patio for them outside of the house.
[24] **Q.** On what date were you contacted about doing

**Page 8**

[1]  work at the Coachman Road address?
[2] **A.** Gosh, I'd say prior, about a month to a month
[3]  and a half ago.
[4] **Q.** Had you ever done any work at that address
[5]  before?
[6] **A.** Oh, yes. Many a times.
[7] **Q.** Tell me about that.
[8] **A.** As far as every bit of work, I couldn't go
[9]  back to the beginning and tell you every little bit
[10]  of work I've done there. I've been working for
[11]  Mrs. and Mrs. Longwell, gosh, I'd say for quite
[12]  some time now.
[13] **Q.** Can you summarize for me the work that you've
[14]  done for them at that Coachman Road address, prior
[15]  to August of 2002?
[16] **A.** Prior -- well within this job that would
[17]  consist of the patio and of the pool, there was
[18]  walls that went to the pool, okay, that were
[19]  erected, probably I'd say about a month prior to
[20]  the -- to this incident.
[21] **Q.** So that would be in approximately July of
[22]  2002?
[23] **A.** Exactly. It was in the summer.
[24] **Q.** Before that what kind of work did you do at

Estate of Marissa Rose Fishman v.
Richard Longwell, et/al

Vincent J. R
January 30, 2

**Page 9**

[1] the Coachman Road address for the Longwells?
[2] **A.** Gosh, I did tile work for them outside of the
[3] house. I did a barbecue pit for them. Enclosed
[4] their air conditioner units with four well block.
[5] Gosh, a bunch and odds and ends, little stuff there
[6] as far as that.
[7] **Q.** Did you participate at all in the original
[8] construction of that home?
[9] **A.** Not in the original construction.
[10] **Q.** At what other locations besides the Coachman
[11] Road address have you done work for the Longwells?
[12] **A.** Actually I did a little bit of work down on
[13] Smiths Bridge Road for the actual daughter of Mr.
[14] Longwell.
[15] **Q.** Which daughter?
[16] **A.** Which would be Rochelle.
[17] **Q.** And what address is that?
[18] **A.** I don't know the address. It's right on
[19] Smiths Bridge Road.
[20] **Q.** Smiths Bridge Road?
[21] **A.** Yes.
[22] **Q.** Is that in Wilmington?
[23] **A.** Yes.
[24] **Q.** When did you do work for Rochelle Fishman at

**Page 10**

[1] the Smith Bridge Road address?
[2] **A.** Gosh, that's probably about -- I'd say
[3] probably a couple years, about two, three years
[4] ago. It was small, a small little tile job inside
[5] the bathroom.
[6] **Q.** Was that before or after the August 30 --
[7] **A.** That was before.
[8] **Q.** For the same reason I was telling you earlier,
[9] you have to let me finish the question even though
[10] you'll probably be able to anticipate what my
[11] question will be. Just let me get it out and then
[12] provide the answer. Will you do that?
[13] **A.** Yes, sir.
[14] **Q.** It will be difficult, but we'll get through
[15] it. I'll have to restate the question.
[16] Was the work that you did for Rochelle
[17] Fishman at her address that you told me about, the
[18] tile work, done before or after August 30, 2002?
[19] **A.** It was done before.
[20] **Q.** What other work have you done for the Longwell
[21] family besides the tile work at Rochelle Fishman's
[22] place and the work that you've told me about
[23] already at the Coachman Road address?
[24] **A.** Is this relating to their personal or

**Page**

[1] business?
[2] **Q.** Anything that you've done for them, either
[3] personal or business related?
[4] **A.** A few things at Air Base Carpet Mart.
[5] **Q.** What have you done at Air Base Carpet Mart?
[6] **A.** I mean I've done a few -- quite a bit of
[7] things. Repaired a wall that a truck has hit.
[8]     **MR. MINTZER:** I'm sorry. I couldn't
[9] hear that.
[10]     **MR. LANDON:** Repaired a wall that a
[11] truck has hit.
[12]     **MR. MINTZER:** There are multiple
[13] addresses for Air Base Carpet Mart, so it
[14] would be helpful to talk about which store.
[15]     **MR. CASEY:** He hadn't gotten it out yet.
[16] I'll ask him which address.
[17] **BY MR. CASEY:**
[18] **Q.** Which address are you talking about?
[19] **A.** The New Castle store.
[20] **Q.** Continue.
[21] **A.** Actually some concrete work on the inside
[22] floor. A little bit of pointing up here and there.
[23] **Q.** And this is all at the New Castle store?
[24] **A.** Uh-uh.

**Page 12**

[1] **Q.** Yes?
[2] **A.** Yes. Yes, sir.
[3] **Q.** What else besides that work at the New Castle
[4] Air Base store, and the work that you told me about
[5] that you've done at the Coachman Road address, and
[6] the tile work done at Rochelle Fishman's place?
[7] **A.** There was a little bit of pointing up I had to
[8] do up in Kensington which was probably not even a
[9] half a day job up there.
[10] **Q.** Kensington where?
[11] **A.** Kensington in Lomax.
[12] **Q.** In Philadelphia?
[13] **A.** Philadelphia.
[14] **Q.** You're talking about the Lomax store in the
[15] Kensington part of Philadelphia?
[16] **A.** Correct.
[17] **Q.** When did you do work there?
[18] **A.** Oh, gosh, I guess it was probably about -- I'd
[19] say probably about a year ago, a little more than a
[20] year.
[21] **Q.** How many times did you do work for the
[22] Longwells at the Kensington location?
[23]     **MR. MINTZER:** Objection to the form. He
[24] said he was doing it for Air Base.

Page 13

[1] **MR. CASEY:** Okay. I think he told me he
[2] did it for the Longwells in a business
[3] capacity. But I don't want to get bogged
[4] down in this.
[5] **MR. MINTZER:** Objection to the form.
[6] They work in a corporate format.
[7] **MR. CASEY:** We're in Delaware. Don't
[8] worry about it. That's all been done.
[9] **BY MR. CASEY:**
[10] Q. How many times did you do work at the Lomax
[11] store?
[12] A. I'd say probably about four or five times at
[13] the most.
[14] Q. When was the first time that you did work
[15] there?
[16] A. Gosh, I'd say prior, probably about ten years
[17] ago.
[18] Q. What other stores besides the New Castle store
[19] and the Lomax store in Philadelphia have you done
[20] work at?
[21] A. There was a little bit of stuff done at
[22] Central Carpet. That was up in New York. It was a
[23] small parapet wall that needed to be repaired.
[24] Q. A small what?

Page 14

[1] A. Parapet wall on top of the building.
[2] Q. For the patio work that brought you to the
[3] Coachman Road address in August of 2002, who
[4] contacted you to inquire about your availability to
[5] do that work?
[6] A. Sure. Actually their construction -- I guess
[7] their construction foreman, which would be John
[8] Manger.
[9] Q. Whose construction foreman?
[10] A. Air Base.
[11] Q. Can you spell his last name?
[12] A. M-A-N-G-E-R.
[13] Q. M-A-N-G-E-R?
[14] A. That's correct, sir.
[15] Q. Is Mr. Manger typically the person who would
[16] contact you about a job for either the Longwells
[17] individually or for Air Base related work?
[18] A. Yes, sir.
[19] Q. Did Mr. Manger call you at your office?
[20] A. He would either call me at my office or call
[21] me on my cell or call my house. He would have all
[22] numbers.
[23] Q. How is it that you remember that Mr. Manger
[24] was the person who called you about the patio work

Page 15

[1] to be done at the Coachman Road address in August
[2] of 2002?
[3] A. I'm sorry, Matt. Can you repeat that, please?
[4] Q. How is it that you remember that Mr. Manger
[5] was the one who contacted you about the patio work
[6] at the Coachman Road address?
[7] A. He's -- he's the gentleman I've always spoke
[8] to, anything that would concern anything with Air
[9] Base or the Longwells.
[10] Q. Out of what office did Mr. Manger work when he
[11] would typically contact you about jobs to be done?
[12] **MR. MINTZER:** Objection to the form.
[13] **THE WITNESS:** I mean it could actually
[14] be -- at that specific time I believe he was
[15] up at the Longwells house when he contacted
[16] me.
[17] **BY MR. CASEY:**
[18] Q. If you were looking for Mr. Manger, where
[19] would you call?
[20] A. I'd have to get on the phone to him.
[21] Q. I know but where would you call?
[22] A. His cell phone would be the best shot for me
[23] to get him.
[24] Q. Would you expect to find him at the New Castle

Page 16

[1] address or some other address?
[2] **MR. MINTZER:** Objection to the form.
[3] **THE WITNESS:** It would be a very good
[4] question. Sometimes. Sometimes not.
[5] **BY MR. CASEY:**
[6] Q. What address would you look to first to find
[7] him?
[8] A. I'd have to say New Castle. The New Castle
[9] store.
[10] Q. Have you ever been to the New Castle store
[11] yourself, sir?
[12] A. Yes. Actually I did work there, which I just
[13] did say.
[14] Q. And have you seen Mr. Manger at the New Castle
[15] store?
[16] A. I saw him there, yes, a few times.
[17] Q. Given that this accident happened on August
[18] 30, 2002, can you give me any idea when the work
[19] started on the patio job?
[20] A. The actual patio job?
[21] Q. Yes.
[22] A. I would have to say -- I would probably say --
[23] probably about two weeks prior, before this.
[24] Q. So approximately, not pinning you down on the

Page 17

[1] exact date, but approximately August 15, 2002?
[2] A. I'd say roughly, within a week to a week and a
[3] half, because there had to be a lot of prep work
[4] done before I could get in there to do what I
[5] needed to do.
[6] Q. Did you sign any documents prior to beginning
[7] work?
[8] A. No.
[9] Q. Did you complete any scope of work documents
[10] or anything like that before beginning work?
[11] A. No. We never -- we never needed actually
[12] stuff. Whatever they needed I completed the job,
[13] thorough, okay. There was never issues as far as.
[14] Q. You typically wouldn't have any paperwork
[15] before you would do a job, if I'm understanding you
[16] correctly; you would do a job, and then, I assume,
[17] submit an invoice?
[18] A. That's correct.
[19] Q. To whom would you submit the invoices?
[20] A. Some would go to -- well they would go to Air
[21] Base Carpet.
[22] Q. Even for the work done at the Longwells
[23] Coachman Road address?
[24] A. Correct.

Page 18

[1] Q. You would submit invoices to Air Base, and, I
[2] assume, to Mr. Manger?
[3] A. Correct. Correct. Mr. Manger would usually
[4] get or occasionally would get the invoice and he
[5] would present it to where it needed to go to.
[6] Q. Would you typically deal with anyone other
[7] than Mr. Manger at Air Base relating to either the
[8] work that you were supposed to be doing or the
[9] follow-up on getting paid?
[10] A. As far as on the work, it would be Mr. Manger,
[11] and Mr. Manger would usually handle everything
[12] pretty much. Occasionally when Mr. Manger wasn't
[13] there, usually Arnold, I would go up and talk to
[14] Arnold.
[15] Q. Arnold Frye?
[16] A. Yes.
[17] Q. What is his job at Air Base?
[18] A. He's actually their controller from what I
[19] understand.
[20] Q. Before you started work on the patio job in
[21] August of 2002, did you have to go out to the
[22] residence to see it and to talk to somebody about
[23] what you were going to do?
[24] A. Absolutely.

Page 19

[1] Q. Yes?
[2] A. Yes.
[3] Q. When do you expect that you did that?
[4] A. Oh, gosh, I'd probably say a month, month and
[5] a half, prior, before August, before the work
[6] started.
[7] Q. Did you meet with someone at the Coachman Road
[8] address?
[9] A. It would be John Manger.
[10] Q. Was anyone with you?
[11] A. No. When I first met John, it was myself.
[12] Q. So it would have been yourself and John Manger
[13] at the Coachman Road address about a month or so
[14] before this accident?
[15] A. Correct.
[16] Q. And what did he tell you needed to be done?
[17] A. Well there was discussion that they was going
[18] to replace all the windows around the enclosed
[19] pool, and then with that they were going to
[20] probably -- before that the whole pool area was
[21] enclosed with glass.
[22]       So they were eliminating some of the
[23] glass, coming up with a knee wall and setting glass
[24] on top of the knee wall, and then from there, that

Page 20

[1] was pretty much that phase of the job, of the pool
[2] area.
[3] Q. So prior to your beginning work, was the pool
[4] enclosed?
[5] A. Yes.
[6] Q. And can you just tell me -- I just don't
[7] understand what --
[8] A. Absolutely.
[9] Q. You were changing the enclosure from what to
[10] what?
[11] A. This pool -- this area of the pool was all
[12] surrounded by glass. The glass started getting
[13] bad, started leaking. So then what they wanted to
[14] do was to replace the glass but not have the glass
[15] go from the ground all the way up. They wanted to
[16] come up with a knee wall, I would say preferably
[17] about four foot high, and the glass unit would sit
[18] on top of the knee wall.
[19] Q. I see. What else besides modifying the
[20] enclosure on the pool were you expecting to be
[21] doing on that job in August of 2002?
[22] A. Well, actually, the first phase of that job
[23] was that, was the wall so they could get the glass
[24] people in and get that pool enclosed. After that

Page 21

[1] then it was the patio area. And --
[2] Q. I'm sorry. What were you going to be doing at
[3] the patio?
[4] A. The patio we were installing pavers, the wrap
[5] around -- the inner part, there was like an L
[6] between the house and the enclosed pool area and we
[7] were covering that section with pavers on the
[8] outside of the house.
[9] Q. Can you spell it, pavers?
[10] A. P-A-V-E-R-S.
[11] Q. And in laymen's terms just describe what you
[12] mean by pavers?
[13] A. It's actually -- they come in all different
[14] sizes, four by four, six by six, six by nine. It's
[15] actually a concrete paver. It's actually like a
[16] walking stone, like a cobblestone.
[17] Q. What were you doing first? Were you going to
[18] fix the enclosure on the pool first and then do the
[19] patio work?
[20] A. The pool was completely done.
[21] Q. That was done first?
[22] A. That whole phase was done. There was nothing
[23] else to be done as far as that.
[24] Q. As of August 30, 2002 the modifications to the

Page 22

[1] pool enclosure had already been completed?
[2] A. It had been completed.
[3] Q. How long did it take you to do that?
[4] A. I would probably say -- I'd say probably about
[5] a week, week and a half. Realistic probably about
[6] a week and a half.
[7] Q. So if you started work -- I know I wasn't
[8] being specific necessarily about the exact date,
[9] but if you started approximately August 15, that
[10] would take you up to about August 25 or so, about
[11] five days before this accident that you completed
[12] the pool enclosure work?
[13] A. Right. This was prior, before -- this was not
[14] within a week's time that this happened, within
[15] each other. This pool area was done probably about
[16] two or three weeks before the pavers were even
[17] started.
[18] Q. So as of about August 15 then, if the accident
[19] happened on August 30 -- by the way you have
[20] invoices for this stuff, right?
[21] A. Gosh, man I got to check. I'm sure I do. I
[22] have to.
[23] Q. We can pin down the exact dates that you
[24] worked?

Page 23

[1] A. If I can locate them. It's been so long.
[2] Q. But have you looked back since you became
[3] aware that there was a lawsuit to see which dates
[4] you were working?
[5] A. I have not. If anything would happen as far
[6] as on my records, I looked. I'm having a heck of a
[7] time finding them. If Air Base could find them,
[8] because I'm sure they have them because I had to
[9] present them issues with the invoices.
[10] Q. And they may, but I just wanted to be specific
[11] about dates.
[12] A. That's fine. As far as the dates, I wish I
[13] could be more helpful to you, as far as the actual
[14] dates, but, unfortunately, I do not remember date
[15] for date. That's a very bad thing with me as far
[16] as paperwork and all that.
[17] Q. I understand. About two weeks or so before
[18] this accident the pool enclosure work was done?
[19] A. It was completed every bit of two to three
[20] weeks before this patio was even started, in full.
[21] It was completed.
[22] Q. And when you completed it, then you moved to
[23] start the patio work?
[24] A. That's correct.

Page 24

[1] Q. And where in relation to the pool is the
[2] patio?
[3] A. It is on the outside of the house. Again, if
[4] I could draw it for you, I could show you better.
[5] If you can picture an L, okay, the
[6] outside of the L, okay, was where the work was
[7] done.
[8] Q. Why don't we --
[9] A. I --
[10] Q. Sir, I have some photographs of the home. Did
[11] you take any before you started work?
[12] A. No, sir.
[13] Q. Is that something you would typically do?
[14] A. No. No.
[15] Q. Did you take any photographs at any time
[16] either before this work that you did in August of
[17] 2002 or after it?
[18] A. No, sir.
[19] Q. So Ashland Construction doesn't have any
[20] photographs of the subject premises or the work
[21] area?
[22] A. Absolutely.
[23] Q. This is a diagram that was produced in
[24] discovery. This was produced by the Air Base

Page 29

[1] that can use some work if we had some for him.
[2] **Q.** Did Mr. Ortiz fill out any paperwork when he
[3] first started working for you pursuant to putting
[4] him on the books?
[5] **A.** Yes. He filled out a W 9.
[6] **Q.** Do you have those W 9's?
[7] **A.** I'd have to check. I don't even know, Matt,
[8] at this point.
[9] **Q.** When was the last time that you saw Mr. Ortiz?
[10] **A.** Actually he went back to Mexico for awhile,
[11] and then he came back, and, actually, I guess
[12] probably about a month ago. He's been working on
[13] and off a little bit with me.
[14] **Q.** He's been working on and off with you?
[15] **A.** Correct.
[16] **Q.** Where does he live; in the area?
[17] **A.** His actual address I don't know offhand. He's
[18] down in the Wilmington area.
[19] **Q.** Do you know his phone number?
[20] **A.** I know his brother-in-law's phone number.
[21] **Q.** Mr. Rizzo, I'm interested in taking his
[22] deposition?
[23] **A.** That's not a problem.
[24] **Q.** Can you help me locate him?

Page 30

[1] **A.** Sure.
[2] **Q.** And secure his cooperation to take a
[3] deposition?
[4] **A.** Sure. Sure. That's not a problem.
[5] **MR. CASEY:** I can do this through your
[6] counsel.
[7] **MR. LANDON:** We can do that. I just
[8] became aware that he's been back in the
[9] area. You're going to need an interpreter
[10] because he doesn't speak English very well.
[11] **MR. CASEY:** Okay. I can do that.
[12] Should I work through you, Roger?
[13] **MR. LANDON:** Yes.
[14] **BY MR. CASEY:**
[15] **Q.** Do you know if he has any immediate plans to
[16] go back to Mexico?
[17] **A.** At this point, Matt, I'm not sure. I mean
[18] it's not been said to me. So I don't know when he
[19] plans on going back or what's going to be going on
[20] with him.
[21] **Q.** Is he now on the books as an employee of yours
[22] today?
[23] **A.** He works with me -- not all the time.
[24] Occasionally, you know. So that's, you know,

Page 31

[1] that's how it's been going with him.
[2] **Q.** Is he on the books?
[3] **A.** Yes. Yes.
[4] **Q.** And you pay worker's compensation insurance
[5] for him?
[6] **A.** Yes. I pay workmen's compensation on all my
[7] employees.
[8] **Q.** What I'm saying is, theres a record of him
[9] being employed by you today?
[10] **A.** Yes.
[11] **Q.** How many employees do you have?
[12] **A.** I just carry a couple employees. About -- I'd
[13] say about two to three employees at the most.
[14] **Q.** Were you aware when you were doing the work at
[15] the Coachman Road address in August of 2002 that
[16] there were young children staying at the premises?
[17] **A.** I -- when I was there, I mean I saw Rochelle
[18] there, and I saw a couple of the older children,
[19] okay. But that was the extent -- I mean -- my work
[20] consisted of outside. I had no business with what
[21] was going on inside with the family or inside the
[22] house or anything.
[23] **Q.** My question though was -- I think you
[24] answered. You said that you were aware that there

Page 32

[1] were some older children?
[2] **A.** Correct.
[3] **Q.** Were you aware that there was this infant,
[4] Marissa Fishman, staying at the premises?
[5] **A.** I had not seen her.
[6] **Q.** So you were not aware --
[7] **A.** Exactly.
[8] **Q.** -- as of August 30, 2002, that there was a
[9] little baby staying at the place?
[10] **A.** That's correct.
[11] **Q.** Did you speak to anybody prior to August 30,
[12] 2002 about any special precautions that you and Mr.
[13] Ortiz needed to take in light of the fact that
[14] there were young children on the premises?
[15] **A.** Can you repeat that?
[16] **Q.** Sure. Did you speak to anybody, either living
[17] at that Coachman Road address or Mr. Manger or
[18] anybody about any precautions that you and Mr.
[19] Ortiz needed to take in doing your work relating to
[20] the presence of young children at that address?
[21] **MR. MINTZER:** Objection to the form.
[22] **THE WITNESS:** No. Positively -- no.
[23] There was nothing ever said that watch the
[24] children, or anything, or anything of that

Page 33

[1] nature. I mean, again, as I can say our job
[2] consisted of outside and that's where we
[3] were.
[4] **BY MR. CASEY:**
[5] **Q.** But the job, sir, took you from the patio into
[6] the pool area, correct?
[7] **A.** No. No. Everything with that pool area was
[8] done. There was no business for me to go in there.
[9] Okay. My job consisted of outside of that pool
[10] area and that house.
[11] **Q.** Were you keeping any equipment or anything
[12] relating to your patio work in the enclosed area of
[13] the pool on August 30, 2002?
[14] **A.** No, sir.
[15] **Q.** Have you looked at the police report?
[16] **A.** No, sir. I have not.
[17] **Q.** Are you aware that there are allegations in
[18] this case that a sliding glass door was left open
[19] either by you or your worker?
[20] **A.** I have not seen it, as far as the police
[21] report, but as far as the truth of the matter is
[22] there was no door that was left open by any of us
[23] because our business was on the outside. We had
[24] nothing to do on the inside.

Page 34

[1] **Q.** I just want to ask you a general question.
[2] Are you aware of the fact that there is an
[3] allegation made against you and your worker that a
[4] door was left open?
[5] **A.** Oh, yes, from everything that -- right.
[6] **Q.** Can you point me to the door that relates to
[7] that allegation, if I show you the photographs, the
[8] door through which, at least as far as you
[9] understand it, this child went through?
[10] **A.** The only possible door that I could see where
[11] it would be would be this door here, from what
[12] they're saying.
[13] **Q.** Let me just make a record. Hold on a second.
[14] You're referring to GORB 23 Bates number. I'll
[15] mark this as Rizzo-2.
[16] (Whereupon Exhibit Rizzo-2 was marked
[17] for identification.)
[18] **BY MR. CASEY:**
[19] **Q.** Can you draw an arrow to the door that you're
[20] talking about, sir?
[21] **A.** (Witness complies.)
[22] **Q.** Just initial it for me.
[23] **A.** (Witness complies.).
[24] **MR. MINTZER:** Can I just see the arrow?

Page

[1] **MR. CASEY:** Sure.
[2] **BY MR. CASEY:**
[3] **Q.** Do you see that door in any of the other
[4] photographs? Take a look through them.
[5] **A.** This would be it here. There was another
[6] sliding door that came off the master bedroom,
[7] here. That's where this slider is at. This slider
[8] here is off the master bedroom. This is the
[9] outside area that I was working, out here.
[10] **Q.** I'll draw an arrow to this door, and the Bates
[11] number is GORB 25.
[12] For the record on the last exhibit,
[13] Rizzo-2, the arrow obviously speaks for itself, but
[14] on the page there are two photographs. We're
[15] referring to the photograph on the lower half of
[16] the page that is marked with the arrow.
[17] On this exhibit we're on the top half of
[18] the page, and I've drawn an arrow too, and tell me
[19] if I'm correct, to the sliding glass door that goes
[20] from the master bedroom into the pool area, and
[21] it's directly opposite the sliding glass door that
[22] you've drawn an arrow to in Rizzo-2; is that right?
[23] **A.** That's correct.
[24] **Q.** This sliding glass door is directly opposite,

Page 36

[1] in Rizzo-3, is directly opposite the sliding glass
[2] door that you marked with an arrow in Rizzo-2?
[3] **A.** Repeat the question, Matt.
[4] (Whereupon Exhibit Rizzo-3 was marked
[5] for identification.)
[6] **BY MR. CASEY:**
[7] **Q.** Sure. Looking at Rizzo-3, I've drawn an arrow
[8] to a sliding glass door, correct?
[9] **A.** Correct.
[10] **Q.** That sliding glass door is directly opposite
[11] the sliding glass door to which you've drawn an
[12] arrow in Rizzo-2, correct?
[13] **A.** Correct.
[14] **Q.** And in the foreground of the photograph in
[15] Rizzo-3 we can actually see the sliding glass door
[16] that comes off the patio, correct?
[17] **A.** Correct.
[18] **Q.** Using Rizzo-2, can you point out to me where
[19] it was in relation to that sliding glass door that
[20] you guys were doing your patio work?
[21] **A.** This is it here, outside, just the outside
[22] area.
[23] **Q.** Just draw a circle there. Okay?
[24] **A.** (Witness complies.)

**Page 37**

[1]    **Q.**   Did you and Mr. Ortiz have to bring tables and
[2]    chairs from any location into the pool area on the
[3]    day of the accident?
[4]    **A.**   Would you like me to tell the whole story?
[5]    **Q.**   Yes.
[6]    **A.**   Prior to when we got there -- okay, our work
[7]    consisted of on the outside, doing the pavers. We
[8]    got there, I would say we were there for probably,
[9]    I'd say for about -- I'd say probably about half an
[10]   hour, forty-five minutes, maybe an hour, when we
[11]   got there. Mrs. Longwell came outside, okay, and
[12]   there was actually a white table, and I believe
[13]   there was a couple chairs that were out there. I
[14]   can't quite remember about the chairs too good, but
[15]   she asked me if we could clean up the table and the
[16]   chairs and bring them in, you know.
[17]          I said -- before we even did that, I
[18]   walked in with Mrs. Longwell, inside the house, I
[19]   followed her down into the pool area, and she said
[20]   this is where I would like you to set the table at.
[21]   Okay.
[22]          I proceeded to walk out of the house.
[23]   She was in front of me. Walked out of the house,
[24]   walked back out the outside door, okay, and then

**Page 38**

[1]    continued with my work. I'd say roughly for about
[2]    another half hour, okay. I guess half an hour,
[3]    forty-five minute, and then got to cleaning off the
[4]    table.
[5]          Okay. We cleaned the table off. We
[6]    scrubbed it down with Ajax and ammonia. I believe
[7]    there was a couple chairs also that we scrubbed
[8]    down also.
[9]          And after everything was done, okay, and
[10]   ready to go back in, then we proceeded to walk --
[11]   we opened up the outside door of the house, we
[12]   walked in with the chairs, and then right back out
[13]   and got the table, and came right back in with the
[14]   table.
[15]          As far as the doors were open, okay, the
[16]   only door that was closed, okay, was the outside
[17]   door that led to the outside of the house. That's
[18]   where we were working at. So we brought the chairs
[19]   in, walked right back out, got the table. We were
[20]   carrying the table in, we were setting the table --
[21]   matter of the fact the table was still in my hands,
[22]   walking backward to the steps that went down to the
[23]   pool area. We were setting the table down, and
[24]   then as -- the table didn't even hit the ground

**Page 39**

[1]    yet, and I looked up, and I heard Rochelle up on
[2]    the top screaming. Okay.
[3]          And then, gosh, it was so fast
[4]    everything that went on, then I seen her come
[5]    running through the area where I was setting the
[6]    table down and running to the pool, and I seen her
[7]    grabbing the baby out of the pool.
[8]    **Q.**   Okay. What time of day did you have the
[9]    conversation with Mrs. Longwell where she asked you
[10]   to clean the tables or the chairs and the table and
[11]   bring them into the pool area. About what time?
[12]   **A.**   It was the morning, probably about nine or ten
[13]   o'clock.
[14]   **Q.**   By the way, have you made any personal notes
[15]   or written this down anywhere, regarding your
[16]   description of events?
[17]   **A.**   No. I mean it's just -- it's cut and dry
[18]   exactly what happened.
[19]   **Q.**   I'm asking on the day of the accident did you
[20]   sit -- did anybody tell you sit down and write down
[21]   what happened?
[22]   **A.**   No. Positively not.
[23]   **Q.**   At no time since August 30, 2002 have you
[24]   actually put pen to paper and wrote down a

**Page 40**

[1]    statement of what happened?
[2]    **A.**   Correct. I have not.
[3]    **Q.**   Have you been interviewed by any
[4]    representative from any insurance company?
[5]    **A.**   When all this, I guess, all this happened.
[6]    **Q.**   I don't want to hear about anything you said
[7]    with your lawyer.
[8]    **A.**   When all this happened I met with John Manger
[9]    and we met at a restaurant up on 202 and Route 1
[10]   with a couple of -- I don't even know where these
[11]   attorneys were from. I don't know if they were --
[12]   whose they were. They just wanted to know the
[13]   incident, what happened.
[14]   **Q.**   None of the attorneys at this meeting with Mr.
[15]   Manger were retained by you, correct?
[16]   **A.**   Absolutely not.
[17]   **Q.**   So they weren't your lawyers?
[18]   **A.**   No.
[19]   **Q.**   And did the lawyers say anything to you at the
[20]   meeting?
[21]   **A.**   Just wanted to know what happened.
[22]   **Q.**   Were they taking notes?
[23]   **A.**   I believe they took a recording.
[24]   **Q.**   They took a recording. Okay.

Estate of Marissa Rose Fishman v.
Richard Longwell, et/al

Vincent J. Riz
January 30, 20-

**Page 41**

[1]        Where exactly did the meeting take place
[2]    on 202?
[3]    **A.**  There was a little corner restaurant, a little
[4]    shopping center. I don't know the name of the
[5]    shopping center. It's right at where Route 1 and
[6]    202 meet. There's a little coffee shop inside
[7]    there.
[8]    **Q.**  How long after the accident was this?
[9]    **A.**  Gosh, I'd say probably four or five months.
[10]   **Q.**  I presume Mr. Manger called you and asked you
[11]   to come meet with him?
[12]   **A.**  That's correct.
[13]   **Q.**  Did you consult with an attorney before you
[14]   went and spoke to them?
[15]   **A.**  No, sir.
[16]   **Q.**  Did any of the attorneys who were present
[17]   advise you that you could bring an attorney with
[18]   you or suggest that you have an attorney with you
[19]   when they were talking to you?
[20]   **A.**  No, sir.
[21]   **Q.**  Do you remember --
[22]   **A.**  Not that I remember.
[23]   **Q.**  Do you remember the names of any of the
[24]   attorneys who were there?

**Page 4**

[1]    **A.**  No, sir.
[2]    **Q.**  About how long was it between when you spoke
[3]    to Mrs. Longwell initially about her desire to have
[4]    you fellows clean the chairs and the table and
[5]    bring them into the pool area and when the accident
[6]    occurred?
[7]    **A.**  I'm sorry, Matt. You have to repeat the
[8]    question.
[9]    **Q.**  About how long was it between when you first
[10]   spoke to Mrs. Longwell about her interest in having
[11]   you fellows do that work, to clean the chairs and
[12]   the table?
[13]   **A.**  As soon as we got there, you mean when I was
[14]   on the job site, when was my conversation with Mrs.
[15]   Longwell?
[16]   **Q.**  Yes?
[17]   **A.**  I would say probably within half an hour or
[18]   forty-five minutes from when I was present on the
[19]   property.
[20]   **Q.**  About half an hour after you first spoke to
[21]   Mrs. Longwell the accident occurred?
[22]   **A.**  No.
[23]   **Q.**  That's what I'm interested in knowing.
[24]   **A.**  Right. I --

**Page 42**

[1]    **A.**  No. I don't. It was actually just one
[2]    gentleman. That was it.
[3]    **Q.**  Do you know who he was?
[4]    **A.**  No, sir.
[5]    **Q.**  Have you seen him since that day?
[6]    **A.**  No.
[7]    **Q.**  If I told you his name, would you remember the
[8]    name?
[9]    **A.**  No. The only way I would be able to find out
[10]   for you is if I were to try to get a hold of Mr.
[11]   Manger.
[12]   **Q.**  Was that attorney present at your earlier
[13]   deposition about a year ago?
[14]   **A.**  No, sir.
[15]   **Q.**  Are you certain that it was recorded, the
[16]   statement that you gave?
[17]   **A.**  Yes. I do remember them recording it.
[18]   **Q.**  Besides that, have you given any recorded
[19]   statements to any person?
[20]   **A.**  No, sir.
[21]   **Q.**  Have you been interviewed, other than -- I'm
[22]   not talking about your lawyer. Have you been
[23]   interviewed by anybody about the facts and
[24]   circumstances of the accident?

**Page 44**

[1]    **Q.**  Let me finish, Mr. Rizzo.
[2]        About how long was it between when you
[3]    first spoke to her and when the accident occurred?
[4]    **A.**  Gosh, I'd say probably, an hour, I guess an
[5]    hour and a half, two hours.
[6]    **Q.**  Did you do any work prior to cleaning off the
[7]    chairs and the table?
[8]    **A.**  I don't understand the question.
[9]    **Q.**  She asked you to -- let me ask you this.
[10]       When you got there that morning you
[11]   weren't expecting to do the chairs and the table,
[12]   correct?
[13]   **A.**  Positively not. My job consisted -- actually
[14]   what my job was was to build this patio for her and
[15]   Mr. Longwell.
[16]   **Q.**  But did you do any work on the patio that day
[17]   prior to cleaning off the chairs and the table?
[18]   **A.**  Oh, yeah. Actually -- I don't know if I was
[19]   cutting in edges or what I was doing. I was
[20]   working on the patio. Absolutely.
[21]   **Q.**  That's when she came up and spoke to you?
[22]   **A.**  Correct.
[23]   **Q.**  Using these photographs can you point out to
[24]   me where the chairs and the table were before you

Vincent J. Rizzo
January 30, 2006

Estate of Marissa Rose Fishman v.
Richard Longwell, et/al

**Page 45**

[1] started cleaning them?

[2] **A.** These photographs aren't going to show it too
[3] good, but I can explain it to you.
[4] The actual -- if I recall correctly, the
[5] actual table was right about here. Right in this
[6] area (indicating.)

[7] **Q.** Let me make a record of what you're talking
[8] about. We're looking at GORB 27, photograph number
[9] 10, the photograph on the lower half of the page,
[10] and the witness is now going to describe, at least
[11] as I understand, generally speaking, where he
[12] thinks the table was.

[13] **A.** That's where the table was. That's not where
[14] I started cleaning it. The table was brought out
[15] from here because there was actually brick dust on
[16] the table. The table was brought out from this
[17] area, and it was brought over to here so I could
[18] reach it with a hose.

[19] **Q.** There was brick dust on the table from the
[20] patio work that you had been doing?

[21] **A.** Right. I mean there was brick dust,
[22] settlement from the trees. The table was dirty.
[23] It wasn't just all brick dust that was it on.

[24] **Q.** But there was brick dust on it?

**Page 46**

[1] **A.** There was -- I mean dust. There was dust from
[2] the -- there was dust from the work I was doing,
[3] and there was berry marks on it from the trees that
[4] was coming down. The table was just dirty. It
[5] needed to be cleaned, regardless of whatever part
[6] of my stuff was, or whatever.

[7] From here the table was brought over to
[8] here. And this is where it was cleaned at.

[9] **Q.** Put a, if you would, sir, an A on this picture
[10] where the table and the chairs --

[11] **A.** I --

[12] **Q.** Wait a minute -- where they were before you
[13] moved them to clean them.

[14] **A.** (Witness complies.) I'm going to say right
[15] about there.

[16] **Q.** Put a B where they were when you cleaned them.

[17] **A.** (Witness complies.) Right there.

[18] **Q.** In the location where you've marked with an A,
[19] is that where both the table and the chairs were?

[20] **A.** Everything was brought to that "B" area to be
[21] reached with the hose to be cleaned.

[22] **Q.** But the -- my question was is the "A" area
[23] where both the table and the chairs were?

[24] **A.** I can't remember, Matt.

**Page 47**

[1] **Q.** In any event you brought everything to the "B"
[2] area to clean it --

[3] **A.** Right. I don't know --

[4] **Q.** Mr. Rizzo, I'm trying to be polite to you.
[5] You've got to let me finish the question. Okay.
[6] Because we're not going to be able to read this,
[7] and I know you're anxious, and you know what I'm
[8] going to ask you, and you could tell me right away,
[9] but try and bear with me.

[10] Let me ask my question and then you give
[11] the answer. Okay.

[12] The "B" area is the location to which
[13] you brought the table and the chairs?

[14] **A.** Correct.

[15] **Q.** What type of table was it?

[16] **A.** A plastic -- I believe a plastic table.

[17] **Q.** What kind of chairs?

[18] **A.** Just regular plastic chairs.

[19] **Q.** Had they been in the patio area since you
[20] fellows had started doing the work putting pavers
[21] on the patio?

[22] **A.** Gosh, Matt, I can't remember that. I don't
[23] know. Because in that area -- I had to cover that
[24] area with pavers also. The table could have been

**Page 48**

[1] around there. It could have been moved a few
[2] times.

[3] **Q.** Tell me, if you can, sir, and I know it's been
[4] awhile, but tell me exactly what you remember Mrs.
[5] Longwell saying to you?

[6] **A.** She was having a party that weekend. Okay.
[7] She asked me if I could clean this table for her,
[8] and set it down where she pointed out to have the
[9] table set up at. And I said, Mrs. Longwell, it
[10] would be no problem. I said I would take care of
[11] it for her.

[12] **Q.** Tell me if I'm correct, my understanding of
[13] the layout of this place is that once you -- by the
[14] way, did Mr. Ortiz clean the tables and chairs with
[15] you?

[16] **A.** Yes. We cleaned the tables -- yes. In fact,
[17] he was doing -- in fact, he was cleaning the table,
[18] a lot of it, too.

[19] **Q.** What I'm wondering about, did he do it, or did
[20] you do it, or did you both do it?

[21] **A.** We both did it.

[22] **Q.** All right. My understanding of this layout is
[23] that after the table and the chairs are cleaned,
[24] you bring them in this door; am I correct?

Estate of Marissa Rose Fishman v.
Richard Longwell, et/al

Vincent J. Ri
January 30, 20

---

**Page 49**

[1] **A.** Correct. From the outside going into the
[2] house.
[3] **Q.** And there are two sliding glass doors between
[4] where the tables and the chairs were when you were
[5] cleaning them and the pool area, correct?
[6] **A.** There was a sliding glass door from the
[7] outside that enters the house, and apparently
[8] there's a glass door that enters into the house to
[9] the pool area, from inside of the house.
[10] **Q.** But you would have to go through, after you
[11] cleaned the table and chairs, you would have to
[12] walk through a glide sliding glass door that goes
[13] from the patio into the house, correct so far?
[14] **A.** That's correct.
[15] **Q.** And then you have to make a left into the
[16] pool, correct?
[17] **A.** Correct.
[18] **Q.** And you would have to walk through a second
[19] sliding glass door to get into the actual area
[20] where the pool is?
[21] **A.** Correct.
[22] **Q.** How many chairs were there?
[23] **A.** I believe there was three, three or four
[24] chairs if I remember correct. I'm not real sure

---

**Page 50**

[1] on -- as far as on the chairs. I know there was no
[2] more than four. If anything, there may have been
[3] less.
[4] **Q.** Using another photograph which I'll mark as --
[5] by the way, the last photograph, the page on which
[6] it appears will be marked as Rizzo-4, and I'll mark
[7] as Rizzo-5 GORB 28.
[8] (Whereupon Exhibits Rizzo-4 and Rizzo-5
[9] were marked for identification.)
[10] **BY MR. CASEY:**
[11] **Q.** The lower half of this page has another
[12] photograph, sir, and in the numbering of these
[13] photographs there's handwritten numbers on these
[14] pages, and it's photograph number 12.
[15] Is this the sliding glass door between
[16] the patio and the house through which you would
[17] have to go after you cleaned the chairs and the
[18] table, this one?
[19] **A.** I need to take a look at it.
[20] **Q.** Sure.
[21] **A.** This is the door outside of the house. Okay.
[22] This is the area where I was working out, out here
[23] in this paver area.
[24] If you're looking through this door, as

---

**Page 51**

[1] I'm expecting what you're telling me, Matt, there's
[2] another door here off to the left-hand side that
[3] enters down -- this is inside the house -- that
[4] enters down into the pool area.
[5] If that's the door you're asking, yes,
[6] that is another door that enters down into the pool
[7] area.
[8] **MR. CASEY:** Rizzo-6 is GORB 15.
[9] (Whereupon Exhibit Rizzo-6 was marked
[10] for identification.)
[11] **BY MR. CASEY:**
[12] **Q.** Does this photograph, number 14, on the lower
[13] half of this page, is that the table that you
[14] cleaned?
[15] **A.** Yeah. That looks like it. That does look
[16] like the table, if I remember correctly. It's been
[17] awhile.
[18] **Q.** Is that photo taken through the door which is
[19] the second of the two doors through which you would
[20] have to go to put the chairs and the table in the
[21] pool room?
[22] **A.** Yes. This door is the one that is inside of
[23] the house. Okay. There are steps right here, and
[24] this is the pool area down here.

---

**Page 52**

[1] **Q.** Describe the room that appears just off the
[2] patio before you get into the pool room?
[3] **A.** The room that is off the patio?
[4] **Q.** Yes.
[5] **A.** I would probably have to say it's, I guess,
[6] like a dining area.
[7] **Q.** Just draw an arrow to the table, if you would,
[8] Mr. Rizzo.
[9] **A.** (Witness complies.)
[10] **MR. CASEY:** Rizzo-7 is GORB 19.
[11] (Whereupon Exhibit Rizzo-7 was marked
[12] for identification.)
[13] **BY MR. CASEY:**
[14] **Q.** Take a look at these photographs, Mr. Rizzo.
[15] They show different vantage points -- I should say
[16] different perspectives, but I believe they show
[17] some chairs and the table to which you referred in
[18] another photograph. Am I correct about that?
[19] **A.** Repeat the question, Matt.
[20] **Q.** Do these photographs in Rizzo-7 depict the
[21] chairs and the table that you cleaned?
[22] **A.** The table -- that is the table I cleaned, from
[23] what I can see. The chairs -- this might have been
[24] one of them there, too.

---

Estate of Marissa Rose Fishman v.
Richard Longwell, et/al

Vincent J. Riz
January 30, 20

Page 57

[1] just want to make sure I understand you correctly,
[2] the chairs that are depicted in the photograph on
[3] the top half of this page, and I'm going to circle
[4] them, do you believe that any of those chairs was
[5] cleaned by you and brought into the room?
[6] **A.** No. There wasn't no chairs like this. This
[7] may have been one of them right here. The slatted
[8] chairs -- they were not slatted.
[9]         (Whereupon Exhibit Rizzo-9 was marked
[10]        for identification.)
[11] **BY MR. CASEY:**
[12] **Q.** So the three chairs to the right of this
[13] photograph were already in the pool room --
[14] **A.** Right.
[15] **Q.** -- and were not included among the chairs that
[16] you cleaned --
[17] **A.** Correct.
[18] **Q.** -- on the patio and brought into the poolroom?
[19] **A.** Correct.
[20] **Q.** But the chair to the left, which I'll mark
[21] with an arrow, on Rizzo-9, police photograph number
[22] 7, is a chair that you cleaned and brought into the
[23] room?
[24] **A.** Uh-uh.

Page 58

[1] **Q.** Yes?
[2] **A.** I would believe so. I mean, if I can remember
[3] correctly on the chairs.
[4] **Q.** Going back to Rizzo-8, police photograph
[5] number 23, I'm going to circle other chairs going
[6] from left to right, at least as I can see them in
[7] this photograph. There are four chairs; am I
[8] right, 1, 2, 3, 4?
[9] **A.** Uh-uh.
[10] **Q.** Yes? You need to answer verbally.
[11] **A.** Yes.
[12] **Q.** Do you believe that any of those four chairs
[13] was among those that you cleaned on the patio and
[14] brought into the poolroom?
[15] **A.** Let me see, Matt. The only ones I remember
[16] was on this side. These chairs were there. Them
[17] chairs were there.
[18] **Q.** Which ones?
[19] **A.** Right there. The ones you circled.
[20] **Q.** So, 1, 2, 3, 4, they were all there?
[21] **A.** The one closest to the table on the other
[22] side, over there --
[23] **Q.** Over here?
[24] **A.** Right. That may have been one I brought in.

Page 5

[1] **Q.** That's a slatted chair.
[2] **A.** Then it's not me then.
[3] **Q.** How about this chair to the right?
[4] **A.** Let me see that one.
[5]     I can't remember. I can't remember. I
[6] know they would have been brought in at one shot.
[7] **Q.** Can you put a number on the number of chairs
[8] that were on the patio that you had to clean and
[9] bring into the pool room?
[10]       **MR. LANDON:** Objection. Asked and
[11] answered.
[12]       **THE WITNESS:** What I already said about
[13] it, two, three, maybe four, if that.
[14] **BY MR. CASEY:**
[15] **Q.** Two to three, maybe four, if that?
[16] **A.** If that, yes.
[17] **Q.** Who carried the chairs in from the patio into
[18] the pool room?
[19] **A.** It would have been Salvador and myself.
[20] **Q.** Do you believe you carried chairs individually
[21] or did you assist one another carrying an
[22] individual chair?
[23] **A.** No. We carried the chairs in separately.
[24] **Q.** How long was it between when you finished

Page 60

[1] cleaning the chairs and the table and when the
[2] accident occurred, when you first observed the
[3] child in the pool, how much time elapsed?
[4] **A.** Gosh, there was none at all. Gosh, seconds.
[5] I mean by the time I got -- by the time I walked
[6] that table in, okay -- when that stuff was cleaned,
[7] it was walked into the house. Okay.
[8]     As soon as -- as soon as the chairs were
[9] set, if that was the case, if the chairs were set
[10] in first or not, I can't quite remember, but I know
[11] I had the table in my hand, setting the table down,
[12] is when I looked up and I heard Rochelle screaming.
[13] **Q.** Did you do anything between the time that the
[14] table and the chairs were cleaned, when you had
[15] finished cleaning, and when you brought them into
[16] the house?
[17] **A.** I don't understand the question.
[18] **Q.** Did you, for example, take a break or do
[19] anything, make a phone call, between the time that
[20] you finished cleaning the chairs and the table and
[21] when you noticed the child in the pool?
[22] **A.** I still don't understand the question.
[23] **Q.** Let's use a hypothetical. You and I are
[24] cleaning the chairs and the table. Are you with

**Page 77**

[1] **A.** It's not just a pool. It's any hazard in
[2] construction, whether there may be a piece of brick
[3] laying down, maybe a cord that someone can trip
[4] over. It could be anything. It's not just the
[5] pool area.
[6] **Q.** I understand that, but you told me that when
[7] you left that area every night there were borders
[8] and caution tape and things like that specifically
[9] for safety put up around the pool, correct?
[10] **A.** On the outside of it. When I was doing that
[11] area on the outside.
[12] **Q.** That's what I'm saying. When you were doing
[13] that area, you did those things specifically for
[14] safety, correct?
[15] **A.** Uh-uh.
[16] **Q.** Yes?
[17] **A.** Yes. That's correct.
[18] **Q.** What training did you get at Astra-Zeneca to
[19] which you alluded to a minute ago?
[20] **A.** As far as?
[21] **Q.** Safety training. You said it. I'm just
[22] trying to figure out what you mean.
[23] **A.** Through OSHA, guidelines of safety up there.
[24] Through meetings. It's all they pump into you,

**Page 78**

[1] safety.
[2] **Q.** What did you do for Astra-Zeneca?
[3] **A.** Masonry. Pretty much all their masonry work,
[4] pretty much.
[5] **Q.** I'm just trying to get a handle on what you
[6] alluded to earlier when you said, I worked at
[7] Astra-Zeneca for 20 years and that's all they
[8] focused on. They were very safety conscious?
[9] **A.** I guess how to answer that question, they
[10] focus on safety. I'm trained on safety an awful
[11] lot.
[12] The incident when it happened at this
[13] ordeal in this residence at this time in this
[14] manner is very terrible, what has happened. Okay.
[15] But my issue was not on the inside of the house.
[16] My job was maintained outside.
[17] Now if there was an issue as far as my
[18] outside work and something happened, I can be
[19] liable or account for the argument of it, but as
[20] far as what went on inside of that house, I'm
[21] not -- I'm not -- I'm not the owner of the house.
[22] I'm not the one who closed the doors. I'm not the
[23] one that opened up the door or anything of that
[24] nature.

**Page 79**

[1] **Q.** Along those very same lines, sir, if you
[2] brought the chairs in first and put them down
[3] around the pool, and then went back out to get the
[4] table, you had to make sure the doors were closed
[5] before you went back out, correct?
[6] **MR. LANDON:** Objection.
[7] **THE WITNESS:** No. No. That's not what
[8] it was.
[9] **BY MR. CASEY:**
[10] **Q.** So you believe you could be safe and leave the
[11] doors open?
[12] **A.** I'm saying --
[13] **MR. LANDON:** Objection.
[14] **BY MR. CASEY:**
[15] **Q.** Here's my question.
[16] Do you believe it would be consistent
[17] with the safety training you had to put the chairs
[18] down and go back out and get the table and leave
[19] the doors open?
[20] **A.** If I was going --
[21] **MR. LANDON:** Objection.
[22] **THE WITNESS:** If I was going to leave
[23] the job for 15, 20, 5 minutes, whatever,
[24] that would be a different story. That table

**Page 80**

[1] was right there with the chairs. There was
[2] no matter of elapsing 30 seconds for me to
[3] walk back out that door, grab that table,
[4] and walk right back in through that next
[5] door and drop that table down.
[6] **BY MR. CASEY:**
[7] **Q.** I believe your answer is no, you don't believe
[8] you needed to close the doors; is that what you're
[9] saying?
[10] **MR. LANDON:** Objection.
[11] **BY MR. CASEY:**
[12] **Q.** Between the time that you put the chairs down
[13] and go to get the table?
[14] **A.** The door was not closed.
[15] **Q.** Sir. Just presume for me, because I think we
[16] have photographs of this -- we have police
[17] photographs. The chairs that you cleaned were
[18] already there, correct? You had already put them
[19] down. Can we at least agree on that?
[20] **A.** No. Because as far as on the chair end of it,
[21] there was not -- there was not a time distance with
[22] these chairs. Like I said, everything was cleaned
[23] at one shot and brought into that house at one
[24] time.

Estate of Marissa Rose Fishman v.
Richard Longwell, et/al

Vincent J. Ri
January 30, 2(

---

**Page 81**

[1]   **Q.** We've already established that you would have
[2]   to put -- if you put the chairs in first, you have
[3]   to put them down in the pool room and go back
[4]   outside to get the table?
[5]   **A.** I was right there at the slider door.
[6]   **Q.** Just bear with me. You'd have to put the
[7]   chairs down and go back outside and get the table,
[8]   correct?
[9]   **A.** Correct.
[10]   **Q.** When you came through the doors to put the
[11]   chairs down, the door to the -- the two doors
[12]   leading into the pool area are open, correct?
[13]   **A.** But the door's right there where I was putting
[14]   the table in.
[15]   **Q.** Correct?
[16]   **A.** Correct.
[17]   **Q.** And then you have to go back outside through
[18]   those doors to get the table, correct?
[19]   **A.** Correct.
[20]   **Q.** My question was, according to the safety
[21]   training that you had, isn't it so that you would
[22]   have to close those doors to go back out and get
[23]   the table before you bought it back in?
[24]   **MR. LANDON:** Objection.

---

**Page 82**

[1]   **THE WITNESS:** If I was leaving that area
[2]   unguarded for a period of time.
[3]   **BY MR. CASEY:**
[4]   **Q.** So you agree with me that if you were leaving
[5]   that area unguarded for a period of time --
[6]   **A.** A period of time.
[7]   **Q.** Okay. Let me get there.
[8]   If you were leaving that area unguarded
[9]   for a period of time, you would be obliged to close
[10]   each of the doors?
[11]   **A.** My -- here we go again with this. My work
[12]   consisted of outside. That door I close from the
[13]   outside work area where I was working at is the
[14]   door that I'm responsible for.
[15]   That door was open inside that house.
[16]   That table was clean by that door. The chairs were
[17]   clean by the door, and when that stuff was brought
[18]   in, it was brought in at one time.
[19]   I have no business in Mr. and Mrs.
[20]   Longwell's house or to help myself to go through
[21]   any door that I please to. That's not what it was.
[22]   Mrs. Longwell asked me to clean the
[23]   table for her. That's what was done.
[24]   When I was done cleaning the table and

---

**Page**

[1]   the chairs, whatever it may have been, she asked me
[2]   to set it down in this one area for her, and that's
[3]   the way it was done.
[4]   **Q.** But you told me earlier that if you were
[5]   leaving the area unguarded for a period of time, it
[6]   would be incumbent upon you, I'm paraphrasing -- I
[7]   want you to tell me if I'm right or wrong -- it
[8]   would be incumbent upon you to make sure each of
[9]   those doors was closed, correct?
[10]   **MR. LANDON:** Objection.
[11]   **THE WITNESS:** Do you object to this
[12]   Roger?
[13]   **MR. LANDON:** You have to answer the
[14]   question.
[15]   **THE WITNESS:** Here's what it is --
[16]   **BY MR. CASEY:**
[17]   **Q.** Let me just instruct you now. I'm asking you
[18]   a specific question. I know you'd like --
[19]   **A.** I --
[20]   **Q.** Hold on a second, sir. I've tried to be very
[21]   patient with you. I'm going to ask you a specific
[22]   question. I want you to answer my question. You
[23]   can have plenty of time to explain other things.
[24]   Here's my question.

---

**Page 84**

[1]   You told me earlier that if that area
[2]   was left unguarded for a certain period of time,
[3]   you would have to close the doors, correct?
[4]   **A.** I'm telling you this, if I walked in that
[5]   house, and I opened up that door, okay, then, yes
[6]   it's my responsibility to close it. But I did not
[7]   open that door.
[8]   The only door I opened was from the
[9]   outside of that house, walking into that house.
[10]   I don't know why she wanted that door
[11]   opened. There could have been a reason why she
[12]   wanted it open, but I know if I opened that door
[13]   physically myself, yes, then it would have been my
[14]   option to close it.
[15]   **Q.** So if you opened the inside door --
[16]   **A.** Correct.
[17]   **Q.** -- then your failure to close it in between
[18]   when you did the work and when the accident
[19]   happened would be your fault?
[20]   **MR. LANDON:** Objection.
[21]   **THE WITNESS:** Say -- repeat that.
[22]   **BY MR. CASEY:**
[23]   **Q.** If you opened the inside door, if it was you
[24]   rather than someone in the house, okay, are you

---

Page 85

[1]  with me so far?
[2]  **A.** Correct.
[3]  **Q.** Then it would be your responsibility to close
[4]  it, correct?
[5]  **A.** If -- if it was said to me to close it.
[6]  That's not what this ordeal was, though.
[7]  **Q.** My question is, sir, if --
[8]  **A.** Now --
[9]  **Q.** Wait a minute. If you opened the door into
[10]  the pool and brought the chairs in, and then went
[11]  back outside to get the table, in order to be
[12]  performing that work in a safe manner, it would be
[13]  your job to close that door that goes into the
[14]  pool, correct?
[15]        **MR. LANDON:** Objection.
[16]        **THE WITNESS:** No. Because that door was
[17]    open. I don't know why -- that's the
[18]    homeowner having the door open.
[19]  **BY MR. CASEY:**
[20]  **Q.** My question though was, if you opened the door
[21]  to bring the chairs into the pool area, sir, if you
[22]  opened the door, and put the chairs down, and then
[23]  had to go back out to get the table, if that's what
[24]  happened, it would be your job after putting the

Page 86

[1]  chairs down and going out onto the patio, to close
[2]  that door to the pool before you go get the table,
[3]  correct?
[4]        **MR. LANDON:** Objection.
[5]        **THE WITNESS:** I mean --
[6]  **BY MR. CASEY:**
[7]  **Q.** Agreed, yes or no?
[8]  **A.** No. It's not agreed totally to the whole
[9]  matter of it.
[10]  **Q.** So that's not your job?
[11]  **A.** Absolutely not.
[12]  **Q.** If you were leaving that area, that is the
[13]  pool area, and the dining room and the patio
[14]  unguarded for a period of time, would it be your
[15]  job to make sure that those doors are closed after
[16]  you worked in that area?
[17]        **MR. LANDON:** Objection.
[18]        **THE WITNESS:** I mean -- I mean I'm
[19]    responsible for my work area. That's what
[20]    I'm responsible for.
[21]  **BY MR. CASEY:**
[22]  **Q.** Your work area that morning, sir, included the
[23]  pool area, correct?
[24]  **A.** No. No. My work area that day --

Page 87

[1]        **MR. LANDON:** Objection. Objection.
[2]  Hold it. Hold it. We're just going on and
[3]  on and on.
[4]        **THE WITNESS:** I'm not going to answer
[5]  these questions.
[6]        **MR. LANDON:** You're arguing with the
[7]  witness about issues that involve legal
[8]  conclusions for one thing.
[9]        For two things they involve
[10]  hypotheticals which we have no foundation
[11]  for given the testimony that he's given.
[12]  And, you know, I don't know if this is --
[13]  you're wasting our time. I'd like you to
[14]  move on beyond this point.
[15]        **MR. CASEY:** I understand what you're
[16]  saying. I disagree with it, but I tried to
[17]  get specific answers from the witness and I
[18]  haven't been able to do it.
[19]        He's told me things that are his
[20]  responsibility according to the safety
[21]  training that he had. There were gratuitous
[22]  things said that I think are areas that I
[23]  can now explore. I think that his answers
[24]  will speak for themselves.

Page 88

[1]  **BY MR. CASEY:**
[2]  **Q.** How do you know that Mr. Ortiz did not open
[3]  the interior door?
[4]  **A.** Because he was with me the whole time. He
[5]  wouldn't have no business in the lady's house.
[6]  **Q.** You don't even remember if he brought chairs
[7]  in or not?
[8]  **A.** My eyes were on him the whole time. He's my
[9]  helper.
[10]  **Q.** How do you know that he wasn't bringing in the
[11]  chairs --
[12]  **A.** Because --
[13]        **MR. CASEY:** Roger, please ask him to do
[14]    it. I've asked him like six times now.
[15]    Please let me finish my question. Okay.
[16]  **BY MR. CASEY:**
[17]  **Q.** How do you know that Mr. Ortiz didn't take it
[18]  upon himself to bring the chairs into the pool
[19]  room, and, accordingly, that he opened the interior
[20]  door; how do you know that?
[21]  **A.** Because I'm his boss, and I would tell him
[22]  what he's to do. He would not take it upon himself
[23]  to do something that I have not asked him to do.
[24]  **Q.** Have you talked to him about this accident?

Estate of Marissa Rose Fishman v.
Richard Longwell, et/al

Vincent J. 1
January 30,

Page 89

[1] A. No, sir. I have not.
[2] Q. Have you had any conversations with him about
[3] it?
[4] A. Not at all.
[5] Q. Do you know whether he's provided any
[6] statements to any person about the accident?
[7] A. The only one I recall is just the cop that was
[8] there that day the incident happened.
[9] Q. One more exhibit, GORB 11.
[10] (Whereupon Exhibit Rizzo-10 was marked
[11] for identification.)
[12] BY MR. CASEY:
[13] Q. Does that show the patio?
[14] A. Yes. This shows the patio. This is before
[15] this work was already started to be done. That's
[16] existing.
[17] Q. Before what?
[18] A. Before the work was to be done.
[19] Q. When you were bringing the furniture in from
[20] the patio into the pool room, were there steps
[21] going in?
[22] A. No.
[23] Q. Going into the house?
[24] A. No. The steps weren't there at that time.

Pag

[1] Q. How long did that job take?
[2] A. I'd say probably about a week, week and a
[3] half, right in that area.
[4] Q. You might have started that in August also?
[5] A. Yes.
[6] Q. And during the time period that you were doing
[7] the knee-high retaining wall job, did you see
[8] Rochelle Fishman living there?
[9] A. I mean I saw her truck there a few times. I
[10] didn't know all this incident was going on with her
[11] and her husband and the whole mess of it.
[12] As far as to answer your question,
[13] Dan, I saw the truck there a couple times.
[14] Q. Did you see her children in the house during
[15] that week you were doing the knee-high wall?
[16] A. I don't even recall. I don't even recall.
[17] Q. Did you know her children at that time, when
[18] you were doing the knee-high wall?
[19] A. I mean I didn't know them by name. I just
[20] knew that they were her children.
[21] Q. Did you know the difference between Alexandra,
[22] Samuel and Marissa?
[23] A. I mean by you telling me the names right now
[24] that's going to reflect one is a boy and one is a

Page 90

[1] Q. So you had already cleared the steps out?
[2] A. That's right.
[3] Q. Did you have to step up?
[4] A. No. It came level right off the patio.
[5] Q. You had already done that?
[6] A. Uh-uh.
[7] Q. You need to say yes or no.
[8] A. Yes.
[9] Q. Did you have to unlock any of the doors before
[10] you carried the furniture into the pool room?
[11] A. No. The doors were unlocked.
[12] MR. CASEY: I believe for the moment
[13] those are all the questions I have.
[14] BY MR. HART:
[15] Q. Mr. Rizzo, good morning, my name is Dan Hart.
[16] We met before at your last deposition.
[17] A. Yes.
[18] Q. I'd like to try to see if I can get a little
[19] handle on some of the frame.
[20] When you were doing the knee-high wall,
[21] the retaining wall around the patio area, that was
[22] completed two weeks before this incident?
[23] A. Prior -- two to three weeks before that job
[24] was completely done.

Page 92

[1] girl.
[2] Q. I know after the incident you know that
[3] Marissa was the little girl who was in the pool?
[4] A. After what I just heard.
[5] Q. When you started the project for the pavers
[6] for the patio, again I'm trying to figure out, how
[7] many days before this incident had you started that
[8] job?
[9] A. As far as the pavers?
[10] Q. Yes.
[11] A. You mean before -- how many days before this
[12] happened?
[13] Q. Yes.
[14] A. I would say probably close to -- I would say
[15] probably about a week.
[16] Q. Now this incident happened on Friday, August
[17] 30 of 2002. Did you work at that site that
[18] Thursday, Wednesday, Tuesday, and Monday?
[19] A. I'm sure -- yes. I'm sure I did. Yes.
[20] Q. During that time period did you see children
[21] in the house?
[22] A. No. I mean I didn't really look inside the
[23] house all the time, what was going on.
[24] Occasionally if I was up doing my work, if I

Estate of Marissa Rose Fishman v.
Richard Longwell, et/al

Vincent J. R
January 30, 2

**Page 97**

[1] time?
[2] **A.** Yes. Mrs. Longwell and I both walked down the
[3] steps into the pool area.
[4] **Q.** And where was Mr. Ortiz during that?
[5] **A.** Outside.
[6] **Q.** He did not come in that time?
[7] **A.** No, sir.
[8] **Q.** After she showed you where she wanted you to
[9] place the table and chairs, who left the pool area
[10] first?
[11] **A.** Mrs. Longwell walked out, and I was in front
[12] of Mrs. Longwell -- I'm sorry. I was in back of
[13] Mrs. Longwell. She opened the door for me to go
[14] out. I walked out of the house. She closed the
[15] door, and that was it.
[16] **Q.** The pool area door, when you -- she walked out
[17] first, and opened the door to what, from the pool
[18] into the dining area?
[19] **A.** No, sir. From the dining room out to the
[20] outside patio area.
[21] **Q.** She let you out basically?
[22] **A.** Yes.
[23] **Q.** And you stepped out?
[24] **A.** Absolutely.

**Page**

[1] like that.
[2] **Q.** And you used Ajax?
[3] **A.** I believe it was Ajax.
[4] **Q.** Where did you get the Ajax?
[5] **A.** She stuck it outside. It was already outside.
[6] **Q.** When did she stick it outside?
[7] **A.** Gosh, this is when I was in the conversation
[8] with her.
[9] **Q.** Then after you finished cleaning the tables
[10] and chairs, did you alert anyone inside the house
[11] that you were going to be bringing them in at that
[12] point?
[13] **A.** No, sir. Her specific words were when I'm
[14] done with it to bring it in and set it down.
[15] **Q.** When you opened the door between the patio
[16] area and the dining room area, was it locked?
[17] **A.** No. That door was open. That's the one she
[18] let me out of.
[19] **Q.** Was it open or was it unlocked?
[20] **A.** It was unlocked. It was a slider.
[21] **Q.** The first time you went in the house with Mrs.
[22] Longwell and then into the pool area, did you see
[23] children?
[24] **A.** No.

**Page 98**

[1] **Q.** And did she close the door behind you?
[2] **A.** Yes. She did.
[3] **Q.** Then how much time elapsed between when you
[4] stepped back out to the patio area and when you
[5] began cleaning the table and chairs?
[6] **A.** I'd say roughly, probably about half an hour,
[7] forty-five minute before we started cleaning the
[8] table and chairs.
[9] **Q.** During that time period what were you doing?
[10] **A.** Well I was working on the outside, the paver
[11] area.
[12] **Q.** Then you began to clean the table and chairs.
[13] Had you spoken at all with Mrs. Longwell? Did she
[14] open the door and say, hey, guys, what's going on
[15] with the table and chairs; any conversation with
[16] anyone in the house?
[17] **A.** No. The conversation was what she asked me to
[18] do, when I had it done, she said just where I want
[19] it at, and put it in here when you're done with it
[20] because we're having a party on the weekend.
[21] **Q.** After you cleaned the tables and chairs, and I
[22] think you said that took half an hour?
[23] **A.** Roughly about half an hour I would assume it
[24] took, half an hour, forty-five minute, something

**Page 100**

[1] **Q.** Did you hear any children?
[2] **A.** No.
[3] **Q.** Did you see any adults other than Mrs.
[4] Longwell?
[5] **A.** No. I didn't. Mrs. Longwell was the only
[6] conversation I had.
[7] **Q.** And then the brief period when you stepped
[8] back out of the pool area to go back out to the
[9] patio area, again briefly into the dining area, did
[10] you see any children at that time?
[11] **A.** No, sir.
[12] **Q.** Did you hear any adults?
[13] **A.** No.
[14] **Q.** From the time period that, the approximate
[15] area when you went back out of the house, did a
[16] half hour of work, approximately a half hour to
[17] clean the table and chairs, did you see or hear any
[18] children?
[19] **A.** No, sir.
[20] **Q.** When you -- I think Mr. Casey was trying to
[21] get to this -- it's your recollection that when you
[22] brought the table and chairs in, the door between
[23] the dining room and the pool, the slider between
[24] the dining room and the pool was open?

Vincent J. Rizzo
January 30, 2006

Estate of Marissa Rose Fishman v.
Richard Longwell, et/al

**Page 101**

[1] A. Correct.
[2] Q. I think you said you knew that because if you
[3] were holding two chairs, you don't recall having to
[4] put them down to get out to the pool area?
[5] A. Correct.
[6] Q. Would it refresh your recollection as to
[7] whether you brought the chairs in first or the
[8] table first?
[9] A. It would have to be chairs, I would have to
[10] assume.
[11] Q. I don't want you to assume anything.
[12] A. Right. I mean I would have to say so.
[13] Q. At that point when you were carrying the
[14] chairs, did you see any children?
[15] A. No, sir.
[16] Q. Did you hear any children?
[17] A. No, sir.
[18] Q. Did you hear anybody calling anyone's name?
[19] A. No. No, sir.
[20] Q. When you put the chairs down in the pool area,
[21] did you see the child in the pool?
[22] A. No, sir. I mean I wasn't even -- I was
[23] putting the chairs down, walked right back out and
[24] grabbed the table, walked right back in.

**Page 102**

[1] It was no more than at the most a 40
[2] second, 30 second ordeal.
[3] Q. I'm asking for your recollection at the time
[4] you brought the chairs in -- let me ask you, did
[5] you carry all three chairs in?
[6] A. If I -- they were plastic chairs, if I
[7] remember correctly, and they were light chairs.
[8] You could put two of them -- just carry two of them
[9] in.
[10] Q. When you went back, let's say you went back
[11] out and brought the table in, and Mr. Ortiz helped
[12] you with the table; is that correct?
[13] A. That's correct.
[14] Q. And while you were entering the pool area to
[15] put the table down, did you see the child in the
[16] pool?
[17] A. No, sir.
[18] Q. That trip, when you're taking the table in
[19] through the house, did you see any children at all?
[20] A. No, sir.
[21] Q. Did you see any adults at all?
[22] A. No, sir.
[23] Q. Did you hear anybody screaming or calling for
[24] any child?

**Page 103**

[1] A. No, sir.
[2] Q. It was when you were about to place the table
[3] down that you first became aware that there was
[4] some sort of problem?
[5] A. I looked up and I saw -- I wondered what she
[6] was screaming about.
[7] Q. Did you see any children in the area?
[8] A. No, sir.
[9] Q. Miss Fishman was inside the dining area when
[10] you heard her scream, correct?
[11] A. Correct.
[12] Q. When she screamed, did you know what was
[13] wrong?
[14] A. No. Not until I -- not until after I seen her
[15] run down to the pool and grab the child.
[16] Q. Did she have to push you to get to the pool?
[17] A. No. I was on the other side of the table.
[18] Q. Do you remember if she had to --
[19] A. I don't remember. I don't believe she did.
[20] Q. Do you remember if she had to push Mr. Ortiz
[21] out of the way to get to the pool?
[22] A. I don't remember that.
[23] Q. Were you in the pool area the entire time she
[24] pulled the child out of the pool and took her from

**Page 104**

[1] the pool area into the dining area?
[2] A. Yes. This happened within seconds. So I mean
[3] it was...
[4] Q. Did anyone, other than Miss Fishman, jump in
[5] the pool to help the child?
[6] A. No.
[7] Q. Did anyone else come from the house out into
[8] the pool area, other than Miss Fishman, while you
[9] were standing there?
[10] A. Not that I remember. I mean I can't remember.
[11] I know Mrs. Longwell came out, and, you know, but I
[12] mean that's -- I don't remember. No to answer your
[13] question.
[14] Q. At that point after the child was out of the
[15] pool area in the dining area, you and Mr. Ortiz
[16] just simply walked back into the dining area and
[17] then out the sliders to the patio; is that correct?
[18] A. Yes. That's correct.
[19] Q. Earlier in your testimony you said you did see
[20] children in the kitchen area. Do you remember when
[21] you saw children in the kitchen area that day?
[22] A. That was as soon as I got there.
[23] Q. So that would have been between eight and
[24] eight-thirty?

Min-U-Script®     B&R Services for Professionals, Inc.