# In The Matter Of:

*James H. Gorbey, Jr., et al v.*
*Robert Longwell, et al*

*Salvador Ortiz-Britto*
*February 23, 2006*

*B&R Services for Professionals, Inc.*
*235 S. 13th Street*
*Philadelphia, PA  19107*
*(215) 546-7400*
*FAX (215) 985-0169*

Original File 022306CY.V1, Pages 1-61

**Word Index included with this Min-U-Script®**

Page 9

MR. CASEY: To cut through some of these questions, I discussed with counsel for Ashland Construction whether we have an agreement that at the time of the accident that is the subject of this lawsuit Mr. Ortiz was employed by the defendant named in the case, Ashland Construction -- Ashland Construction Company, Incorporated. And counsel for that defendant has stated that we have such an agreement. So that will allow me to explore other areas now.

MR. LANDON: That is correct.

BY MR. CASEY:

Q. Sir, since the date of the incident that brings you here to this deposition, have you discussed it with any person besides a lawyer?

A. No.

Q. Have you discussed it with Mr. Rizzo?

A. No.

Q. Did you discuss what had happened with Mr. Rizzo on the day of the accident?

A. No. We didn't talk about that at all.

Q. Why?

A. Because the police arrive there and started

Page 10

asking us questions.

Q. Did you speak to a police officer?

A. Yes.

Q. What did you tell the police officer about what had happened?

A. Because the police arrive there and he asked me what I was doing. And I told him that my boss ordered me to wash the table and some chairs that were in the backyard.

Q. What else, if anything, did you tell the police officer?

A. They asked me who opened that door, the back door, who opened that door. I couldn't say, because I didn't see who opened the door.

Q. You understand that there was a door leading from the patio into the house, and then another door going from the house into the pool area?

A. Yes.

Q. What door were you referring to when you told me that the police officer asked you who opened that door?

A. The one to the swimming pool.

Q. For how long had you been working at the

Page 1

home where the drowning occurred prior to the day of the accident?

A. I was working there for about a month, to a month and a half.

Q. Every day?

A. Yes.

Q. What were you doing there?

A. We were working in making pave work. We were putting some stones around the swimming pool.

Q. Were you also doing repairs to the enclosure around the pool?

A. Yes.

Q. And did your work cause you to have to be both inside the pool area and outside the pool area?

A. Yes.

Q. When you told me that your boss ordered you to clean furniture, are you talking about Mr. Rizzo?

A. Yes. He ordered me.

Q. At around what time did you arrive at the home on the morning of the incident?

A. Between 9:00, 9:30, 10 o'clock in the

Page 12

morning.

Q. I have a copy of the police report, and I can tell you that it says that you told the police officer you did observe numerous children playing inside the residence near the kitchen that day.

A. No, I didn't say that to the police. I don't -- I didn't.

Q. So you didn't tell the police officer, or any police officer, that you had observed numerous children playing inside the residence near the kitchen area?

A. No.

Q. Does Mr. Rizzo speak Spanish?

A. No.

Q. How does he tell you what to do on the jobs when you work for him?

A. Because my brother-in-law speaks English.

Q. Was your brother-in-law present at the residence, at the Coachman Road residence on the date of this accident?

A. No.

Q. Was any other person, besides yourself and Mr. Rizzo from Ashland Construction, present at

Page 13

[1] the Coachman Road address on the day of the
[2] accident?
[3] A. No.
[4] Q. At around what time did Mr. Rizzo order you
[5] to clean the furniture that was on the patio?
[6] A. When we just arrive he told me to wash this
[7] furniture because they were filthy with dirt.
[8] Q. With brick dust?
[9] A. Yes.
[10] Q. Did you at any time that day speak with any
[11] of the persons who lived at the home?
[12] A. No.
[13] Q. Did you at any time that day see any person
[14] who lived inside the home out on the patio?
[15] A. No. Everybody was inside.
[16] Q. Did you arrive at the job site that day
[17] with Mr. Rizzo?
[18] A. Yes.
[19] Q. Were you with Mr. Rizzo at all times
[20] between arriving at the job site and when the
[21] incident occurred?
[22] A. Yes.
[23] Q. So if I'm understanding you, it was within
[24] a few minutes of arriving at the job site that

Page 14

[1] day that Mr. Rizzo ordered you to clean the
[2] furniture?
[3] A. Yes.
[4] Q. How long did it take you to clean the
[5] furniture?
[6] A. Maybe 20 -- maybe 30 minutes, 40 minutes.
[7] Q. Did Mr. Rizzo help you clean the furniture?
[8] A. Yes.
[9] Q. Did anyone else help you clean the
[10] furniture?
[11] A. No.
[12] Q. Did Mr. Rizzo at some point order you to
[13] carry the furniture inside to the pool area?
[14] A. Yes.
[15] Q. Did he assist you in carrying the furniture
[16] inside to the pool area?
[17] A. Yes.
[18] Q. Prior to the date of this accident, when
[19] you first started working at the home, did Mr.
[20] Rizzo give you any training or instruction about
[21] protecting the pool from the children who were
[22] living in the home?
[23] A. He never say anything, no. He didn't say
[24] anything.

Page 15

[1] Q. When you first started working at the home
[2] a month, or a month and a half prior to the date
[3] of this accident, between then and the date of
[4] the accident, did anyone other than yourself and
[5] Mr. Rizzo from Ashland Construction work at the
[6] home?
[7] A. Yes.
[8] Q. Who?
[9] A. He will use gestures and tell me what to
[10] do.
[11] Q. No. My question was, did anyone other than
[12] yourself and Mr. Rizzo from Ashland Construction
[13] work at the home at any time between the date
[14] that the project started and the date of this
[15] incident?
[16] A. No. Only myself and my boss.
[17] Q. So none of your brothers, or your brothers
[18] in-law, no other employees from Ashland
[19] Construction worked at the Coachman home address?
[20] A. No.
[21] Q. Did you at all times take instruction for
[22] this job from Mr. Rizzo?
[23] A. Yes.
[24] Q. On how many occasions prior to working at

Page 16

[1] this home, the Coachman Road address, had you
[2] worked with Mr. Rizzo at a residence where there
[3] was a pool?
[4] A. No, this was the first.
[5] Q. So since you had been working for Ashland
[6] Construction, this job at the Coachman Road
[7] address was the first job at which you worked
[8] where there was a pool in the work area?
[9] A. Yes.
[10] Q. When you would leave the job at night when
[11] you were finished, would you take any steps to
[12] protect the pool from children who were living at
[13] the home?
[14] A. No, because I was never inside there. My
[15] work was outside.
[16] Q. Did Mr. Rizzo work inside the pool area?
[17] A. Outside with me.
[18] Q. I'm not talking about the date of the
[19] accident, I'm talking about for the month or so
[20] while you had been there.
[21] A. That we -- if we get in the house?
[22] Q. Well, in the month or so prior to the date
[23] of this accident you were putting knee wall
[24] around the pool, correct?

Page 29

[1] you're telling me?
[2] A. It was closed.
[3] Q. Was it locked?
[4] A. Yes.
[5] Q. It was a sliding glass door, correct?
[6] A. Yes.
[7] Q. Did you have to knock on the door?
[8] A. Yes.
[9] Q. Did you -- you, Mr. Ortiz, you knocked on
[10] the door?
[11] A. Yeah.
[12] Q. And someone from inside the home let you
[13] in?
[14] A. Yes.
[15] Q. And then when you got inside the dining
[16] room, you had to go through door number two into
[17] the pool, correct?
[18] A. That one was already open.
[19] Q. You haven't talked to Mr. Rizzo lately,
[20] have you?
[21] A. No.
[22] Q. You haven't talked to him about his
[23] deposition?
[24] A. No.

Page 30

[1] Q. So when you got inside the dining room
[2] through door number one, as you're sitting here
[3] today, you remember that door number two, the
[4] sliding glass door, was open?
[5] A. Yes.
[6] Q. Did the person who opened the door for you
[7] go back inside the house?
[8] A. I don't know. I didn't see anybody opening
[9] the door. I don't know who did it.
[10] Q. No, did the person who opened door number
[11] one to let you into the dining room then leave
[12] and go back into the kitchen?
[13] A. Yes, to the kitchen.
[14] Q. So at that point it was just you and Mr.
[15] Rizzo, correct?
[16] A. Yes.
[17] Q. And then the door going into the pool area,
[18] when you got into the dining room, had already
[19] been open, meaning slid, S-L-I-D, open for you?
[20] A. That door was already open.
[21] Q. And did you have two or three chairs with
[22] you at this point?
[23] A. Yes.
[24] Q. And what was Mr. Rizzo carrying?

Page 31

[1] A. I think he was carrying the table.
[2] Q. Well, he told me that you assisted him
[3] carrying the table when he gave his deposition.
[4] Which one is right?
[5]     MR. LANDON: Objection to the form.
[6]     THE WITNESS: I think that we were
[7] carrying first the chairs and then the table.
[8] BY MR. CASEY:
[9] Q. So how many chairs were you carrying?
[10] A. Three.
[11] Q. And was Mr. Rizzo carrying chairs at this
[12] point also?
[13] A. I don't remember very well. I don't
[14] remember if he was carrying chairs or the table.
[15] Q. All right. So you went into the pool area
[16] and put the chairs down?
[17]     MR. LANDON: Objection to the form.
[18]     THE WITNESS: Yes.
[19] BY MR. CASEY:
[20] Q. Did Mr. Rizzo come into the pool area with
[21] you?
[22] A. Yes. To drop the chairs that he had too.
[23] Q. So he was carrying chairs?
[24] A. I think so.

Page 32

[1] Q. Okay. And then you and Mr. Rizzo went back
[2] outside?
[3] A. Yes.
[4] Q. When you went from the pool area into the
[5] dining room to go back out to the patio, did you
[6] close the door between the pool and the dining
[7] room?
[8] A. When we dropped the chairs there?
[9] Q. No. You dropped the chairs, correct?
[10] A. Yes.
[11] Q. Then you went back into the dining room and
[12] then you went back out into the patio, correct?
[13] A. Yes.
[14] Q. To get the other furniture, correct?
[15] A. Uh-huh.
[16] Q. Yes?
[17] A. Yes.
[18] Q. When you left the pool area to go into the
[19] dining room before going out to the patio, did
[20] you close the door between the pool and the
[21] dining room?
[22] A. The problem is that I was going to -- we
[23] were carrying the chairs getting in. The owner
[24] of the house, the lady, came behind me, and she

Page 49

[1] soap?
[2] A. No.
[3] Q. The Clorox, was it a liquid Clorox or
[4] powder?
[5] A. Liquid.
[6] Q. And you and Mr. Rizzo cleaned the table and
[7] the chairs; is that correct?
[8] A. Yes.
[9] Q. Before you cleaned the table and the
[10] chairs, did you go into the house for any reason
[11] that morning?
[12] A. No.
[13] Q. Before you cleaned the table and the
[14] chairs, did you go into the pool area for any
[15] reason that morning?
[16] A. No.
[17] Q. After you cleaned the table and the chairs,
[18] it's my understanding that you've testified that
[19] had you to knock on the door, door number one, to
[20] get somebody's attention to let you in?
[21] A. Yes. To open the door.
[22] Q. And did someone come and open the door for
[23] you?
[24] A. Yes.

Page 50

[1] Q. Who was that? Can you describe the person?
[2] A. I don't remember it was the lady or the
[3] gentleman.
[4] Q. It may have been a lady or a gentleman, you
[5] don't recall?
[6] A. I don't remember that.
[7] Q. When you knocked who the door, where was
[8] Vinnie?
[9] A. He was helping me to clean the furniture.
[10] Q. Was he behind you carrying anything at that
[11] time when you knocked?
[12] A. Yes.
[13] Q. What he was carrying?
[14] A. I am not sure if he was carrying the table.
[15] I think that he was carrying the table, but I'm
[16] not sure.
[17] Q. And you think that at the time that you
[18] knocked on the door, door number one, you were
[19] carrying two or three chairs?
[20] A. Three chairs.
[21] Q. At the time either the gentleman or lady
[22] came and opened the door and you had the three
[23] chairs, what happened next? Tell me what
[24] happened?

Page 51

[1] A. I was carrying the chairs. I was turning
[2] to the left when I saw that the lady was
[3] screaming behind me, and she throw herself into
[4] the swimming pool. What I did is that I throw
[5] the chairs and I went to help the lady.
[6] Q. When they came and opened the door and you
[7] had two or three chairs, did you step into the
[8] dining room before the woman jumped into the
[9] pool?
[10] A. I was getting in with the chairs and I put
[11] the chairs to my left.
[12] Q. Did you -- before the woman jumped in the
[13] pool, did you go into the dining room and then
[14] into the pool area?
[15] A. Yes.
[16] Q. When you went into the pool area from the
[17] dining room, did you see the child in the pool?
[18] A. No.
[19] Q. Did you put your chairs down before the
[20] woman jumped into the pool?
[21] A. When I saw her jumping in, in the pool.
[22] Q. Did Vinnie come into the pool area before
[23] the woman jumped into the pool?
[24] A. I don't remember that.

Page 52

[1] Q. Do you know where Vinnie was when the woman
[2] jumped into the pool?
[3] A. I think that he was outside.
[4] Q. Did the woman, who jumped into the pool,
[5] push you at all?
[6] A. No. No.
[7] Q. The table that you had cleaned, do you know
[8] where it was when the woman jumped into the pool?
[9] A. I don't remember.
[10] Q. Do you know if it was already in the pool
[11] area or if it was still outside?
[12] A. I think I was already inside, but I don't
[13] remember that very well.
[14] Q. Did you help carry the table inside at all
[15] that day?
[16] A. I think so.
[17] Q. Do you think -- did you help carry the
[18] table into the pool area before the woman jumped
[19] into the pool?
[20] A. I didn't understand that question.
[21] Q. You said that you think that you helped
[22] carry the table into the pool area that day,
[23] correct?
[24] A. Yes. But I don't remember where we put it.