1

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF DELAWARE

- - -

| | | |
|---|---|---|
| JAMES H. GORBEY, JR., | : | CIVIL ACTION |
| Administrator of the | | |
| ESTATE of MARISSA ROSE | : | NO. 04-4098 |
| FISHMAN, Deceased | | |
| | : | |
| -vs- | | |
| | : | |
| RICHARD LONGWELL | | |
| | : | |

- - -

| | | |
|---|---|---|
| JAMES H. GORBEY, JR., | : | CIVIL ACTION |
| Administrator of the | | |
| ESTATE of MARISSA ROSE | : | NO. 04-4118 |
| Deceased | | |
| | : | |
| -vs- | | |
| | : | |
| ASHLAND CONSTRUCTION | | |
| COMPANY, INC., et al | : | |

- - -

Oral deposition of ERIC C. FISHMAN, taken on behalf of the Defendant, Richard Longwell, in the Law Offices of MURPHY, SPADARO & LANDON, 1011 Centre Road, Wilmington, Delaware, on Wednesday, April 5, 2006, commencing at or about 2:15 p.m., before Colleen A. Young, Court Reporter - Notary Public.

- - -

B & R SERVICES FOR PROFESSIONALS, INC.
235 SOUTH 13th STREET
PHILADELPHIA, PENNSYLVANIA 19107
(215) 546-7400
B&R Services for Professionals, Inc.

```
 1      A.    1992.
 2      Q.    At Sweet News, was that a sole
 3   proprietorship?
 4      A.    Yes.
 5      Q.    When you went to work at Airbase in 1992,
 6   what did you do there?
 7      A.    I ran a location in Philadelphia, Lomax Rug
 8   Company.
 9      Q.    You say you ran it.  Were you a manager of
10   a particular store at that location?
11      A.    Correct.
12      Q.    Obviously, they sold rugs.  Any other
13   products?
14      A.    All flooring from area rugs, broadloom,
15   wood, vinyl, ceramic.
16      Q.    Did you maintain that position at Airbase
17   from 1982 to 2002, or did your position change at
18   some point?
19      A.    My position changed.
20      Q.    When and to what?
21      A.    19, I guess 1994 it changed to vice
22   president till 2002.
23      Q.    When you became vice president in 1994, how
24   did your job duties change?
```

1   A.   Traveled to several locations, managing
2   employees, and that's basically it at that point
3   in '94.
4   Q.   As a vice president in 1994, were you a
5   step above the store managers?
6   A.   Yes.
7   Q.   Why did you leave in 2002?
8   A.   They terminated me. My father-in-law fired
9   me from the job.
10  Q.   And your father-in-law is who?
11  A.   Richard Longwell.
12  Q.   At some point you were married to Rochelle
13  Fishman, correct?
14  A.   1992.
15  Q.   At some point did you and Rochelle Fishman
16  separate?
17  A.   Marital home. How do you determine
18  separation?
19  Q.   Did there come a point when the two of you
20  were no longer living together?
21  A.   That would be -- let me give you the
22  exact -- I'm trying to figure out the exact date
23  for you. It would be middle of August 2002. It
24  would be --

1   from even prior to her -- even prior to her
2   announcement of getting a divorce, which would
3   have been 2001. December of 2001.
4   Q.  December of 2001 she told her parents that
5   she was -- or she told you?
6   A.  She didn't tell me in 2000 -- December of
7   2001. And I can't tell you what she had told her
8   folks, because I don't know.
9   Q.  Okay. Well, what makes you say that she
10  announced it in December of 2001?
11  A.  We were down at their property down in
12  Hallandale, Florida that we vacationed several
13  times a year, and the relationship that the -- it
14  was extremely uncomfortable because I could sense
15  there was a lot of tension, and different than
16  any other time. So I had a keen sense that
17  something was not right.
18  Q.  Can you explain the circumstances of your
19  termination from Airbase in, I don't think you
20  gave me a month, but you told me it was 2002?
21  A.  Yes. It was January of 2002.
22  Q.  What happened then?
23  A.  Richard, it wasn't him personally, the
24  controller, Arnold Frye, but Richard told him to

1     well, we represent the estate at this time.
2     There may have been some relationship between
3     Eric Fishman and our firm prior to the
4     appointment of the administrator of the
5     estate, and I will assert a privilege if
6     there are any type of attorney/client
7     relationship at that time. So I don't think
8     it's appropriate for him to testify about any
9     contact he had with our firm relating to the
10    claim of his or potential claim for his
11    deceased daughter.
12  BY MR. MAKARA:
13  Q.    Is it your understanding, Mr. Fishman, that
14  you were represented by Kline & Specter at some
15  point?
16  A.    Yes.
17  Q.    Okay. To the extent that I'm going to ask
18  you questions today about this claim by the
19  Estate of Marissa Rose Fishman, would you be
20  willing to waive any potential attorney/client
21  privilege between you and Kline & Specter?
22          MR. VAN NAARDEN: Again, we don't
23      represent Mr. Fishman for purposes of this
24      deposition, but, the attorney/client

B&R Services for Professionals, Inc.

```
 1         privilege would not terminate, or any
 2         discussions that we had or did not have with
 3         Mr. Fishman at that time wouldn't terminate
 4         upon our being appointed as counsel for the
 5         estate.  So I would instruct him not to
 6         answer.
 7              MR. MAKARA:  Agreed.  But he certainly
 8         can waive the privilege if he so chooses, and
 9         I don't think you can instruct him to answer.
10         In any case, it's up to you, Mr. Fishman.
11              THE WITNESS:  I would rather not.
12              MR. LANDON:  If I can have a
13         clarification.  I understand that you're not
14         representing Mr. Fishman for purposes of the
15         deposition today.  Is your firm currently
16         representing Mr. Fishman for any purposes?
17              MR. VAN NAARDEN:  No.
18    BY MR. MAKARA:
19    Q.   Mr. Fishman, if you just look at the
20         documents that I handed you.  Turning to the
21         second page, that document appears to be signed
22         by Thomas R. Kline, Esquire, and I think if I'm
23         reading it correctly it is dated January 11th of
24         2003.
```

1   Is that your understanding of when
2   this document would have been prepared?
3   A.   I guess you would be correct. I'm not sure
4   of the exact -- whether that's a seven or a one.
5   I'm not sure.
6   Q.   Whatever it is, it is.
7   A.   Yeah.
8   Q.   If you would turn to the fourth page. The
9   title of that document is Petition of Probate
10  Estate and Fiduciaries Code to Grant Letters of
11  Administration. Do you see that?
12  A.   I do.
13  Q.   What was your understanding of the purpose
14  of this document being filed?
15  A.   Do I need to...
16  Q.   I'm not asking you about anything that your
17  attorney told you, I just want your understanding
18  of why this document was being filed in Delaware
19  County?
20  A.   It's being filed in Delaware County because
21  that's where the -- where myself and my ex-wife
22  resided in Delaware County.
23  Q.   But do you know what this document was
24  asking for? What was its purpose in being filed

1      with the court?

2      A.    I guess it's to grant the letters of

3      administration.

4      Q.    With you as the administrator, correct?

5      A.    Correct.

6      Q.    If you go to paragraph five of that

7      document it says, Petitioner, Eric C. Fishman,

8      seeks to open the estate of his deceased

9      daughter, Marissa Rose Fishman, for the purposes

10     of initiating a civil action and/or conducting an

11     investigation regarding the death of Marissa Rose

12     Fishman which occurred on August 30th, 2002,

13     while she was in the custody and control of her

14     natural mother, Rochelle Fishman, and/or

15     grandparents, Barbara and Richard Longwell at the

16     Longwell residence.

17             Do you see that?

18     A.    I do see that.

19     Q.    Did you have an opportunity to review this

20     document before it was filed by your attorneys?

21     A.    I did.

22     Q.    And if you skip to the next to the last, or

23     third from the last page there, your name appears

24     in what appears to be a signature.  Is that your

1   signature on this document?
2   A.   That's my signature.
3   Q.   And you did sign this document before it
4   was filed by your attorney at that time?
5   A.   Yes.
6   Q.   What I just said that is set forth in
7   paragraph five, is that true and accurate as far
8   as you are concerned?
9   A.   It is.
10  Q.   Can you tell me why it was that you thought
11  that an investigation regarding the death of
12  Marissa Rose Fishman should be conducted?
13  A.   Considering that I was at work, Airbase
14  Carpet Mart, and Marissa Rose, who was at the
15  grandparents' home, and nobody has ever come to
16  me to tell me what actually happened in that
17  house.
18  Q.   Did you ever discuss what happened with
19  your wife?
20  A.   Absolutely not.  They would never -- nobody
21  has discussed, communicated, or in any fashion,
22  my ex-wife, or my ex in-laws, or anybody else
23  that was in that house.
24  Q.   So you've never discussed the circumstances

```
 1      with Richard Longwell either?
 2      A.    My ex-father-in-law.
 3      Q.    Or Barbara Longwell?
 4      A.    Correct.
 5      Q.    And that's at any time since the accident
 6      happened?
 7      A.    Absolutely.
 8      Q.    Did you ever discuss with either your wife,
 9      or Barbara or Richard Longwell, the prospect or
10      the idea of filing a lawsuit based upon the
11      accident?
12      A.    Absolutely not.
13      Q.    Did you believe at the time of the filing
14      of this document that you should be appointed as
15      the administrator of the Estate of Marissa Rose
16      Fishman as opposed to your wife Rochelle?
17      A.    I did.
18      Q.    Why?
19      A.    I felt that being the father I was entitled
20      to that.
21      Q.    Is there any reason that you didn't think
22      that your wife should be the administrator of the
23      estate?
24      A.    I did not.
```

1   Q.   You did not think that?

2   A.   No, no, no. I thought not.

3   Q.   Why didn't you think she should be the

4   administrator?

5   A.   I just decided that I should be.

6   Q.   Now, if you skip down to paragraph 12 of

7   that document, that says, Eric C. Fishman,

8   natural father of Marissa Rose Fishman, deceased,

9   requests he be appointed Administrator of the

10  Estate of Marissa Rose Fishman, deceased, so that

11  he may, amongst other things, retain counsel to

12  investigate the death of Marissa Rose Fishman,

13  and institute a lawsuit against any and all

14  parties responsible for the injuries to and death

15  of Marissa Rose Fishman, deceased.

16              Is that true and accurate?

17  A.   That's true.

18  Q.   Why was it that you thought it would be

19  necessary to instrument a lawsuit at the time

20  this document was filed?

21  A.   I lost my child at that house, and was

22  never -- nobody has ever come forward to tell me

23  anything about it. I felt that was my obligation

24  to my daughter.

1   Q.   Did you believe that someone was at fault
2   in the course of that accident?
3   A.   I would presume so. Absolutely.
4   Q.   Why?
5   A.   Considering there was, I'm going to
6   estimate, there was 14 people in that house, and
7   there were 14 responsible adults in that house
8   there was only one child, 20 months.
9   Q.   Did you ever have any type of court hearing
10  or appearance after the time that this petition
11  was filed?
12  A.   A court appearance?
13          MR. VAN NAARDEN: You mean as it
14      relates to the appointment of the
15      administrator?
16          MR. MAKARA: Right. Based upon this
17      petition.
18          THE WITNESS: I haven't appeared in
19      court on any other situation other than with
20      Matt Casey to -- within Delaware County with
21      Mr. Gorbey, I guess being...
22  BY MR. MAKARA:
23  Q.   Let me phrase it to you this way. This
24  petition -- from what we just read, this petition

```
 1    is asking the court to appoint you as the
 2    administrator of the estate, correct?
 3    A.    Correct.
 4    Q.    Did that ever happen?
 5    A.    It did.
 6    Q.    You were appointed the administrator of the
 7    estate?
 8    A.    I think Mr. -- maybe I'm getting confused.
 9    I think Mr. Gorbey was appointed administrator of
10    the estate.
11    Q.    Okay.
12    A.    That's...
13    Q.    Do you have any understanding as to why you
14    were not appointed administrator of the estate?
15    In other words, this petition was not granted by
16    the court.
17    A.    Right.
18    Q.    Do you know why?
19    A.    I believe because neither myself or my
20    wife, that Mr. Gorbey had to be appointed.
21    Q.    And you did go to court at some point to
22    discuss that, or present that to a judge, there
23    was some type of court appearance?
24    A.    There was.
```

```
 1    Q.    And you were present at that time?
 2    A.    I don't know if I was present.  I'm not
 3    sure.  I'm not sure.
 4    Q.    Do you know, as you sit here today, whether
 5    your wife, your ex-wife, agreed with the idea of
 6    filing a lawsuit on behalf of the Estate of
 7    Marissa Rose Fishman?
 8    A.    Whether he agreed?
 9    Q.    Yes.
10    A.    I haven't had any correspondence.
11    Q.    So you wouldn't know one way or the other?
12    A.    I haven't had any correspondence.
13    Q.    Did you ever discuss the filing of a
14    lawsuit on behalf of Marissa, your daughter, with
15    Mr. Gorbey?
16    A.    Personally with Mr. Gorbey?
17    Q.    Yes.
18    A.    No, I haven't spoken to Mr. Gorbey.
19    Q.    Did you ever discuss the filing of a
20    lawsuit on behalf of Marissa with anyone at Kline
21    & Specter?
22          MR. VAN NAARDEN:  Again, I object.
23          To the extent that it calls for privileged
24          information during a limited time period when
```

B&R Services for Professionals, Inc.

```
 1         we represented him for purposes of opening an
 2         estate, I will instruct him not to answer.
 3    BY MR. MAKARA:
 4    Q.   Okay.  I will pose that question to you
 5         limited to the time period after your petition
 6         had been denied, and since Mr. Gorbey has been
 7         appointed as the administrator, have you had any
 8         discussions since then with anyone from Kline &
 9         Specter?
10    A.   No, I have not.
11    Q.   Going back to the incident we talked about
12         in August of 2002 that happened in Longport, New
13         Jersey, were the police involved in that incident
14         at all?
15    A.   What report on what incident in Longport,
16         New Jersey?
17    Q.   You stated that your wife was at Longport,
18         down the shore in Longport visiting.
19    A.   No.  No.  I stated that she was visiting
20         her parents in Longport, came back, and drove
21         back to the marital home, and that's when she
22         drove up the driveway.
23    Q.   Were you in Longport in August of 2002?
24    A.   In Longport in 2002?  I guess.  A specific
```

<u>ERIC C. FISHMAN</u>                                36

1    time?

2    Q.    On that -- on that weekend, or whatever

3    time period it was that your wife took the

4    children and left, had you been in Longport that

5    day or the day before?

6    A.    Yeah.  I was in Longport, New Jersey,

7    correct.

8    Q.    That same day?

9    A.    No, I don't believe it was the same day,

10   but I'm trying to remember.  It might have been

11   the day before or so.

12   Q.    Was there any dispute between you and your

13   wife that occurred while the two of you were in

14   Longport, New Jersey in August of 2002?

15   A.    No.

16   Q.    On the day of the accident, Marissa's

17   accident, how did you find out about it?

18   A.    I received a phone call from my

19   ex-brother-in-law.  I was at Airbase Carpet Mart

20   working in the same office with my father-in-law.

21   Ex-father-in-law.

22   Q.    What location?

23   A.    Here in Delaware.  In New Castle, Delaware.

24   It's the main headquarters.

B&R Services for Professionals, Inc.

```
 1   Q.   Upon finding out about the accident, what
 2   did you do?
 3   A.   I immediately ran out to get into my car,
 4   and at that point my ex-father-in-law told me
 5   that he would drive me.
 6   Q.   And did he?
 7   A.   He did.  He got in the car, and the first
 8   things out of his mouth in that car was, I can't
 9   leave Barbara or Rochelle alone ever.
10   Q.   He can't, or you can't?
11   A.   No, I said he.
12   Q.   He said this?
13   A.   Richard said to me that he could not,
14   Richard Longwell could not leave Rochelle Fishman
15   and Barbara Longwell alone in the house.
16   Q.   Did he say anything else?
17   A.   I guess he apologized.
18   Q.   When you say he apologized, apologized to
19   who?
20   A.   He apologized to me.
21   Q.   For what?
22   A.   For what I just repeated to you twice.
23   Q.   What is it that you think he meant by that?
24   A.   That they're not responsible to be left
```