1  alone.

2  Q.    Did you have any discussion with Richard
3  about the accident, or anyone else that day about
4  the accident?

5  A.    When I arrived at the hospital my ex-wife
6  apologized. Told me she was sorry. And I had no
7  conversation.

8  Q.    Other than that, nothing else?

9  A.    I was pretty much -- let's see. I might
10 have -- I spoke with -- I wanted to find out
11 immediately what the emergency physician on hand,
12 how long Marissa was in the pool at that point,
13 and he had indicated that she was there for quite
14 some time.

15 Q.    What was his name?

16 A.    I'm not -- it was -- I'm not exactly -- I
17 know that if I was to take a stab at it, it was
18 an S-K-I or S-K-Y last name.

19 Q.    What exactly did he tell you? Do you
20 remember his exact words?

21 A.    He told me that she was -- because I wanted
22 to find out. My first response was to find out
23 how much down time there was. And he told me
24 that at that point she was in the pool for quite

1   some time.

2   Q.   Those were his exact words?

3   A.   Yes.  Absolutely.  And he tried to reassure
4   me that he was going to do everything he could
5   possibly do.  And at that point they moved her
6   upstairs and I was by my daughter's side the
7   entire time.

8   Q.   Did you ever have any conversation with
9   anyone else that day?

10  A.   There was -- there was the nurses, of
11  course, and other people telling me what
12  procedures they're going to do.  I had several
13  conversations with the doctor.  There was no
14  communication with my wife, or ex-wife.  There
15  was other family members that were there, and
16  nobody ever came up to me.

17  Q.   You didn't speak with anyone else that was
18  at the house at the time of the accident?

19  A.   I tried.  I tried asking everybody, and
20  nobody would talk to me.  That's the Longwell
21  family, everybody that was involved there.
22  Nobody would say anything.

23  Q.   Did you ever speak to the contractors who
24  were working at the house on that day, anyone

```
 1    employed by the contractors?
 2    A.    Sure.  Of course, I did.
 3    Q.    Who did you speak to?
 4    A.    There was a John Magner.  There was a
 5    Vinnie Rizzo.  There was two other workers there,
 6    and I apologize, I don't know the gentleman's
 7    name.  I'm familiar with who they are, but I
 8    don't know their names.  And I approached them.
 9    All they did was apologize, and they didn't
10    discuss anything.
11    Q.    Do you believe that the accident was the
12    fault of Barbara Longwell?
13    A.    Considering that she is the -- she lives --
14    she owns the property, she was there, it's her
15    home, I can't say that, you know, it's her
16    particularly.  It's 14 people in that house.
17    Fourteen adults.
18    Q.    How about Richard Longwell, do you believe
19    the accident was his fault in any way?
20    A.    It's his property.  To point who is at
21    fault, whether they had taken property security
22    measures and so forth, access to the pool and
23    outdoors locked, covered.  There are numerous
24    situations there.  The workers at the house.  I
```

```
 1    can stress to you once again it's a 20 month baby
 2    girl.
 3    Q.    Do you presently have custody of your
 4    children?
 5    A.    I do.
 6    Q.    Is that partial custody, or what is the
 7    arrangement?
 8    A.    Shared custody.
 9    Q.    How often do you have the children?
10    A.    I see my kids every other weekend;
11    Wednesdays, every other for dinner and a sleep-
12    over.  All holidays.
13              She gets, my ex-wife gets Jewish
14    holidays and that's when I see my kids.
15              MR. MAKARA:  I will turn it over to
16         my colleague.  I may have some questions for
17         you when he is done.
18    BY MR. LANDON:
19    Q.    Mr. Fishman, I am Roger Landon, and I
20    represent Vinnie Rizzo, and his company, and his
21    brother.
22              I'm not sure if I misheard you or
23    whether you may have misspoke, but I'm not clear
24    on the date that the controller met with you on
```

```
 1    202 and terminated you.  I think you said January
 2    of '02.  Is it January of '03?
 3    A.    Yes, it probably was.
 4    Q.    To give you a reference, the drowning
 5    occurred in August in of '02.
 6    A.    Right.
 7    Q.    So it was January of '03?
 8    A.    Correct.
 9    Q.    Do you happen to remember the month or the
10    season of the year when you went to the Kline &
11    Specter firm to retain them?
12    A.    No, I don't.  I don't recall that exactly.
13    Q.    Was it sometime after you were fired by
14    Airbase?
15    A.    Yes.  Absolutely.
16    Q.    Did they give you any severance package?
17    A.    They gave me nothing.
18    Q.    Was that a highly compensated position
19    while you were there for those ten years?
20    A.    Absolutely.
21    Q.    Was your compensation substantially higher
22    than it had been in your own business, Sweet
23    News?
24    A.    It was higher.
```

B&R Services for Professionals, Inc.

```
 1    Q.    And since that time, have you been able to
 2          earn compensation coming near anything that you
 3          were earning at Airbase?
 4    A.    No.
 5    Q.    I take it you really have no contact, other
 6          than maybe through lawyers, with your ex-wife
 7          since the -- since that day in the hospital when
 8          she apologized to you after you arrived at the
 9          hospital to find your daughter had drown; is that
10          correct?
11    A.    That's correct.
12    Q.    And I take it from what you're saying that
13          the whole Longwell family basically shut down and
14          stopped talking to you at that point, too?
15    A.    Correct.
16    Q.    Have you been able, through any source, to
17          obtain copies of any of the transcripts of the
18          depositions of the people who have given
19          deposition testimony in this lawsuit?
20    A.    You know, I haven't.
21    Q.    You're interested in finding out what
22          happened?
23    A.    I sure am.
24    Q.    Before the date of the drowning, had
```

B&R Services for Professionals, Inc.

1      Richard Longwell ever said anything to you, or in
2      your presence along the lines of what he said to
3      you in the car on the way to the hospital, which
4      you interpreted as his thought that neither his
5      wife nor his daughter were responsible enough to
6      stay in that house and take care of kids with
7      that pool being there?
8      A.    Repeat the question for me, please.
9      Q.    If I can, you mentioned that in the car
10     Richard Longwell, as he is driving you to the
11     hospital says something to the effect of, I can't
12     leave Barbara and Rochelle alone in that house
13     ever.  That's what I wrote down.  Something to
14     that effect.
15     A.    That's exactly how it was.
16     Q.    You interpreted that as Richard Longwell
17     saying my wife and my youngest daughter are not
18     competent to take care of the kids in the house?
19     A.    No.  Barbara Longwell and Rochelle
20     Longwell, not my youngest daughter.
21     Q.    I was saying Richard was talking about
22     Barbara, his wife, and Rochelle, his youngest
23     daughter.
24     A.    His youngest daughter.

1   Q.   Richard is saying my wife and daughter, in
2   my opinion aren't capable of looking after the
3   kids in the house. There is a swimming pool
4   there, and look what they've done. That's how
5   you interpreted it?
6   A.   That's how I interpreted it.
7        MR. MAKARA: I object to the extent
8        he never said anything about the swimming
9        pool.
10  BY MR. LANDON:
11  Q.   Is that what you thought he meant?
12  A.   Yeah, absolutely that's what I thought he
13  meant.
14  Q.   And I guess my question was, had he ever
15  expressed that sentiment to you or anyone else in
16  your presence before that day?
17  A.   Yeah, Richard had -- absolutely has brought
18  up at other times about his daughter and about
19  his wife.
20  Q.   Give me examples.
21  A.   Just the same type of, you know, of what he
22  told me in the car that this is, you know, as he
23  brought it across it was not an uncommon
24  situation.

1    Q.    Now you've mentioned that you -- as best
2    you can figure there were 14 adults in the house.
3    I'm going to tell you, based on the investigation
4    that has happened in the lawsuit, the police
5    report, the depositions, as best we can tell as
6    the lawyers here after the fact, are the six
7    family members, or employees of family members of
8    in the house, then my client, Vinnie Rizzo out-
9    side bringing stuff in and out, and his employee,
10   Mr. Ortiz.
11                So there would have been the great-
12   grandmother, Helen Longwell; Barbara Longwell;
13   Rochelle; her sister, Debra; her cousin, Allison;
14   a domestic, Theresa Savalla; and then Vinnie,
15   Vincent Rizzo and Salvatore Ortiz.
16                That's a total of eight people.
17   Altogether eight adults.
18   A.    Alexandra Fishman; Harrison Fishman; Samuel
19   Fishman.  That's more going.
20   Q.    Right.  They're all kids?
21   A.    Kids in -- sure, they're children.
22   Q.    But I thought you said earlier 14 adults.
23   I got eight adults and four kids.  I'm just
24   trying to figure out the people that you're aware

1    of that I'm not?

2    A.    Well, Barbara's sister, was she at the

3    house?

4    Q.    Right.  Barbara's sister.

5    A.    Was she at the house?

6    Q.    What is her name?

7    A.    I'm trying to remember.  It's been a long

8    time.

9    Q.    We've not heard that Barbara's sister was

10    at the house yet that day.  Barbara testified

11    that other family members were coming later that

12    day, but weren't there at the time.

13    A.    Okay.

14    Q.    You were under the impression that maybe

15    Barbara's sister was there?

16    A.    Barbara's sister, the husband.  Let's see

17    now.  Yeah, I was -- I was under the impression,

18    because there was a -- there was -- Michael had a

19    bris the day before, and there was a lot of

20    family members in for that.

21    Now whether they -- who was staying

22    where and who was there at that exact time, 8:30,

23    I can't exactly tell you the time, but I was at

24    work it was 8:30, 9 o'clock.  Yeah, I was under

1   the impression because there was a lot of family
2   members in from all other for that situation that
3   there would be other people at the house.
4   Q.   I take it that you had been in that house
5   in your ten years of marriage, yes?
6   A.   I have.
7   Q.   Did the Longwells have any particular rules
8   about the doors from the living space of the
9   house into the pool enclosure area?
10  A.   No rules.
11  Q.   Were there occasions where -- how many
12  occasions do you think you were in that house
13  before August of '02?
14  A.   I was married from '92.
15  Q.   Dozens of times?
16  A.   If not more.
17  Q.   And were there, on those occasions where
18  you were in the house, were there -- I take it on
19  most of those occasions there were at least some
20  kids around, your kids at least?
21  A.   Absolutely.
22  Q.   And other kids, cousins, and so forth?
23  A.   Yes.
24  Q.   Friends?

1   A.   Uh-huh.
2   Q.   The doors typically stayed closed and
3   locked, or were they sometimes open?
4            MR. VAN NAARDEN:  You're just
5       talking about the doors to the pool, Roger?
6            MR. LANDON:  Yes.
7            THE WITNESS:  Both.  Open and closed.
8   BY MR. LANDON:
9   Q.   Because what we've heard from the Longwell
10  family members is that there was this practice or
11  policy, if you will, that those doors were always
12  to remain locked while people were in the house,
13  and they were always shut and always locked all
14  the time.  Is that --
15  A.   That is not accurate.
16  Q.   Does that seem to be accurate as far as
17  your experience is concerned?
18  A.   No.
19  Q.   After the petition that Kline & Specter
20  filed on your behalf seeking to have you assigned
21  as the administrator of the estate of your
22  daughter, after that petition failed and you were
23  not appointed the administrator, is that when
24  your lawyer/client relationship with the firm

1       ended?

2       A.      Yes.

3       Q.      Did you ever hire another law firm to

4       advise you with respect to your potential rights

5       as a wrongful death plaintiff in a potential

6       lawsuit that you could file on your own against

7       the potentially responsible parties?

8               MR. VAN NAARDEN:  Objection.  You

9       can answer.

10              THE WITNESS:  No.  No.

11              MR. LANDON:  That's not a

12      privileged objection.

13              MR. VAN NAARDEN:  You can answer it if

14      you know.

15              THE WITNESS:  I haven't.

16      BY MR. LANDON:

17      Q.      So the Kline & Specter firm was the only

18      firm that you consulted with whatsoever with

19      respect to your daughter's death?

20      A.      Yes.

21      Q.      Is that true?

22              Did you ever make a decision not to

23      file a wrongful death claim on your own behalf

24      for the death of your daughter?