IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| JAMES H. GORBEY, JR., Administrator of the Estate of Marissa Rose Fishman, Deceased,<br><br>            Plaintiff,<br><br>    v.<br><br>RICHARD LONGWILL, BARBARA LONGWILL, AIR BASE CARPET MART, INC., d/b/a Air Base Distributing, Inc., d/b/a Air Base Carpet Mart, AIR BASE DISTRIBUTING, INC., ASHLAND CONSTRUCTION COMPANY, INC., JOSEPH RIZZO & SONS CONSTRUCTION VINCENT RIZZO CONSTRUCTION CO., INC., d/b/a Ashland Construction Co., Inc., JOSEPH V. RIZZO, VINCENT RIZZO,<br><br>            Defendants. | C.A. No. 05-211 KAJ<br>JURY TRIAL DEMANDED |

    Deposition of BARBARA H. LONGWILL, taken pursuant to notice at the law offices of Murphy, Spadaro & Landon, 1011 Centre Road, Suite 210, Wilmington, Delaware, beginning at 1:20 p.m. on Tuesday, March 7, 2006, before Heather M. Triozzi, Registered Professional Reporter, Certified Shorthand Reporter, and Notary Public.

Hawkins Reporting Service
715 North King Street - Wilmington, Delaware  19801
(302) 658-6697

1   here.
2   BY MR. VAN NAARDEN:
3       Q.  Okay.  Do you know if during the time that
4   Vinnie was doing his work on the patio if that
5   structure stayed intact or if he had to take it
6   down?
7       A.  No.  No.  No.
8           It was always -- it's always intact.
9   I mean, it's -- maybe they reinforce the piling,
10  the -- I'm in Florida now, the wood.
11          But, no, that's always there.
12      Q.  How long -- if we use a point in time,
13  August 30th, 2002 as the point in time, how long
14  prior to that time had Rochelle and the kids been
15  living at your house?
16      A.  Rochelle would really know the date,
17  because Eric had been -- the police had called
18  Rochelle.  We had been in New Jersey.
19          I don't remember when it was.  And
20  she drove home.
21          We were driving home in the car, and
22  we get a phone call that she had been called by
23  the police that her husband had been picked up in
24  Longport, that they thought he was crazy or

1   something.
2           And we were very afraid for
3   Rochelle, and even called our therapist to see if
4   we should bring her, you know, to protect her.
5   And we told her not -- you know, just to go home,
6   get a few things and come back to our house.
7   Otherwise, she was headed home.
8           She was living at home, even though
9   in separate bedrooms.  She was in the midst of a
10  divorce, you know, proceedings or separation at
11  the time.
12       Q.  After that initial time where you said she
13  grabbed a few things, did she ever go back to her
14  house to get more stuff to come and stay at your
15  house?
16       A.  I -- I think she was afraid to go back to
17  the house.
18       Q.  Do you know if that incident --
19       A.  She wanted Eric to leave.
20       Q.  -- when Eric was picked up by the police
21  and you got that phone call, and Rochelle and the
22  kids came to stay with you, was that during the
23  summer of 2002?
24       A.  Yes, that was.  Yes, it was just a few

1   weeks before.
2       Q.   It was a few weeks before August 30th?
3       A.   Correct.
4       Q.   To go forward from August 30, '02, how
5   long did Rochelle and the kids stay at this
6   particular property after August 30 of 2002?
7       A.   She was waiting for Eric to leave the
8   house until -- she just stayed there.  She
9   just -- school was close by, and her physician
10  was close by, her children's physician.
11      Q.   So do you know how long in time she
12  stayed, or is she still there?
13      A.   No.  She finally left.  She was there
14  almost two years.
15           She wasn't planning on that.
16      Q.   I understand.
17      A.   Neither was I.
18      Q.   I understand.  Did you make room for her
19  in the house and the kids when she came?
20      A.   Sure.  You make room for her.
21      Q.   And where did she stay?  Did they have
22  their own rooms?
23      A.   They didn't each have a room.  I'd have to
24  have a mansion for that.