IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF DELAWARE

— — —

JAMES H. GORBEY, JR.,        :        CIVIL ACTION
Administrator of the
ESTATE of MARISSA ROSE       :        NO. 04-4098
FISHMAN, Deceased

                             :

-vs-

                             :

RICHARD LONGWELL

                             :

— — —

JAMES H. GORBEY, JR.,        :        CIVIL ACTION
Administrator of the
ESTATE of MARISSA ROSE       :        NO.  04-4118
Deceased

                             :

-vs-

                             :

ASHLAND CONSTRUCTION
COMPANY, INC., et al         :

— — —

        Oral deposition of ERIC C. FISHMAN,

taken on behalf of the Defendant, Richard

Longwell, in the Law Offices of MURPHY, SPADARO &

LANDON, 1011 Centre Road, Wilmington, Delaware,

on Wednesday, April 5, 2006, commencing at or

about 2:15 p.m., before Colleen A. Young, Court

Reporter - Notary Public.

— — —

B & R SERVICES FOR PROFESSIONALS, INC.
235 SOUTH 13th STREET
PHILADELPHIA, PENNSYLVANIA 19107
(215) 546-7400
B&R Services for Professionals, Inc.

1     that.

2     Q.     Why did you contact Kline & Specter?

3     A.     For the death of my daughter Marissa Rose.

4     Q.     Did you consult with your wife at the time,

5     Rochelle, in the course of contacting Kline &

6     Specter about that matter?

7     A.     Contacted my...

8     Q.     Did you discuss it with your wife, the fact

9     that you were contacting Kline & Specter at that

10    time?

11    A.     No.

12    Q.     Was she involved at all in dealing with

13    Kline & Specter?

14    A.     None.

15    Q.     When you contacted Kline & Specter, did you

16    go there and meet with someone?

17    A.     I did.

18    Q.     Do you remember who that was?

19    A.     Tom Kline.  And also Diane Hockstein, Rob

20    Ross.  I think that was it.  Yeah, that was it.

21    Q.     What was the substance of your discussion

22    with them at that time?

23                  MR. VAN NAARDEN:  I object.  For

24            purposes of this deposition I don't know --

B&R Services for Professionals, Inc.

ERIC C. FISHMAN                                25

1          well, we represent the estate at this time.

2          There may have been some relationship between

3          Eric Fishman and our firm prior to the

4          appointment of the administrator of the

5          estate, and I will assert a privilege if

6          there are any type of attorney/client

7          relationship at that time.  So I don't think

8          it's appropriate for him to testify about any

9          contact he had with our firm relating to the

10         claim of his or potential claim for his

11         deceased daughter.

12   BY MR. MAKARA:

13   Q.     Is it your understanding, Mr. Fishman, that

14   you were represented by Kline & Specter at some

15   point?

16   A.     Yes.

17   Q.     Okay.  To the extent that I'm going to ask

18   you questions today about this claim by the

19   Estate of Marissa Rose Fishman, would you be

20   willing to waive any potential attorney/client

21   privilege between you and Kline & Specter?

22               MR. VAN NAARDEN:  Again, we don't

23          represent Mr. Fishman for purposes of this

24          deposition, but, the attorney/client

1       privilege would not terminate, or any

2       discussions that we had or did not have with

3       Mr. Fishman at that time wouldn't terminate

4       upon our being appointed as counsel for the

5       estate.  So I would instruct him not to

6       answer.

7               MR. MAKARA:  Agreed.  But he certainly

8       can waive the privilege if he so chooses, and

9       I don't think you can instruct him to answer.

10      In any case, it's up to you, Mr. Fishman.

11              THE WITNESS:  I would rather not.

12              MR. LANDON:  If I can have a

13      clarification.  I understand that you're not

14      representing Mr. Fishman for purposes of the

15      deposition today.  Is your firm currently

16      representing Mr. Fishman for any purposes?

17              MR. VAN NAARDEN:  No.

18  BY MR. MAKARA:

19      Q.    Mr. Fishman, if you just look at the

20      documents that I handed you.  Turning to the

21      second page, that document appears to be signed

22      by Thomas R. Kline, Esquire, and I think if I'm

23      reading it correctly it is dated January 11th of

24      2003.

1              Is that your understanding of when

2     this document would have been prepared?

3     A.    I guess you would be correct.  I'm not sure

4     of the exact -- whether that's a seven or a one.

5     I'm not sure.

6     Q.    Whatever it is, it is.

7     A.    Yeah.

8     Q.    If you would turn to the fourth page.  The

9     title of that document is Petition of Probate

10    Estate and Fiduciaries Code to Grant Letters of

11    Administration.  Do you see that?

12    A.    I do.

13    Q.    What was your understanding of the purpose

14    of this document being filed?

15    A.    Do I need to...

16    Q.    I'm not asking you about anything that your

17    attorney told you, I just want your understanding

18    of why this document was being filed in Delaware

19    County?

20    A.    It's being filed in Delaware County because

21    that's where the -- where myself and my ex-wife

22    resided in Delaware County.

23    Q.    But do you know what this document was

24    asking for?  What was its purpose in being filed

ERIC C. FISHMAN                                    28

1     with the court?

2     A.    I guess it's to grant the letters of

3     administration.

4     Q.    With you as the administrator, correct?

5     A.    Correct.

6     Q.    If you go to paragraph five of that

7     document it says, Petitioner, Eric C. Fishman,

8     seeks to open the estate of his deceased

9     daughter, Marissa Rose Fishman, for the purposes

10    of initiating a civil action and/or conducting an

11    investigation regarding the death of Marissa Rose

12    Fishman which occurred on August 30th, 2002,

13    while she was in the custody and control of her

14    natural mother, Rochelle Fishman, and/or

15    grandparents, Barbara and Richard Longwell at the

16    Longwell residence.

17              Do you see that?

18    A.    I do see that.

19    Q.    Did you have an opportunity to review this

20    document before it was filed by your attorneys?

21    A.    I did.

22    Q.    And if you skip to the next to the last, or

23    third from the last page there, your name appears

24    in what appears to be a signature.  Is that your

B&R Services for Professionals, Inc.

1        signature on this document?

2        A.     That's my signature.

3        Q.     And you did sign this document before it

4        was filed by your attorney at that time?

5        A.     Yes.

6        Q.     What I just said that is set forth in

7        paragraph five, is that true and accurate as far

8        as you are concerned?

9        A.     It is.

10       Q.     Can you tell me why it was that you thought

11       that an investigation regarding the death of

12       Marissa Rose Fishman should be conducted?

13       A.     Considering that I was at work, Airbase

14       Carpet Mart, and Marissa Rose, who was at the

15       grandparents' home, and nobody has ever come to

16       me to tell me what actually happened in that

17       house.

18       Q.     Did you ever discuss what happened with

19       your wife?

20       A.     Absolutely not.  They would never -- nobody

21       has discussed, communicated, or in any fashion,

22       my ex-wife, or my ex in-laws, or anybody else

23       that was in that house.

24       Q.     So you've never discussed the circumstances

ERIC C. FISHMAN                                    30

1        with Richard Longwell either?

2        A.      My ex-father-in-law.

3        Q.      Or Barbara Longwell?

4        A.      Correct.

5        Q.      And that's at any time since the accident

6        happened?

7        A.      Absolutely.

8        Q.      Did you ever discuss with either your wife,

9        or Barbara or Richard Longwell, the prospect or

10       the idea of filing a lawsuit based upon the

11       accident?

12       A.      Absolutely not.

13       Q.      Did you believe at the time of the filing

14       of this document that you should be appointed as

15       the administrator of the Estate of Marissa Rose

16       Fishman as opposed to your wife Rochelle?

17       A.      I did.

18       Q.      Why?

19       A.      I felt that being the father I was entitled

20       to that.

21       Q.      Is there any reason that you didn't think

22       that your wife should be the administrator of the

23       estate?

24       A.      I did not.

1    Q.    You did not think that?

2    A.    No, no, no.  I thought not.

3    Q.    Why didn't you think she should be the

4    administrator?

5    A.    I just decided that I should be.

6    Q.    Now, if you skip down to paragraph 12 of

7    that document, that says, Eric C. Fishman,

8    natural father of Marissa Rose Fishman, deceased,

9    requests he be appointed Administrator of the

10   Estate of Marissa Rose Fishman, deceased, so that

11   he may, amongst other things, retain counsel to

12   investigate the death of Marissa Rose Fishman,

13   and institute a lawsuit against any and all

14   parties responsible for the injuries to and death

15   of Marissa Rose Fishman, deceased.

16              Is that true and accurate?

17   A.    That's true.

18   Q.    Why was it that you thought it would be

19   necessary to instrument a lawsuit at the time

20   this document was filed?

21   A.    I lost my child at that house, and was

22   never -- nobody has ever come forward to tell me

23   anything about it.  I felt that was my obligation

24   to my daughter.

ERIC C. FISHMAN                                      32

1    Q.    Did you believe that someone was at fault

2    in the course of that accident?

3    A.    I would presume so.  Absolutely.

4    Q.    Why?

5    A.    Considering there was, I'm going to

6    estimate, there was 14 people in that house, and

7    there were 14 responsible adults in that house

8    there was only one child, 20 months.

9    Q.    Did you ever have any type of court hearing

10   or appearance after the time that this petition

11   was filed?

12   A.    A court appearance?

13                MR. VAN NAARDEN:  You mean as it

14         relates to the appointment of the

15         administrator?

16                MR. MAKARA:  Right.  Based upon this

17         petition.

18                THE WITNESS:  I haven't appeared in

19         court on any other situation other than with

20         Matt Casey to -- within Delaware County with

21         Mr. Gorbey, I guess being...

22   BY MR. MAKARA:

23   Q.    Let me phrase it to you this way.  This

24   petition -- from what we just read, this petition

ERIC C. FISHMAN                                    33

1      is asking the court to appoint you as the

2      administrator of the estate, correct?

3      A.     Correct.

4      Q.     Did that ever happen?

5      A.     It did.

6      Q.     You were appointed the administrator of the

7      estate?

8      A.     I think Mr. -- maybe I'm getting confused.

9      I think Mr. Gorbey was appointed administrator of

10     the estate.

11     Q.     Okay.

12     A.     That's...

13     Q.     Do you have any understanding as to why you

14     were not appointed administrator of the estate?

15     In other words, this petition was not granted by

16     the court.

17     A.     Right.

18     Q.     Do you know why?

19     A.     I believe because neither myself or my

20     wife, that Mr. Gorbey had to be appointed.

21     Q.     And you did go to court at some point to

22     discuss that, or present that to a judge, there

23     was some type of court appearance?

24     A.     There was.

1        Q.      And you were present at that time?

2        A.      I don't know if I was present.  I'm not

3    sure.  I'm not sure.

4        Q.      Do you know, as you sit here today, whether

5    your wife, your ex-wife, agreed with the idea of

6    filing a lawsuit on behalf of the Estate of

7    Marissa Rose Fishman?

8        A.      Whether he agreed?

9        Q.      Yes.

10       A.      I haven't had any correspondence.

11       Q.      So you wouldn't know one way or the other?

12       A.      I haven't had any correspondence.

13       Q.      Did you ever discuss the filing of a

14   lawsuit on behalf of Marissa, your daughter, with

15   Mr. Gorbey?

16       A.      Personally with Mr. Gorbey?

17       Q.      Yes.

18       A.      No, I haven't spoken to Mr. Gorbey.

19       Q.      Did you ever discuss the filing of a

20   lawsuit on behalf of Marissa with anyone at Kline

21   & Specter?

22                   MR. VAN NAARDEN:  Again, I object.

23            To the extent that it calls for privileged

24            information during a limited time period when

         B&R Services for Professionals, Inc.

1            we represented him for purposes of opening an

2            estate, I will instruct him not to answer.

3    BY MR. MAKARA:

4    Q.      Okay.  I will pose that question to you

5    limited to the time period after your petition

6    had been denied, and since Mr. Gorbey has been

7    appointed as the administrator, have you had any

8    discussions since then with anyone from Kline &

9    Specter?

10   A.      No, I have not.

11   Q.      Going back to the incident we talked about

12   in August of 2002 that happened in Longport, New

13   Jersey, were the police involved in that incident

14   at all?

15   A.      What report on what incident in Longport,

16   New Jersey?

17   Q.      You stated that your wife was at Longport,

18   down the shore in Longport visiting.

19   A.      No.  No.  I stated that she was visiting

20   her parents in Longport, came back, and drove

21   back to the marital home, and that's when she

22   drove up the driveway.

23   Q.      Were you in Longport in August of 2002?

24   A.      In Longport in 2002?  I guess.  A specific

                 B&R Services for Professionals, Inc.

1       time?

2       Q.      On that -- on that weekend, or whatever

3       time period it was that your wife took the

4       children and left, had you been in Longport that

5       day or the day before?

6       A.      Yeah.  I was in Longport, New Jersey,

7       correct.

8       Q.      That same day?

9       A.      No, I don't believe it was the same day,

10      but I'm trying to remember.  It might have been

11      the day before or so.

12      Q.      Was there any dispute between you and your

13      wife that occurred while the two of you were in

14      Longport, New Jersey in August of 2002?

15      A.      No.

16      Q.      On the day of the accident, Marissa's

17      accident, how did you find out about it?

18      A.      I received a phone call from my

19      ex-brother-in-law.  I was at Airbase Carpet Mart

20      working in the same office with my father-in-law.

21      Ex-father-in-law.

22      Q.      What location?

23      A.      Here in Delaware.  In New Castle, Delaware.

24      It's the main headquarters.

ERIC C. FISHMAN                                      50

1        ended?

2        A.      Yes.

3        Q.      Did you ever hire another law firm to

4        advise you with respect to your potential rights

5        as a wrongful death plaintiff in a potential

6        lawsuit that you could file on your own against

7        the potentially responsible parties?

8                       MR. VAN NAARDEN:  Objection.  You

9             can answer.

10                      THE WITNESS:  No.  No.

11                      MR. LANDON:  That's not a

12            privileged objection.

13                      MR. VAN NAARDEN:  You can answer it if

14            you know.

15                      THE WITNESS:  I haven't.

16       BY MR. LANDON:

17       Q.      So the Kline & Specter firm was the only

18       firm that you consulted with whatsoever with

19       respect to your daughter's death?

20       A.      Yes.

21       Q.      Is that true?

22                      Did you ever make a decision not to

23       file a wrongful death claim on your own behalf

24       for the death of your daughter?

                B&R Services for Professionals, Inc.

ERIC C. FISHMAN                              51

1    A.    No.

2    Q.    Did you know that you could have if you had

3    done so within two years of her death?

4    A.    I was informed.

5    Q.    Did you make a decision not to do that?

6    A.    Uh-huh.  I just -- I didn't bother.

7    Q.    Was there an autopsy done?

8    A.    That's a very good question.  A very good

9    question.

10            I had instructed to find out the

11   cause of death and also to have an autopsy done.

12   Barbara Longwell went back into that hospital --

13   came into that hospital and had requested not to

14   have autopsy due to the -- because it's in the

15   Jewish religion not to have an autopsy done.

16   Barbara Longwell -- I'm the father.  I went back

17   and instructed to have an autopsy done on the

18   body.

19   Q.    It didn't happen?

20   A.    You tell me.  You have all the records.

21   Q.    You don't know?

22   A.    Exactly.  You tell me.  Was that --

23   Q.    I don't know.

24   A.    Okay.  Do I?  I don't know either.  I don't

                B&R Services for Professionals, Inc.