1    work at the Coachman Road address?
2    A.   Gosh, I'd say prior, about a month
3    and a half ago.
4    Q.   Had you ever done any work at that
5    before?
6    A.   Oh, yes.  Many a times.
7    Q.   Tell me about that.
8    A.   As far as every bit of work, I could
9    back to the beginning and tell you every
10   of work I've done there.  I've been working
11   Mrs. and Mrs. Longwell, gosh, I'd say
12   some time now.
13   Q.   Can you summarize for me the work
14   done for them at that Coachman Road a
15   to August of 2002?
16   A.   Prior -- well within this job th
17   consist of the patio and of the pool,
18   walls that went to the pool, okay, that
19   erected, probably I'd say about a month
20   the -- to this incident.
21   Q.   So that would be in approximately
22   2002?
23   A.   Exactly.  It was in the summer.
24   Q.   Before that what kind of work did

B-1

1  was pretty much that phase of the job, of the pool
2  area.
3  Q.  So prior to your beginning work, was the pool
4  enclosed?
5  A.  Yes.
6  Q.  And can you just tell me -- I just don't
7  understand what --
8  A.  Absolutely.
9  Q.  You were changing the enclosure from what to
10 what?
11 A.  This pool -- this area of the pool was all
12 surrounded by glass.  The glass started getting
13 bad, started leaking.  So then what they wanted to
14 do was to replace the glass but not have the glass
15 go from the ground all the way up.  They wanted to
16 come up with a knee wall, I would say preferably
17 about four foot high, and the glass unit would sit
18 on top of the knee wall.
19 Q.  I see.  What else besides modifying the
20 enclosure on the pool were you expecting to be
21 doing on that job in August of 2002?
22 A.  Well, actually, the first phase of that job
23 was that, was the wall so they could get the glass
24 people in and get that pool enclosed.  After that

*B-2*

B & R Services for Professionals, Inc.

```
 1   then it was the patio area.  And --
 2   Q.  I'm sorry.  What were you going to be doing at
 3   the patio?
 4   A.  The patio we were installing pavers, the wrap
 5   around -- the inner part, there was like an L
 6   between the house and the enclosed pool area and we
 7   were covering that section with pavers on the
 8   outside of the house.
 9   Q.  Can you spell it, pavers?
10   A.  P-A-V-E-R-S.
11   Q.  And in laymen's terms just describe what you
12   mean by pavers?
13   A.  It's actually -- they come in all different
14   sizes, four by four, six by six, six by nine.  It's
15   actually a concrete paver.  It's actually like a
16   walking stone, like a cobblestone.
17   Q.  What were you doing first?  Were you going to
18   fix the enclosure on the pool first and then do the
19   patio work?
20   A.  The pool was completely done.
21   Q.  That was done first?
22   A.  That whole phase was done.  There was nothing
23   else to be done as far as that.
24   Q.  As of August 30, 2002 the modifications to the
```


B-3

B & R Services for Professionals, Inc.

```
 1    pool enclosure had already been completed?
 2    A.   It had been completed.
 3    Q.   How long did it take you to do that?
 4    A.   I would probably say -- I'd say probably about
 5    a week, week and a half.  Realistic probably about
 6    a week and a half.
 7    Q.   So if you started work -- I know I wasn't
 8    being specific necessarily about the exact date,
 9    but if you started approximately August 15, that
10    would take you up to about August 25 or so, about
11    five days before this accident that you completed
12    the pool enclosure work?
13    A.   Right.  This was prior, before -- this was not
14    within a week's time that this happened, within
15    each other.  This pool area was done probably about
16    two or three weeks before the pavers were even
17    started.
18    Q.   So as of about August 15 then, if the accident
19    happened on August 30 -- by the way you have
20    invoices for this stuff, right?
21    A.   Gosh, man I got to check.  I'm sure I do.  I
22    have to.
23    Q.   We can pin down the exact dates that you
24    worked?
```

B-4

B & R Services for Professionals, Inc.

```
 1    A.   There was a little ramp that came down here
 2    right to the sidewalk.
 3    Q.   Okay.  I understand.
 4              Were you physically present at the
 5    Coachman Road address each day that the pool
 6    enclosure work --
 7    A.   Yes.
 8    Q.   -- and the patio work was being done?
 9    A.   Absolutely.
10    Q.   Who was working with you from Ashland
11    Construction, and I'm talking about when the work
12    began, when you first started doing the pool
13    enclosure work?
14    A.   Oh, gosh, I guess -- well Salvador Ortiz, he
15    was with me -- he was with me for the pavers, and
16    he was with me for a little bit, I'd say of the
17    actual enclosure work of the pool area.
18    Q.   Was anyone else from Ashland Construction
19    there besides Mr. Ortiz?
20    A.   No.  That was about it.  He was about the only
21    gentleman that was there.
22    Q.   So for the few weeks that you were working at
23    the Coachman Road address first doing the pool
24    enclosure work, and then doing the patio paver
```

B-5

B & R Services for Professionals, Inc.

1  Q.   Did you and Mr. Ortiz have to bring tables and
2  chairs from any location into the pool area on the
3  day of the accident?
4  A.   Would you like me to tell the whole story?
5  Q.   Yes.
6  A.   Prior to when we got there -- okay, our work
7  consisted of on the outside, doing the pavers.  We
8  got there, I would say we were there for probably,
9  I'd say for about -- I'd say probably about half an
10 hour, forty-five minutes, maybe an hour, when we
11 got there.  Mrs. Longwell came outside, okay, and
12 there was actually a white table, and I believe
13 there was a couple chairs that were out there.  I
14 can't quite remember about the chairs too good, but
15 she asked me if we could clean up the table and the
16 chairs and bring them in, you know.
17       I said -- before we even did that, I
18 walked in with Mrs. Longwell, inside the house, I
19 followed her down into the pool area, and she said
20 this is where I would like you to set the table at.
21 Okay.
22       I proceeded to walk out of the house.
23 She was in front of me.  Walked out of the house,
24 walked back out the outside door, okay, and then

B-6

B & R Services for Professionals, Inc.

```
 1        started cleaning them?
 2        A.   These photographs aren't going to show it too
 3        good, but I can explain it to you.
 4                  The actual -- if I recall correctly, the
 5        actual table was right about here. Right in this
 6        area (indicating.)
 7        Q.   Let me make a record of what you're talking
 8        about. We're looking at GORB 27, photograph number
 9        10, the photograph on the lower half of the page,
10        and the witness is now going to describe, at least
11        as I understand, generally speaking, where he
12        thinks the table was.
13        A.   That's where the table was. That's not where
14        I started cleaning it. The table was brought out
15        from here because there was actually brick dust on
16        the table. The table was brought out from this
17        area, and it was brought over to here so I could
18        reach it with a hose.
19        Q.   There was brick dust on the table from the
20        patio work that you had been doing?
21        A.   Right. I mean there was brick dust,
22        settlement from the trees. The table was dirty.
23        It wasn't just all brick dust that was on it.
24        Q.   But there was brick dust on it?
```

B-7

```
 1   A.   There was -- I mean dust.  There was dust from
 2   the -- there was dust from the work I was doing,
 3   and there was berry marks on it from the trees that
 4   was coming down.  The table was just dirty.  It
 5   needed to be cleaned, regardless of whatever part
 6   of my stuff was, or whatever.
 7            From here the table was brought over to
 8   here.  And this is where it was cleaned at.
 9   Q.   Put a, if you would, sir, an A on this picture
10   where the table and the chairs --
11   A.   I --
12   Q.   Wait a minute -- where they were before you
13   moved them to clean them.
14   A.   (Witness complies.)  I'm going to say right
15   about there.
16   Q.   Put a B where they were when you cleaned them.
17   A.   (Witness complies.)  Right there.
18   Q.   In the location where you've marked with an A,
19   is that where both the table and the chairs were?
20   A.   Everything was brought to that "B" area to be
21   reached with the hose to be cleaned.
22   Q.   But the -- my question was is the "A" area
23   where both the table and the chairs were?
24   A.   I can't remember, Matt.
```



B-8

B & R Services for Professionals, Inc.

VINCENT J. RIZZO

1   Q.   In any event you brought everything to the "B"
2   area to clean it --
3   A.   Right.  I don't know --
4   Q.   Mr. Rizzo, I'm trying to be polite to you.
5   You've got to let me finish the question.  Okay.
6   Because we're not going to be able to read this,
7   and I know you're anxious, and you know what I'm
8   going to ask you, and you could tell me right away,
9   but try and bear with me.
10          Let me ask my question and then you give
11  the answer.  Okay.
12          The "B" area is the location to which
13  you brought the table and the chairs?
14  A.   Correct.
15  Q.   What type of table was it?
16  A.   A plastic -- I believe a plastic table.
17  Q.   What kind of chairs?
18  A.   Just regular plastic chairs.
19  Q.   Had they been in the patio area since you
20  fellows had started doing the work putting pavers
21  on the patio?
22  A.   Gosh, Matt, I can't remember that.  I don't
23  know.  Because in that area -- I had to cover that
24  area with pavers also.  The table could have been

B-9

B & R Services for Professionals, Inc.

1          You told me earlier that if that area
2   was left unguarded for a certain period of time,
3   you would have to close the doors, correct?
4   A.   I'm telling you this, if I walked in that
5   house, and I opened up that door, okay, then, yes
6   it's my responsibility to close it.  But I did not
7   open that door.
8          The only door I opened was from the
9   outside of that house, walking into that house.
10         I don't know why she wanted that door
11  opened.  There could have been a reason why she
12  wanted it open, but I know if I opened that door
13  physically myself, yes, then it would have been my
14  option to close it.
15  Q.   So if you opened the inside door --
16  A.   Correct.
17  Q.   -- then your failure to close it in between
18  when you did the work and when the accident
19  happened would be your fault?
20              MR. LANDON:  Objection.
21              THE WITNESS:  Say -- repeat that.
22  BY MR. CASEY:
23  Q.   If you opened the inside door, if it was you
24  rather than someone in the house, okay, are you

B - 10

VINCENT J. RIZZO

1   chairs down and going out onto the patio, to close
2   that door to the pool before you go get the cable,
3   correct?
4              MR. LANDON:  Objection.
5              THE WITNESS:  I mean --
6   BY MR. CASEY:
7   Q.   Agreed, yes or no?
8   A.   No.  It's not agreed totally to the whole
9   matter of it.
10  Q.   So that's not your job?
11  A.   Absolutely not.
12  Q.   If you were leaving that area, that is the
13  pool area, and the dining room and the patio
14  unguarded for a period of time, would it be your
15  job to make sure that those doors are closed after
16  you worked in that area?
17             MR. LANDON:  Objection.
18             THE WITNESS:  I mean -- I mean I'm
19      responsible for my work area.  That's what
20      I'm responsible for.
21  BY MR. CASEY:
22  Q.   Your work area that morning, sir, included the
23  pool area, correct?
24  A.   No.  No.  My work area that day --



B-11

B & R Services for Professionals, Inc.