Westlaw.

Not Reported in A.2d                                                                                                              Page 1

Not Reported in A.2d, 2003 WL 23009254 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

H
Only the Westlaw citation is currently available.
UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.
Superior Court of Delaware.
Jay HAWTHORNE, Plaintiff,
EDIS COMPANY and Edis Building Systems, Inc. and Ernest Disabatino and Sons, Inc. and Construction Safety Consultants, Inc. and Atlas Lab Associates and Atlas Point, LLC and Crystal Holdings, Inc. Defendants/Third Party Plaintiffs
v.
SUMMIT STEEL, INC. Third Party Defendant.
No. 01C-09-183 HLA.

Submitted May 19, 2003.
Decided July 14, 2003.

Upon Defendants, Edis Company and Crystal Holdings, Inc. and Third Party Defendant's Motions for Summary Judgment. Denied.

MEMORANDUM OPINION

ALFORD, J.
*1 On this 14th day of July 2003, upon consideration of EDIS Company ("EDIS"), Crystal Holdings, Inc. ("Crystal") and Summit Steel, Inc.'s ("Summit Steel") Motions for Summary Judgment, Plaintiff's Response in Opposition to the Motions and the record, it appears to the Court that:

STATEMENT OF FACTS

On April 6, 2000, Jay Hawthorne, ("Hawthorne") suffered a workplace injury which occurred as he was laying out metal decking at the Uniqema construction site in New Castle, Delaware while within the scope of his employment with Summit Steel. EDIS, the general contractor, subcontracted with Summit Steel to perform certain iron work in connection with the erection of a four-story building on the construction site. The structural steel framework was erected as well as the lower three floors decked.

Hawthorne and two other Summit Steel employees were laying decking on the roof of the Uniqema building. The two other employees were carrying a piece of sheet metal out to the front of the area where they were working. Hawthorne was working behind them and had just opened a bundle of sheets. Hawthorne was preparing to start shaking them out when a gust of wind came up. The two other employees began to lose control of the sheet that they were carrying and Hawthorne stopped to help them. The wind gust then lifted up a piece of sheet metal from one of the bundles which had been untied and it struck Hawthorne in the back causing him to fall fifteen feet to the deck below. A thirty foot tie-off policy was in effect at the construction site, pursuant to OSHA guidelines, thus Plaintiff was not wearing any fall protection at the time of the accident. EDIS implemented a six foot fall protection policy in March of 2002, one year after the date of this accident. Previous to 1996, EDIS Company had adopted a fifteen foot fall protection policy for steel erectors. At that time, this policy recognized a stricter guideline than the OSHA requirement. Unexplainably, after a worksite accident occurred in 1996, EDIS instituted a thirty foot tie-off policy which was ultimately in effect the day of Hawthorne's accident.

Hawthorne suffered a spinal cord injury with quadriplegia, leaving him unable to live independently. Plaintiff has a substantially reduced life expectancy and will require constant medical and nursing care in order to keep him alive.

The accident was investigated by Mr. George Warner, President of Construction Safety Consultants ("CSC"), Defendant's safety consultant for approximately twenty years. Prior to the accident, as a matter of routine, Mr. Warner would inspect the performance of the independent

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                           Page 2
Not Reported in A.2d, 2003 WL 23009254 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

contractors for safety compliance, prepare a letter containing his observations, and send the letter to Mr. Richard DiSabatino, EDIS' Safety Director, who would them usually route them throughout the company to various individuals on a routing slip. For assurance that the independent contractors received this information, Mr. DiSabatino would require that a representative from the company sign off on the routing slip and return it to EDIS. The prepared safety inspection reports in the weeks preceding the accident were never sent to Summit Steel. Additionally, subsequent to a similar accident in 1996, Mr. Warner recommended a six foot tie-off policy and EDIS agreed to adhere to this policy, but did not implement it until March of 2001, approximately one year after Plaintiff's accident.

*2 In his Complaint filed September 25, 2001, Hawthorne alleges that EDIS was negligent in that it failed to inspect the project for dangerous conditions and failed to provide a safe work area for Hawthorne. Further, Hawthorne contends that this accident was foreseeable and EDIS, despite notice, did not follow the advice of their own safety consultant to change the fall protection policy employed at the construction site. Hawthorne argues that this failure demonstrates a reckless indifference to a foreseeable risk to the steel workers. EDIS acts solely as a construction management company and contracted with co-defendant, Atlas Point as general contractor for the Uniqema project.

EDIS moves the Court for Summary Judgment in its favor as it alleges that the undisputed facts compel the conclusion that EDIS owed no duty to Hawthorne, was not negligent, and thus is not liable for the injuries Hawthorne sustained by falling off of a roof while working for EDIS' subcontractor, Summit Steel. Summit Steel's arguments support EDIS's arguments and where they differ, are discussed separately. Crystal's arguments are discussed separately below.

STANDARD OF REVIEW

Summary judgment is appropriate when the moving party has shown that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law.[FN1] In considering such a motion, the Court must evaluate the facts in the light most favorable to the non-moving party.[FN2] Summary judgment will not be granted under circumstances where the record reasonably indicates that a material fact is in dispute or if it seems desirable to inquire more thoroughly into the facts in order to clarify the application of law to the circumstances.[FN3]

FN1. *Moore v. Sizemore*, 405 A.2d 679 (Del.1979).

FN2. *Id.*

FN3. *Ebersole v. Lowengrub*, 180 A.2d 467 (Del.1962).

LIABILITY OF GENERAL CONTRACTOR

It is well settled under Delaware law that neither the owner nor general contractor has a duty to protect an independent contractor's employee from hazards created by doing of the contract work or condition of the premises or manner in which work is performed, unless the owner or general contractor retains active control over the manner in which the work is carried out and the methods used.[FN4] While the concept of active control is an elastic one, it is ordinarily not inferred from the mere retention by the owner or general contractor of a right to inspect the work of an independent contractor or to exercise general superintendence over such work in order to assure complicity with the contract terms.[FN5] However, if the authority exerted by the general contractor over the work is insufficient to render it liable under the general rule regarding active control, " 'the owner may still be liable to some extent if it retained sufficient control over part of the work or if it retained possessory control over the work premises during the work." '[FN6] Furthermore, in the absence of "active control," a general contractor can, in some circumstances, be held liable where the general contractor has " voluntarily assumed responsibility for workplace safety."[FN7] "Whether a duty exists is entirely a question of law, to be determined by reference to

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                                          Page 3
Not Reported in A.2d, 2003 WL 23009254 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

the body of statutes, rules, principles, and precedents which make up the law; and it must be determined only by the court." [FN8]

> FN4. *O'Connor v. Diamond State Telephone Co.*, 503 A.2d 661, 663 (Del.Super.Ct.1985)(citing *Williams v. Cantera*, 274 A.2d 698 (Del.Super.Ct.1971)).
>
> FN5. *Id.* at 662 (citing *Seeney v. Dover Country Club Apartments, Inc.*, 318 A.2d 619 (Del.Super.Ct.1974).
>
> FN6. *Bryant v. Delmarva Power & Light Co.*, 1995 WL 653987 at *7 (Del.Super.Ct.).
>
> FN7. *Kilgore v. R.J. Kroener, Inc.* 2002 WL 480944, *7 (Del.Super.Ct.).
>
> FN8. *Id.*

### CONTENTIONS OF EDIS COMPANY

*3 EDIS contends that no evidence has been produced which suggests that EDIS retained active control over the methods or manner of the particular work performed by Hawthorne or control of the areas in which Summit Steel employees were working. EDIS points to the testimony of its safety coordinator, who testified that each construction subcontractor is responsible for the safety of its own employees, as well as the procedures, means and methods specific to their trades. EDIS argues that it is not an expert in specific construction trades and the safety measures specific to ironworking, thus EDIS maintains it cannot be held liable. EDIS further contends that there exists no competent evidence that it actively controlled the rooftop area in which Hawthorne was working, nor did it voluntarily assume responsibility for workplace safety on the Uniqema project, contractually, impliedly, or otherwise.

EDIS points out that Delaware courts have held that contractors are not liable for injuries sustained by a subcontractor's employees from the ordinary and customary risks common to construction work. [FN9] EDIS states that the danger of falling from a construction site during structural steel erection is an ordinary and customary risk common to ironworkers. EDIS argues that there is simply no duty on its part to insure its subcontractors from customary risks of the trade. EDIS further points out that it does not supply tools, safety equipment, or training for its subcontractors.

> FN9. *Bowles v. White Oak, Inc.* 1988 WL 97901 at *7 (Del.Super.Ct.).

Finally, EDIS asserts that Summit Steel was not in violation of any OSHA regulations when installing the metal decking. EDIS further states that OSHA does not impose any standard of care or duty upon EDIS beyond that imposed by Delaware common law.

### CONTENTIONS OF PLAINTIFF

Hawthorne asserts that (1) there was a voluntary assumption of safety by EDIS; (2) there was a contractual obligation owed by EDIS; (3) EDIS controlled the means and methods of Summit Steel's decking work and (4) EDIS controlled the work area where the decking work was being performed. Hawthorne further contends that although EDIS is not an expert in steel erection, EDIS was familiar with the need for appropriate fall protection for steel erection. Hawthorne states that EDIS was aware of this need because of a serious career ending incident involving Jacob Boyce on July 1, 1996, at EDIS' Wilmington Trust project.

Hawthorne points out that after this incident, EDIS was informed by its own Safety Consultant that it was necessary to adopt a six foot tie-off for fall protection in order to avoid a subsequent accident. Hawthorne contends that EDIS ignored its Safety Consultant's advice and proceeded to allow iron work to be done pursuant to OSHA requirements which permitted iron workers to fall a distance of thirty feet without any type of fall arrest system. Despite the recommendation of its Safety Consultant in 1996, EDIS did not implement a six

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                                                Page 4
Not Reported in A.2d, 2003 WL 23009254 (Del.Super.)
(Cite as: Not Reported in A.2d)

foot fall protection policy until March of 2002, one year after the date of this accident and five years after the date of the Jacob Boyce incident. Previous to the Boyce accident in 1996, EDIS had adopted a fifteen foot fall protection policy for steel erectors. This fifteen foot policy recognized a stricter guideline than the OSHA requirement and was contemporaneous with a shift in the industry to a tightening up on fall protection for steel erectors.

*4 Hawthorne argues that EDIS' contractual obligation requires it to accept ultimate responsibility for safety at the job site and EDIS knew how to deal appropriately with the inherent risks presented by falls of fifteen feet or less from firsthand experience and from the advice of its Safety Consultant. Further, Hawthorne maintains that EDIS "controlled" the safety aspect of the Uniqema worksite, as it controlled the tie-off policy.

*Voluntary Assumption of Safety*

Hawthorne points out that in Delaware, those who have responsibility for workplace safety must take reasonable measures to ensure the safety of those at the worksite.[FN10] A duty to ensure workplace safety can be imposed upon a party who "by agreement or otherwise, undertakes responsibility for implementing the required safety measures.[FN11] When a breach of this duty causes injury to a worker, the responsible party can be held liable under negligence law.

>
> FN10. *Bryant v. Delmarva Power & Light Co.*, 1995 WL 653987 at *7 (Del.Super.Ct.).
>
> FN11. *Figgs v. Bellevue Holding Company*, 652 A.2d 1084, 1092 (Del.Super.Ct.1994)(citing *Rabar v. E.I. duPont de Nemours & Co.*, 415 A.2d 499, 505 (Del.Super.Ct.1980)).

Hawthorne states that through a twenty year relationship with its Safety Consultant and the customary practice of not only inspecting the iron workers' work but also stopping the work and directly instructing the iron workers that EDIS voluntarily assumed a responsibility for safety at the work site. Additionally, Hawthorne contends that EDIS assumed the responsibility of safety pursuant to its obligations under the contract and executed this responsibility, in part through the assistance of Construction Safety Consultants.

Hawthorne further enumerates that EDIS assumed a duty of workplace safety evidenced by: (1) the hiring of Construction Safety Consultants ("CSC") to regularly monitor, supervise and enforce safety compliance by subcontractors including Summit Steel; (2) the sending of Safety Compliance Citations to the offending contractors; (3) accident investigation by CSC; (4) EDIS's Zero Accidents Safety Program; and (5) the recognition of the need for and the adoption of a fall protection policy for steel erectors which exceed the minimum safety requirements of OSHA.

Hawthorne relies on *Rabar v. E.I. duPont de Nemours & Co., Inc.*,[FN12] in which the Court examined record facts tending to show voluntary assumption of safety and considered it significant that duPont had assigned its own safety engineer to oversee safety aspects of the construction. In the instant case, Plaintiff points to testimony of Mr. Warner, who describes how he provided safety instruction and some training directly to the subcontractors and was involved in the enforcement of safety compliance by dealing directly with the employees of the independent contractor. On his first visit to the worksite, Mr. Warner observed that Summit Steel ironworkers were not tied off and he stopped them, informed them that they had to learn how to tie off and use their harnesses and he later wrote a report stating this information.

>
> FN12. 415 A.2d 499, 507 (Del.Super.Ct.1980).

One of the prepared safety inspection reports dated March 8, 2000, specifically highlighting the need for formal fall protection training of Summit Steel employees, was never acted upon by Mr. DiSabatino and was not sent to Summit Steel.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                                                  Page 5
Not Reported in A.2d, 2003 WL 23009254 (Del.Super.)
(Cite as: Not Reported in A.2d)

*5 Furthermore, Plaintiff points but that after the 1996 Boyce incident, Mr. Warner discussed the need to adopt a six foot tie off policy with Richard DiSabatino, EDIS' Safety Director. Mr. DiSabatino was in agreement with Mr. Warner regarding this new standard. Upon subsequent inquiry, over a four year period, Mr. DiSabatino stated that he was "working on it" with regard to implementation of this policy. EDIS Company does not contest that it had actual notice that this six foot fall protection policy, which is stricter than OSHA guidelines, was necessary to protect steel workers.

As Hawthorne points out, the principle of voluntary assumption of safety is stated in the Restatement of Torts (Second) Section 324A (1965) below:
One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if (a) his failure to exercise reasonable care increases the risk of such harm, or (b) he has undertaken to perform a duty owed by the other to the third person, or (c) the harm is suffered because of reliance of the other or the third person upon the undertaking.

Hawthorne specifically contends that by EDIS' clear pronouncement of preventing future accidents in its Zero Accident Safety Manual, stating the acceptance of the need for a six foot tie-off policy after the Boyce accident, and Mr. Warner's testimony that EDIS was "working on it" over the years preceding Hawthorne's accident, a factual issue is raised as to whether EDIS voluntarily assumed the duty to change its fall protection standard for steel erectors and follow the advice of its safety consultant in order to protect future ironworkers from injury. Hawthorne would have been in the class of individuals which EDIS' new fall protection policy would have protected. Hawthorne points out that there exist questions of fact as to whether EDIS owed a duty to Hawthorne and whether EDIS exercised reasonable care in its unexplained failure to follow through on changing its fall protection requirements and adopting a six foot tie-off standard for steel erection prior to Hawthorne's accident.

Finally, with regard to EDIS' OSHA compliance, Hawthorne points out that OSHA provides that nothing in OSHA shall be construed to "enlarge or diminish or effect in any other manner the common law or statutory rights, duties or liabilities of employers and employees under any law with respect to any injuries, diseases or death of employees arising out of, or in the course of, employment." [FN13] Thus, Hawthorne contends, that OSHA is not determinative of the duty or the standard of care, especially considering all of the warnings EDIS ignored. The Court concurs with this contention.

FN13. 29 U.S.C. § 653(b)(4).

*Contractual Obligation*

Hawthorne relies on clauses in two contracts: 1) the contract between Owner, Atlas Point, LLC and EDIS for the construction of the Uniqema office building and 2) the subcontract between EDIS and Summit Steel. The contract between EDIS and Atlas Point, LLC incorporates by reference AIA General Terms and Conditions. The relevant sections are as follows:
*6 3.3.1. of the General Conditions, "[EDIS] shall be solely responsible for and have control over construction means, methods, techniques, sequences and procedures and for coordinating all portions of the Work under the Contract unless the Contract Documents give other specific instructions."

Article 10 of the contract between EDIS and Atlas Point, LLC provides in applicable part: 10.1.1 [EDIS] shall be responsible for initiating, maintaining and supervising all safety precautions and programs in connection with the performance of the [EDIS-Atlas] Contract.
10.1.2 Safety of Persons and Property
10.1.2.1 [EDIS] shall take reasonable precautions for the safety of, and shall provide reasonable protection to prevent damage, injury or loss to employees on the Work and other persons who may be affected thereby.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                 Page 6
Not Reported in A.2d, 2003 WL 23009254 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

10.1.2.3 [EDIS] shall erect and maintain, as required by existing conditions and progress of the work, all reasonable safeguards for the safety and protection.

10.1.2.6 [EDIS] shall designate a responsible member of the Contractor's organization at the site whose duty shall be the prevention of accidents.

In *Kilgore*, the Court considered the testimony of the parties in order to determine how that testimony related to contract performance.[FN14] The *Kilgore* Court concluded that the actions of the parties did not rise to the level of active control and that there was no voluntary assumption of safety.[FN15] Hawthorne states that the record was silent as to the parties' interpretation of their contractual obligations. Hawthorne further points to the testimony of Richard DiSabatino to illustrate that EDIS did not contract away its responsibility for overall workplace supervision and oversight, but rather shared the duty with Summit Steel. Further, Mr. DiSabatino testified that EDIS was responsible for supervising all safety precautions and programs in connection with the contract. Hawthorne argues that this responsibility for supervising all safety distinguishes the instant case from the *Kilgore* case where the actions of the parties did not rise to the level of active control and there was no voluntary assumption of safety.[FN16]

> FN14. *Kilgore v. R.J. Kroener, Inc.*, 2002 WL 480944 (Del.Super.Ct.).
>
> FN15. *Id.*
>
> FN16. *Id.*

The *Kilgore* case may further be distinguished from the instant case, because in *Kilgore* testimony indicated that rather than taking corrective measures themselves, representatives of the general contractor, would go to the subcontractors representatives.[FN17] In the instant case the safety consultant went directly to the employees of the subcontractor and informed them that they were not tied off and that they had to do so.

> FN17. *Kilgore v. R.J. Kroener, Inc.*, 2002 WL 480944, at *8 (Del.Super.Ct.).

*Defendant's Control of Means and Methods*

Hawthorne first points out that in *Cook v. E.I. duPont deNemours and Company* the Court held that whether defendant retained active control over the plaintiff could not be determined as a matter of law, and the Court found an appropriate factual issue for the jury in that: a) a duPont (the general contractor in that case) supervisor was present at the construction site on a daily basis, b) a duPont supervisor was engaged in communication with the subcontractor on a daily basis, c) duPont supplied tools to the subcontractor on at least one occasion, d) duPont actively controlled, directed, and restricted movements of the subcontractor's employees and e) duPont inspected the subcontractor's offices and vehicles retaining the ability to search the premises in case of a problem.[FN18]

> FN18. 2001 WL 1482685 (Del.Super.Ct.).

*7 In the instant case, Hawthorne points out that similarly: a) an EDIS supervisor was present at the construction site on a daily basis, b) an EDIS supervisor was engaged in communication with the subcontractor, c) supplied tools and materials to Summit Steel, and d) EDIS actively controlled, directed, and restricted the movements of the Summit Steel employees. Hawthrone, thus contends that viewing the facts in the light most favorable to the Plaintiff, the Court should find that EDIS sufficiently "interjected itself" into the day-to-day operations of Summit Steel to such an extent that genuine issues of material fact exist on the issue of control over the means and methods of the decking work performed by Summit Steel.

*Defendant's Control of Work Area*

Hawthorne further maintains that a question of fact is presented as to whether EDIS owed a duty as EDIS maintained control of the work area. Hawthorne points out that although the *Rabar* case

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d

Page 7

Not Reported in A.2d, 2003 WL 23009254 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

was overruled on other grounds, the *Rabar* work-area control test is still intact.[FN19] Hawthorne states that in *Rabar*, "although [the owner] did not retain any direct control over most of the individual workers, including plaintiff, in the manner of performance of their day-to-day jobs, a jury could reasonably find that [the owner] had retained sufficient control generally over the project and the job site to render it jointly responsible, along with the various contractor-employers, for proper safety regulation implementation." [FN20] Hawthorne goes on to point out that the Uniqema project was a multi-employer worksite and that at the time of the incident two Connectiv employees were working in the area below, and were within approximately 15 to 20 feet of the fall. Hawthorne, therefore, maintains that safe fall protection policies are required not only for the protection of the ironworkers, but for the safety of the workers below and all workers on the worksite. Hawthorne distinguishes the *Bryant* case, in which the Court concluded that the owner did not retain control over the work area where the plaintiff's accident occurred and noted that at the time of the incident the only workers in the area were subcontractor employees.[FN21] In the instant case, Connectiv employees were in close proximity, working below Hawthorne. Hawthorne contends that it is EDIS, not Summit Steel that is in the position of authority to provide a safe workplace for all trades relative to the fall protection issues. Hawthorne states that Summit Steel has no supervisory responsibility or oversight responsibility for Connectiv. Hawthorne further asserts that EDIS permitted Summit Steel workers to work at heights of up to thirty feet without fall protection policies and since the average height between floors of the building was approximately fifteen feet, this put workers at risk of death or injury and the only way to eliminate or guard against that risk would be to enforce a six foot tie off policy. Additionally, Hawthorne points out that EDIS adopted a fifteen foot tie off policy previous to the Boyce incident in 1996. Hawthorne relies on this to illustrate that EDIS had "control" of the fall protection mandate at the worksite. Also, Hawthorne contends that EDIS' adoption of the 100% fall protection in March of 2001, meaning the six foot fall protection standard, for steel erectors is further evidence that EDIS "controlled" this important safety issue which affects workers of different subcontractors at the worksite.

> FN19. *Bryant v. Delmarva Power & Light Company*, 1995 WL 653987, at *7 (Del.Super.Ct.).

> FN20. *Rabar v. E.I. duPont de Nemours & Co., Inc.*, 415 A.2d 499, 507 (Del.Super.Ct.1980).

> FN21. *Bryant v. Delmarva Power & Light Company*, 1995 WL 653987 (Del.Super.Ct.).

### ADDITIONAL CONTENTIONS OF THIRD PARTY DEFENDANT

*8 Summit Steel supports all of EDIS' arguments and further states that Plaintiff's argument is flawed for two reasons: 1) there is no evidence that the factual circumstances regarding the Connective employees constitutes an overlapping work area within the meaning of the rule articulated in *Rabar*, and 2) even if this were an overlapping work area, the letter and spirit of the rule dictates that Connective, not EDIS, would be the party which would share in the responsibility for the safety of Hawthorne's work area. However, this mischaracterizes Hawthorne's argument as Hawthorne alleges that ultimately, EDIS had control of the work site. As Hawthorne has demonstrated, a jury could reasonably find that EDIS was in control of the worksite or that it voluntarily assumed control of safety at the worksite. Consequently, neither EDIS, nor Summit Steel are entitled to summary judgment on either issue.

### CONTENTIONS OF CRYSTAL HOLDINGS, INC.

Crystal is a holding company under which EDIS operates. Crystal is the majority stock owner and employs all individuals working for EDIS. It does not hold itself out in the construction industry as being involved in the construction business, but

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

http://print.westlaw.com/delivery.html?format=HTMLE&dataid=B005580000028930004...    5/30/2006

Not Reported in A.2d                                                                                                        Page 8

Not Reported in A.2d, 2003 WL 23009254 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

operates as a payroll management company to facilitate the division of union and non-union employees under Crystal Holdings, Inc. As such, Crystal states it does not owe a duty to Hawthorne.

However, Hawthorne contends that Crystal is liable to the Hawthorne for the acts of its agent subsidiary. Hawthorne points out that Crystal owned all of EDIS' stock, Crystal and EDIS had common officers and directors, Crystal supplied all of EDIS' employees and paid these employees. Hawthorne points to *Rhoads v. Ammeraal* which states that for the parent corporation to be liable for its subsidiary's activities it must dominate those activities.[FN22] Some factors to consider in determining this domination are: stock ownership, officers and directors, financing, responsibility for day-to-day operations, arrangements for payment of salaries and expenses and origin of subsidiary's business and assets.[FN23] In the instant case, Hawthorne points out that Andrew DiSabatino, Brian DiSabatino, and Richard DiSabatino own all of Crystal's stock. In turn, Crystal owns all of EDIS' stock. Crystal and EDIS share corporate officers and directors. Andrew DiSabatino is the President of Crystal and the C.E.O. of EDIS. Richard DiSabatino is Crystal's Safety Director and the Director of EDIS. Brian Disabatino is the Operations and Marketing Director of Crystal and a Vice President of EDIS. As Hawthorne points out these facts demonstrate that the same three people dominated both companies. Hawthorne contends that Crystal exercised sufficient control over EDIS Company to hold Crystal responsible under an agency theory. Crystal had responsibility for the day-to-day operations because EDIS has no employees. Thus, even though Crystal states that it operates only as a payroll management company for EDIS, Crystal employees do construction management work.

FN22. 1988 WL 32012 (Del.Super.Ct.).

FN23. *Id.* at 4 (citations omitted).

*9 The Court finds that the evidence in the record raises a factual question as to whether Crystal controlled the day to day operations of EDIS.

## DISCUSSION

In order to hold EDIS liable for Hawthorne's injury under negligence principles, Hawthorne must show that EDIS had a legal duty to protect him from the type of harm that caused his injury.[FN24] As discussed, generally an owner or general contractor does not have a duty to protect the employees of an independent contractor from the hazards of completing the contract.[FN25] Thus, an exception to the general rule of lack of duty must be present. In other words, the general contractor, must either retain active control over the manner in which the work is carried out and the methods used or voluntarily assume responsibility for workplace safety.[FN26]

FN24. *Bryant v. Delmarva Power & Light Company*, 1995 WL 653987, *2 (Del.Super.Ct.).

FN25. *O'Connor v. Diamond State Tel. Co.*, 503 A.2d 661, 663 (Del.Super.Ct.1985).

FN26. *Kilgore v. R.J. Kroener, Inc.*, 2002 WL 480944, at *6-*7 (Del.Super.Ct.).

Viewing the facts in the light most favorable to the Hawthorne, the Court finds that Hawthorne is correct in his assertion that there exists a question of fact as to whether EDIS owed a duty to Hawthorne. "Delaware law measures duties owed in terms of reasonableness. One's duty is to act reasonably, as a reasonably prudent [person] (or entity) would."[FN27] EDIS' previous enforcement of a fifteen foot fall protection policy, a policy stricter than was required by OSHA guidelines, coupled with the fact that EDIS' Safety Director was in agreement with his Safety Consultant for a six foot fall protection policy and was "working on it" for four years previous to Hawthorne's injury creates a genuine issue of fact as to whether EDIS exercised reasonable care in its unexplained failure to follow through on changing its fall protection requirements and adopting a six foot tie-off for steel erection prior to Hawthorne's accident and whether EDIS had "control" over the worksite.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                                                   Page 9
Not Reported in A.2d, 2003 WL 23009254 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

FN27. *See Figgs v. Bellevue Holding Company,* 652 A.2d 1084, 1092 (Del.Super.Ct.1994)(citing *Delmarva Power & Light Co. v. Burrows,* 435 A.2d 716, 718 (Del.Supr.1981) (citations omitted)).

The existence of a duty will always be a fact specific inquiry. Summary judgment is not appropriate here because there are material issues of fact in dispute. Hawthorne has presented facts to indicate that EDIS voluntarily assumed responsibility for workplace safety. EDIS' safety consultant of twenty years not only performed inspections at the worksite, but also instructed employees of the subcontractor in fall protection techniques. Further, as noted, EDIS' long recognition of the need for, and the eventual adoption of, a six foot fall protection policy which exceeds OSHA guidelines manifest the assumption of responsibility for workplace safety. Additionally, Hawthorne points out EDIS' contractual obligations for workplace safety. Hawthorne has presented evidence that indicates EDIS' control of the means and methods of the work performed by Summit Steel. EDIS' supervisor was present, and engaged in communication with the subcontractor at the site, and EDIS supplied tools and materials to the subcontractor. Finally, Hawthorne has shown evidence that indicates EDIS may have retained active control of the subcontractors' work. Specifically, Hawthorne exhibits genuine issues of material fact in the area of fall protection issues, showing that EDIS was in a position of authority to provide a safe workplace for all trades. Thus, a jury must consider the facts presented in order to determine whether EDIS is legally responsible for Hawthorne's injury and summary judgment is therefore not proper.

## CONCLUSION

*10 For the aforementioned reasons, Defendants, EDIS Company and Crystal Holdings, Inc. and Third Party Defendant, Summit Steel's Motions for Summary Judgment are hereby DENIED.

IT IS SO ORDERED.

Del.Super.,2003.
Hawthorne v. Edis Co.
Not Reported in A.2d, 2003 WL 23009254 (Del.Super.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.