Westlaw.

Not Reported in A.2d                                                                                                          Page 1

Not Reported in A.2d, 1995 WL 653987 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

C
Only the Westlaw citation is currently available.
UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.
    Superior Court of Delaware, New Castle County.
        Ralph A. BRYANT, Jr., et. al., Plaintiffs,
                            v.
    DELMARVA POWER & LIGHT COMPANY, a
        Delaware corporation, et al., Defendants.
                Civ.A. No. 89C-08-070.

                Submitted: Aug. 15, 1995.
                Decided: Oct. 2, 1995.

Defendants' Motions for Summary Judgment - GRANTED.

Richard H. Morse, Omar Y. McNeill, Wilmington, for Plaintiff.
F. Alton Tybout, Wilmington, for Defendant Philadelphia Electric Company.
Robert S. Goldman, and Lisa C. McLaughlin, Wilmington, for Defendants Alantic City Electric, Delmarva Power & Light Company, and Public Service Electric and Gas.
James F. Kipp, and Francis J. Schanne, for Gilbert Commonwealth Defendants.

             MEMORANDUM OPINION
BABIARZ, Judge.
*1 This is the Court's decision on several pending Motions for Summary Judgment. Moving for summary judgment are defendants Delmarva Power & Light Company ("DP&L"), Public Service Electric & Gas Company ("PSE&G"), Atlantic City Electric Company ("ACE"), and Philadelphia Electric Company ("PECO") (collectively the "utility defendants"). Also moving for summary judgment are the defendants identified in plaintiff's complaint as "the Gilbert/Commonwealth" defendants (hereinafter "Gilbert").

                 I. FACTS
This case arises from an accident at a marine construction site. In April 1987, Gates Construction Company ("Gates") was hired under contract by one or more of the utility defendants to reconstruct the foundation of a tower used to support an electric transmission line which transverses the Delaware river. According to the complaint, the tower had been damaged when it was struck by an oil tanker in an accident unrelated to this litigation. At the construction site, concrete pilings used to rebuild the foundation were lifted and maneuvered by a crane located on a floating barge. Both the crane and barge were owned by Gates. Additionally, Gates was responsible for selecting and maintaining the crane and barge involved in the accident. On August 10, 1987, the crane capsized while lifting a concrete piling, causing injury to the crane's operator, plaintiff Ralph A. Bryant, Jr. ("plaintiff"). It is undisputed that plaintiff was a Gates employee at the time of the accident.

Plaintiff asserts that the accident occurred because there was no "lift plan" in place. According to plaintiff, a lift plan would have revealed that the crane which capsized was inadequate to perform the work required in the tower reconstruction project. Thus, plaintiff asserts, if a lift plan had been prepared or implemented, the accident would not have occurred.

Plaintiff advances the following argument in support of his conclusion that the utility defendants are liable for his injuries. The transmission tower, plaintiff contends, was owned and controlled by all of the utility defendants, and all of the utility defendants were parties to the contract with Gates. Plaintiff asserts that the utility defendants are liable to plaintiff because they were negligent in failing to implement safety measures which would have prevented the accident.

In response, utility defendants assert that the tower

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                                                  Page 2
Not Reported in A.2d, 1995 WL 653987 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

was owned solely by DP&L and that DP&L was the only utility defendant who was a party to the contract with Gates. Moreover, utility defendants--assuming *arguendo* that they shared ownership of the transmission tower--contend that they cannot be held liable to plaintiff because they were under no legal obligation to implement safety measures relative to plaintiff's operation of his employer's crane.

It is undisputed that defendant Gilbert, an engineering concern, was hired to provide engineering and construction management assistance in connection with the reconstruction project. Plaintiff contends that Gilbert was hired on behalf of all utility defendants, who, in turn, maintain that Gilbert was hired only by DP&L.

*2 Plaintiff alleges that Gilbert is liable to him because it too was negligent in failing to implement safety measures which would have prevented the accident. Like the utility defendants, Gilbert asserts that it was under no legal duty to protect plaintiff from the risks inherent in operating his employer's crane.

### II. SUMMARY JUDGMENT STANDARD

The question presented by these motions is whether the utility defendants and/or Gilbert were under a legal duty to protect the plaintiff from the type of accident which caused his injuries. In considering this question, the Court must view all facts of record in the light most favorable to the nonmoving party, i.e., the plaintiff. *See Burkhart v. Davies*, Del. Supr., 602 A.2d 56, 59 (1991), *cert. denied*, 112 S. Ct. 1946 (1992); *Baylis v. Wilmington Medical Center, Inc.*, Del. Supr., 477 A.2d 1051, 1057 (1984). Thus, the Court will assume that the utility defendants shared ownership of the construction site where plaintiff was injured and that the utility defendants were jointly responsible for hiring Gilbert to provide engineering and construction management assistance in connection with the reconstruction project.

Summary judgment may be granted only where the pleadings, depositions, answers to interrogatories, admissions on file and affidavits, if any, "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Del. Super. Ct. Civ. R. 56(c). Summary judgment will be denied where the proffered evidence provides "a reasonable indication that a material fact is in dispute." *Ebersole v. Lowengrub*, Del. Supr., 180 A.2d 467, 470 (1962).

### III. DISCUSSION

In order to be held liable in negligence, defendants had to have been under a legal obligation--a duty--to protect plaintiff from the risk of harm which caused his injuries. *See, e.g., Murphy v. Godwin*, Del. Super., 303 A.2d 668, 674 (1973) (liability for negligent nonfeasance may be found only where relationship between the parties is of such a character that social policy justifies imposition of a duty to act); *Rosenblatt v. Exxon Co.*, Md., 642 A.2d 180, 188 (1994) (existence of legally cognizable duty owed by defendant to plaintiff is essential to cause of action in negligence). Whether a duty exists "is entirely a question of law, to be determined by reference to the body of statutes, rules, principles and precedents which make up the law; and it must be determined only by the court." W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 37, at 236 (5th ed. 1984); *see also O'Connor v. Diamond State Telephone Co.*, Del. Super., 503 A.2d 661, 663 (1985) ("The question of duty is traditionally an issue for the court."). The Court will consider, first, whether a duty was owed to plaintiff by the utility defendants and, second, whether a duty was owed to plaintiff by Gilbert.

#### A. The Utility Defendants

Before addressing the specific questions raised by the utility defendants' motions, it is necessary to discuss a recent development in Delaware law regarding workplace safety. Until recently, the issue of who is legally responsible for implementing construction-site safety regulations was governed by this Court's decision in *Rabar v. E.I. duPont de*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                                                Page 3
Not Reported in A.2d, 1995 WL 653987 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

*Nemours & Co., Inc.*, 415 A.2d 499 (1980). Briefly, the *Rabar* court was called upon to determine who is legally responsible for implementing workplace safety regulations which had been adopted by the Delaware Department of Labor (the "DOL") pursuant to 19 Del. C. § 106(a)[FN1]. *Rabar*, 415 A.2d at 503. In interpreting 19 Del. C. § 106(a), the *Rabar* court found that the responsibility for implementing Delaware's workplace safety regulations fell upon: (1) those who control the workers (i.e., employers), (2) those who control the work area, and (3) those who voluntarily, by agreement or otherwise, undertake responsibility for implementing required safety measures. *Rabar*, 415 A.2d at 503-05.

> FN1. Section 106(a) of title 19 provides as follows:
> The Department may make, modify and repeal rules for the prevention of accidents or of industrial or occupational diseases in every employment or place of employment or such rules for the construction, repair and maintenance of places of employment as shall render them safe. Such rules when made shall have the force and effect of law and shall be enforced in the same manner as this chapter.

*3 This Court's recent decision in *Figgs v. Bellevue Holding Co.*, Del. Super., 652 A.2d 1084 (1994) held that *Rabar* has been effectively overruled by the decision of the United States Supreme Court in *Gade v. National Solid Wastes Management Ass'n*, 112 S. Ct. 2374 (1992). *Figgs*, 652 A.2d at 1088-90. In short, *Gade* held that the Occupational Safety and Health Act of 1970 (the "OSH Act") pre-empts:
any state law or regulation that establishes an occupational health and safety standard on an issue for which [the Occupational Safety and Health Administration ("OSHA")] has already promulgated a standard, unless the State has obtained the [Secretary of Labor's] approval for its own plan.
*Gade*, 112 S. Ct. at 2382 (interpreting 29 U.S.C. § 667(b)). Noting that the Delaware DOL had merely adopted federal OSHA regulations and that Delaware had not obtained the Secretary of Labor's approval for its own workplace safety plan, the *Figgs* court found that Delaware's workplace safety regulations had been pre-empted by the OSH Act. *Figgs*, 652 A.2d at 1088-90 (citing *Gade*, 112 S. Ct. at 2382). Accordingly, the *Figgs* court concluded that "there are no valid and enforceable" Delaware workplace safety regulations which can be used to form the basis for imposition of a duty under Delaware law. *See Id.* at 1090.

With this background in place, the Court will consider whether the utility defendants were under a legal duty to protect plaintiff from the accident which caused his injuries.

*1. The OSH Act*

Since Delaware's workplace safety regulations have been pre-empted by the OSH Act, the Court must consider whether the OSH Act imposes a legal duty upon property owners to provide for the safety of employees of independent contractors. In the Court's view, the OSH Act imposes no such duty. First, the OSH Act expressly places responsibility for complying with OSHA regulations on employers. 29 U.S.C. § 654(a). Second, nothing in the OSH Act shall be construed "to enlarge or diminish or affect in any other manner the common law or statutory rights, duties, or liabilities of employers and employees under any law with respect to injuries, diseases, or death of employees arising out of, or in the course of, employment." 29 U.S.C. § 653(b)(4). Thus, it has been held that the OSH Act does not enlarge the responsibilities of owners of property to the employees of independent contractors. *Sullins v. Third and Catalina Constr. Partnership*, Ariz. Ct. App., 602 P.2d 495, 498-99 (1979); *Cochran v. International Harvester Co.*, W.D. Ky., 408 F. Supp. 598, 602 (1975); *see also Jeter v. St. Regis Paper Co.*, 5th Cir., 507 F.2d 973, 977 (1975) ("It seems clear that Congress did not intend [the OSH Act] to create a new private cause of action, but, on the contrary, intended private rights to be unaffected thereby.").

Additionally, as recognized by this Court in *Figgs*, the OSH Act "does not establish a private right of

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                 Page 4
Not Reported in A.2d, 1995 WL 653987 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

action and, therefore, plaintiff cannot seek relief" under the Act. 652 A.2d at 1091. Thus, the Court concludes that the OSH Act and the regulations issued pursuant thereto[FN2] do not impose a legal duty upon the utility defendants. As a result, "plaintiff's causes of action are limited to common law tort claims." *Figgs* 652 A.2d at 1091. Accordingly, the Court will consider whether utility defendants were legally obligated to provide for plaintiff's safety under Delaware common law.

> FN2. In the instant case, plaintiff contends that the accident resulted from violation of the following OSHA regulation:
> (f) *Floating cranes and derricks*-(1) *Mobile cranes mounted on barges.* (i) When a mobile crane is mounted on a barge, the rated load of the crane shall not exceed the original capacity specified by the manufacturer.
> (ii) A load rating chart, with clearly legible letters and figures, shall be provided with each crane, and securely fixed at a location easily visible to the operator.
> (iii) When load ratings are reduced to stay within the limits for list of the barge with a crane mounted on it, a new load rating chart shall be provided.
> (iv) Mobile cranes on barges shall be positively secured.
> 29 C.F.R. § 1926.550(f)(1)(i)-(iv) (emphasis in original).

### 2. The Common Law Control Test

*4 In the instant case, plaintiff was an employee of an independent contractor hired by the utility defendants to perform work on property owned by the utility defendants. Where this type of relationship exists, Delaware courts have long held that

neither an owner nor general contractor has a duty to protect an independent contractor's employee from hazards created by the doing of the contract work or the condition of the premises or the manner in which the work is performed unless the owner or general contractor retains active control over the manner in which the work is carried out and the methods used.

*O'Connor v. Diamond State Telephone Co.,* Del. Super., 503 A.2d 661, 663 (1985). See also *Seeney v. Dover Country Club Apartments, Inc.,* Del. Super., 318 A.2d 619, 621 (1974); *Williams v. Cantera,* Del. Super., 274 A.2d 698, 700 (1971). Active control over the method and manner is "not inferred from the mere retention by the owner or general contractor of a right to inspect the work of an independent contractor or to exercise general superintendence over such work in order to assure complicity with the contract terms." *Seeney,* 318 A.2d at 621.

Utility defendants contend that they did not exercise active control over the method and manner of Gates' work. In support of this contention, utility defendants rely upon the following evidence of record. Utility defendants' contract with Gates (the "Gates contract") provides that Gates is responsible for the safety of its employees and for complying with all applicable safety regulations. (Gates' Contract Specifications § 2:22). Additionally, the Gates contract provides that "[t]he means and methods employed for performing the details of the WORK shall be [Gates'] responsibility, subject to suggestions or approval by the OWNER as may be necessary to safeguard the character or results of the WORK." (Gates' Contract Specifications § 2:03.2).

Utility defendants also rely upon the testimony of Fred MacLennan, a Gates superintendent who was the senior person for Gates at the construction site at the time of the accident. MacLennan Deposition at 26, 61. MacLennan testified as to the following. Gates owned and selected the particular crane and barge that were being used in the tower reconstruction project. At the time of the accident, plaintiff was receiving direction regarding movement of the crane from Andrew Weatherby, a Gates employee. The only people who had anything to do with the operations being conducted at the time of the accident were Gates employees. DP&L's field representative Roland Guthrie was present at the time of the accident, but he took no part in the operations being conducted at that time; he was merely an observer. MacLennan Deposition at 87-89.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d    Page 5

Not Reported in A.2d, 1995 WL 653987 (Del.Super.)
(Cite as: Not Reported in A.2d)

Additionally, utility defendants rely upon the testimony of plaintiff himself, who testified as to the following. While operating the crane, plaintiff took all his directions from Andrew Weatherby, a Gates employee. Gates hired plaintiff and had the authority to fire or discipline plaintiff if there were any problems. If plaintiff had questions regarding safety or regarding what needed to be done and how it needed to be done, he would go to Gates personnel for direction. Plaintiff had no work-related contact with any utility defendant employees. On the day of the accident, plaintiff took direction only from Gates employees. Bryant Deposition at 78-79.

*5 Plaintiff asserts that there is a factual question as to whether the utility defendants retained sufficient control over the method and manner of Gates' work at the construction site. In support, plaintiff points to record evidence that the utility defendants dictated the concrete mix designs to be used by Gates, determined actions to correct "tip elevation" problems, and had a field representative at the worksite at all times that the work was being performed. Additionally, plaintiff pointed out at oral argument that defendant Gilbert, an engineering consultant hired by utility defendants, at one point advised Gates that it could not use a "vibratory hammer" to compact fill around piles.

For several reasons, the Court finds that the record evidence is legally insufficient to raise a factual question as to whether the utility defendants retained active control over the method and manner of Gates' performance of the delegated tasks. First, the deposition testimony relied upon by plaintiff indicates that utility defendants kept field representatives on site solely to insure that Gates' work complied with specifications. For example, DP&L field representatives Roland Guthrie and Frank Sobonya testified as follows:
Q. What did the field representatives do?

A. Generally? The eyes and ears, another pair of eyes to make sure that the contractor followed the specifications and plans, whatever.
Q. How did they go about making sure the contractor followed the specifications and plans?
A. They were on the job site daily and observed.

Guthrie Deposition at 7.Q. Now did anybody other than Gilbert Commonwealth who DP&L hired -- or DP&L's own chief construction supervisor Roland Guthrie involve themselves in managing the construction project?
A. No.
Q. You did mention Papp. Did he have any responsibilities in that regard?
A. No. Our job was to make sure that the job was done according to specification.

Sobonya Deposition at 37.

Second, the deposition testimony relied upon plaintiff concerning the "vibratory hammer" indicates that Gates had approached Gilbert representative Lester Walcott to determine whether use of the vibratory hammer would be effective. Mr. Walcott testified as follows:
Q. How frequently did you talk to the people from Gates?
A. Generally only if we had a scheduled meeting. If they had a problem and wished to speak to me and made a request to speak to me, of course I made myself available.
Q. Do you recall that happening?

A. Oh, I can remember one instance where I was asked whether a vibratory hammer, for example, could be used to compact fill around the piles rather than additional blows on the pilings themselves.

Q. When you were asked by Gates if it could use a vibratory hammer, did you tell it that it could use or it could not use one?
A. Could not.
Q. Why not?
A. Because that was not a procedure that had been tested for the situation that was in question here.

*6 Walcott Deposition at 13-14.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d    Page 6

Not Reported in A.2d, 1995 WL 653987 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

Similarly, the deposition testimony relied upon by plaintiff concerning "tip elevation" indicates that Gates had approached utility defendants with the problem:
Q. So if there was a problem with the piling tip elevation, [Gates] would tell [DP&L's representative] Mr. Guthrie and he would tell you?
A. Generally that was true, yes.

Walcott Deposition at 12.

Under Delaware law, a property owner may exercise "general superintendence" over an independent contractor's work in order to assure that the work complies with the owner's specifications. *See Seeney*, 318 A.2d at 621. Where a property owner does so, he is not deemed to have exercised "active control" over the independent contractor's method and manner of performing the work. *Id.* The testimony upon which plaintiff relies indicates that utility defendants dictated the concrete mix designs to be used by Gates and, on occasion, provided Gates with direction as to how best to proceed in order to achieve the desired results. In taking such actions, the utility defendants did no more than maintain general superintendence over Gates' work in order to safeguard the integrity of the results of such work. The trier of fact could not reasonably conclude otherwise. Accordingly, the Court concludes, as a matter of law, that the utility defendants did not actively control the method and manner of Gates' work.

*3. The Peculiar Risk Doctrine*

Under the peculiar risk doctrine, one who employs an independent contractor to do work which the employer should recognize as likely to create a peculiar risk of physical harm unless special precautions are taken, is subject to liability for injuries caused by the absence of such precautions if the employer fails to provide for such precautions. *Bowles v. White Oak, Inc.*, Del. Super., C.A. No. 86C-AP-107, slip op. at 14-15. Del Pesco, J. (Sept. 15, 1988) (citing Restatement (Second) of Torts § 413 (1965)). A peculiar risk is a special risk "peculiar to the work to be done, and arising out of its character, or out of the place where it is to be done, against which a reasonable man would recognize the necessity of taking special precautions." *Bowles*, slip op. at 15. However, application of the doctrine is necessarily limited so that employers of independent contractors will not have to step in and make themselves conversant with all activities of their independent contractors. *Id.*

Utility defendants have presented uncontradicted expert testimony indicating that the accident in the case *sub judice* could have been prevented by adherence to "routine marine construction safety practices." Hogan Affidavit at 2-3; Zeise Affidavit at 2-3 (adherence to OSHA, ANSI and industry standards eliminates the risk of crane overturning). Because the record is undisputed on this issue, the Court finds that the utility defendants cannot be held liable under the peculiar risk doctrine. As this Court stated in *Bowles*, "every construction job has some inherent dangers for which routine precautions are necessary, and the employer of an independent contractor should not be held responsible for such routinely encountered risks." *Bowles*, slip op. at 15-16.

*4. Legal Responsibility For Workplace Safety*

*7 As stated earlier, in *Rabar* this Court was called upon to determine who is legally responsible for implementing workplace safety regulations which had been adopted by the Delaware Department of Labor (the "DOL") pursuant to its authority under 19 Del. C. § 106(a). *See Rabar*, 415 A.2d at 503-05. Although the *Rabar* court's ultimate conclusion regarding the effect of Delaware's workplace safety regulations has been overruled by *Gade*, the Court is not convinced that *Rabar's* analytical framework should be discarded. Rather, the *Rabar* methodology should be retained for purposes of determining who is legally responsible under Delaware common law for maintaining workplace safety. Those responsible for workplace safety under the *Rabar* methodology have a common law duty take reasonable measures to provide for the safety of workers at the worksite. Where a breach of this duty causes injury to a worker, the responsible party can be held liable under traditional principals of negligence law. Accordingly, the Court will

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                                   Page 7
Not Reported in A.2d, 1995 WL 653987 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

apply Rabar's methodology to determine whether the utility defendants were legally responsible for workplace safety in the instant case.

*(a) Employment*

The *Rabar* court held that responsibility for implementing Delaware's then-existing workplace safety regulations fell first upon the affected worker's employer. *Rabar,* 415 A.2d at 503-04. However, the *Rabar* court recognized that an employer of an injured worker is immune from common law tort liability under the Delaware Workmen's Compensation Act, *id.* at 506 n.1 (citing 19 Del. C. § 2304), even though such employer may be subject to civil or criminal penalties for violation of Delaware's then-existing workplace safety regulations under 19 Del. C. § 116.

As discussed earlier, Delaware's workplace safety regulations are no longer enforceable because they have been pre-empted by the OSH Act. *Figgs,* 652 A.2d at 1088-90. The OSH Act specifically provides that it shall not "be construed to supersede or in any manner affect any workmen's compensation law." 29 U.S.C. § 653(b)(4). Thus, employers remain immune from common law tort liability to injured workers under the Delaware Workmen's Compensation Act. *See* 19 Del. C. § 2304. Nonetheless, the OSH Act provides that employers who violate OSHA regulations are subject to civil or criminal penalties. *See* 29 U.S.C. § 666.

The foregoing establishes that employers, although responsible for maintaining a safe workplace for their employees, cannot be held liable in negligence to their employees who are injured in the workplace. In the instant case, it is undisputed that plaintiff was an employee of Gates, not the utility defendants. FN3 Moreover, if plaintiff had been employed by the utility defendants, he would be barred from recovering from them in tort under the Delaware Workmen's Compensation Act. *See* 19 Del. C. § 2304.

FN3. The factors considered in determining whether an employer-employee relationship exists are as follows: (1) who hired the employee; (2) who can discharge the employee; (3) who pays the employee's wages; and (4) who has the power to control the conduct of the employee in the particular job he is performing. *Rabar,* 415 A.2d at 504.

*(b) Work-Area Control*

The *Rabar* court held that, in certain situations, the employer of an affected worker will not be the only party responsible for implementing workplace safety regulations:

*8 By holding that every employer is responsible for implementing the safety regulations in the place or places where its employees may be affected, the Court is not ruling that each employer is exclusively responsible therefor. While such will often be the case where there is but one possible employer involved, achievement of the statutory purposes will often necessitate joint or overlapping responsibility in situations where multiple employers have employees working in the same or general area.... In order to assure that such workers will be provided a reasonably safe "place of employment," it is appropriate to require those who control the work area to also be responsible for safety regulation implementation, along with individual employers for the benefit of all workers in the area.... [Those] who control the work area will best be able to eliminate safety hazards arising from the condition of the premises. Where several employers jointly control a definable work area, all such employers will be jointly responsible for safety regulation implementation in such area along with each individual employer whose employees work in that area.

*Rabar,* 415 A.2d at 504. The *Rabar* court recognized that ordinarily a property owner who hires an independent contractor owes no duty to the independent contractor's employees unless the owner retains the power to control the method and manner of doing the contract work. *Id.* at 506. Nonetheless, the Court found that "even if the control exercised by the owner over the entire project is insufficient to render it liable under this

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                                              Page 8
Not Reported in A.2d, 1995 WL 653987 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

test, the owner may still be liable to some extent if it retained sufficient control over part of the work or if it retained possessory control over the work premises during the work." *Id.* at 506 (citing Restatement (Second) of Torts §§ 414, 422(a) (1965)).

The Court finds that *Rabar's* work-area control test should be retained for purposes of determining whether a particular person or entity can be held liable in negligence for failing to maintain workplace safety. Thus, those found to be in control of a defined work area are under a common law duty to make reasonable efforts to provide for the safety of workers in the controlled area.

In the instant case, it is undisputed that the "work area" where plaintiff's accident occurred was a crane resting atop a floating barge. Utility defendants have come forward with uncontradicted evidence that Gates was solely responsible for the selection and maintenance of the crane involved in the accident. Additionally, utility defendants have proffered uncontradicted evidence that at the time of the accident the crane was being operated by a Gates employee, the plaintiff, at the direction of another Gates employee, Andrew Weatherby. Still, plaintiff contends that a jury could reasonably conclude that utility defendants retained sufficient control of the worksite to be held legally responsible for implementing safety procedures. In support, plaintiff points to record evidence that utility defendants: (i) scheduled all phases of the project, (ii) provided certain materials, (iii) constructed a temporary site-office and storage facility, and (iv) determined who could have access to certain areas on the project site and made security arrangements for the site. *See* Guthrie Deposition at 11, 14, 38, 47, 100.

*9 The Court finds the evidence relied upon by plaintiff legally insufficient to give rise a factual question under the work-area control test. In short, the evidence upon which plaintiff relies does not tend to show that the utility defendants retained any meaningful level of control over the crane and barge where the accident took place. Rather, it is undisputed that the crane and barge were selected and maintained by the utility defendants'

independent contractor, Gates. Additionally, it is undisputed that at the time of the accident the crane was being operated by a Gates employee taking directions only from other Gates employees. Thus, the Court concludes as a matter of law that the utility defendants did not retain sufficient control over the work area where plaintiff's accident occurred in order to be held liable in negligence for plaintiff's injuries.

*(c) Voluntary Assumption of Responsibility for Safety*

In *Rabar*, this Court held that a duty to implement safety regulations is imposed upon one who voluntarily, by agreement or otherwise, undertakes responsibility for implementing safety measures, even though such person otherwise has no direct responsibility to do so under applicable statutes and regulations. *Rabar*, 415 A.2d at 505. The *Figgs* court recognized the continuing vitality of this rule as a matter of Delaware common law. *Figgs*, 652 A.2d at 1092 (citing Restatement (Second) of Torts § 324A (1965)).

In the instant case, plaintiff contends that there exists a genuine question of fact as to whether utility defendants voluntarily assumed responsibility for safety. According to plaintiff, a factual question is raised based upon record evidence of the following:
1. the utility defendants, acting through PSE&G, conducted a safety inspection and OSHA certification of another crane (the "Beasley crane") used by another contractor ("Comstock") on the same reconstruction project;
2. the utility defendant's contract with Gates included the following provision: "[t]he means and methods employed for performing the details of the work should be [Gates'] responsibility subject to suggestions or approval by the owner as may be necessary to safeguard the character or results of the work";
3. the utility defendants pointed out and required correction of OSHA violations by contractors, addressed safety at project meetings and allegedly retained the right to shut down the project if it was unsafe.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d										Page 9
Not Reported in A.2d, 1995 WL 653987 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

In the Court's view, the foregoing factors, when viewed in the light most favorable to plaintiff, are insufficient to raise a genuine issue of fact on the question of whether the utility defendants voluntarily assumed responsibility for safety at the reconstruction site.

First, the utility defendants' inspection of the Beasley crane has no bearing on the issue of whether the utility defendants voluntarily assumed responsibility for safety under the contract with Gates. The inspection of the Beasley crane took place one month before Gates even entered into a contract with the utility defendants. Moreover, the Beasley crane was used by another contractor ("Comstock") in connection with a different contract (the "Comstock contract"). There is no evidence of record to show that the utility defendants inspected or otherwise involved themselves in the selection of the crane operated by plaintiff. Rather, it is undisputed that the crane used by plaintiff was selected solely by Gates personnel.

*10 Second, an assumption of responsibility for safety is not evidenced by the utility defendants' contractual reservation of the right to make suggestions and approvals necessary to safeguard the results of the work.[FN4] Under Delaware law, it is well-settled that this type of reservation of rights will not subject a property owner to liability for injuries to an employee of an independent contractor. *See Seeney v. Dover Country Club Apartments, Inc.,* Del. Super., 318 A.2d 619, 621 (1974); *Williams v. Cantera,* Del. Super., 274 A.2d 698, 701 (1971).

> FN4. Plaintiff's contention in this regard is severely undermined by another provision in the utility defendants' contract with Gates. Section 2:22.1 states as follows:
> [Gates] is responsible for the safety of his employees and the employees of his Subcontractor. He shall take all necessary or advisable precautions for the safety of all persons and property at, on, or near his WORK. He shall comply with all applicable safety standards established and promulgated under the Federal Occupational Safety and Health Act (Public Law 91-596). He shall comply with all additional applicable regulations of federal, state, county, municipal or any other regulatory body who may have jurisdiction over the WORK involved.

Nevertheless, plaintiff relies upon the testimony of his expert to the effect that the utility defendants would be viewed in the construction industry as having assumed responsibility for safety on the project by virtue of having inspected the Beasley crane and having included the reservation of rights clause in the contract. Again, utility defendants' inspection of the Beasley crane--while it may evidence a voluntary assumption of responsibility for safety with respect to the Comstock contract--does not evidence an assumption of such responsibility under the Gates contract. On the contrary, utility defendants' failure to inspect the Gates crane tends only to show that they were not voluntarily assuming responsibility for safety under the Gates contract. Also, as stated earlier, the fact that utility defendants reserved the right to make suggestions and approvals as necessary to safeguard the results does not, under Delaware law, evidence a property owner's intent to take legal responsibility for safety. Accordingly, the Court concludes that the testimony of plaintiff's expert does not raise a factual question on the issue of whether the utility defendants voluntarily assumed responsibility for safety.

Finally, there is plaintiff's contention that utility defendants voluntarily assumed responsibility for safety because they pointed out and required correction of OSHA violations by contractors, addressed safety at project meetings, and allegedly retained the right to shut down the project if it was unsafe. In this regard, plaintiff cites to the testimony of various field representatives employed by utility defendants who were present at the construction site at various times. *See* Papp deposition at 7-8, 17-19; Van Name deposition at 23, 28; Guthrie deposition at 19, 87, 89, 96; Walcott deposition at 28.

The Court has carefully reviewed the portions of the record upon which plaintiff relies. The testimony indicates that utility defendants' field

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                         Page 10
Not Reported in A.2d, 1995 WL 653987 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

representatives were on site to monitor the progress of the work and to insure that Gates was adhering to the specifications contained in the contract. Viewed in the light most favorable to plaintiff, the testimony indicates that these individuals viewed it part of their job to advise Gates' management of any observed safety violations at the worksite. According to the record, the only observed safety violations involved workers who failed to wear hard hats and life vests. The utility defendants did not directly order workers to comply with these safety regulations. Rather, they advised Gates' management of the problem and expected Gates to correct it.

*11 The foregoing testimony is, as a matter of law, insufficient to create a factual question as to whether utility defendants voluntarily assumed responsibility for worker safety on the project. In the instant case, responsibility for workplace safety was contractually placed upon Gates. Additionally, Fred MacLennan, Gates' senior person at the accident site, testified that he himself was responsible for safety at the worksite. MacLennan Deposition at 97. In advising Gates of certain observed safety violations, utility defendants were pointing out Gates' failure to adhere to one of the specifications contained in the contract. In the Court's view, this type of activity does not evidence a voluntary assumption of responsibility for safety. A property owner does not voluntarily assume responsibility for workplace safety by advising his independent contractor of observed safety violations where the independent contractor is contractually required to maintain workplace safety.

### 5. Trade Custom

Relying upon this Court's decision in *Figgs v. Bellevue Holding Company*, Del. Super., 652 A.2d 1084 (1994), plaintiff contends that a legal duty to act could arise from a "trade custom" of which a defendant knew or should have known. According to plaintiff, *Figgs* stands for the proposition that the existence of a trade custom defines a standard of conduct which, in turn, imposes a legal duty to act in accordance with the particular trade custom. Plaintiff has come forward with expert testimony to the effect that a trade custom existed pursuant to which the utility defendants were required to determine that a proper "lift plan" was in place prior to permitting plaintiff to begin the lift in which the accident occurred. According to plaintiff's expert, this trade custom is based upon recognized industry practices, OSHA regulations and standards promulgated by the American National Standards Institute ("ANSI"). Plaintiff contends that summary judgment must be denied because there is a material question of fact as to whether the trade custom actually exists. According to plaintiff, a legal duty will be created if the trier of fact accepts the testimony of plaintiff's expert regarding the existence of a trade custom.

In the Court's opinion, plaintiff's argument lacks merit because it eviscerates the distinction between "duty" and "standard of care". The existence of a custom--although relevant in establishing an applicable *standard of care, e.g., Delmarva Power & Light v. Stout*, Del. Supr., 380 A.2d 1365, 1367 (1977)--does not establish the existence of a legal *duty*. As this Court stated in *O'Connor v. Diamond State Telephone Co.*, Del. Super., 503 A.2d 661 (1985), whether a duty exists depends in part on the "relationship between the parties" including any "contractual obligations" which may exist. *Id.* at 663. Other relevant factors in determining whether a duty exists include the "statutes, rules, principles and precedents which make up the law." Keeton, *supra*, § 37, at 236. Most importantly, whether a duty exists is for the Court to decide as a matter of law. *Id.; see also Kuyper v. Gulf Oil Corp.*, Del. Supr., 410 A.2d 164, 165 (1979) (whether defendant, a chimney cleaner, had duty to inspect plaintiff's chimney for defects prior to cleaning was a matter for the Trial Judge to decide); *O'Connor*, 503 A.2d at 663. In *Figgs*, this Court expressly recognized this principle, stating "whether or not one contractor owed a duty to a plaintiff is generally one of law to be determined by the Court." *Figgs*, 652 A.2d at 1088.

*12 The "standard of conduct" or, alternatively, "standard of care" has been described as "the necessary complement of duty." Keeton, *supra*, § 37, at 236. "In negligence cases, once a duty is found, the duty, in theory at least, always requires

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

http://print.westlaw.com/delivery.html?format=HTMLE&dataid=B00558000000030260004...   5/30/2006

Not Reported in A.2d                                                                                                          Page 11
Not Reported in A.2d, 1995 WL 653987 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

the same standard of conduct, that of a reasonable person under the same or similar circumstances...."  *Id.* Thus, our Supreme Court has instructed:
The standard of care required of all defendants in tort actions is that of a reasonably prudent man. That standard, however, is not a definite rule easily applicable to every state of facts. The details of the standard, of necessity, must be formulated in each particular case in light of its peculiar facts. In each case the question comes down to 'what a reasonable man would have done under the circumstances.' In close or doubtful cases, ... that question is to be determined by the jury.

*Stout,* 380 A.2d at 1367 (citations omitted) (quoting *Robelen Piano Company v. DiFonzo,* Del. Supr., 169 A.2d 240, 244-45 (1961)). In *Stout,* the Supreme Court explained that custom may be considered as evidence, not of the existence of a *duty,* but instead of the *standard of care.* In a particular case, "what a reasonable person would do " may be established through the aid of evidence of custom, or through the aid of expert testimony, but such evidence is neither always necessary nor controlling ....

*Stout,* 380 A.2d at 1367 (citations omitted).

Relying upon *Figgs,* plaintiff attempts to elevate the role of custom from its traditional status as evidence of the *standard of care* to an unprecedented status as creator of a *duty.* As explained below, *Figgs* cannot be read as supporting plaintiff's position. The *Figgs* case involved a construction-site accident that occurred inside a partially constructed building. The plaintiff, an employee of a subcontractor, was injured when he fell from a staircase which had been constructed by another subcontractor, defendant Franklin. *Figgs,* 652 A.2d at 1087-88. The plaintiff asserted that Franklin was liable in negligence for plaintiff's injuries because Franklin had failed to install temporary handrails on the staircase. *Id.* at 1088.

The *Figgs* court was called upon to determine whether Franklin owed a legal duty to the plaintiff, an employee of another subcontractor. *Id.* The plaintiff argued that Franklin "owed a duty to plaintiff based upon trade custom of which it either knew or should have known by virtue of the OSHA regulations." *Figgs,* 652 A.2d at 1091. After noting that OSHA regulations do not directly impose a duty upon a subcontractor to the employee of another subcontractor, the *Figgs* court stated " however, there may be evidence sufficient to establish a *standard of conduct* for contractors and subcontractors." *Figgs,* 652 A.2d at 1091 (emphasis supplied) (citing Restatement (Second) of Torts § 286 (1965)). The Court concluded its discussion on this subject as follows:

*13 Allowing the OSHA requirements to serve as a guide for a *standard of conduct* is not inconsistent with the federal OSHA statutes. Furthermore, the fact that the subcontractors regularly received reports, prepared at [the general contractor's] direction, regarding inspections for compliance with OSHA may support the argument that such regulations defined the standard on the site. A fact issue remains as to whether a *standard of conduct* can be proved and whether it has been breached by Franklin.

*Figgs,* 652 A.2d at 1091 (emphasis supplied).

*Figgs* does not stand for the proposition that the existence of a trade custom creates a duty. Rather, the *Figgs* court determined, albeit implicitly, that under the circumstances Franklin owed a common law duty to the plaintiff. Nowhere did the *Figgs* court state that Franklin's duty was created by the existence of a trade custom. The discussion in *Figgs* regarding OSHA regulations was limited in scope to the possibility that such regulations may have relevance with regard to the applicable *standard of care.*

The foregoing establishes that plaintiff cannot rely upon an alleged trade custom to establish that the utility defendants owed a duty to protect plaintiff from the accident which caused his injuries. The existence of a trade custom or industry standard is relevant only in the context of determining a standard of care, and even in this context such evidence is not controlling. *See Stout,* 380 A.2d at 1367-68.

*6. Simple Negligence*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                                Page 12
Not Reported in A.2d, 1995 WL 653987 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

According to plaintiff, the utility defendants' inspection of the Beasley crane demonstrates that utility defendants were aware of the dangers associated with crane lifts. Thus, plaintiff contends, there remains a material question of fact as to whether the utility defendants were negligent by failing to protect against an event that a reasonably prudent person would protect against. In this regard, plaintiff relies upon the general principal of negligence law that "[i]f a party acts unreasonably by failing to protect against an event that a reasonably prudent person would protect against, then that negligent actor may be liable for simple negligence." *Figgs,* 652 A.2d at 1092 (citing *Delmarva Power & Light Co. v. Burrows,* Del. Supr., 435 A.2d 716, 718 (1981)).

Plaintiff's reliance upon *Figgs* and *Burrows* is misplaced. The rule set forth in those cases applies where a someone is injured as a result of a dangerous condition created by the defendant. In *Figgs,* the defendant created a hazard by constructing a staircase with no handrails. *Figgs,* 652 A.2d at 1092. In *Burrows,* the defendant created a dangerous condition by installing uninsulated high voltage wires near the roof of a residence. *Burrows,* 435 A.2d at 717. Under such circumstances, the law imposes a duty upon the person creating the hazard to protect against reasonably foreseeable danger and events which may reasonably be expected to occur. *Id.* "One breaches that duty by not protecting against an event that a reasonably prudent [person] would protect against." *Id.*

*14 In the instant case, plaintiff does not contend that his injuries resulted from a hazard or dangerous condition created by the utility defendants. It follows that utility defendants cannot be held liable under the rule set forth in *Figgs* and *Burrows.*

### 7. Negligent Employment

Plaintiff claims that utility defendants are liable to plaintiff for his injuries because they were negligent in employing Gates for the reconstruction project. In support of its negligent employment argument, plaintiff relies upon utility defendants' field notes prepared *after* Gates had been hired but before plaintiff was injured. The notes relied upon by plaintiff state that Gates was "really floundering" and that "we should start looking for someone else to do this job." Utility defendants respond that a negligent employment claim cannot be based upon the independent contractor's conduct after having been awarded the job.

The question presented is whether Delaware recognizes a cause of action for negligent *retention* --as opposed to *selection*--of an independent contractor. In *Bowles v. White Oak, Inc.,* Del. Super., C.A. No. 86C-AP-107, Del Pesco J. (Sept. 15, 1988), this Court recognized a cause of action for negligent *selection* of an independent contractor. *Bowles,* slip op. at 11-14. However, the Court is unaware of any Delaware cases recognizing a cause of action for negligent *retention* of an independent contractor.[FN5]

> FN5. A cause of action for negligent retention of an independent contractor has been recognized in other jurisdictions. *See Woodson v. Rowland,* N.C., 407 S.E.2d 222, 239 (1991); *Philip Morris, Inc. v. Emerson,* Va., 368 S.E.2d 268, 279 (1988).

For present purposes, the Court need not decide whether a claim for negligent retention of an independent contractor is cognizable under Delaware law. This is so because plaintiff has failed to come forward with evidence from which the trier of fact could reasonably conclude that the utility defendants were negligent for keeping Gates on the job. While it is clear from the field notes that utility defendants had concerns about Gates, plaintiff has failed to come forward with sufficient evidence to support a finding that those concerns related to safety. Having carefully reviewed the field notes submitted by plaintiff, the Court concludes that utility defendants' concerns were related to Gates' ability to complete the job on schedule. The law does not require a property owner to fire his independent contractor merely because the contractor fails to complete work on schedule. Thus, utility defendants could not held liable under a negligent retention theory.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                                      Page 13
Not Reported in A.2d, 1995 WL 653987 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

### B. Gilbert

Like the utility defendants, Gilbert contends that it was under no legal obligation to protect plaintiff from the accident which caused his injuries. In response, plaintiff asserts that pursuant to trade custom Gilbert was under a duty report any safety violations at the project and to determine that a proper lift plan was in place before plaintiff began the lift which caused his injuries. As discussed earlier, the existence of a trade custom does not establish the existence of a legal duty. Rather, whether a duty exists a question of law to be determined by the Court. *Figgs,* 652 A.2d at 1087; *O'Connor,* 503 A.2d at 663.

*15 In the instant case, the record does not support a determination that Gilbert had a legal duty to protect plaintiff from the accident which caused his injuries. It is undisputed that Gilbert was hired as an independent contractor to provide the utility defendants with engineering and construction management assistance and to help the utility defendants verify that Gates was complying with contract specifications. Gilbert's contract with the utility defendants specifies that Gilbert is not assuming responsibility for safety with respect to the operations of the utility defendants' other independent contractors, such as Gates. (Gilbert Contract, Paragraph 8). Additionally, the record does not support a finding that Gilbert controlled the method and manner of Gates' work or exercised control over the work area where the accident occurred. Thus, Gilbert cannot be held liable under the common law control test or the work-area control test.

Plaintiff contends that Gilbert can be held liable because it voluntarily assumed responsibility for implementing safety measures at the worksite. In support of this argument, plaintiff relies upon the testimony of Gilbert representative Lester Walcott, who indicated that he would report any unsafe practices that he observed to DP&L's Roland Guthrie. Walcott Deposition at 27. Walcott also testified that Gilbert's inspectors would typically make note of any observed accidents
because accident reports are required to be written by the contractor when an accident occurs. And in order to make certain that this sort of thing is being done, inspectors also will typically report to the owner any accidents that they observe or become aware of.

Walcott Deposition at 45.

In the Court's view, Walcott's testimony is insufficient to raise a question of fact on the issue of whether Gilbert voluntarily assumed responsibility for safety at the worksite. In short, one does not assume legal responsibility for implementing safety measures by merely reporting observed accidents and unsafe practices. Thus, the trier of fact could not reasonably conclude that Gilbert voluntarily undertook responsibility for implementing safety measures based on the record before the Court.

For these reasons, the Court holds that Gilbert was not under a legal obligation to protect plaintiff from the accident which caused his injuries.

### IV. CONCLUSION

Based on the foregoing, the Court concludes that neither the utility defendants nor Gilbert were under a legal duty to protect plaintiff from the accident which caused his injuries. It follows that neither the utility defendants nor Gilbert can be held liable to plaintiff in negligence. Accordingly, the Motions for Summary Judgment filed by DP&L, PSE&G, ACE, PECO and Gilbert are hereby GRANTED. IT IS SO ORDERED.

Del.Super.,1995.
Bryant v. Delmarva Power & Light Co.
Not Reported in A.2d, 1995 WL 653987 (Del.Super.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.