Westlaw.

Not Reported in F.Supp.2d

Page 1

Not Reported in F.Supp.2d, 1999 WL 191570 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

C
Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court, D. Delaware.
Jiz Shu LI, as Administrator of the Estate of De Zhu Li, Shun Zou Jin, Yong Ri Li and Yong Yue Li, Plaintiffs,
v.
CAPANO BUILDERS, INC., a Delaware Corporation, White Oak Builders, Inc., a Delaware Corporation, Ark Contractors, Inc., a Delaware Corporation, and Mun Soek Lee d/b/a Rising Sun Contractors, Co., Defendants.
No. 97-549-SLR.

March 26, 1999.

Arthur M. Krawitz, Esquire and Mary Catherine Landis, Esquire of Doroshow & Pasquale, Wilmington, Delaware. Counsel for Plaintiff.
Carl N. Kunz, III, Esquire of Murphy Spadaro & Landon, Wilmington, Delaware. Counsel for defendants White Oak Builders, Inc. and Capano Builders, Inc.

MEMORANDUM OPINION

ROBINSON, District J.

I. INTRODUCTION

*1 Jiz Zhu Li, Yong Yue Li, Yong Ri Li, and Shun Zou Jin [FN1] (collectively "plaintiffs") filed this action following the accidental death of De Zhu Li ("decedent").[FN2] Decedent was killed while hanging vinyl siding at development property owned by defendant White Oak Builders, Inc. ("White Oak"). Defendant Capano Builders, Inc. is the general contractor for White Oak's development project. Plaintiffs have filed tort claims under Delaware law against White Oak, Capano Builders, Ark Contractors, Inc. ("Ark"), and Mun Soek Lee, d/b/a Rising Sun Contractors ("Rising Sun").

Currently before the court is White Oak and Capano Builder's (collectively "defendants") motion for summary judgment. (D.I.62) The court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(2).[FN3] Plaintiffs and defendants agree that Delaware substantive law governs this case. (See D.I. 66 at 9) For the reasons that follow, the court shall grant defendants' motion for summary judgment.

FN1. Yong Yue Li and Yong Ri Li reside either in the Republic of China or in South Korea. Shun Zou Jin, a Chinese national, died shortly after decedent and, pursuant to Fed.R.Civ.P. 25(a)(2), plaintiffs filed a motion for suggestion of death on May 22, 1998. (D.I.57) Jiz Zhu Li since has moved to substitute himself as administrator of the estate of Shun Zou Jin. (D.I.70) Defendants, however, object on the grounds that Jin's death predated the institution of the instant suit. Defendants have requested the court to hold in abeyance plaintiff's motion for substitution pending further research by the parties. (D.I.73) In light of the court's decision, defendants' objection is moot.

FN2. Plaintiffs Yong Yue Li and Yong Ri Li have filed tort claims under the Delaware Wrongful Death statute. See 10 Del. C. §§ 3721 et seq.

FN3. If decedent had been a resident alien, there would be no diversity jurisdiction over Jiz Zhu Li's claims against defendants. See 28 U.S.C. § 1332(a) ("an alien admitted ... for permanent residence shall be deemed a citizen of the state in which such alien is domiciled"). Both decedent and defendants were domiciled in Delaware, and for purposes of diversity jurisdiction, a decedent's legal

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Page 2
Not Reported in F.Supp.2d, 1999 WL 191570 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

representative assumes the citizenship of the decedent. *See* 28 U.S.C. § 1332(c)(2). At the time of his death, however, decedent held an expired United States "R/B1" visa. (*See* D.I. 64 at A40) These types of visas are issued to aliens entering the United States to work in a religious capacity. *See* 8 U.S.C. § 1101(a)(15)(R); 22 C.F.R. § 41.31(a) (1998); *see also* United States Dep't of State, Bureau of Consular Affairs, Visa Servs. (Feb.1988) <http://travel.state.gov/visa;tempreligiwkr.html>. Thus, at the time of his death, decedent was a Chinese national, not a resident alien. Hence, there is complete diversity between the administrator, a citizen of a foreign state, and defendants, citizens of Delaware. *See id.* § 1332(a)(2); *Strawbridge v. Curtiss*, 7 U.S. (3 Cranch) 267, 2 L.Ed. 435 (1806).

II. BACKGROUND

This action arises out of the accidental death of a Chinese alien working illegally [FN4] at Lot 28 in White Oak's residential development property known as "Bear Crossing." The basic facts surrounding decedent's employment and death are undisputed. White Oak owns the Bear Crossing site, and Capano Builders served as the general contractor at Bear Crossing. (D.I. 63 at 1) Frank J. Capano is the president of both White Oak and Capano Builders, and he selected all subcontractors that worked at Bear Crossing. (D.I. 63 at 5-6; D.I. 64 at A50, A55) Capano selected Ark to provide roofing, siding, and rain gutters for homes under construction at Bear Crossing. (D.I. 64 at A16) Ark subcontracted the siding work for Lot 28 to Mun Soek Lee, who owned and operated Rising Sun Contractors. Rising Sun, however, had no employees, and Lee further subcontracted Lot 28's siding work to Chung Nam Pak who, in turn, employed decedent.

FN4. At the time of his death, decedent had an expired Chinese passport and an expired United States visa. (D.I. 64 at A34-41) No wage or tax information has been submitted of record.

Defendants employed Larry Blevins as their on-site foreman, and Blevins reported to the site nearly every day. Blevins scheduled contractors and ensured that contractors arrived at the site on time. Blevins also inspected subcontracted work for compliance with contractual specifications. Blevins inspected the siding work of Chung Nam Pak and his employees. (D.I. 64 at 5) Blevins, however, was not present when the fatal accident occurred.

The accident occurred on Sunday, January 26, 1997. Chung Nam Pak, along with decedent and another worker, were at Lot 28 preparing to install vinyl siding on a nearly completed home. To install siding, decedent and his co-worker first had to erect a "pump jack." A pump jack consists of two thirty to thirty-five foot poles that support a plank upon which the workers stand while installing siding. (D.I. 63 at 6; D.I. 66 at A139-40) Decedent leaned one of the poles against the roof line and as he walked away from the pole, it fell on his head and crushed his skull. Decedent was not wearing a hard hat. There were no eye-witnesses to the accident-Pak was on the other side of the house and decedent's co-worker had his back turned. Two days later, doctors declared decedent "brain dead" and removed him from life support. (D.I. 64 at A26-28) Plaintiffs then filed the instant action.

III. STANDARD OF REVIEW

*2 A court shall grant summary judgment only if " the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party bears the burden of proving that no genuine issue of material fact exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 n. 10, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). "Facts that could alter the outcome are 'material,' and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                  Page 3
Not Reported in F.Supp.2d, 1999 WL 191570 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

the person with the burden of proof on the disputed issue is correct." *Horowitz v. Federal Kemper Life Assurance Co.,* 57 F.3d 300, 302 n. 1 (3d Cir.1995) (internal citations omitted). If the moving party has demonstrated an absence of material fact, the nonmoving party then "must come forward with ' specific facts showing that there is a genuine issue for trial.' " *Matsushita,* 475 U.S. at 587 (quoting Fed.R.Civ.P. 56(e)). The court will "view the underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion." *Pennsylvania Coal Ass'n v. Babbitt,* 63 F.3d 231, 236 (3d Cir.1995). The mere existence of some evidence in support of the nonmoving party, however, will not be sufficient for denial of a motion for summary judgment; there must be enough evidence to enable a jury reasonably to find for the nonmoving party on that issue. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). If the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

### IV. DISCUSSION

Plaintiffs contend that White Oak and Capano Builders are liable in negligence for decedent's death. Plaintiffs' claims rest solely upon Delaware common law. In order to be held liable in negligence under Delaware law, plaintiffs must prove that defendants had a legal duty to protect decedent from the type of harm that caused his death. *See Bryant v. Delmarva Power & Light Co.,* Civ.A. No. 89C-08-070, 1995 WL 653987, at *2 (Del.Super.Oct.2, 1995). Whether a duty exists is " entirely a question of law, to be determined by reference to the body of statutes, rules, principles and precedents which make up the law; and it must be determined only by the court." *Bryant,* 1995 WL 653987, at *2 (citing W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 37, at 236 (5th ed.1984)); *see also O'Connor v. Diamond State Tel. Co.,* 503 A.2d 661, 663 (Del.Super.1985) (noting that "[t]he question of duty is traditionally an issue for the court").

Neither party disputes that Ark and its subcontractors were independent contractors. The contract between Capano Builders and Ark explicitly states that Ark "shall be considered an independent contractor." (D.I. 64 at A17) Plaintiffs concede that Delaware law generally does not impose a duty upon an owner or general contractor to protect the employees of an independent contractor from the hazards of completing the contract. *See O'Connor,* 503 A.2d at 663. Plaintiffs premise defendants' liability upon three exceptions to this general rule. The court will evaluate each of these arguments in turn.

### A. Active Control Over the Manner and Methods of the Work

*3 In Delaware, an owner or general contractor has a duty to protect an independent contractor's employees when the owner or contractor "retains active control over the manner in which the work is carried out and the methods used." *O'Connor,* 503 A.2d at 663 (citing *Williams v. Cantera,* 274 A.2d 698, 700 (Del.Super.1971)). While the concept of active control is an "elastic one," *see O'Connor,* 503 A.2d at 662, it is not inferred from mere retention by the owner or contractor of the right to inspect or to supervise the work for conformity with the contract. *See Seeney v. Dover Country Club Apartments, Inc.,* 318 A.2d 619, 621 (Del.Super.1974).

In the case at bar, plaintiffs argue that defendants' sole on-site employee, Larry Blevins, actively supervised the manner and methods of the siding contractors. According to plaintiffs, Blevins " coordinated and scheduled all subcontractors for the [Bear Crossing] project and actively directed when and where various aspects of the work would be done." (D.I. 66 at 11) Plaintiffs also claim that Blevins controlled "the timing and manner in which the subcontractors ... and their employees[ ] completed their work." (D.I. 66 at 11) As evidence of Blevins' control of the worksite, plaintiffs point to testimony in which Blevins admitted that he would not permit subcontractors to work if the site

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Page 5 of 8

Not Reported in F.Supp.2d                                                                                          Page 4
Not Reported in F.Supp.2d, 1999 WL 191570 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

had open ditches or exposed plumbing and that he would clean debris from around the house before the subcontractors arrived. (D.I. 67 at B22-23) Blevins also testified that he once told a siding subcontractor not to work on a "dangerously windy" day.[FN5] (D.I. 64 at A127)

> FN5. Later in his testimony, Blevins indicated that the subcontractor did not attempt to work that day. (See D.I. 64 at A142 ("I mean he knew it was windy and he didn't stick around. He didn't even try to, you know-I guess he came there, was hoping the wind would die down even that day.")). The court finds that this lone incident does not rise to the level of controlling the work of independent contractors at Bear Crossing.

The record reveals, however, that Blevins' role at the site did not rise to the level of "active control" over the subcontractors. When a house was ready for siding, Blevins merely called the siding subcontractor, Ark, and "wait[ed] for the siding crew to show up." (D.I. 64 at A119) Blevins neither requested a particular siding crew nor demanded a certain number of workers from Ark. He had limited contact with the siding subcontractors while they worked at the site. (D.I. 64 at A120) Although he would inspect the various houses for compliance with the siding subcontract, he would not supervise the construction of the pump jacks because he believed that subcontractors "should know what was safe for them and what wasn't." (D.I. 64 at A122) Blevins also inspected the finished siding before authorizing Capano Builders to pay the subcontractors.

The facts of the case at bar are analogous to those in *Seeney*. In *Seeney*, the Delaware Superior Court found that defendants' on-site foreman did not control the manner and methods of an independent contractor's work even though the foreman coordinated the work of the various subcontractors, told subcontractors when and where to install pipeline, and inspected the work for compliance with the contract. See *Seeney*, 318 A.2d at 621-22. The Superior Court found that

*4 [i]mparting such instructions to the independent contractor did not demonstrate control by the owner over the manner and means of accomplishing the [work]. Instead, the owner was merely exercising his right to supervise the general result and also the immediate results, from time to time, as the work progressed.

*Id.* at 622 (internal quotations omitted). In cases where courts have found owners or general contractors to have retained control over the workplace, the owners or general contractors have engaged in far more extensive supervision of the worksite than defendants have in the case at bar. *See, e.g., Rabar v. DuPont de Nemours & Co.*, 415 A.2d 499, 507 (Del.Super.1980) (finding that defendant had retained sufficient control of the work area where defendant dictated the number of workers to be used by the subcontractor and supplied all construction materials, tools, equipment, and facilities).

The record is devoid of evidence demonstrating that defendants directed or controlled the subcontracted work at Bear Crossing. Unlike the defendants in *Rabar*, defendants in the instant case supplied no materials or equipment to the vinyl siding subcontractors. Significantly, the pump jack pole that fell on decedent did not belong to defendants. Moreover, like the foreman in *Seeney*, Blevins merely scheduled the arrival of subcontractors and directed them to the appropriate house. Plaintiffs' expert witness even testified that defendants did not supervise the subcontractors at Bear Crossing. (D.I. 64 at A234-235)

The fact that Blevins would not allow subcontractors to work around open plumbing or debris does not imply that he controlled the manner and method of the siding work. Indeed, defendants, through Blevins, had a duty to make the premises safe for business invitees like siding subcontractors.[FN6] See *Seeney*, 318 A.2d at 622 (explaining that " the possessor of land owes a duty to maintain the premises in a reasonably safe condition and to warn [business invitees] of all defects of which he knows or has reason to know"). It would be perverse to punish defendants by finding that compliance with this duty necessarily entails actively controlling the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                   Page 5
Not Reported in F.Supp.2d, 1999 WL 191570 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

work of their independent contractors.

> FN6. Plaintiffs have offered no evidence that defendants breached their duty to keep the premises safe for business invitees.

Thus, plaintiffs have failed to present evidence that defendants retained active control over the siding work at Lot 28. As such, defendants owed no legal duty to protect decedent, an employee of an independent contractor, from the hazards implicit in completing the siding contract.

### B. Voluntary Assumption of Responsibility for Workplace Safety

Plaintiffs contend that, even in the absence of active control of the subcontractors' work, defendants voluntarily assumed responsibility for workplace safety. (D.I. 66 at 14-16) In Delaware, those who have responsibility for workplace safety must take reasonable measures to ensure the safety of those at the worksite. *See Bryant,* 1995 WL 653987, at *7. A duty to ensure workplace safety can be imposed upon a party who " 'by agreement or otherwise, undertakes responsibility for implementing the required safety measures." ' *Figgs v. Bellevue Holding Co.,* 652 A.2d 1084, 1092 (Del.Super.1994) (quoting *Rabar,* 415 A.2d at 505). Where a breach of this duty causes injury to a worker, the responsible party can be held liable under the traditional principles of negligence law. *See Bryant,* 1995 WL 653987, at *7.

*5 Plaintiffs contend that defendants voluntarily assumed responsibility for safety when Blevins forbade a subcontractor from working in windy conditions and when Blevins prohibited subcontractors from working around open ditches and exposed plumbing. Plaintiffs also claim that Blevins enforced safety regulations regarding the use of hard hats. (D.I. 66 at 15)

The Delaware Superior Court has held, however, that such precautions do not compel a finding that an owner or general contractor voluntarily assumed responsibility for workplace safety. *See Bryant,* 1995 WL 653987, at *10-11. In *Bryant,* the defendants "pointed out and required correction of OSHA violations by contractors, addressed safety at project meetings, and allegedly retained the right to shut down the project if it was unsafe." *Id.* at *10. Nonetheless, the Superior Court found that "[a] property owner does not voluntarily assume responsibility for workplace safety by advising his independent contractor of observed safety violations where the independent contractor is contractually required to maintain workplace safety. " *Id.* at *11.

In the case at bar, plaintiffs admit that defendants' contract with Ark required Ark to assume responsibility for safety. (D.I. 64 at 15) Moreover, defendants undertook none of the safety measures initiated by the defendants in *Bryant*. Defendants did not conduct safety meetings with subcontractors or call safety violations to the attention of subcontractors. (D.I. 64 at A52-53, A188) Indeed, defendants' foreman left the safety of pump jacks to the siding subcontractors. (D.I. 64 at A122) Defendants also did not distribute any safety publications to subcontractors. None of defendants' corporate officers oversaw safety at building sites or ensured that subcontractors abided by OSHA regulations. (D.I. 64 at A48, A54, A74-75, A123-24) Defendants' president testified that he imposed no safety requirements on subcontractors and that he held subcontractors responsible for the training of their own employees. (D.I. 64 at A52-53)

In short, plaintiffs have offered no evidence from which a reasonable factfinder could conclude that defendants voluntarily assumed responsibility for the safety of subcontractors at Bear Crossing.[FN7] Indeed, the record clearly indicates that defendants relied upon independent contractors to ensure the safety of subcontracted workers. Consequently, the court finds that defendants did not assume responsibility for worker safety at Bear Crossing.

> FN7. Defendants required subcontractors to wear hard hats only after decedent's accidental death. (D.I. 64 at A124-26) Some witnesses testified that, two years before the accident, defendants had sent a

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Page 6

Not Reported in F.Supp.2d, 1999 WL 191570 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

memo to subcontractors that required the use of hard hats at defendants' building sites. Plaintiffs have not produced that memo, and it is unclear that it was directed to subcontractors at Bear Crossing. In any event, standing alone, the memo would not establish that defendants voluntarily assumed responsibility for safety at their worksites. *See Bryant,* 1995 WL 653987, at *11.

### C. Negligent Selection of Ark

Plaintiffs also argue that defendants are liable under a theory of negligent hiring. (D.I. 66 at 16-18) Delaware courts have adopted the tort of Negligence in Selection of a Contractor as set forth in Restatement (Second) of Torts § 411. *See Fisher v. Reid,* Civ. A. Nos. 94-C-08-002, 93C-07-001, 1996 WL 453444, at *5-6 (Del.Super. June 19, 1996); *Bowles v. White Oak, Inc.,* C.A. No. 86C-AP-107, 1988 WL 97901, at *5 (Del.Super.Sept.15, 1988). Section 411 provides that:
*6 An employer is subject to liability for physical harm to third persons caused by his failure to exercise reasonable care to employ a competent and careful contractor
(a) to do work which will involve a risk of physical harm unless it is skillfully and carefully done, or
(b) to perform any duty which the employer owes to third persons.[FN8]

> FN8. Delaware courts have held that employees of independent contractors have standing to sue under § 411. *See Fisher,* 1996 WL 453444, at *5.

Restatement (Second) of Torts § 411 (1965). The negligence of the contractor, in and of itself, is insufficient to impose liability on the employer. *See Bowles,* 1988 WL 97901, at *5. Instead, "it is necessary that the harm complained of result from some quality in the independent contractor which made it negligent for the employer to entrust the work to him." *Id.* (citing Restatement § 411, comment b). In hiring an independent contractor, an employer must exercise reasonable care under the circumstances. *Id.* (citing Restatement § 411, comment c).

Plaintiffs contend that defendants are liable under this theory because they failed to inquire into the qualifications of Ark's subcontractors and because decedent's death resulted from Ark's indifference to the proper selection and training of its subcontractors. (D.I. 66 at 16-18) Plaintiffs' expert testified that decedent and his co-workers had questionable training in hanging vinyl siding as well as an impaired ability to follow written safety instructions. (D.I. 66 at A268) Assuming, for the purposes of this motion, that Ark negligently hired unskilled siding subcontractors, such negligence is insufficient to impose liability upon defendants.

The crucial question is whether decedent's death resulted "from some quality in the independent contractor which made it negligent for [defendants] to entrust the work to [it]." *Bowles,* 1988 WL 97901, at *5. Because defendants contracted with Ark, and not with Mun Soek Lee or Chung Nam Pak, it is defendants' decision to hire Ark that must be reviewed for negligence.

The record is conspicuously lacking in evidence tending to show that defendants were negligent in hiring Ark. Defendants hired Ark because Ark had the resources to complete the siding and roofing of over 200 houses at Bear Crossing. Ark "was probably the largest roofing and siding company in the State of Delaware." (D.I. 64 at A160) Although defendants knew that Ark subcontracted siding work to others, there is no evidence to suggest that defendants knew that Ark subcontracted to dangerously unskilled workers. Indeed, Frank Capano testified that he was "sure [Ark] had to pick qualified people." (D.I. 64 at A52) Ark's own stated criteria for hiring subcontractors were "needed equipment, truck [ownership], license and insurance and experience in knowing how to hang siding." (D.I. 64 at A160) Ark verified the Delaware contractor licenses of each subcontractor, and it refused to pay subcontractors unless they held valid insurance policies. (D.I. 64 at A162-63) Ark verified the experience and quality of subcontractors by calling previous customers. (D.I.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                              Page 7
Not Reported in F.Supp.2d, 1999 WL 191570 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

64 at A163) Ark also required its subcontractors to abide by Occupational Safety and Health Administration ("OSHA") regulations, and it provided subcontractors with written OSHA safety guidelines. (D.I. 64 at A23, A167-68, A170-71) Moreover, Ark employed a manager who had been certified as an OSHA safety inspector. (D.I. 64 at A169)

*7 Plaintiffs have failed to present any competing evidence from which a reasonable factfinder could conclude that defendants were negligent in hiring Ark. Plaintiffs merely rely upon Ark's alleged negligence in subcontracting the work at Lot 28 to Mun Soek Lee and Chung Nam Pak. This, however, cannot serve as a basis for imposing liability upon defendants. See Bowles, 1988 WL 97901, at *5.

Summary judgment is appropriate because plaintiffs have not demonstrated, under any theory of liability, that defendants owed decedent a duty. Thus, defendants are not legally responsible for decedent's death. Because actions brought under Delaware's Wrongful Death Statute are subject to " the same infirmaties as would have existed in a suit by the deceased if still alive," defendants also owed no duty to plaintiffs Yong Yue Li, Yong Ri Li, and Shun Zou Jin. See Drake v. St. Francis Hosp., 560 A.2d 1059, 1062 (Del.1989) (internal quotations omitted). Accordingly, the court shall grant defendants' motion for summary judgment.

## V. CONCLUSION

For the aforementioned reasons, defendants' motion to dismiss is granted. An order shall issue consistent with this memorandum opinion.

D.Del.,1999.
Li v. Capano Builders, Inc.
Not Reported in F.Supp.2d, 1999 WL 191570 (D.Del.)

Briefs and Other Related Documents (Back to top)

• 1:97CV00549 (Docket) (Oct. 03, 1997)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.