# In The Matter Of:

*Estate of Marissa Rose Fishman v.*
*Richard Longwell, et/al*

---

*Vincent J. Rizzo*
*January 30, 2006*

---

*B&R Services for Professionals, Inc.*
*235 S. 13th Street*
*Philadelphia, PA 19107*
*(215) 546-7400*
*FAX (215) 985-0169*

Original File 013006p1.txt, Pages 1-125

**Word Index included with this Min-U-Script®**

Vincent J. Rizzo
January 30, 2006

Estate of Marissa Rose Fishman v.
Richard Longwell, et/al

Page 21

[1] then it was the patio area. And --
[2] Q. I'm sorry. What were you going to be doing at
[3] the patio?
[4] A. The patio we were installing pavers, the wrap
[5] around -- the inner part, there was like an L
[6] between the house and the enclosed pool area and we
[7] were covering that section with pavers on the
[8] outside of the house.
[9] Q. Can you spell it, pavers?
[10] A. P-A-V-E-R-S.
[11] Q. And in laymen's terms just describe what you
[12] mean by pavers?
[13] A. It's actually -- they come in all different
[14] sizes, four by four, six by six, six by nine. It's
[15] actually a concrete paver. It's actually like a
[16] walking stone, like a cobblestone.
[17] Q. What were you doing first? Were you going to
[18] fix the enclosure on the pool first and then do the
[19] patio work?
[20] A. The pool was completely done.
[21] Q. That was done first?
[22] A. That whole phase was done. There was nothing
[23] else to be done as far as that.
[24] Q. As of August 30, 2002 the modifications to the

Page 22

[1] pool enclosure had already been completed?
[2] A. It had been completed.
[3] Q. How long did it take you to do that?
[4] A. I would probably say -- I'd say probably about
[5] a week, week and a half. Realistic probably about
[6] a week and a half.
[7] Q. So if you started work -- I know I wasn't
[8] being specific necessarily about the exact date,
[9] but if you started approximately August 15, that
[10] would take you up to about August 25 or so, about
[11] five days before this accident that you completed
[12] the pool enclosure work?
[13] A. Right. This was prior, before -- this was not
[14] within a week's time that this happened, within
[15] each other. This pool area was done probably about
[16] two or three weeks before the pavers were even
[17] started.
[18] Q. So as of about August 15 then, if the accident
[19] happened on August 30 -- by the way you have
[20] invoices for this stuff, right?
[21] A. Gosh, man I got to check. I'm sure I do. I
[22] have to.
[23] Q. We can pin down the exact dates that you
[24] worked?

Page 23

[1] A. If I can locate them. It's been so long.
[2] Q. But have you looked back since you became
[3] aware that there was a lawsuit to see which dates
[4] you were working?
[5] A. I have not. If anything would happen as far
[6] as on my records, I looked. I'm having a heck of a
[7] time finding them. If Air Base could find them,
[8] because I'm sure they have them because I had to
[9] present them issues with the invoices.
[10] Q. And they may, but I just wanted to be specific
[11] about dates.
[12] A. That's fine. As far as the dates, I wish I
[13] could be more helpful to you, as far as the actual
[14] dates, but, unfortunately, I do not remember date
[15] for date. That's a very bad thing with me as far
[16] as paperwork and all that.
[17] Q. I understand. About two weeks or so before
[18] this accident the pool enclosure work was done?
[19] A. It was completed every bit of two to three
[20] weeks before this patio was even started, in full.
[21] It was completed.
[22] Q. And when you completed it, then you moved to
[23] start the patio work?
[24] A. That's correct.

Page 24

[1] Q. And where in relation to the pool is the
[2] patio?
[3] A. It is on the outside of the house. Again, if
[4] I could draw it for you, I could show you better.
[5]    If you can picture an L, okay, the
[6] outside of the L, okay, was where the work was
[7] done.
[8] Q. Why don't we --
[9] A. I --
[10] Q. Sir, I have some photographs of the home. Did
[11] you take any before you started work?
[12] A. No, sir.
[13] Q. Is that something you would typically do?
[14] A. No. No.
[15] Q. Did you take any photographs at any time
[16] either before this work that you did in August of
[17] 2002 or after it?
[18] A. No, sir.
[19] Q. So Ashland Construction doesn't have any
[20] photographs of the subject premises or the work
[21] area?
[22] A. Absolutely.
[23] Q. This is a diagram that was produced in
[24] discovery. This was produced by the Air Base

Page 37

[1] Q. Did you and Mr. Ortiz have to bring tables and
[2] chairs from any location into the pool area on the
[3] day of the accident?
[4] A. Would you like me to tell the whole story?
[5] Q. Yes.
[6] A. Prior to when we got there -- okay, our work
[7] consisted of on the outside, doing the pavers. We
[8] got there, I would say we were there for probably,
[9] I'd say for about -- I'd say probably about half an
[10] hour, forty-five minutes, maybe an hour, when we
[11] got there. Mrs. Longwell came outside, okay, and
[12] there was actually a white table, and I believe
[13] there was a couple chairs that were out there. I
[14] can't quite remember about the chairs too good, but
[15] she asked me if we could clean up the table and the
[16] chairs and bring them in, you know.
[17]     I said -- before we even did that, I
[18] walked in with Mrs. Longwell, inside the house, I
[19] followed her down into the pool area, and she said
[20] this is where I would like you to set the table at.
[21] Okay.
[22]     I proceeded to walk out of the house.
[23] She was in front of me. Walked out of the house,
[24] walked back out the outside door, okay, and then

Page 38

[1] continued with my work. I'd say roughly for about
[2] another half hour, okay. I guess half an hour,
[3] forty-five minute, and then got to cleaning off the
[4] table.
[5]     Okay. We cleaned the table off. We
[6] scrubbed it down with Ajax and ammonia. I believe
[7] there was a couple chairs also that we scrubbed
[8] down also.
[9]     And after everything was done, okay, and
[10] ready to go back in, then we proceeded to walk --
[11] we opened up the outside door of the house, we
[12] walked in with the chairs, and then right back out
[13] and got the table, and came right back in with the
[14] table.
[15]     As far as the doors were open, okay, the
[16] only door that was closed, okay, was the outside
[17] door that led to the outside of the house. That's
[18] where we were working at. So we brought the chairs
[19] in, walked right back out, got the table. We were
[20] carrying the table in, we were setting the table --
[21] matter of the fact the table was still in my hands,
[22] walking backward to the steps that went down to the
[23] pool area. We were setting the table down, and
[24] then as -- the table didn't even hit the ground

Page 39

[1] yet, and I looked up, and I heard Rochelle up on
[2] the top screaming. Okay.
[3]     And then, gosh, it was so fast
[4] everything that went on, then I seen her come
[5] running through the area where I was setting the
[6] table down and running to the pool, and I seen her
[7] grabbing the baby out of the pool.
[8] Q. Okay. What time of day did you have the
[9] conversation with Mrs. Longwell where she asked you
[10] to clean the tables or the chairs and the table and
[11] bring them into the pool area. About what time?
[12] A. It was the morning, probably about nine or ten
[13] o'clock.
[14] Q. By the way, have you made any personal notes
[15] or written this down anywhere, regarding your
[16] description of events?
[17] A. No. I mean it's just -- it's cut and dry
[18] exactly what happened.
[19] Q. I'm asking on the day of the accident did you
[20] sit -- did anybody tell you sit down and write down
[21] what happened?
[22] A. No. Positively not.
[23] Q. At no time since August 30, 2002 have you
[24] actually put pen to paper and wrote down a

Page 40

[1] statement of what happened?
[2] A. Correct. I have not.
[3] Q. Have you been interviewed by any
[4] representative from any insurance company?
[5] A. When all this, I guess, all this happened.
[6] Q. I don't want to hear about anything you said
[7] with your lawyer.
[8] A. When all this happened I met with John Manger
[9] and we met at a restaurant up on 202 and Route 1
[10] with a couple of -- I don't even know where these
[11] attorneys were from. I don't know if they were --
[12] whose they were. They just wanted to know the
[13] incident, what happened.
[14] Q. None of the attorneys at this meeting with Mr.
[15] Manger were retained by you, correct?
[16] A. Absolutely not.
[17] Q. So they weren't your lawyers?
[18] A. No.
[19] Q. And did the lawyers say anything to you at the
[20] meeting?
[21] A. Just wanted to know what happened.
[22] Q. Were they taking notes?
[23] A. I believe they took a recording.
[24] Q. They took a recording. Okay.

Page 57

[1] just want to make sure I understand you correctly,
[2] the chairs that are depicted in the photograph on
[3] the top half of this page, and I'm going to circle
[4] them, do you believe that any of those chairs was
[5] cleaned by you and brought into the room?
[6] A. No. There wasn't no chairs like this. This
[7] may have been one of them right here. The slatted
[8] chairs -- they were not slatted.
[9]         (Whereupon Exhibit Rizzo-9 was marked
[10]        for identification.)
[11] BY MR. CASEY:
[12] Q. So the three chairs to the right of this
[13] photograph were already in the pool room --
[14] A. Right.
[15] Q. -- and were not included among the chairs that
[16] you cleaned --
[17] A. Correct.
[18] Q. -- on the patio and brought into the poolroom?
[19] A. Correct.
[20] Q. But the chair to the left, which I'll mark
[21] with an arrow, on Rizzo-9, police photograph number
[22] 7, is a chair that you cleaned and brought into the
[23] room?
[24] A. Uh-uh.

Page 58

[1] Q. Yes?
[2] A. I would believe so. I mean, if I can remember
[3] correctly on the chairs.
[4] Q. Going back to Rizzo-8, police photograph
[5] number 23, I'm going to circle other chairs going
[6] from left to right, at least as I can see them in
[7] this photograph. There are four chairs; am I
[8] right, 1, 2, 3, 4?
[9] A. Uh-uh.
[10] Q. Yes? You need to answer verbally.
[11] A. Yes.
[12] Q. Do you believe that any of those four chairs
[13] was among those that you cleaned on the patio and
[14] brought into the poolroom?
[15] A. Let me see, Matt. The only ones I remember
[16] was on this side. These chairs were there. Them
[17] chairs were there.
[18] Q. Which ones?
[19] A. Right there. The ones you circled.
[20] Q. So, 1, 2, 3, 4, they were all there?
[21] A. The one closest to the table on the other
[22] side, over there --
[23] Q. Over here?
[24] A. Right. That may have been one I brought in.

Page 59

[1] Q. That's a slatted chair.
[2] A. Then it's not me then.
[3] Q. How about this chair to the right?
[4] A. Let me see that one.
[5]     I can't remember. I can't remember. I
[6] know they would have been brought in at one shot.
[7] Q. Can you put a number on the number of chairs
[8] that were on the patio that you had to clean and
[9] bring into the pool room?
[10]    MR. LANDON: Objection. Asked and
[11] answered.
[12]    THE WITNESS: What I already said about
[13] it, two, three, maybe four, if that.
[14] BY MR. CASEY:
[15] Q. Two to three, maybe four, if that?
[16] A. If that, yes.
[17] Q. Who carried the chairs in from the patio into
[18] the pool room?
[19] A. It would have been Salvador and myself.
[20] Q. Do you believe you carried chairs individually
[21] or did you assist one another carrying an
[22] individual chair?
[23] A. No. We carried the chairs in separately.
[24] Q. How long was it between when you finished

Page 60

[1] cleaning the chairs and the table and when the
[2] accident occurred, when you first observed the
[3] child in the pool, how much time elapsed?
[4] A. Gosh, there was none at all. Gosh, seconds.
[5] I mean by the time I got -- by the time I walked
[6] that table in, okay -- when that stuff was cleaned,
[7] it was walked into the house. Okay.
[8]     As soon as -- as soon as the chairs were
[9] set, if that was the case, if the chairs were set
[10] in first or not, I can't quite remember, but I know
[11] I had the table in my hand, setting the table down,
[12] is when I looked up and I heard Rochelle screaming.
[13] Q. Did you do anything between the time that the
[14] table and the chairs were cleaned, when you had
[15] finished cleaning, and when you brought them into
[16] the house?
[17] A. I don't understand the question.
[18] Q. Did you, for example, take a break or do
[19] anything, make a phone call, between the time that
[20] you finished cleaning the chairs and the table and
[21] when you noticed the child in the pool?
[22] A. I still don't understand the question.
[23] Q. Let's use a hypothetical. You and I are
[24] cleaning the chairs and the table. Are you with

Page 77

[1] A. It's not just a pool. It's any hazard in
[2] construction, whether there may be a piece of brick
[3] laying down, maybe a cord that someone can trip
[4] over. It could be anything. It's not just the
[5] pool area.
[6] Q. I understand that, but you told me that when
[7] you left that area every night there were borders
[8] and caution tape and things like that specifically
[9] for safety put up around the pool, correct?
[10] A. On the outside of it. When I was doing that
[11] area on the outside.
[12] Q. That's what I'm saying. When you were doing
[13] that area, you did those things specifically for
[14] safety, correct?
[15] A. Uh-uh.
[16] Q. Yes?
[17] A. Yes. That's correct.
[18] Q. What training did you get at Astra-Zeneca to
[19] which you alluded to a minute ago?
[20] A. As far as?
[21] Q. Safety training. You said it. I'm just
[22] trying to figure out what you mean.
[23] A. Through OSHA, guidelines of safety up there.
[24] Through meetings. It's all they pump into you,

Page 78

[1] safety.
[2] Q. What did you do for Astra-Zeneca?
[3] A. Masonry. Pretty much all their masonry work,
[4] pretty much.
[5] Q. I'm just trying to get a handle on what you
[6] alluded to earlier when you said, I worked at
[7] Astra-Zeneca for 20 years and that's all they
[8] focused on. They were very safety conscious?
[9] A. I guess how to answer that question, they
[10] focus on safety. I'm trained on safety an awful
[11] lot.
[12] The incident when it happened at this
[13] ordeal in this residence at this time in this
[14] manner is very terrible, what has happened. Okay.
[15] But my issue was not on the inside of the house.
[16] My job was maintained outside.
[17] Now if there was an issue as far as my
[18] outside work and something happened, I can be
[19] liable or account for the argument of it, but as
[20] far as what went on inside of that house, I'm
[21] not -- I'm not -- I'm not the owner of the house.
[22] I'm not the one who closed the doors. I'm not the
[23] one that opened up the door or anything of that
[24] nature.

Page 79

[1] Q. Along those very same lines, sir, if you
[2] brought the chairs in first and put them down
[3] around the pool, and then went back out to get the
[4] table, you had to make sure the doors were closed
[5] before you went back out, correct?
[6] MR. LANDON: Objection.
[7] THE WITNESS: No. No. That's not what
[8] it was.
[9] BY MR. CASEY:
[10] Q. So you believe you could be safe and leave the
[11] doors open?
[12] A. I'm saying --
[13] MR. LANDON: Objection.
[14] BY MR. CASEY:
[15] Q. Here's my question.
[16] Do you believe it would be consistent
[17] with the safety training you had to put the chairs
[18] down and go back out and get the table and leave
[19] the doors open?
[20] A. If I was going --
[21] MR. LANDON: Objection.
[22] THE WITNESS: If I was going to leave
[23] the job for 15, 20, 5 minutes, whatever,
[24] that would be a different story. That table

Page 80

[1] was right there with the chairs. There was
[2] no matter of elapsing 30 seconds for me to
[3] walk back out that door, grab that table,
[4] and walk right back in through that next
[5] door and drop that table down.
[6] BY MR. CASEY:
[7] Q. I believe your answer is no, you don't believe
[8] you needed to close the doors; is that what you're
[9] saying?
[10] MR. LANDON: Objection.
[11] BY MR. CASEY:
[12] Q. Between the time that you put the chairs down
[13] and go to get the table?
[14] A. The door was not closed.
[15] Q. Sir. Just presume for me, because I think we
[16] have photographs of this -- we have police
[17] photographs. The chairs that you cleaned were
[18] already there, correct? You had already put them
[19] down. Can we at least agree on that?
[20] A. No. Because as far as on the chair end of it,
[21] there was not -- there was not a time distance with
[22] these chairs. Like I said, everything was cleaned
[23] at one shot and brought into that house at one
[24] time.

Page 81

Q. We've already established that you would have to put -- if you put the chairs in first, you have to put them down in the pool room and go back outside to get the table?
A. I was right there at the slider door.
Q. Just bear with me. You'd have to put the chairs down and go back outside and get the table, correct?
A. Correct.
Q. When you came through the doors to put the chairs down, the door to the -- the two doors leading into the pool area are open, correct?
A. But the door's right there where I was putting the table in.
Q. Correct?
A. Correct.
Q. And then you have to go back outside through those doors to get the table, correct?
A. Correct.
Q. My question was, according to the safety training that you had, isn't it so that you would have to close those doors to go back out and get the table before you bought it back in?
    MR. LANDON: Objection.

Page 82

    THE WITNESS: If I was leaving that area unguarded for a period of time.
BY MR. CASEY:
Q. So you agree with me that if you were leaving that area unguarded for a period of time --
A. A period of time.
Q. Okay. Let me get there.
   If you were leaving that area unguarded for a period of time, you would be obliged to close each of the doors?
A. My -- here we go again with this. My work consisted of outside. That door I close from the outside work area where I was working at is the door that I'm responsible for.
   That door was open inside that house. That table was clean by that door. The chairs were clean by the door, and when that stuff was brought in, it was brought in at one time.
   I have no business in Mr. and Mrs. Longwell's house or to help myself to go through any door that I please to. That's not what it was.
   Mrs. Longwell asked me to clean the table for her. That's what was done.
   When I was done cleaning the table and

Page 8

the chairs, whatever it may have been, she asked me to set it down in this one area for her, and that's the way it was done.
Q. But you told me earlier that if you were leaving the area unguarded for a period of time, it would be incumbent upon you, I'm paraphrasing -- I want you to tell me if I'm right or wrong -- it would be incumbent upon you to make sure each of those doors was closed, correct?
    MR. LANDON: Objection.
    THE WITNESS: Do you object to this Roger?
    MR. LANDON: You have to answer the question.
    THE WITNESS: Here's what it is --
BY MR. CASEY:
Q. Let me just instruct you now. I'm asking you a specific question. I know you'd like --
A. I --
Q. Hold on a second, sir. I've tried to be very patient with you. I'm going to ask you a specific question. I want you to answer my question. You can have plenty of time to explain other things.
    Here's my question.

Page 8

   You told me earlier that if that area was left unguarded for a certain period of time, you would have to close the doors, correct?
A. I'm telling you this, if I walked in that house, and I opened up that door, okay, then, yes it's my responsibility to close it. But I did not open that door.
   The only door I opened was from the outside of that house, walking into that house.
   I don't know why she wanted that door opened. There could have been a reason why she wanted it open, but I know if I opened that door physically myself, yes, then it would have been my option to close it.
Q. So if you opened the inside door --
A. Correct.
Q. -- then your failure to close it in between when you did the work and when the accident happened would be your fault?
    MR. LANDON: Objection.
    THE WITNESS: Say -- repeat that.
BY MR. CASEY:
Q. If you opened the inside door, if it was you rather than someone in the house, okay, are you

**Page 85**

[1] with me so far?
[2] A. Correct.
[3] Q. Then it would be your responsibility to close
[4] it, correct?
[5] A. If -- if it was said to me to close it.
[6] That's not what this ordeal was, though.
[7] Q. My question is, sir, if --
[8] A. Now --
[9] Q. Wait a minute. If you opened the door into
[10] the pool and brought the chairs in, and then went
[11] back outside to get the table, in order to be
[12] performing that work in a safe manner, it would be
[13] your job to close that door that goes into the
[14] pool, correct?
[15]     MR. LANDON: Objection.
[16]     THE WITNESS: No. Because that door was
[17] open. I don't know why -- that's the
[18] homeowner having the door open.
[19] BY MR. CASEY:
[20] Q. My question though was, if you opened the door
[21] to bring the chairs into the pool area, sir, if you
[22] opened the door, and put the chairs down, and then
[23] had to go back out to get the table, if that's what
[24] happened, it would be your job after putting the

**Page 86**

[1] chairs down and going out onto the patio, to close
[2] that door to the pool before you go get the table,
[3] correct?
[4]     MR. LANDON: Objection.
[5]     THE WITNESS: I mean --
[6] BY MR. CASEY:
[7] Q. Agreed, yes or no?
[8] A. No. It's not agreed totally to the whole
[9] matter of it.
[10] Q. So that's not your job?
[11] A. Absolutely not.
[12] Q. If you were leaving that area, that is the
[13] pool area, and the dining room and the patio
[14] unguarded for a period of time, would it be your
[15] job to make sure that those doors are closed after
[16] you worked in that area?
[17]     MR. LANDON: Objection.
[18]     THE WITNESS: I mean -- I mean I'm
[19] responsible for my work area. That's what
[20] I'm responsible for.
[21] BY MR. CASEY:
[22] Q. Your work area that morning, sir, included the
[23] pool area, correct?
[24] A. No. No. My work area that day --

**Page 87**

[1]     MR. LANDON: Objection. Objection.
[2] Hold it. Hold it. We're just going on and
[3] on and on.
[4]     THE WITNESS: I'm not going to answer
[5] these questions.
[6]     MR. LANDON: You're arguing with the
[7] witness about issues that involve legal
[8] conclusions for one thing.
[9] For two things they involve
[10] hypotheticals which we have no foundation
[11] for given the testimony that he's given.
[12] And, you know, I don't know if this is --
[13] you're wasting our time. I'd like you to
[14] move on beyond this point.
[15]     MR. CASEY: I understand what you're
[16] saying. I disagree with it, but I tried to
[17] get specific answers from the witness and I
[18] haven't been able to do it.
[19] He's told me things that are his
[20] responsibility according to the safety
[21] training that he had. There were gratuitous
[22] things said that I think are areas that I
[23] can now explore. I think that his answers
[24] will speak for themselves.

**Page 88**

[1] BY MR. CASEY:
[2] Q. How do you know that Mr. Ortiz did not open
[3] the interior door?
[4] A. Because he was with me the whole time. He
[5] wouldn't have no business in the lady's house.
[6] Q. You don't even remember if he brought chairs
[7] in or not?
[8] A. My eyes were on him the whole time. He's my
[9] helper.
[10] Q. How do you know that he wasn't bringing in the
[11] chairs --
[12] A. Because --
[13]     MR. CASEY: Roger, please ask him to do
[14] it. I've asked him like six times now.
[15] Please let me finish my question. Okay.
[16] BY MR. CASEY:
[17] Q. How do you know that Mr. Ortiz didn't take it
[18] upon himself to bring the chairs into the pool
[19] room, and, accordingly, that he opened the interior
[20] door; how do you know that?
[21] A. Because I'm his boss, and I would tell him
[22] what he's to do. He would not take it upon himself
[23] to do something that I have not asked him to do.
[24] Q. Have you talked to him about this accident?