```
         IN THE UNITED STATES DISTRICT COURT
            FOR THE DISTRICT OF DELAWARE


JAMES H. GORBEY, JR.,          )
Administrator of the           )
Estate of Marissa Rose         )
Fishman, Deceased,             )
                               )
              Plaintiff,       )
                               ) C.A. No. 05-211 KAJ
    v.                         ) JURY TRIAL DEMANDED
                               )
RICHARD LONGWILL, BARBARA      )
LONGWILL, AIR BASE CARPET      )
MART, INC., d/b/a Air Base     )
Distributing, Inc., d/b/a      )
Air Base Carpet Mart, AIR      )
BASE DISTRIBUTING, INC.,       )
ASHLAND CONSTRUCTION           )
COMPANY, INC., JOSEPH          )
RIZZO & SONS CONSTRUCTION      )
VINCENT RIZZO CONSTRUCTION     )
CO., INC., d/b/a Ashland       )
Construction Co., Inc.,        )
JOSEPH V. RIZZO, VINCENT       )
RIZZO,                         )
                               )
              Defendants.      )
```

      Deposition of BARBARA H. LONGWILL, taken
pursuant to notice at the law offices of Murphy,
Spadaro & Landon, 1011 Centre Road, Suite 210,
Wilmington, Delaware, beginning at 1:20 p.m. on
Tuesday, March 7, 2006, before Heather M.
Triozzi, Registered Professional Reporter,
Certified Shorthand Reporter, and Notary Public.

1   Q.  So I want to make sure I'm clear.  You
2   don't have any memory of seeing anybody else who
3   was living there in the house at that time?
4       You don't recall seeing any of those
5   people from the time that your husband left at
6   9:00 or 9:15 until Marissa was discovered in the
7   pool; is that accurate?
8   A.  I would say that's accurate.
9   Q.  Okay.  Do you have any recollection,
10  taking that same time period again, and if we
11  can, just for the sake of argument, since you've
12  testified that your husband left around 9:00 or
13  9:15, and the police report says 10:13 for the
14  time of the occurrence, if we can use that hour
15  and 15 minute window of time or hour and 13
16  minute window of time.
17      During that window of time, do you
18  have a recollection of ever noticing whether or
19  not the interior door from the dining area to the
20  pool area was open or closed?
21  A.  The interior door to the pool area, if it
22  would have been open, I would have closed it,
23  because that's what I do.
24  Q.  If you had noticed that it was open, you

```
 1    Q.   Okay.  Was anybody working with him?
 2    A.   Yes.
 3    Q.   Who?
 4    A.   I don't know his name.
 5    Q.   Hispanic gentleman?
 6    A.   Mm-hmm.
 7    Q.   Did you ask Mr. Rizzo to do anything to
 8  the table other than take the plants off it and
 9  bring it in?
10    A.   No, I did not.
11    Q.   Okay.  You didn't ask him to clean it?
12    A.   I don't remember asking him to clean it.
13  But I -- you know, I assume if he was going to
14  bring it in, he would have cleaned it, I guess.
15    Q.   Okay.  You haven't read his deposition
16  transcript?
17    A.   Pardon?
18    Q.   Have you read his deposition transcript?
19    A.   No, I have not.
20    Q.   Have you read any accounts of what he has
21  said happened that morning?
22    A.   I don't remember doing so.  No.
23    Q.   Okay.  Did you ever talk to him after the
24  fact about how or why it had happened?
```

1   A.   No.  My heart was broken.
2   Q.   Do you blame him for what happened?
3         MR. HART:  I'm going to object to
4   the question, but you can answer.
5   BY MR. LANDON:
6   Q.   Do you blame Mr. Rizzo for what happened?
7         MR. HART:  I'll object.
8         THE WITNESS:  I -- I can't answer.
9   BY MR. LANDON:
10  Q.   Okay.  I don't want to push this real
11  hard, but what do you mean by that, you can't
12  answer?
13        You just don't want to answer?
14        MR. HART:  I'm going to -- she's
15  answered the question.  She said she can't
16  answer.
17  BY MR. LANDON:
18  Q.   Why can't you answer?
19  A.   I can't -- I can't answer.  To me, it's
20  like an act of God.
21        I can't answer.
22  Q.   When you asked Mr. Rizzo to bring the
23  table in, did he -- and you've described how you
24  stood in the dining area.  Did you actually open

1  the door to the pool enclosure?
2      A.   Yeah.  I opened it slightly to, you know,
3  just to point.
4      Q.   Okay.  And where was he when you were
5  doing that?
6           Did he come inside and stand in the
7  dining room?
8      A.   He was behind me.  I believe he was behind
9  me.
10          I don't remember exactly, but I
11 believe he was behind me.
12     Q.   In the dining area?
13     A.   Mm-hmm.
14     Q.   Yes?
15     A.   Yes.  Okay.
16          I'm sorry.
17     Q.   And what did you say to him?  I just want
18 you to put it down here?
19     A.   Yeah, just put it over here.
20     Q.   Just pointed to where you wanted it?
21     A.   Right.
22     Q.   Do you have any idea where Marissa was at
23 that moment?
24     A.   No, I do not.

1  seen her open that door?
2     A.  No.  As a matter of fact, when the police
3  took the report, they even tried to open that
4  door, and they -- it was very difficult.
5     Q.  How about -- and I want to go through some
6  of the other kids who were there on the 30th.
7         I know that you said that Alexandra
8  was there.
9     A.  Hmm.
10    Q.  She was eight years old at the time,
11 approximately?
12    A.  I guess.
13    Q.  Do you know if you had ever seen her
14 actually pull that door open?
15    A.  Everybody had a tough time pulling that
16 door open, and they weren't allowed to pull the
17 door open.
18    Q.  Okay.
19        MR. HART:  Listen carefully to the
20 question, which was did you ever see.
21        THE WITNESS:  No.
22 BY MR. VAN NAARDEN:
23    Q.  Okay.  How about Harrison?
24    A.  No.

Barbara H. Longwill                                86

1  the house?
2      A.   He's been in the house.  Yes.
3      Q.   Was he involved in building the house?
4      A.   I don't know if he was involved in
5  building the house.  He may have been involved in
6  part of the -- I don't remember.
7           I know that it's a long time, but
8  he's been working for a long time.
9      Q.   So you and your husband were comfortable
10 enough with Vinnie to allow him to be in the
11 interior of your house?
12     A.   Correct.
13     Q.   And is that something that if he was in
14 the interior of your house, would he normally ask
15 you, like, knock on the door, ring the bell
16 before he came in, or sometimes he would just
17 walk in and do what he needed to do?
18     A.   No.  He would -- he would -- he would be
19 proper.
20          He would ring the bell and ask me.
21 He's always a proper person.
22     Q.   Okay.  You were asked a question before
23 about which chairs we are talking about here,
24 which chairs were taken from the patio to the