# EXHIBIT A

# In The Matter Of:

*Estate of Marissa Rose Fishman v.*
*Richard Longwill*

---

*Corporal Claudine Malone*
*May 17, 2006*

---

*B&R Services for Professionals, Inc.*
*235 S. 13th Street*
*Philadelphia, PA 19107*
*(215) 546-7400*
*FAX (215) 985-0169*

Original File 51706kha.txt, Pages 1-62

**Word Index included with this Min-U-Script®**

Page 21

[1] Marissa went upstairs to brush her teeth. During that
[2] time period, the grandmother of Marissa walked --
[3] opened the door from the kitchen area to the pool area
[4] to ask the workers if they would move a table and
[5] chairs -- a set of table and chairs that were in the
[6] pool area to the outside so that she could clean or do
[7] something in that area. And when she did that, she
[8] left the door open and it was in that time that
[9] Marissa wandered out to the pool area and we suspect
[10] reached for a toy that was floating inside the pool
[11] since there was no one else in that area at the time.
[12] Q. Let's back up for a second.
[13] A. Okay.
[14] Q. Was it your understanding that the
[15] construction workers were taking a table from the pool
[16] area out to the patio to clean or the other way
[17] around?
[18] A. It was my understanding that she -- that
[19] grandmom had asked them to move something for her from
[20] the pool area to the outside.
[21] Q. Okay. And that's just going on your -- on
[22] your memory and recollection?
[23] A. My recollection, yes.
[24] Q. Okay. I'm just going to represent to you that

Page 22

[1] we've taken some various depositions in the case --
[2] A. Mm-hmm.
[3] Q. -- including the grandmother and it's our
[4] understanding that the construction workers were
[5] instructed to take the patio furniture from the
[6] outside patio into the pool area.
[7] A. Okay. Well, that may very well be. I may be
[8] incorrect.
[9] Q. That's fine. Additionally, you said that you
[10] were informed that the grandmother left the door open?
[11] A. That's what I recall, yes.
[12] Q. And this is something -- the information that
[13] you received from whom; is that from the sister, from
[14] the aunt?
[15] A. From the sister, yes, from the aunt.
[16] Q. Since you don't have a copy of it, I'm just
[17] going to show you the investigative narrative that was
[18] conducted by Officer Schlosser.
[19] A. Yes.
[20] Q. One, two -- third paragraph. I actually
[21] highlighted it.
[22] A. Yes.
[23] Q. Do you see where it says -- I'm reading upside
[24] down, but door that was left open by construction

Page 23

[1] workers working on the residence. I guess I should
[2] read the whole thing.
[3] A. I recall reading that also.
[4] Q. Okay. As you read that, does that refresh
[5] your recollection as to who left that door open?
[6] A. That is -- that is different from my
[7] recollection of -- of what -- the statements that I
[8] received that day.
[9] Q. Okay. And that was a statement -- we just
[10] talked to Officer Schlosser.
[11] A. Mm-hmm.
[12] Q. But that was a statement that he received from
[13] both -- from both Alexandra and Barbara.
[14] A. Okay.
[15] Q. And you have an understanding that Barbara is
[16] the grandmother?
[17] A. Grandmother.
[18] Q. Okay. This initial -- just so we're clear,
[19] that's not -- that's different than what you recall?
[20] A. That is different from what I recall.
[21] Q. As you sit here today, do you know if you put
[22] in your report that aunt told you that grandmother,
[23] meaning Barbara, had left that door open?
[24] A. I could only guess that I would have put that

Page 24

[1] because if it was contained in any interview and it
[2] stuck in my mind, then it would be documented as such.
[3] Q. Okay. If it's not -- and we're going to do
[4] everything we can to get that report.
[5] A. Sure.
[6] Q. But if it's not in your report, you believe
[7] it's a possibility that maybe your recollection is
[8] wrong as to what the aunt told you?
[9] A. I am certain that I was informed that grandmom
[10] left the door open because it was explained to me that
[11] that was why grandmom was that particularly despondent
[12] about Marissa being in the hospital, being hurt,
[13] subsequently dying, because she had left that door
[14] open and that it was particularly chaotic in the
[15] household which is -- as we all know sitting here
[16] today, when these accidents occur, when everything is
[17] not as it normally is and something is disrupted,
[18] something like this happens.
[19] Q. Did Deborah tell you where she got that
[20] information from, that grandmother had left the door
[21] open?
[22] A. Not that I recall.
[23] Q. Okay. Anything else that you can tell me
[24] about the interview that you conducted with Deborah

Page 25

[1] Fox?
[2] **A.** She frequently conveyed that this was a
[3] difficult time for the family, for her sister in
[4] particular and her sister's husband -- I thought they
[5] had had four children, I may be mistaken -- and hard
[6] on the kids and that the kids had been kind of
[7] recently transplanted to the grandparents' house
[8] because they had been separated. So everything wasn't
[9] as it normally was.
[10] **Q.** Did Deborah convey any information to you
[11] about construction workers who were doing work on the
[12] outside area of the home?
[13] **A.** I knew there had been construction workers
[14] there. What they were working on I don't remember.
[15] **Q.** Did Deborah convey to you any concern that she
[16] had about potentially the construction workers playing
[17] some role in that door being open?
[18] **A.** No.
[19] **Q.** When you were conducting this interview, were
[20] you taking notes?
[21] **A.** I was.
[22] **Q.** And do you retain those notes?
[23] **A.** They should be with the Master Supplement
[24] Report.

Page 26

[1] **Q.** I asked you before, but you weren't taking an
[2] audio recording of it?
[3] **A.** No.
[4] **Q.** Approximately how long were you with Deborah
[5] getting her interview?
[6] **A.** I don't remember. If I had to estimate, I
[7] would say it was less than an hour.
[8] **Q.** And what was the next thing you did after you
[9] conducted the interview with Deborah Fox?
[10] **A.** I will probably fail you in trying to recall
[11] what I did sequentially that day. I know there was a
[12] lot of interruption from medical staff and I was
[13] frequently getting updates from them, frequently
[14] getting updates from the scene via a cell phone. And
[15] I went in to look at Marissa to make sure that -- as
[16] protocol that there weren't any injuries that
[17] indicated to me that there was a criminal act.
[18] somewhat of a cursory examination just to be sure
[19] there was no signs of bruising, injury, ligature
[20] marks, anything -- anything like that. But my -- my
[21] next interview would have been with her mom.
[22] **Q.** That's Rochelle?
[23] **A.** Marissa's mom, yeah, Rochelle.
[24] **Q.** Where was that interview conducted?

Page 27

[1] **A.** In the same room.
[2] **Q.** And was she -- was it just you and Rochelle?
[3] **A.** It was -- it would have been us in the same
[4] corner. I would say the -- the room was at least this
[5] wide and probably twice the width -- or this long and
[6] at least twice the width.
[7] **Q.** Were you jotting notes down?
[8] **A.** Yes, yes.
[9] **Q.** And that's something that would also be
[10] contained in your file, evidence file?
[11] **A.** Yes, with the -- either in the evidence file
[12] or in the master report with -- attached to the master
[13] report.
[14] **Q.** What did Rochelle tell you?
[15] **A.** She was talking about how -- the same thing,
[16] the marital problems that her and her husband had been
[17] having and that they had been separated and there
[18] was -- there seemed to be a lot of conflict between
[19] the two of them concerning the children.
[20]     I don't think that the children staying there
[21] was something that he approved of or desired as I'm
[22] sure is the case in many separations.
[23]     She said that the -- the same thing, that
[24] there was going to be a religious celebration. I want

Page 28

[1] to say it was a Jewish -- pardon me for not knowing
[2] the proper terminology, but a Brisk or something of
[3] that nature.
[4] **Q.** Mm-hmm.
[5] **A.** And that there was going to be a lot of family
[6] coming in from out of town and some were staying there
[7] and some were staying in hotels. And there was a lot
[8] of -- a lot of preparation that her mom was doing to
[9] get ready for the celebration; that she had gone
[10] upstairs to -- solely to brush her teeth and back down
[11] again. And when she came back down, she said where's
[12] Marissa. Everybody was going I don't know, where's
[13] Marissa, and they started looking around. And
[14] frantically, obviously, one of the first places they
[15] checked was the pool and Marissa was face down in the
[16] water.
[17]     She indicated to me that she had gone
[18] upstairs, brushed her teeth and returned back down and
[19] that her sister was making a phone call to her
[20] husband, who I believed was back in Florida, in an
[21] adjoining room but out of eye shot, if you will, of
[22] the pool area. And Marissa was -- you know, had been
[23] playing with toys when she had left her, when she had
[24] gone up to brush her teeth.

Page 37

[1] of the children in the property?
[2]     **MR. HART:** Objection. You can answer
[3] the question if you understand it.
[4] **A.** A pool if it did not have a barrier in between
[5] to me would have been a hazardous condition. This
[6] door -- or there was a -- I understood that, although
[7] I didn't observe it myself, there was a barrier
[8] between the living space and the residence and the
[9] pool area that would have prevented -- if everything
[10] was the way it should have been that day, it would
[11] have prevented such a hazard.
[12] **BY MR. VAN NAARDEN:**
[13] **Q.** When you say barrier, do you mean the sliding
[14] door?
[15] **A.** The door.
[16] **Q.** Okay. Did you make a conclusion or a
[17] determination in your investigation conclusively as to
[18] who left that door open?
[19] **A.** Without looking at my notes, it was, from my
[20] recollection and my conclusion, that the grandmother
[21] -- the maternal grandmother had left that door open to
[22] request from the workers that they move that
[23] furniture.
[24] **Q.** I'm sorry, could you say that again?

Page 38

[1] **A.** Sure. It was my recollection that the
[2] maternal grandmother had opened that door from the
[3] kitchen area to go ask the workers to move furniture
[4] for her as a favor.
[5] **Q.** While conducting your investigation, I
[6] understand your recollection when you talked to
[7] Rochelle -- or, rather, when you talked to Deborah
[8] that she indicated that the grandmother left the door
[9] open. And now that we've looked at the investigative
[10] report, I think we can agree that the interview taken
[11] of Rochelle at least says something different,
[12] correct?
[13] **A.** Mm-hmm, mm-hmm, yes.
[14] **Q.** Is that something that you would need to
[15] reconcile before you came to any conclusion about --
[16] as to who left the door open?
[17] **A.** No, not in this incident because the -- the
[18] statute that I would be concerning myself with
[19] criminally would have been one of endangering the
[20] welfare of a child. If -- it was my interpretation
[21] that the door had been left open for 20 minutes, 10
[22] minutes, 15 minutes. I don't know -- I don't know
[23] that I can give you a specific time limit, but
[24] something that a reasonable person would think would

Page 39

[1] have been over -- overboard creating a hazard, then it
[2] would be where I would want -- want to consult with an
[3] Attorney General on whether to press charges for
[4] endangering, then it would have been more important
[5] for me to find out with some precision who left the
[6] door open and that would probably -- if I was
[7] considering that statute, I would have brought that
[8] person in and Mirandized them and sat them down and
[9] took an audio and videotaped statement.
[10] **Q.** And that wasn't done in this case?
[11] **A.** That was not done in this case because that
[12] hazardous condition did not exist.
[13] **Q.** Do you know how long construction workers were
[14] moving that furniture --
[15] **A.** No.
[16] **Q.** -- in between the outside or the inside?
[17] **A.** No.
[18] **Q.** Do you know how many trips they took from --
[19] to go from -- whether it be the pool house to the
[20] patio, from the patio to the pool house?
[21] **A.** No.
[22] **Q.** And did you ever -- did you ever conduct any
[23] interviews with the construction workers?
[24] **A.** No.

Page 40

[1] **Q.** That was done by Officer Santos?
[2] **A.** I believe so. I'm not sure. I'd have to
[3] refer to his supplement to be exact.
[4] **Q.** Well, I have his supplement here.
[5] **A.** Do you have it?
[6] **Q.** It's like three lines long.
[7] **A.** I would feel uncomfortable speaking of his
[8] interview in particular because I'm not Spanish
[9] speaking and I wasn't present for it.
[10] **Q.** Do you know of anybody else who conducted any
[11] interviews with the construction workers other than
[12] Officer Santos?
[13] **A.** Not without looking through the file. Yeah, I
[14] don't know of any to speak to.
[15] **Q.** Before you concluded your investigation in
[16] this case, you would have read over the statement that
[17] Officer Santos transcribed of the interview between
[18] him and Mr. Ortiz, correct?
[19] **A.** I would have either read it or it would have
[20] been a spoken conversation between me and Officer
[21] Santos.
[22] **Q.** Do you know if you had a conversation with --
[23] between you and Officer Santos relating to Mr. Ortiz'
[24] investigation?