ESTATE OF MARISSA ROSE FISHMAN
VS.
ASHLAND CONSTRUCTION COMPANY ET AL.

**ENGINEER'S PRELIMINARY REPORT**                                **JUNE 8, 2006**

---

**INTRODUCTION**

Marissa Fishman, a 20 month old girl, was staying with three siblings and her mother at Richard and Barbara Longwill's (the grandparents) house located at 3220 Coachman Road in Wilmington, Delaware. The Longwills were having construction work done by Ashland Construction Company to the in-ground swimming pool enclosure and adjacent patio. On August 30, 2002, an entrance door to the swimming pool was left open and unattended. Marissa entered the pool enclosure and drowned in the pool.

This investigation was conducted in order to determine if there were dangerous conditions which were a cause of the incident.

**MATERIALS AVAILABLE FOR REVIEW**

1. Fourth Amended Complaint, dated August 16, 2004.

2. Civil Action Complaint, dated August 30, 2004.

3. Transcript of Deposition of Richard Longwill, dated December 6, 2004.

4. Transcript of Deposition of Arnold W. Frey, dated December 23, 2004.

5. Transcript of Deposition of Vincent Rizzo, dated December 30, 2004.

6. Transcript of Deposition of Vincent J. Rizzo, dated January 30, 2006.

7. Transcript of Deposition of Salvador Ortiz-Britto, dated February 23, 2006.



1

8.  Transcript of Deposition of Barbara H. Longwill, dated March 7, 2006.

9.  Transcript of Deposition of Rochelle B. Longwill, dated March 7, 2006.

10. Transcript of Deposition of James H. Gorbey, Jr., Esq, dated April 5, 2006.

11. Transcript of Deposition of Officer Marc Alfree, dated April 5, 2006.

12. Transcript of Deposition of Eric C. Fishman, dated April 5, 2006.

13. Transcript of Deposition of Officer John W. Schlosser, dated May 17, 2006.

14. Transcript of Deposition of Corporal Claudine Malone, dated May 17, 2006.

## DESCRIPTION OF SITE CONDITIONS AND THE INCIDENT

Richard and Barbara Longwill purchased the house located at 3220 Coachman Road in Wilmington in 1969. In about 1979, the Longwill's added an in-ground swimming pool.

By 2002, the glass walled enclosure around the pool area had aged. Ashland Construction/Vincent Rizzo was hired to take down the pool's existing perimeter wall and replace it with a stone mortar knee wall. A different contractor put in new glass panes above Ashland/Rizzo's knee wall to complete the wall. In addition to construction of the pool's new perimeter wall, Ashland/Rizzo was hired to construct a patio consisting of blocks just outside of the pool enclosure.

There are two entrances to the pool enclosure. One is from the master bedroom. The other is from the dining room. On August 30, 2002, the sliding glass door from the dining room was left open. Twenty month old Marissa entered the pool enclosure by herself, either jumped or fell into the pool and drowned.



## ANALYSIS

Incident was foreseeable

Vincent Rizzo was aware that there were children in the house (January 30th depo. pgs. 66 and 67). Rizzo knew that he had to be careful not to allow children to get into the pool area (Rizzo Jan. 30th depo. pg. 75). Rizzo was aware that access to the pool enclosure was provided by just two access locations, one of which was a sliding glass door from the master bedroom and the other was a sliding glass door from the dining room (Rizzo Jan. 30th depo. pgs. 34 to 36). When the glass sliding door between the pool area and the dining room was open, there was no physical obstruction to someone walking into the pool area. Rizzo had an obligation to work safely, particularly so because of the presence of small children.

An open and unguarded doorway into the pool area would expose the children to the hazard of drowning in the pool, which is what happened in this case. Twenty month old Marissa walked into the pool area and either fell or jumped into the pool and drowned. Such outcome was foreseeable.

Duty, custody and control

Ashland/Rizzo undertook the responsibility of performing construction related work at the Longwill residence. Once Ashland/Rizzo began work on the Longwill property they were obligated to insure that the areas they were working on remained safe and hazard-free to any residents/bystanders. Rizzo acknowledged his understanding of such duty when he testified that he knew that he had to be careful not to allow children to get into the pool area (Rizzo Jan. 30th depo. pg. 75).

It is clear that the indoor pool area was a place where Ashland/Rizzo was doing construction related work. More specifically, on August 30, 2002, Ashland/Rizzo was doing work that required them to be inside the pool area. Therefore, Ashland/Rizzo had custody/control of the ingress/egress of the indoor pool area and were responsible for keeping the area safe and hazard free. They failed to do so, leaving the sliding glass door open and allowing Marissa to gain access to the indoor pool area.



3

Who left the door open

In the morning of August 30, 2002, Vincent Rizzo and Salvador Ortiz-Britto were working on the patio. Barbara Longwill came outside and asked that the men bring a table and chairs that were located outside and put them inside the pool enclosure (Rizzo Jan. 30th depo. pg. 37). In order to show the workers where to put the table and chairs, Barbara Longwill led Rizzo inside and opened the sliding glass door that separates the dining room from the pool enclosure in order to point out where she wanted the table and chairs (B. Longwill depo. pg. 37). Longwill testified that she "feels" she then closed the door but did not lock it (B. Longwill depo. pg. 39). Longwill based her feeling on twenty three years of opening and closing that door (B. Longwill depo. pg. 38); but, it appears that she did not have a specific recollection of closing that door that time. Longwill went back to the kitchen and continued working there until Marissa was found in the pool (B. Longwill depo. pg. 40).

Rizzo testified that he followed Longwill back into the house from the pool area and he said that she did not close the sliding door (Rizzo Jan. 30th depo. pg. 120). Rizzo did not close the door despite the fact that he was the last person out (Rizzo Jan. 30th depo. pg. 121). Rizzo had seen small children in the kitchen earlier that same morning (Rizzo Jan. 30th depo. pgs. 66 and 67). He knew that he had to be careful not to allow children to get into the pool area (Rizzo Jan 30th depo. pg. 75); yet, he did not shut the door after himself.

About one to one and one-half hours after being shown where to place the table and chairs, Rizzo and his workman, Ortiz, began to bring in the table and chairs (Rizzo Jan 30th depo. pg. 44). Rizzo testified that the door to the pool enclosure was open when he approached it with chairs in his arms (Rizzo Jan. 30th depo. pg. 62).

Based upon Rizzo's testimony, he was the last one out of the pool enclosure through the sliding glass door early in the morning, and he did not close that door. Then, he returned with two chairs in his arms one to one and one-half hours later and observed that the sliding glass door to the pool area was still open. It appears that the door was open the entire one to one and one-half hours. Additionally, during the time that Rizzo and Ortiz were bringing in the chairs and table, they left the door open (Rizzo Jan 30th depo. pg. 80).



Robson Forensic
INCORPORATED

4

When did Marissa enter the pool enclosure

Based upon the available information, nobody observed Marissa entering the pool enclosure.

In the morning of August 30, 2002, Rochelle Longwill was in the kitchen with her four children having breakfast (R. Longwill depo. pg. 10). After breakfast, Rochelle proceeded to the back of the house accompanied by Rochelle's sister and three of Rochelle's children. Rochelle suddenly realized that Marissa was not present and went looking for her (R. Longwill depo. pg. 10). She came upon the pool enclosure entrance and observed the glass sliding door open and Marissa floating in the pool (R. Longwill depo. pg. 10). Rizzo and Ortiz were inside the pool enclosure at the moment when Rochelle discovered Marissa in the pool (R. Longwill depo. pg. 11 and (Rizzo Jan. 30th depo. pgs. 38, 39, 59 and 60).

There are only two ways to get into the pool enclosure directly from inside the house. One is through the sliding glass door from the dining room, which is the door discussed in the above paragraphs. The second means of access is through a glass sliding door from the master bedroom (B. Longwill depo. pg. 12). That second door was locked and bolted the entire morning and nobody went in or out through that door (B. Longwill depo. pg. 54). Therefore, Marissa's means of access into the swimming pool enclosure was through the doorway from the dining room.

Based on the above, it is clear that Marissa entered the pool enclosure through the open sliding glass door from the dining room sometime between just after Barbara Longwill showed Vincent Rizzo where she wanted the table and chairs and one to one and one-half hour later when Rizzo and Britto had returned to the pool area and Marissa was found floating in the pool.

Wilmington building code

Wilmington's city council adopted the 1996 BOCA National Building Code during 1996. BOCA stands for Building Officials and Code Administrators International, Inc. The BOCA code was widely used by states and municipalities in the northeastern and central United States as a building code. Wilmington continued to use that 1996 BOCA code until they adopted the 2003 International Building Code, which adoption postdates the subject incident.



The Wilmington City Code, as the first paragraph in their Chapter 4 - Buildings and Building Regulations, state:

> The purpose of this chapter and the building, plumbing, mechanical and other technical codes adopted in this chapter is to provide minium standards to safeguard life, limb, health, property and the public welfare insofar as they are affected by the design, construction, quality of materials, workmanship, use and occupancy, location and maintenance of all buildings and structures and their appurtenances and service equipment in the city....

The Wilmington City Code, Section 108.1.1, Issuing permits, says:

> Permits will be issued only to general contractors licensed by the city, except that permits may be issued to owners, tenants or their authorized agents, for buildings, additions and alterations, not exceeding a cost of $10,000.00. It shall be unlawful for any of the aforesaid persons to proceed with work without having first obtained the permits required by this code. No permit shall, however, be required for the following items, subject to the exceptions noted: a. storm doors (except in city historic districts); b. front doors (except in city historic districts); c. down spouts; d. gutters; e. roof patching; f. dry wall (less than 100 square feet or three sheets, which ever is larger); g. floor underlayment; h. carpeting; i. interior and exterior painting; j. windows (except in historic districts or requiring modifying the structural opening); k. nonstructural doors (except in historic districts); l. installation of plumbing fixtures including faucets, vanities, water closets, tubs, and shut-off valves for water lines; m. concrete sidewalks located on private property (maximum of 150 sq./ft.); and n. wrapping of windows and soffits (except in historic districts).

The 1996 BOCA code requires:

9. Where a wall of a dwelling unit serves as part of the barrier and contains a door that provides direct access to the pool, one of the following shall apply:

> 9.1 All doors with direct access to the pool through that wall shall be equipped with an alarm which produces an audible warning when the door and its screen, if present, are opened....



6

> 9.2 All doors with direct access to the pool through that wall shall be equipped with a self-closing and self-latching device with the release mechanism located a minimum of 54 inches (1372 mm) above the floor. Swinging doors shall open away from the pool area.
>
> 9.3 The pool shall be equipped with a power safety cover....

The 1996 BOCA code also requires:

> A swimming pool or appurtenances thereto shall not be constructed, installed, enlarged or altered until construction documents have been submitted and a permit has been obtained from the code official....

The work being done by Ashland/Rizzo included removal of the existing perimeter wall surrounding the pool, not including the house wall, and rebuilding the perimeter wall with a knee wall, plus, building a stone floored patio outside.

Based upon the Wilmington City Code, a permit should have been obtained prior to this work going forward. The total cost of the work would appear to exceed $10,000., so Ashland/Rizzo should have applied and received the construction permit prior to proceeding with the work. The applicant is responsible for safety on the job.

The record does not indicate that a building permit was applied for nor whether one was received. If it is factual that there was no application for a building permit, it deprived the building official of the opportunity to review what was intended to be done and to determine if one of the safety devices required by the 1996 BOCA code would be necessary. Apparently, there was a violation of the Wilmington City Code by Ashland/Rizzo.

The open door was a dangerous condition which was a cause of Marissa's death.

If the sliding door had been equipped with either the self-closing mechanism or audible alarm, Marissa's drowning would have been avoided.

Ashland/Rizzo had a duty to operate in a safe manner. Their leaving the door open created the dangerous condition which led to Marissa's death.



<u>Lack of barrier to pool a well understood danger</u>

According to the U.S. Consumer Product Safety Commission, 85% of child drownings each year happen at their own pool or at a friend's.

Drowning is the second most numerous cause of death for children under the age of 5 in the U.S.

It is widely understood that putting up barriers to prevent access to pools by children who stray from adult supervision is of great importance.

As noted above, Rizzo understood that care had to be taken not to allow the children unobstructed access to the pool area.

As noted above, the BOCA code requires barriers and alarms to protect small children from approaching a pool without supervision.
The National Spa and Pool Institute (NSPI) is a national organization of pool and pool equipment builders, manufacturers, suppliers and operators. For decades they have published national standards dealing with issues, including safety issues, for public and private above ground and in-ground pools. The NSPI consistently makes the point that pools need to be guarded by fencing and/or other means to prevent incidents such as what happened to Marissa.

In the subject case, the glass sliding door was the barrier between the children and the pool. Rizzo was the last person out from the pool enclosure and he left the glass sliding door open. In doing so, Rizzo removed the barrier. He knew that there were small children in the house. Rizzo made a terrible mistake

Rizzo's leaving the door open was a violation of national standards for pool safety and created the dangerous condition which was a direct cause of Marissa's death.



**FINDINGS**

Within the bounds of reasonable engineering probability, and subject to change if additional information becomes available, it is my professional opinion that:

1. The open glass sliding door was a dangerous condition and a direct cause of Marissa's drowning death.

2. The foreseeability of such type incident taking place if children got into the pool area was clear to Rizzo.

3. Ashland/Rizzo created the dangerous condition when Rizzo failed to close the glass sliding door after he exited the pool area.

4. Ashland/Rizzo failed to operate in a safe manner as required by the Wilmington City Code.

5. Ashland/Rizzo's leaving of the glass sliding door open violated national standards regarding pool safety.

6. Ashland/Rizzo's failure to close the door in leaving the pool enclosure disregarded widely known and publicized dangers regarding pool drownings of children.

7. Ashland/Rizzo undertook the responsibility for work outside and inside the pool area and had responsibility for safety of the residents.

8. Ashland/Rizzo was in control of the indoor and outdoor area.

9. But for Rizzo's mistake in leaving the sliding glass door open, Marissa would still be alive.


Alan E. Meade, P.E.



9

**Robson Forensic**
INCORPORATED

ALAN E. MEADE, P.E.
Civil Engineer

**Civil Engineering, Design, and Construction:** Sewage treatment plants, water treatment plants, pumping stations, pipelines, office buildings, apartment buildings, houses, shopping malls, warehouses, stadiums, schools, manufacturing facilities, heavy industrial equipment, chemical facilities, laboratories, tunnels, train stations, bus garages, roadways, bridges, parking decks, dams, lagoons, docks, airports, mines, tunnels, heating systems, and ventilation.

**Construction Engineering:** Inspection, scheduling, construction management, asbestos investigation, maintenance of traffic, building demolition, site clearing, debris removal, site drainage, utility relocation, underpinning, new utility installation, geological investigation, shoring, excavating, underpinning, sheetpiling, foundation, tunnel, mine, scaffolding, ladders, steel, concrete, wood superstructure, roofing, exterior cladding, interior finishes, elevator, ventilation, steam heating, air conditioning, process equipment, manufacturing machinery, gas detectors, piping, instruments and controls, paving, bridging, ramps, decking, derricks, material hoists, construction equipment and related OSHA workplace safety requirements.

**Accidents:** In workplace, construction site, industrial, commercial, home, highway, marine, mine and mass transit. Due to fire, explosion, slip, fall, impaling, asphyxiation, drowning, crash, collapse, impact and crushing.

**Building Failures:** Roof collapse, excessive foundation settlement, floor/wall cracking, plumbing leakage, fire damage and equipment malfunction.

**Equipment Mishaps:** Construction machines, heavy industrial machines, forklifts, cranes, furnaces, air pollution control equipment, pumps, valves, piping, gas holders, blowers, fans, hoists, conveyors, ladders, elevators, escalators, furnaces, tanks, ventilation, instrumentation, and controls.

**Maritime Mishaps:** Piers, loading cranes, dock fenders.



**ALAN E. MEADE, P.E.**
Civil Engineer

**PROFESSIONAL EXPERIENCE**

| | |
|---|---|
| 1995 to present | **Robson Forensic, Inc.**<br>Manager - Philadelphia/Southern New Jersey area. Provide technical services to attorneys, insurance companies and self-insureds in the areas of civil engineering, construction related injuries, industrial accidents, and engineering professional liability. |
| 1977 to 1998 | **Central Jersey Inspections, Inc.**<br>Inspected houses, apartment buildings, commercial structures and industrial installations for condition, safety and conformance with codes. Investigated building failures, foundation problems, structural distress and mechanical failures/insufficiencies. Evaluated conformance of building to NJ Uniform Construction Code, New York City Building Code, BOCA, OSHA and other construction and property maintenance standards. |
| 1988 to 1995 | **Schoor DePalma, Inc. (Engineers and Developers)**<br>Directed the demolition of old facilities and planning, permitting, engineering design and construction of new pumping stations, maintenance garages, roadways, sidewalks, and sewers. Site selection, facilities design, value engineering, bid package preparation, negotiated and executed agreements with construction contractors, construction quality control, scheduling, performance tracking, safety monitoring (OSHA), facilities start-up, testing and training of operating personnel. |
| 1995 | **URS Corporation (Consulting Engineers)**<br>Managed the design of stormwater pollution control plants. |
| 1984 to 1988 | **Hazen & Sawyer, P.C. (Consulting Engineers)**<br>Managed the construction of a major new wastewater treatment plant adjacent to the East River in New York. Plans and specification, construction quality control, safety monitoring (OSHA), scheduling, change order preparation and economic and progress impact evaluation, excavations, pilings, caissons, foundations. ship piers, underground utilities, structures, tanks, gas holders/burners, odor control equipment, piping, machinery, controls, plumbing, heating, air conditioning, electrical, computerized controls, contractor payments, claim analyses, testing, start-up and operator training. |
| 1982 to 1983 | **Hayden-Wegman, P.C.**<br>Directed the modernization of a large municipal waste incinerator, including state of the art air pollution control equipment in Bronx, New York. |



## ALAN E. MEADE, P.E.
### Civil Engineer

| | |
|---|---|
| 1980 to 1981 | **Gilbert Associates**<br>Managed planning and construction of regional sewerage systems in eastern Pennsylvania. |
| 1977 to 1980 | **Camp, Dresser & McKee (Consulting Engineers)**<br>Managed the construction of major process type industrial facilities, associated office buildings and freight rail facilities, CPM schedule preparation, construction progress monitoring, cost control, quality control, solve field problems, change order negotiation, progress payments, testing and start-up for facilities ranging to $45 million value. |
| 1971 to 1977 | **Madigan-Praeger, Inc. (Consulting Engineers)**<br>Supervised and controlled the construction of a large water pollution facility in New York as the Resident Engineer. This included inter-contractor coordination, interpretations of plans and specifications, expediting the work, quality control, solving technical and field condition problems, administration of progress payments and change technical and field condition problems, administration of progress payments and change orders. Earlier, prepared plans and specifications of heavy rail mass transit facilities. |
| 1968 to 1971 | **Sverdrup Corporation (Consulting Engineers)**<br>Designed portions of station and tunnel for new subway in Washington, D.C. |
| 1966 to 1968 | **Electric Boat Division of General Dynamics Corp. (Manufacturers)**<br>Designed portions of nuclear powered attack submarines. |

### EDUCATION

 Polytechnic Institute of New York (Brooklyn, NY), B.S. Civil Engineering
 Rutgers University (Piscataway, NJ), graduate studies
 University of Connecticut (Storrs, CT), graduate studies

### MEMBERSHIPS

 National Society of Professional Engineers
 American Society of Civil Engineers

### PROFESSIONAL REGISTRATIONS

 Professional Engineer: New Jersey, New York, and Pennsylvania